UNITED STATED DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————X

UNITED STATES OF AMERICA

             v.                                  24 Mag. 4375

LUIGI MANGIONE,

                        Defendant.

————————————————————X

## DEFENDANT LUIGI MANGIONE'S MOTION TO PRECLUDE THE GOVERNMENT FROM SEEKING THE DEATH PENALTY

Karen Friedman Agnifilo
Marc Agnifilo
Jacob Kaplan
AGNIFILO INTRATER LLP
445 Park Ave., 7th Fl.
New York, NY 10022

Avi Moskowitz
MOSKOWITZ COLSON
GINSBERG & SCHULMAN
80 Broad Street, Suite 1900
New York, NY 10004

## **TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................................... 1

II.   STATEMENT OF FACTS ......................................................................................... 3

    A.    The Attorney General's April 1, 2025, Press Release ............................................. 3

    B.    The Attorney General's Instagram Posts ................................................................. 5

    C.    The Attorney General's Televised Appearance on Sunday, April 6, 2025 .............. 5

    D.    Case History of *United States v. Mangione* ........................................................... 6

    E.    Arguments Made to and Mitigating Factors Shared with the Previous
        Administration's Capital Case Section That Have Been Seemingly Ignored
        by the Attorney General ........................................................................................... 9

        1.    The Pending Manhattan D.A. Case Undermines the Federal Interest
            in Capital Punishment ................................................................................. 9

        2.    The Aggravating Factors Do Not Sufficiently Outweigh the
            Mitigating Factors ..................................................................................... 11

        3.    An Analysis of The Cases Where the S.D.N.Y. Has Sought the Death
            Penalty Over the Past Almost Four Decades Illustrate That the
            Mangione Case Is an Outlier ..................................................................... 13

III.  ARGUMENT ............................................................................................................ 14

    A.    The Attorney General's Directive to Seek the Death Penalty Is a Breach of
        Established Death Penalty Protocol, As Well As Arbitrary and Political ............. 14

        1.    The Attorney General Has Abandoned Established Death Penalty
            Protocol ..................................................................................................... 14

        2.    The Attorney General's Decision is Arbitrary .......................................... 15

        3.    The Attorney General's Decision is Political ............................................. 16

        4.    Where the Attorney General's Order That the S.D.N.Y. Prosecutors
            Seek the Death Penalty Violates the Established Protocol, and is
            Arbitrary and Political, and Where Her Public Statements Have
            Tainted the Grand Jury, This Court Should Take Action ......................... 17

5.     This Court Should Not Presume Good Faith by the Attorney General ........................................................................................... 19

i.     Dismissal of *United States v. Eric Adams* .................................... 20

ii.     The Removal of Abrego Garcia .................................................... 20

iii.     Retaliatory Executive Orders Against Law Firms ........................ 21

B.     The Attorney General's Three Public Statements Have Prejudiced the Federal Case, the New York State Case and the Federal Grand Jury Proceedings ........................................................................................... 23

C.     The Attorney General Violated Local Rule 23.1 ..................................... 25

D.     The Government Should Provide Defense Counsel with the Recommendation of the S.D.N.Y. to The Capital Case Section as Well as All Memoranda provided to the Capital Case Section or the Attorney General ................................................................................................... 26

E.     The Government Should Provide Defense Counsel with Emails, Records, Documents and Notes of Communications Between a Government Official and Anyone Advocating for the Death Penalty or Any Penalty on Behalf of Any Business, Corporate Interest, Lobbyist or Other Party Directly or Indirectly ............................................................................................... 26

IV.    CONCLUSION ................................................................................................. 27

UNITED STATED DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
——————————————————X

UNITED STATES OF AMERICA

                        v.

LUIGI MANGIONE,

                    Defendant.
——————————————————X

24 Mag. 4375

## DEFENDANT LUIGI MANGIONE'S MOTION TO PRECLUDE THE GOVERNMENT FROM SEEKING THE DEATH PENALTY

## I.    <u>INTRODUCTION</u>

When the United States plans to kill one of its citizens, it must follow statutory and internal procedures. Defendant Luigi Mangione seeks Court intervention now not merely because the Government has failed to follow these procedures but because it has abandoned them. He seeks Court intervention because the Attorney General has explicitly stated that she has ordered the death penalty to "carry out President Trump's agenda to stop violent crime and Make America Safe Again." Mr. Mangione's counsel asked for three months to prepare a fulsome mitigation submission to the Department of Justice's Capital Committee and was ignored.

The stakes could not be higher. The United States government intends to kill Mr. Mangione as a political stunt. We appreciate, and will address, the province and discretion of the Executive Branch of government, and how, in the usual course, courts defer to the Executive's established procedures. But the Attorney General's actions and public statements in this case have not followed the usual course. Because the Attorney General has chosen to proceed in this way, Mr. Mangione's Due Process rights have already been violated and the manner in which the Government has acted has prejudiced the grand jury pool and has corrupted the grand jury process.

We seek two forms of relief from the Court. First, because the Attorney General's direction to the S.D.N.Y. prosecutors—issued publicly, as a press release—to seek a death sentence for Mr. Mangione is political, arbitrary, capricious, a breach of established death penalty protocol and has now indelibly prejudiced this process, the Government should be precluded from seeking the death penalty. Second, because of the highly public nature of the Attorney General's press release directive, her follow-up Instagram post stating plainly Mangione is guilty of murder (though he is still unindicted, let alone convicted), and her statement that Mr. Mangione should be executed because he committed two particular statutory aggravating factors, the Attorney General has prejudiced the grand jury process in this District. Accordingly, any grand jury that is or is to be empaneled on Mr. Mangione's case should be polled on their exposure to the Attorney General's improper statements and actions. Of course, as explained below, the impropriety of the Attorney General's conduct is clear from her obvious violation of Local Rule 23.1. The Attorney General compounded this prejudice by appearing on television on Sunday, April 6, 2025, and stating that she has received "death threats for seeking the death penalty."

As a result, this Court should: (i) Preclude the Government from seeking the death penalty; (ii) Order that any proposed federal grand jurors be screened for exposure to the Attorney General's prejudicial public statements; (iii) Order the Attorney General to certify she has read Local Rule 23.1; (iv) Restrain the Attorney General from extrajudicial statements in violation of the Rule that could prejudice Mr. Mangione's right to a fair hearing by a grand jury, including the grand jury's consideration of death-eligible offenses and factors; (v) Order the Government to produce for in camera inspection any memoranda, documents and notes from the S.D.N.Y.'s consideration of the death penalty, as well as any memoranda, documents, and notes provided to the Attorney General as part of her "careful consideration" of the evidence; and (vi) Order the Government to produce

to Mr. Mangione any emails, records, documents, memoranda and notes of any communication between a government official and anyone advocating for the death sentence, or any particular sentence, in this case by or on behalf of any business, corporate interest, lobbyist or other party, directly or indirectly.

## II.    <u>STATEMENT OF FACTS</u>

**A.**    **The Attorney General's April 1, 2025, Press Release**

On the morning of April 1, 2025, the United States Attorney General issued a press release (attached as Exhibit 1).[1] The title of the press release is "Attorney General Pamela Bondi Directs Prosecutors To Seek Death Penalty For Luigi Mangione." In the release, the Attorney General wrote, "After careful consideration, I have directed federal prosecutors to seek the death penalty in this case **as we carry out President Trump's agenda to stop violent crime and Make America Safe Again.**" (Emphasis added). The Attorney General continued, "as alleged, Luigi Mangione stalked and murdered United Health Care executive Brian Thompson on December 4, 2024. The murder was an act of political violence. Mangione's actions involved substantial planning and premeditation and because the murder took place in public with bystanders nearby **may** have posed a grave risk of death to additional persons."[2] (Emphasis added). The Attorney General concluded the Press Release by stating "[t]his is in line with Attorney General Bondi's Day One Memo as Attorney General entitled Reviving the Federal Death Penalty and Lifting The

---

[1]Counsel for Mr. Mangione were first informed by a newspaper reporter that the Attorney General directed the line prosecutors to seek the death penalty.

[2]The Attorney General misstated the statutory aggravating factor, which states that "the defendant . . . knowingly created a grave risk of death to 1 or more persons in addition to the victim of the offense."

Moratorium On Federal Executions." The Attorney General's statements were immediately and widely reported by press outlets around the world, including the *New York Times*, *New York Post*, *Wall Street Journal*, *BBC*, *Reuters*, *Associated Press*, *Al Jazeera*, *CNN*, *Fox News*, *Law.com*, *Guardian*, *Washington Post*, *CBS News*, *USA Today*, *Bloomberg*, *Los Angeles Times*, *Chicago Tribune*, *Politico*, *ABC News* and countless others.

Rather than authorizing the S.D.N.Y. prosecutors to seek the death penalty in a non-public communication, the Attorney General saw fit to direct them to do so via press release. In this release, she did not once say that Mr. Mangione had not yet been indicted for any federal crime, or that these are mere "allegations." She never once discussed the presumption of innocence or that Mr. Mangione is innocent until proven guilty. She assured the country that she gave the matter "careful consideration." But, as indicated below, when the defense asked for three months to conduct an albeit abbreviated mitigation investigation[3] and prepare a submission to the current administration's Capital Case Section, this request was ignored. Also, to the extent she referred to two statutory aggravating factors, she materially misstated one of them. She also called the incident "an act of political violence" even though Mr. Mangione is charged in a complaint with stalking a single person who was not a politician or even political.

The Attorney General's press release is relevant because it is evidence of the political and arbitrary nature of this decision. However, the Attorney General was not done making public statements about this case.

---

[3]The defense was told numerous times that a decision was imminent, thus we requested a reasonable three months rather than the 9 months to 1 year that a more fulsome proper mitigation investigation can take, especially in a case such as this one.

**B.    The Attorney General's Instagram Posts**

Shortly after the Attorney General's press release, the Attorney General launched an Instagram account (attached as Exhibit 2). The inaugural two posts of the Attorney General's new Instagram account were a photograph of the Attorney General standing before the seal of the United States Department of Justice and the following message: "Luigi Mangione's murder of Brian Thompson—an innocent man and father of two young children—was a premeditated, cold-blooded assassination that shocked America. After careful consideration, I have directed federal prosecutors to seek the death penalty in this case as we carry out President Trump's agenda to stop violent crime and Make America Safe Again."

The Attorney General again failed to mention that Mr. Mangione has not been indicted nor that he is presumed to be innocent. She did reemphasize that the decision was based on politics, specifically the administration's agenda to "Make America Safe Again." She was still not done making public statements and prejudicing Mr. Mangione.

**C.    The Attorney General's Televised Appearance on Sunday, April 6, 2025**

On Sunday, April 6, 2025, the Attorney General appeared on *Fox News Sunday*. Concerning the Luigi Mangione case and her direction to prosecutors to seek the death penalty, she stated the following:

> The President's directive was very clear: we are to seek the death penalty when possible. It hadn't been done in four years. I was a capital prosecutor. I tried death penalty cases throughout my career. If there was ever a death case, this is one. This guy is charged with hunting down a CEO, a father of two, a married man. Hunting him down and executing him. I feel like these young people have lost their way. I was receiving death threats for seeking the death penalty on someone who is charged with an execution of a CEO. We are going to continue to do the right thing. We are not going to be deterred by political motives. I've seen a protestor walking down the street here, "free Luigi," I mean this guy is charged with a violent crime and we are going to seek the death penalty whenever possible.

The Attorney General's television appearance was similar to her first two public statements in that she never mentioned that Mr. Mangione was not indicted nor that he has the presumption of innocence. She emphasized, for the third time, that her decision to seek the death penalty was based on the President's directive, specifically that the administration will seek the death sentence "whenever possible." She then invoked her personal experience, saying that she was a capital prosecutor, who tried death penalty cases and that "If there was ever a death case, this is one." The Attorney General stated during her television appearance that a reason she ordered the death sentence was because the alleged victim was a CEO. Counsel is aware of no provision in the death penalty statute or in the Department of Justice's death penalty protocol that allows for consideration of the social, economic or professional status of an alleged homicide victim in determining whether to seek the death penalty.

The Attorney General's pattern of public statements show with remarkable clarity and consistency that she has ordered this capital prosecution unabashedly for political reasons, that her statements prejudice any potential grand jury pool, and that the victim's professional status as a CEO was relevant to her decision. As will be shown below, her decision was also reached without any regard to the established Department of Justice death penalty protocol, which she has wholly abandoned.

D.    **Case History of *United States v. Mangione***

Following an investigation undertaken almost exclusively by the Manhattan District Attorney and New York City Police Department, Luigi Mangione was arrested in Altoona, Pennsylvania on Monday, December 9, 2024. Four days later, on Friday, December 13, 2024, the undersigned counsel—Karen Friedman Agnifilo and Marc Agnifilo—visited with him for the first time in a jail in Pennsylvania. On Monday, December 16, 2024, counsel informed the Manhattan

District Attorney that Mr. Mangione was waiving extradition to New York to be prosecuted by the Manhattan District Attorney. It bears noting that the reason the District Attorney was seeking a waiver of extradition and that Mr. Mangione agreed to one was because there was no federal case on the horizon.  Had there been a federal case, he would have been arrested by the FBI, brought to the nearest federal magistrate judge and the case would have started in that fashion, not requiring the additional step of waiver of extradition. Mangione's counsel made arrangements with the Manhattan District Attorney and New York State Supreme Court Justice Gregory Carro for Mr. Mangione to appear in New York State Supreme Court, Part 32, on Thursday December 19, 2024, for arraignment on a First-Degree Murder Indictment returned in New York County. Meanwhile, law enforcement was orchestrating the mother of all "perp walks," attended by none other than the New York City Mayor.  As we prepared for the Supreme Court arraignment, counsel was contacted by a newspaper reporter who asked, in substance, whether it was true that the "Feds were stealing the case?"  Seemingly a shock to all, including the Manhattan District Attorney's office, it turned out to be true.

Rather than Mr. Mangione being brought to New York Supreme Court on December 19, 2024, he was brought to the U.S. District Court for the Southern District of New York for an initial appearance on a Complaint signed the previous day by the Magistrate Judge. The Complaint charged four counts. Count Three, Murder Through Use of a Firearm, charges that Mr. Mangione used a firearm during the crime of Stalking and in the course of that crime committed Murder; this charge carries a maximum penalty of death.

Counsel for Mr. Mangione has been in regular contact with the prosecutors from the S.D.N.Y. assigned to this case. In early January 2025, the prosecutors and counsel emailed about a meeting with the Capital Review Committee under the prior administration. On Wednesday,

-7-

January 8, 2025, the prosecutors sent an email setting the time of this meeting on Monday, January 13, 2025, at 11:45 AM, and further advised that the defense was free to make a written submission but one was not required.

On Sunday, January 12, 2025, at 9:07 a.m., the defense emailed an eleven-page written submission to the Capital Case Section and the three S.D.N.Y. prosecutors detailing why the death penalty was inappropriate in this case. On January 13, 2025, the defense made an oral presentation to members of the Capital Case Section and the S.D.N.Y. prosecutors.

On January 24, 2025, defense counsel spoke with the prosecutors, who said that there was no decision yet but that the decision was "imminent."

On Tuesday, February 4, 2025, defense counsel spoke with the S.D.N.Y. prosecutors, who indicated that the Capital Review Committee (under the previous administration) had not made a decision. During this and other calls, the S.D.N.Y. prosecutors informed counsel that the current administration had not yet assembled a functioning Capital Review Committee due to the recent change in administration. Also, on February 4, 2025, the Court appointed Avraham "Avi" Moskowitz as learned counsel.

On Thursday, February 6, 2025, defense counsel emailed the S.D.N.Y. prosecutors that "if the Capital Crimes Section is unable to make a decision based on our first submission, we respectfully request 3 months in order to give us time to conduct a thorough mitigation investigation in order to submit additional information." (2/6/25 Email, attached as Exhibit 3).

On March 12, 2025, defense counsel spoke with the S.D.N.Y. prosecutors, who stated that a decision on the death penalty would be reached without waiting for the defense to submit mitigating factors. On April 1, 2025, the Attorney General issued a press release directing the S.D.N.Y. prosecutors to seek the death penalty.

**E.     Arguments Made to and Mitigating Factors Shared with the Previous Administration's Capital Case Section That Have Been Seemingly Ignored by the Attorney General**

As noted, on Wednesday, January 8, 2025, the S.D.N.Y. prosecutors informed defense counsel that the Capital Case Committee was available for a Teams virtual meeting on Monday, January 13, 2025. The prosecutors further explained that because of the impending change in administration, the Monday deadline was firm. On the morning of Sunday, January 12, 2025, counsel submitted an eleven-page single-spaced letter. On Monday, January 13, 2025, counsel discussed the issues raised in the letter with the S.D.N.Y. prosecutors and the then-constituted Capital Case Committee. The Committee appeared to accept the arguments of counsel and did not push back as to any of them. Solely so the Court can understand the points made, we briefly outline them here.

**1.     The Pending Manhattan D.A. Case Undermines the Federal Interest in Capital Punishment**

Counsel argued that the Justice Manual speaks precisely to a situation where, as here, a defendant is being actively prosecuted by a local prosecutor for the same conduct charged under federal law, and where the local charges carry the possibility of life in prison. On this point, the Justice Manual provides as follows:

> [p]rior to charging a capital offense, prosecutors must (1) carefully assess whether an accused is subject to effective prosecution in another jurisdiction (JM 9-27.240) (for this purpose, the legal unavailability of capital punishment in the state where the crime was committed should not form the basis for concluding the state cannot effectively prosecute the case) and (2) thoroughly review the substantial federal interest principles outlined at JM 9-27.230 and the dual and successive prosecution policies ("Petite policy") outlined at JM 9-2-031 and be able to articulate in submissions to the Department what specific federal interests justify the charge(s). Priority should be given to crimes causing the most harm to the nation, including through widespread impact to the community.

Justice Manual, 9-10.140 (Substantial Federal Interest).

In light of the New York State case, prosecutors must "carefully assess" whether that case is an "effective prosecution." It is impossible for the S.D.N.Y. prosecutors, a Capital Case Committee member or indeed the Attorney General to view the New York State case as anything other than an "effective prosecution," as that term is used in the Manual. The State's case charges, among other crimes, the crime of Murder in the First Degree, in violation of Penal Law § 125.27. This is the single most serious offense recognized in the New York Penal Law. The sentencing for a violation of Penal Law § 125.27 is provided in Penal Law § 60.06, which states, in part, that "when a defendant is convicted of murder in the first degree . . . the court shall . . . sentence the defendant to death,[4] to life imprisonment without parole . . . or to a term of imprisonment for a class A-1 felony other than a sentence of life imprisonment without parole."

As the Justice Manual also makes clear, the fact that the State of New York does not currently have a death penalty does not make the State's prosecution of Mr. Mangione any less "effective." Indeed, the Manual seems to have contemplated this exact situation and provides that a state prosecution can be altogether effective even if it cannot legally result in capital punishment. There is no indication that the Attorney General followed any of the procedures set out in the Justice Manual, 9-10.140. Rather, the Attorney General's directive, as well as her other public statements, focus exclusively on the "Make America Safe Again" policy as well as her contention that the death penalty was particularly appropriate because "[i]t hadn't been done in four years." While a new administration must be given wide latitude to develop new and different policies to

---

[4]New York State has abolished and reinstated capital punishment several times. In 2004, in *People v. LaValle*, 3 N.Y.3d 88 (2004), the New York State Court of Appeals ruled that the death penalty violated the New York State constitution because of a statutory direction on how the trial jury was to be instructed in the event of a deadlock. Accordingly, while the wording of the Penal Law continues to provide for the possibility of capital punishment for First Degree Murder, it has not been pursued in over twenty years and will not be pursued by the State of New York here.

help the American people, this does not include abandoning its own death penalty protocol so the Government can kill a particular defendant without regard to the law or settled procedures.

### 2.     The Aggravating Factors Do Not Sufficiently Outweigh the Mitigating Factors

The Justice Manual states that to justify a federal death penalty prosecution, the aggravating factors should sufficiently outweigh the mitigating factors. Here, they do not. Based on the filed federal complaint and other information provided by law enforcement,[5] the only aggravating factor that can conceivably apply is related to "substantial planning and premeditation," under Title 18, United States Code, Section 3592(c)(9). None of the other statutory or non-statutory factors apply to the crime or the defendant.

In addition to "substantial planning and premeditation," counsel alerted the Government in our January 12, 2025, letter to another factor, whether the defendant "knowingly created a grave risk of death to one or more persons in addition to the victim of the offense." 18 U.S.C. § 3592(c)(5). We stated that although the Government may errantly consider this factor, a careful analysis of this consideration weighs against seeking the death penalty for at least three reasons. First, here, the allegation is of a highly targeted shooting that took place at close-range. Second, the alleged shooting occurred at a time when the streets of Manhattan were relatively empty and there was little chance anyone else would be hurt, much less killed. Third, Counts One and Two of the federal complaint charge stalking—of a single, specific, alleged victim. Indeed, the jurisdictional hook for the murder and firearms charges in Counts Three and Four of the federal complaint are the very same allegations of stalking—again, of a single, specific person. Therefore,

---

[5]We are not of course conceding the truth of any set of facts but instead merely reciting what has been alleged by the authorities.

to a greater extent than most cases, the federal government's own theory in this case is that Mr. Mangione posed a threat to only one person—the person he allegedly stalked. Because it is clear that this aggravating factor does not apply, the Attorney General changed the wording to make it appear that it may fit the conduct, when it does not.

As to the only aggravating factor that could plausibly apply—"substantial planning and premeditation," under Title 18, United States Code, Section 3592(c)(9)—there appears to have never been an instance where the S.D.N.Y. filed a notice to seek capital punishment where the sole aggravating factor was "substantial planning and premeditation." We pointed out in our letter and during the January 13, 2025, virtual presentation that the "substantial planning and premeditation" factor is particularly weak in this case because it would be virtually impossible to have the offense charged under Count Three without substantial planning and premeditation. Count Three charges that Mangione stalked the victim with a gun by travelling in interstate commerce and murdering him. The crime itself requires substantial planning and premeditation; simply put, it is impossible to stalk someone between states with a gun and with the intent to kill the person and not also satisfy the aggravating factor of substantial planning and premeditation.

In terms of mitigating factors, Mr. Mangione's background reveals an exemplary life in every respect. He was, and is, a loved and cherished son, brother, uncle and cousin in a large, close, loving family. He was the valedictorian of his high school where he led the robotics team to the Eastern Regional Finals. He graduated from the University of Pennsylvania in four years with both a Bachelor's and a Master's Degree in Computer Science. He spent his life playing soccer and baseball; he ran track and wrestled.

When compared with Mr. Mangione's life of love, support and excellence, and no criminal record, the sole statutory aggravating factor pales in comparison. The Justice Manual requires that

the aggravating factors sufficiently outweigh the mitigating ones. Because they do not, a capital prosecution is not warranted.

>    **3.    An Analysis of The Cases Where the S.D.N.Y. Has Sought the Death Penalty Over the Past Almost Four Decades Illustrate That the Mangione Case Is an Outlier**

Counsel pointed out to the Capital Committee of the prior administration that since 1988, the U.S. Attorney in this District has filed Notices of Intent (NOI) to seek the death penalty in roughly 17 cases. (*See* Appendix A for a summary of these cases). Every one of the cases involved defendants who committed murder as part of a violent drug or racketeering enterprise, in furtherance of a narcotics business or as part of a terrorist organization. This alone is a major distinction from this case. A defendant who has joined a violent drug, racketeering, or terrorist enterprise has already made a commitment to significant criminal activity. This is obviously not the case with Mr. Mangione.

All but four defendants were charged with multiple murders. As to each of the defendants charged with a single murder—Deric Frank, Jose Santiago, Alan Quinones, and Diego Rodriguez—each defendant had already made a commitment to a life of crime by joining a violent drug gang or being involved in the sale of narcotics on a large scale. In addition, each defendant engaged in conduct involving aggravating factors not present here. For instance, Deric Frank killed a witness to his drug activity after kidnapping and torturing the victim; Santiago was a member of a racketeering enterprise and specifically ordered the victim to be killed in front of the victim's wife and children; Quinones and Rodriguez tortured and killed an informant as part of their membership in a violent drug organization.

These four defendants are vastly distinct from Mr. Mangione for a host of reasons, only some of which we will note here. First, each of the four defendants charged with one murder was

involved in serious criminal activity, whether that be dealing in narcotics or being a member of a violent drug or racketeering enterprise. <u>Second</u>, all of the defendants committed murder involving torture or physical abuse of the victim, which is not present here. <u>Third</u>, two others committed a contract killing of an informant. Of course, for the remaining 12 defendants, each committed multiple murders and did so as part of a violent drug enterprise or a terrorist organization.

While the Attorney General stated during her television appearance that "If there was ever a death case, this is one," that statement is wholly inconsistent with the historical record of death penalty cases in this District.

### III.    <u>ARGUMENT</u>

**A.    The Attorney General's Directive to Seek the Death Penalty Is a Breach of Established Death Penalty Protocol, As Well As Arbitrary and Political**

Given these facts and circumstances, the Attorney General's directive to seek death should be vacated for three related reasons. First, the Attorney General has abandoned the established death penalty protocol. Second, the Attorney General's decision is arbitrary and capricious in that she has directed the death penalty where (i) the existence of the New York County District Attorney case undercuts the federal interest in the death penalty; (ii) there is only one colorable statutory aggravating factor that does not outweigh the mitigating factors; and (iii) this case is so far outside the realm of cases where the S.D.N.Y. has sought the death penalty. Third, the Attorney General's decision is explicitly and wholly political.

**1.    The Attorney General Has Abandoned Established Death Penalty Protocol**

As noted, counsel was given five days' notice before the only meeting afforded counsel with the Capital Case Committee, which was a hastily assembled virtual Microsoft Teams meeting. In preparation for that meeting, and with the limited time permitted, counsel prepared a letter that

-14-

they submitted the day before the meeting. This was the only submission and the only Capital Case Committee meeting afforded counsel. Significantly, the submission to and the meeting with the Capital Case Committee were with the one existing under the previous administration. Since the change in administration, counsel has not been asked for a submission or offered the opportunity to meet with the Capital Case Committee formed by and existing under the current administration.

After counsel was informed that the prior administration's Capital Case Committee did not reach a decision as to the death penalty, counsel sent an email to the S.D.N.Y. prosecutors on February 6, 2025, stating, "if the Capital Crimes Section is unable to make a decision based on our first submission, we respectfully request 3 months in order to give us time to conduct a thorough mitigation investigation in order to submit additional information." (2/6/25 Email, attached as Exhibit 3). Less than two months later, without warning, the Attorney General issued the press release with the direction to seek the death penalty.

This is not a situation, like with some other cases, *see United States v. Saipov*, 2019 WL 624176 (S.D.N.Y. Feb. 14, 2019), where the Department of Justice failed to follow each and every aspect of the exhaustive death penalty protocol. Rather, this is a wholesale rejection by the Attorney General herself of the protocol in its entirety.

### 2.    The Attorney General's Decision is Arbitrary

It is not surprising that, after a wholesale rejection of the death penalty protocol, the Attorney General ordered the death penalty. Counsel advanced three cogent reasons why the Mangione case was plainly outside the realm of cases where this District has sought the death penalty. We pointed out the specific Justice Manual sections stating that the federal interest in a death penalty prosecution is diminished where there is an effective local prosecution, as is undoubtedly the case here. We pointed out that only one statutory aggravating factor could

conceivably apply to the alleged conduct. In response, the Attorney General literally changed the wording of a second factor in her press release ordering the death penalty to make it falsely appear that there were two applicable factors instead of one. The Attorney General's directive to seek the death penalty under such circumstance can only be described as arbitrary and capricious. Finally, we listed the cases where the S.D.N.Y. had sought the death penalty over the past four decades.

Rather than relying on these reasons, the Attorney General cited the professional status of the victim as a CEO, the fact that the previous administration had not sought the death penalty in four years and that her decision to order it here was due to the president's policy to "Make America Safe Again." Also, if the death penalty was being ordered pursuant to policy instead of publicity, the Attorney General would not have put her directive in the form of a press release followed by an Instagram post that effectively launched a new government social media account.

### 3.    The Attorney General's Decision is Political

The Attorney General's decision is explicitly and unapologetically political. The Attorney General could hardly have been clearer as to the basis for her directive that the prosecutors seek the death penalty in this case: to "carry out President Trump's agenda to stop violent crime and Make America Safe Again." *See* Attorney General's Press Release (Exhibit 1); Attorney General's Instagram Post (Exhibit 2). Not only did she explicitly cite to the administration's policy to Make America Safe Again in the original press release of April 1, 2025, she reiterated during her televised appearance on Sunday, April 6, 2025, that "the President's directive was very clear: we are to seek the death penalty whenever possible."

Because the driving factor for the Attorney General ordering the death penalty was politics and not the facts of the case, including any mitigating factors, as she is required to do, it is no surprise that the defense's request for three months to "conduct a thorough mitigation investigation

in order to submit additional information" (*see* Exhibit 3) was ignored. Ultimately, any mitigation would have fallen on deaf ears in any event, as the Attorney General was plainly concerned only with "the President's directive" and with the "Make America Safe" policies of the administration instead of the facts of this case.

> ### 4. Where the Attorney General's Order That the S.D.N.Y. Prosecutors Seek the Death Penalty Violates the Established Protocol, and is Arbitrary and Political, and Where Her Public Statements Have Tainted the Grand Jury, This Court Should Take Action

Mr. Mangione starts his analysis, as will this Court, from the standpoint that under normal circumstances, the Attorney General "retains broad discretion in (her) prosecutorial decision-making." *United States v. Saipov*, 2019 WL 624176, at *3 (S.D.N.Y. Feb. 14, 2019) (quoting *United States v. Armstrong*, 517 U.S. 456, 464 (1996)). As Judge Broderick further noted in *Saipov*, "[p]olicy considerations behind a prosecutor's traditionally wide discretion suggest the impropriety of (courts) requiring prosecutors to defend their decisions to seek death penalties." *Saipov*, 2019 WL 624176, at *3 (quoting *McCleskey v. Kemp*, 481 U.S. 279, 296 (1987)). "Absent a preliminary showing of arbitrary action, the Court must assume that the Attorney General's decision (to seek the death penalty) was made in good faith." *Saipov*, 2019 WL 624176, at *3 (quoting *United States v. Kee*, 2000 WL 863119, at 4 (S.D.N.Y. June 27, 2000)).

The facts in Saipov are distinct from those in this case and should lead to a different result. Saipov was accused, and later convicted, of intentionally driving a flatbed truck onto a cycling and pedestrian pathway in lower Manhattan, killing eight people and injuring another eighteen, in furtherance of the activities of the Islamic State of Iraq and Al-Sham ("ISIS"). Saipov was arrested on October 31, 2017. The next day, President Trump posted to his Twitter account, "NYC terrorist was happy as he asked to hang his ISIS flag in his hospital room. He killed 8 people, badly injured

12. SHOULD GET DEATH PENALTY!" *Saipov*, 2019 WL 624176, at *2. Over the following days, President Trump made further statements about Saipov, at least one of which involved the death penalty. Defense counsel did not make a motion to the Court for any relief at the time of the tweets, choosing instead to move to preclude the Government from seeking the death penalty on September 6, 2018, roughly ten months later, which was subsequently denied by the court.

The first key difference between *Saipov* and this case is that between the time of the president's tweets and the defendant's motion, Saipov's counsel was afforded the death penalty protocol assured to death-eligible defendants. He was invited to make a written mitigation submission and he did so. He was invited to make an in-person presentation to the S.D.N.Y. prosecutors and he did so. The S.D.N.Y. prosecutors then sent both Saipov's written submission and its own submission to the Attorney General's Review Committee on Capital Cases (the Capital Review Committee). Defense counsel was then invited to make a second in-person mitigation presentation, this one directly to the Capital Review Committee in July 2018, and they did so. The Committee then made a recommendation to then-Attorney General Jefferson Sessions III. After defense counsel was invited to make, and made: (i) a written presentation, (ii) an in-person presentation to the S.D.N.Y. and (iii) an in-person presentation to the Capital Review Committee, but before the final decision of the Attorney General, defense counsel for the first time moved to preclude the Government from seeking the death penalty due to the president's tweets from ten months earlier. What is clear in *Saipov* is that despite the president's tweets, Saipov was afforded, and availed himself of, the established Justice Department protocols assured to defendants in death penalty cases.

The second distinction between *Saipov* and Mr. Mangione is that in *Saipov*, the Court opined that the president's tweets did not impact the judgement of Attorney General Sessions.

-18-

Here, it is the Attorney General herself who has rushed to judgement without affording the defendant the procedures outlined in the Department of Justice's death penalty protocols. Moreover, in this case, unlike in *Saipov*, the one making the offending remarks is the Attorney General herself. Here, the one and only person legally permitted to make this decision is the same person who breached the established protocol, making a decision that is blatantly arbitrary and political and then publicizing that decision in a manner to prejudice the grand jury hearing this case.

The third distinction is that in *Saipov*, the court observed that the defense failed to show that the Attorney General's decision was influenced by politics. Here, the Attorney General has stated explicitly that her decision to order the death penalty was to "carry out President Trump's agenda to stop violent crime and Make America Safe Again." Accordingly, because the facts in *Saipov* are plainly distinct, it is not persuasive authority over this case.

### 5.    This Court Should Not Presume Good Faith by the Attorney General

Historically, Courts rightly presumed that the Executive branch "properly discharged its official functions." *United States v. Armstrong*, 517 U.S. 456, 464 (1996). "Absent a preliminary showing of arbitrary action, the Court must assume that the Attorney General's decision (to seek the death penalty) was made in good faith." *United States v. Saipov*, 2019 WL 624176, at *2 (S.D.N.Y. Feb. 14, 2019); *United States v. Kee*, 2000 WL 863119, at *4 (S.D.N.Y. June 27, 2000). With a few exceptions, for over two hundred years the Executive Branch earned the presumption of good faith. Over the last two months, it lost it.

i.        **Dismissal of *United States v. Eric Adams***

On February 10, 2025, the United States Attorney for the Southern District of New York received a letter from the Deputy Attorney General directing her office to dismiss without prejudice the Indictment against Eric Adams. There was no question as to the quality of the evidence or the propriety of the charges. The former U.S. Attorney stated that the deal proposed by the Deputy Attorney General, "dismissing the charges against Adams in return for his assistance in enforcing the federal immigration laws," violates "commonsense beliefs in the equal administration of justice, the Justice Manual, and the Rules of Professional Conduct." (Letter of U.S. Attorney Danielle Sassoon to The Honorable Pamela Jo Bondi, Attorney General of the United States, dated February 12, 2025). The U.S. Attorney's letter analogized the Adams deal with the Justice Department to a "quid pro quo," and an "improper exchange" and a bribe. She noted that a member of her team was admonished for taking notes, and that all notes were collected and kept after the meeting. Significant to the Mangione case, she wrote that she was "baffled by the **rushed and superficial process by which this decision was reached** . . . without her direct input on the ultimate stated rationales for dismissal." *Id*. (Emphasis added).[6]

ii.        **The Removal of Abrego Garcia**

On March 12, 2025, ICE Agents arrested Abrego Garcia without a warrant and sent him to the Terrorism Confinement Center in El Salvador. Six years earlier, he had been granted withholding of removal, meaning that an immigration judge ruled he should not be returned to that country. His detention and removal were unquestionably illegal and without proper process. When

---

[6]In dismissing the case against Mayor Adams, District Judge Dale E. Ho noted that, despite the Justice Department's discretion and presumption of good faith, the court believed that the relief the Justice Department was seeking, a dismissal without prejudice, was inappropriate. *United States v. Adams*, 2025 WL 978572, at *22 (S.D.N.Y. Apr. 2, 2025).

the government attorney appearing before the District Court at Abrego Garcia's hearing candidly and truthfully admitted that no order of removal was part of the record, he was put on administrative leave for failure to represent his client, which was the Department of Homeland Security. The Attorney General discussed this issue on Sunday, April 6, 2025, during the same interview referenced above where she addressed Mr. Mangione. Discussing why the lawyer arguing the Abrego Garcia case was put on administrative leave for being candid with the Court, the Attorney General stated, "on day one I issued a memo that you are to vigorously advocate on behalf of the United States. Our client in this matter was Homeland Security. . . . He did not argue, he shouldn't have taken the case, he shouldn't have argued it if that was what he was going to do. He's on administrative leave now."

Just as the U.S. Attorney resigned, along with several other officials, due to the egregious violations of process, a government lawyer was punished and put on administrative leave for being candid with the court over the lack of a removal order for Abrego Garcia. Ultimately, this government lawyer was on the right side of the law, as the Supreme Court last night upheld the District Court's ruling requiring that the government facilitate Abrego Garcia's release from custody in El Salvador. *Noem v. Abrego Garcia*, 604 U.S. ___ (2025).

### iii.    Retaliatory Executive Orders Against Law Firms

In March 2025, the Executive Branch issued retaliatory Executive Orders against four law firms, alleging "dishonest and dangerous activity" or "activity that undermines justice and the interests of the United States."[7]    These Orders sought to eliminate the security clearances of the

---

[7]On March 6, 2025, Executive Order 14230 was issued against Perkins Coie LLP; on March 14, 2025, Executive Order 14237 was issued against Paul Weiss; On March 25, 2025, Executive Order 14246 was issued against Jenner & Block; and on March 27, 2025, Executive Order 14250 was issued against WilmerHale.

firms' attorneys and to terminate the firms' federal contracts, among other things. The Orders do not remotely purport to be based on legal process. Rather, they are pure manifestations of the will and personal animosity of the Executive Branch at this moment in history.

This conduct highlights that this Attorney General and other leaders in the Justice Department have a demonstrated track record of abandoning process wholesale. When others in the Justice Department insist that the established processes be followed, they are either fired or forced to resign. These are not normal times. By directing the S.D.N.Y. prosecutors to seek the death penalty without affording even a modicum of process to Luigi Mangione, by fashioning this order in the form of a press release, followed by an Instagram post, followed by a prejudicial television appearance, the Attorney General is being consistent with the new culture of the highest levels of the Justice Department, one that values personal will over process, publicity over discretion and partisan politics over justice. While it is regrettable that the Executive Branch has abandoned due process in so many areas, this is the very first case where this Justice Department has abandoned due process in seeking the death penalty. Because they are going to use this Court to do it, the time for this Court to act is now.

This is admittedly an unusual procedural setting to ask for the Court's assistance. Certainly, the prevailing wisdom would be that counsel awaits an Indictment, the assignment of a District Judge and an eventual Notice of Intent to seek the death penalty. However, by then a tainted grand jury may have already returned a true bill. Because the Attorney General's press release stated that she concluded that two statutory aggravating factors applied to the charged conduct, and that she said in her television appearance that she was a capital crimes prosecutor and that if there was ever a death penalty case, this is it, and because she said that she herself had been threatened because of her decision to seek the death penalty, there is a real chance that she has tainted this grand jury.

Also, because it is clear that the Attorney General has made a final decision to seek the death sentence even without providing counsel with a full opportunity to present mitigating circumstances (despite our request to do so), there is no meaningful opportunity at this point to change her mind. She has made it clear that her decision was driven by the administration's policy to "Make America Safe Again." Also, it is clear that she wanted this case to be the administration's first death penalty case. She issued the press release around her new Instagram account so she could advertise her decision to seek the death sentence in this case. Just like the Attorney General had no interest in adhering to process over the dismissal of the Eric Adams case or the illegal removal of Abrego Garcia, she has no interest in adhering to process in seeking the death sentence for Luigi Mangione. The record is clear. The Court does not need any more information than it now has to conclude that the Attorney General's order to execute Mr. Mangione is arbitrary, political and a breach of the established death penalty protocol. This Court does not have to wait for an Indictment and a Notice of Intent to act. It should take action now and stop this corrupt process in its tracks.

**B.    The Attorney General's Three Public Statements Have Prejudiced the Federal Case, the New York State Case and the Federal Grand Jury Proceedings**

The United States Attorney General is our nation's highest law enforcement official. Her three public statements have significantly prejudiced this case, the New York State case, and the federal grand jury presentation. As for the press release directing the S.D.N.Y. to seek the death penalty, there is no reason—aside from an improper one—to make this directive publicly. Like every Attorney General making a death penalty decision before this one, she could have simply communicated her decision to the line prosecutors within the Justice Department, who would then notify the defendant.

But that was not enough for the Attorney General. Because she wanted to not merely tell the local prosecutors of her decision, she wanted to tell the world of her decision, including the grand jurors who will hear this case. She wanted the world, and the grand jurors, to know that her decision was rooted in the president's policy, specifically his "agenda to stop violent crime and Make America Safe Again."  She called the murder "an act of political violence," even though Mr. Mangione is charged by complaint with stalking a single person. She signaled to the world, and the grand jurors, that she—the United States Attorney General—has concluded that the defendant violated two statutory aggravating factors, one of which she badly mis-stated. Because a grand jury would have to find these statutory factors present in order to vote a true bill for a death-eligible offense, the Attorney General's prejudicial statements go to the heart of what the grand jurors must decide. *United States v. Kee*, 2000 WL 863119, at *3 (S.D.N.Y. 2000) ("As the Supreme Court first made clear in *Gregg v. Georgia*, 428 U.S. 153 (1976), the concepts of aggravating and mitigating factors are the foundation of a constitutional capital sentencing scheme.").

As noted, the Attorney General also never so much as suggested that Mangione was presumed innocent and that he was still not indicted for any federal crime.

That her real motive was press attention and not merely giving a directive to her line prosecutors is shown by what she did next. She timed the start of her Instagram Account specifically around the Mangione press release. She ordered the death penalty and publicly released her order so she would have "content" for her newly launched Instagram account. Again, her Instagram postings bear no indication that this defendant is presumed innocent.

In her television appearance, she told viewers that she was a "capital prosecutor," and that she "tried death penalty cases throughout my career."  She then assured Americans and prospective

jurors that, "if there was ever a death case, this is one."  She then twice stated that the victim was a CEO in explaining why the death sentence was appropriate.

These statements would be inappropriate and prejudicial in any context. However, the Attorney General is specifically aware that she has caused the S.D.N.Y. prosecutors to start a grand jury presentation where they would seek the death penalty. The Court simply cannot sit back and do nothing while a grand jury is convened which has been exposed to this sort of malicious, intentional prejudice. Not in any case much less a capital case.

**C.      The Attorney General Violated Local Rule 23.1**

Local Rule 23.1(b) provides as follows:

> With respect to a grand jury or other pending investigation of any criminal matter, a lawyer participating in or associated with the investigation (including government lawyers…) shall refrain from making any extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication that goes beyond the public record or that is not necessary to inform the public that the investigation is underway, to describe the general scope of the investigation, or to obtain assistance in the apprehension of a suspect, to warn the public of any dangers, or otherwise to aid in the investigation, if there is a substantial likelihood that the dissemination will interfere with a fair trial or otherwise prejudice the administration of justice.

When the Attorney General issued a press release directing the S.D.N.Y. prosecutors to seek the death penalty, she knew they would do so by commencing a grand jury investigation. The Attorney General's public, extrajudicial statements in the initial press release, in her Instagram post and as part of her television appearance prejudiced the very grand jury proceeding that she brought about.

Because the Attorney General is directing that the grand jury investigation be commenced, she is a lawyer "participating in or associated with the investigation."  Accordingly, she is within the purview of Local Rule 23.1. As such, she has an obligation to "refrain from making any

extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication that goes beyond the public record or that is not necessary to inform the public that the investigation is underway, to describe the general scope of the investigation, or to obtain assistance in the apprehension of a suspect, to warn the public of any dangers, or otherwise to aid in the investigation, if there is a substantial likelihood that the dissemination will interfere with a fair trial or otherwise prejudice the administration of justice."

The Attorney General's three statements are extrajudicial statements. For the reasons set forth above, they are plainly prejudicial toward the administration of justice, which in this case involves a grand jury considering an indictment that can result in Luigi Mangione being executed.

**D.    The Government Should Provide Defense Counsel with the Recommendation of the S.D.N.Y. to The Capital Case Section as Well as All Memoranda provided to the Capital Case Section or the Attorney General**

The recommendation of the S.D.N.Y. as well as all memoranda provided to the Capital Case Section or the Attorney General would be relevant in the ultimate determination of whether the Attorney General's decision is arbitrary and political, on the one hand, or principled and based on proper procedures, on the other. Accordingly, we ask the Court to direct the Government to provide these materials to counsel.

**E.    The Government Should Provide Defense Counsel with Emails, Records, Documents and Notes of Communications Between a Government Official and Anyone Advocating for the Death Penalty or Any Penalty on Behalf of Any Business, Corporate Interest, Lobbyist or Other Party Directly or Indirectly**

During her television appearance, the Attorney General stated that a reason she ordered the death penalty was because the victim was a CEO. This raises the question of why the Attorney General would be motivated to seek the death sentence because the victim was a CEO when the professional status of any homicide victim is plainly not a factor either in the relevant statute or

the Justice Department's protocol.  If the Justice Department was moved to seek the death sentence due to any communications by or on behalf of any corporate interest, this would be relevant to a finding that the death penalty was being applied in an arbitrary manner. Accordingly, the defense seeks all information that would tend to show that anyone on behalf of any business interest communicated with the Department of Justice concerning the sentencing of Luigi Mangione.

### IV.    <u>CONCLUSION</u>

For all the reasons stated above, we respectfully ask this court to grant the requested relief.

Respectfully submitted,

_____
Karen Friedman Agnifilo
Marc Agnifilo
Jacob Kaplan
AGNIFILO INTRATER LLP
445 Park Ave., 7th Fl.
New York, NY 10022

_____/s/_____
Avi Moskowitz
MOSKOWITZ COLSON
GINSBERG & SCHULMAN
80 Broad Street, Suite 1900
New York, NY 10004

**APPENDIX A**

Prior Cases Where the S.D.N.Y. Sought the Death Penalty

On December 11, 1997, the Government filed a NOI as to Clarence Heatley, who was charged with the murders of eight people, some of which were for pecuniary gain, as part of his leadership in a continuing criminal enterprise.

On January 8, 1998, the Government filed a NOI as to John Cuff, who was charged with killing nine people, some of which murders involved torture, as part of his membership in a continuing criminal enterprise.

On June 2, 1998, the Government filed a NOI as to Deric Frank, who was charged with murder during a kidnapping, where the murder involved torture or serious abuse of the kidnapping victim and where the murder was to eliminate a witness to the defendant's narcotics distribution business.

On January 28, 1999, the Government filed a NOI as to Peter Rollack, who was charged with the killing of two people, one of whom Rollack ordered to be murdered while Rollack was serving a prison sentence in North Carolina. Rollack, who was the head of the Sex Money Murder Set of the East Coast Bloods, continued to order murders even while incarcerated at the Metropolitan Detention Center.

On February 4, 2000, the Government filed a NOI as to Jose Santiago, who was charged with committing murder in furtherance of a racketeering enterprise which involved a grave risk of death of other persons. As a non-statutory factor, the NOI specifies that the defendant insisted that the victim would be murdered in front of his wife and children.

On February 7, 2000, the Government filed a NOI as to Charles Michael Kee, who was charged with murder in aid of racketeering. While the only listed statutory factor was substantial planning and premeditation, there were three listed non-statutory aggravating factors involving

multiple instances of sexual assault of a minor and using minors to commit robberies and other violent crimes as part of his racketeering enterprise.

On June 26, 2000, the Government filed a NOI as to Mohamed Rashed Daoud Al-Owhali, who was charged with using a weapon of mass destruction to bomb the United States Embassy in Nairobi, Kenya, killing 213 persons as part of the international terrorist group Al-Qaeda.

On December 10, 2000, the Government filed a NOI as to Khalfan Khamis Mohamed, who was charged with using a weapon of mass destruction in connection with the bombing of the U.S. Embassy in Tanzania, killing 11 persons as part of the international terrorist group Al Qaeda.

On October 26, 2001, the Government filed a NOI as to Alan Quinones, who was charged with the contract killing of an informant, such murder having involved torture or physical abuse of the murder victim and as noted, having been done for money. In addition, the murder was part of the defendant's membership in a drug distribution racketeering enterprise.

On October 26, 2001, the Government filed a NOI as to Diego Rodriguez, who was charged with the same contract killing of the informant indicated above.

On March 7, 2003, the Government filed a NOI as to Elijah Bobby Williams, who was charged with killing three people for pecuniary gain and involving a grave risk of death to others. As a non-statutory factor, the NOI indicated that the defendant was charged with conspiring to distribute cocaine and cocaine base contemporaneous with the murders.

On March 7, 2003, the Government filed a NOI as to Michael Williams, who was charged with killing the same three people under the same circumstances as Elijah Bobby Williams, above.

On February 23, 2004, the Government filed a NOI as to Xavier Williams, who was charged with killing the same three people under the same circumstances as Michael Williams and Elijah Bobby Williams, above.

On February 19, 2006, the Government filed a NOI as to Charod Becton, who was charged with killing three people in exchange for pecuniary gain as part of his membership in the racketeering enterprise Murder Unit. In addition, the defendant tortured one or more of his murder victims and created a grave risk of death to people other than the murder victims.

On February 24, 2006, the Government filed a NOI as to Darryl Henderson, who was charged, along with Charod Becton, with killing three people, some of which murders were for pecuniary gain and involved torture or physical abuse of the murder victim. In addition, the defendant had a prior conviction for a serious narcotics offense. Also, the three murders were part of the defendant's membership in Murder Unit, a violent racketeering enterprise.

On September 13, 2006, the Government filed a NOI as to Khalid Barnes, who was charged with the murders of two people in exchange for pecuniary gain and as part of his membership in a violent drug enterprise. He had a prior conviction for interstate travel in aid of racketeering and was on court supervision for that conviction when he committed the murders.

In September 2018, the Government advised the Court that it was seeking the death penalty as to Sayfullo Saipov, who was accused of killing 8 people and injuring another 18 people on a lower Manhattan bike path as part of his purported membership with ISIS.