UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                              :

UNITED STATES OF AMERICA         :
                              :
     - v. -                        :           25 Cr. 176 (MGG)
                              :

LUIGI NICHOLAS MANGIONE,      :
                              :
                              :
            Defendant.        :
                              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR AN INFORMATIONAL OUTLINE OF CERTAIN AGGRAVATING FACTORS

SEAN S. BUCKLEY
Attorney for the United States Acting Under
Authority Conferred By 28 U.S.C. § 515

Dominic A. Gentile
Jun Xiang
Alexandra Messiter
Thomas John Wright
Assistant United States Attorneys
     - Of Counsel -

## <u>TABLE OF CONTENTS</u>

**PRELIMINARY STATEMENT** _____ **2**

   I.   Background _____ 2

**ARGUMENT** _____ **3**

   II.   The Law Does Not Require the Government to Provide Evidentiary Detail of Aggravating

   Factors _____ 3

      1. Applicable Law _____ 2

      2. Discussion _____ 3

   III.   The Defendant Has Received Sufficient Notice of Each Aggravating Factor _____ 8

     1. Grave Risk of Death to Additional Persons _____10

     2. Substantial Planning and Premeditation _____11

     3. Victim Impact _____ 12

     4. Future Dangerousness _____ 14

     5. The Cases Cited by the Defendant Are Distinguishable _____17

    **CONCLUSION** _____ **19**

# TABLE OF AUTHORITIES

CASES

*California v. Ramos*, 463 U.S. 992, 998–99 (1983) ...................................................... 5

*Gray v. Netherland*, 518 U.S. 152, 166–70 (1996)........................................................ 4

*Payne v. Tennessee*, 501 U.S. 808, 825 (1991)............................................................ 14

*United States v. Arnold*, No. 15 Cr. 20652 (GCS), 2019 WL 5842925, at *5 (E.D. Mich. Nov. 7, 2019)......................................................................................................................... 6

*United States v. Battle*, 173 F.3d 1343, 1347 (11th Cir. 1999)............................... 4, 6, 17

*United States v. Bin Laden*, 126 F. Supp. 2d 290 (S.D.N.Y. 2001)............................. 18

*United States v. Briseno*, No. 11 Cr. 77 (PPS), 2014 WL 12682281, at *2-3 (N.D. Ind. Nov. 14, 2014)................................................................................................................. 6, 8

*United States v. Candelario-Santana*, 368 F. Supp. 3d 316, 325 (D. Puerto Rico 2019).............. 7

*United States v. Cooya*, 2011 WL 5878382 (M.D. Pa. Nov. 23, 2011)........................... 7

*United States v. Higgs*, 353 F.3d 281, 325 (4th Cir. 2003)................................... 4, 6, 17

*United States v. Kenny*, 462 F.2d 1205, 1212 (3d Cir. 1972) ...................................... 9

*United States v. LeCroy*, 441 F.3d 914, 930 (11th Cir. 2006) ............................. 4, 6, 17

*United States v. Lee*, 274 F.3d 485, 495 (8th Cir. 2001) .................................... 4, 6, 17

*United States v. Llera Plaza*, 179 F. Supp. 2d 464, 472 (E.D. Pa. 2001) ...................... 18

*United States v. Montgomery*, 10 F. Supp. 3d 801, 822 n.7, 823 (W.D. Tenn. 2014)........... 7

*United States v. Nguyen*, 928 F.Supp.1525, 1550 (D. Kan. 1996) ................................ 7

*United States v. Ofomata*, No. 17 Cr. 201 (LMA), 2019 WL 527696, at *12 (E.D. La. Feb. 11, 2019)......................................................................................................................... 6

*United States v. Sablan*, No. 00 Cr. 531, 2006 WL 1028780 at *27-28 (D. Colo. Apr. 18, 2006) 6

*United States v. Saipov*, 17 Cr. 722, Dkt. No. 482, (S.D.N.Y. Aug. 11, 2022) ................ 17

*United States v. Solomon*, 513 F. Supp. 2d 520, 538-39 (W.D. Pa. 2007) ....................... 6

*United States v. Solomon*, No. 05 Cr. 385513, 2007 WL 9702871, at *2 (W.D. Pa. June 26, 2007) .......................................................................................................................... 8

*United States v. Taylor*, 316 F. Supp. 2d 730, 741 (N.D. Ind. 2004) ............................ 6

*United States v. Tipton*, 90 F.3d 861, 896 (4th Cir. 1996)........................................ 11

*United States v. Whitten*, 610 F.3d 168, 187-88 (2d Cir. 2010).................................. 14

*United States v. Williams*, 00 Cr. 1008 (NRB), 2004 WL 2980027, at *23 (S.D.N.Y. Dec. 22, 2004)......................................................................................................................... 19

STATUTES

18 U.S.C. § 3592(c)(5)................................................................................................. 3

18 U.S.C. § 3592(c)(9)........................................................................................... 3, 12

18 U.S.C. § 3593(a)(1)................................................................................................. 4

18 U.S.C. § 3593(a)(2)................................................................................................. 4

18 U.S.C. § 3593(c) ..................................................................................................... 7

## <u>TABLE OF AUTHORITIES</u>

18 U.S.C. § 924(j) ......................................................................................................... 2

18 U.S.C. §§ 2261A(1)(A) ............................................................................................. 2

18 U.S.C. §§ 2261A(2)(A) ............................................................................................. 2

18 U.S.C. §§ 3591–3598 ................................................................................................ 3

18 U.S.C. § 924(c) .......................................................................................................... 3

18 U.S.C. § 2261(b)(1) ................................................................................................... 2

18 U.S.C. § 2261(b)(1); (3) ............................................................................................ 2

**RULES**

Fed. R. Evid. 403 ........................................................................................................... 7

**OTHER AUTHORITIES**

Dan Mangan, 'Deny,' 'defend,' 'depose': UnitedHealthcare CEO killing shell casings had words written on them, CNBC (Dec. 5, 2024) ............................................................ 15

Tracking Luigism Online, City Journal (Aug. 14, 2025) ............................................. 16

Wanted' CEO posters and other threats emerge after Mangione arrest, NBC News (Dec. 11, 2024) ...................................................................................................................... 16

Words on ammo in CEO shooting echo common phrase on insurer tactics: Delay, deny, defend, Associated Press (Dec. 5, 2024) ........................................................................ 15

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to defendant Luigi Nicholas Mangione's motion for an informational outline of the evidence the Government intends to offer to prove various aggravating factors alleged in the Government's Notice of Intent to Seek the Death Penalty. The defendant—who makes this motion before a trial date has been set— claims that he lacks the detail necessary to adequately defend against the aggravating factors at a potential sentencing phase of a trial.

The defendant's motion should be denied for two reasons. First, the law does not require the Government to identify in an outline all of the evidence it will present to support the alleged aggravating factors at the penalty phase, let alone to do so well in advance of a trial that has yet to be scheduled. Second, the Complaint, Indictment, Notice of Intent to Seek the Death Penalty, and pretrial discovery (which extends beyond Rule 16 to include, for example, witness statements) provide sufficient notice of all the aggravating factors on which the Government intends to rely. Accordingly, the Court should deny the defendant's motion as premature.

### I.    Background

On December 4, 2024, at approximately 6:45 a.m., the defendant approached UnitedHealthcare CEO Brian Thompson from behind on West 54th Street in midtown Manhattan and fatally shot him several times using a nine-millimeter handgun equipped with a silencer. The defendant had arrived in New York City more than a week earlier, traveling by bus from out of state. He was captured in Altoona, Pennsylvania several days after the murder.

On December 18, 2024, the defendant was charged in this District by Complaint in four counts: (1) stalking by means of interstate travel, in violation of 18 U.S.C. §§ 2261A(1)(A) and 2261(b)(1); (2) cyberstalking, in violation of 18 U.S.C. §§ 2261A(2)(A) and 2261(b)(1); (3) murder through use of a firearm, in violation of 18 U.S.C. § 924(j), a death-eligible offense;

and (4) possession and discharge of a firearm equipped with a silencer, in violation of 18 U.S.C. §924(c). On April 17, 2025, a grand jury sitting in this District returned Indictment 25 Cr. 176 (MMG), charging the defendant in the same four counts.

On April 24, 2025, the Government filed its Notice of Intent to Seek the Death Penalty (the "Notice"), setting forth the aggravating factors it intends to prove at sentencing. The Notice identifies two statutory aggravating factors—grave risk of death to additional persons, 18 U.S.C. § 3592(c)(5), and substantial planning and premeditation, 18 U.S.C. § 3592(c)(9)—as well as three non-statutory aggravating factors: victim impact, future dangerousness, and selection of site and victim for an act of violence, 18 U.S.C. § 3593(a)(2). For purposes of this motion, the defendant does not challenge the non-statutory factor concerning the selection of site and victim for an act of violence.

## **ARGUMENT**

### II.   The Law Does Not Require the Government to Provide Evidentiary Detail of Aggravating Factors

The defendant seeks broad and detailed advance notice of the "theories and facts" the Government may introduce during a potential penalty phase, claiming he is currently "blind" to such information. (Def. Mem. at 4, Dkt. No. 40). However, neither the Federal Death Penalty Act ("FDPA"), 18 U.S.C. §§ 3591–3598, nor the Constitution imposes any such obligation on the Government. The statute does not require the Government to disclose the specific evidence it intends to present to prove the existence of aggravating factors, and courts have consistently rejected similar demands. Moreover, any request for further detail, if warranted at all, is more appropriately considered at a time closer to trial; the defendant's motion is, at a minimum, premature. Accordingly, the weight of authority, including decisions from multiple Courts of

3

Appeals and numerous district courts, squarely foreclose the defendant's position at this point in the proceedings.

1.  **Applicable Law**

The FDPA requires the Government, "a reasonable time before trial," to provide notice that it intends to seek the death penalty and believes the circumstances of the offense justify such a sentence if the defendant is convicted. 18 U.S.C. § 3593(a)(1). That notice must also set forth the aggravating factors the Government intends to prove in support of a death sentence. 18 U.S.C. § 3593(a)(2).

As numerous federal courts have held, however, neither the FDPA nor the Constitution requires the Government to disclose in advance the specific evidence it will use to prove those factors. *See, e.g.*, *Gray v. Netherland*, 518 U.S. 152, 166–70 (1996) (affirming that there is no constitutional right to general discovery in criminal cases and indicating that due process does not require advance disclosure of the Government's aggravating evidence in capital sentencing); *United States v. LeCroy*, 441 F.3d 914, 930 (11th Cir. 2006) ("The government was not obligated to outline what specific pieces of evidence it planned to use to support the aggravating factors."); *United States v. Higgs*, 353 F.3d 281, 325 (4th Cir. 2003) ("The FDPA and the Constitution require that the defendant receive adequate notice of the aggravating factor . . . not notice of the specific evidence that will be used to support it."); *United States v. Lee*, 274 F.3d 485, 495 (8th Cir. 2001) ("Lee had no right to advance notice of the specific evidence the government would use to prove those [aggravating] factors."); *United States v. Battle*, 173 F.3d 1343, 1347 (11th Cir. 1999) ("The Government is not required to provide specific evidence in its Notice of Intent").

Thus, while a defendant is entitled to notice of the aggravating factors that may render him eligible for the death penalty, that requirement is satisfied in FDPA prosecutions by the

Indictment and the Notice of Intent to Seek the Death Penalty, which together fulfill the Government's constitutional and statutory obligations.

## 2. Discussion

The defendant contends that the Notice is over-generalized and lacks the factual specificity necessary to provide meaningful notice of the Government's case in aggravation. (Def. Mem. at 3-4). In particular, the defendant argues, with regard to the statutory aggravating factor of grave risk of death to additional persons, that the Notice fails to identify the individuals allegedly placed at grave risk of death and the conduct by the defendant that created that risk. (*Id.*) As to the non-statutory aggravating factor of victim impact, the defendant claims that the Notice does not provide the particular personal characteristics of the victim the Government intends to prove, or the specific family members, friends, and co-workers affected and the nature of the impact on them. (*Id.*) He further claims that, with regard to the non-statutory factor of future dangerousness, the Notice provides no detail regarding when or how he allegedly expressed an intent to target an entire industry, how he purportedly intended to do so, or how any such conduct demonstrates future dangerousness. (*Id.*) Relying on these purported deficiencies, the defendant asks the Court to compel the Government to provide an informational outline.

In so arguing, the defendant points to the heightened due process standard that applies in death penalty cases. (*Id.* at 6). But, although the law affords heightened protections in capital matters, it does so through procedural mechanisms such as "a bifurcated proceeding, instruction on the factors to be considered, and meaningful appellate review," rather than by prescribing "the particular *substantive* factors that should be deemed relevant to the capital sentencing decision." *California v. Ramos*, 463 U.S. 992, 998–99 (1983) (emphasis in original). The overwhelming majority of federal courts have concluded that the FDPA itself provides those procedural

safeguards in federal capital prosecutions. For example, the FDPA imposes many procedural requirements on the Government, including that the Government provide advance notice of its intent to seek the death penalty and of the aggravating factors alleged to exist, and that it prove those factors beyond a reasonable doubt to a unanimous jury. But, it does not require that the Government provide a guide to its case or identify all of the evidence that it will offer at sentencing in support of the aggravating factors. To the contrary, the Government satisfies its legal obligations about notice when it informs a defendant of the aggravating factors it intends to prove during the capital phase of a trial. As every federal Court of Appeals to have considered the issue has held, the Notice is the only notice to which the defendant is entitled regarding aggravating factors. *See, e.g., LeCroy*, 441 F.3d at 929; *Higgs*, 353 F.3d at 325; *Lee*, 274 F.3d at 495; *Battle*, 173 F.3d at 1347.

The overwhelming majority of district courts across the nation have followed the precedents set by the Courts of Appeals. *See, e.g., United States v. Arnold*, No. 15 Cr. 20652 (GCS), 2019 WL 5842925, at *5 (E.D. Mich. Nov. 7, 2019) ("The FDPA and the Constitution give defendants the right to advance notice of the aggravating factors the government seeks to prove at sentencing but do not require advance notice of the specific evidence the government will use to prove those factors."); *United States v. Ofomata*, No. 17 Cr. 201 (LMA), 2019 WL 527696, at *12 (E.D. La. Feb. 11, 2019) (denying request for informational outline of evidence because notice of intent met statutory and constitutional requirements); *United States v. Briseno*, No. 11 Cr. 77 (PPS), 2014 WL 12682281, at *2-3 (N.D. Ind. Nov. 14, 2014) (denying request for informational outline and holding that neither the Constitution nor the FDPA required the Government "to preview its evidentiary support for the aggravating factors it has disclosed"); *United States v. Solomon*, 513 F. Supp. 2d 520, 538-39 (W.D. Pa. 2007) (finding that

superseding indictment and notice of intent sufficed to advise defendant of allegations, and denying request for further detail); *United States v. Sablan*, No. 00 Cr. 531, 2006 WL 1028780 at *27-28 (D. Colo. Apr. 18, 2006) ("[T]he [notice of intent] does not need to include specific details [about the evidence]" to support denial of a defendant's motion to strike a statutory aggravator.); *United States v. Taylor*, 316 F. Supp. 2d 730, 741 (N.D. Ind. 2004) ("The Notice of Intent informs the Defendant that the Government intends to seek the death penalty and lists the aggravating factors that the Government will seek to prove. The statute requires no more."); *United States v. Nguyen*, 928 F.Supp.1525, 1550 (D. Kan. 1996) (holding that the Government's notice of intent was permissible even though "it list[ed] only the aggravating circumstances and provide[d] no detail about the evidence the government intend[ed] to offer in support"). This Court should follow the same course.

The defendant further argues that the Court should order the informational outline because it will enable the Court to fulfill its "gatekeeping function." (Def. Mem. at 7, 12, 16). This argument is similarly unavailing. As in any criminal case, the trial court in a capital case serves a gatekeeping function as to the admissibility of evidence. In this—as in any other case—the defendant, after reviewing the Government's pretrial notice of its witnesses, and upon receipt of those materials at the appropriate time, the Court can then properly exercise its authority to rule upon such motions and the concomitant law relating to such disclosures. *Compare* Fed. R. Evid. 403 *with* 18 U.S.C. § 3593(c). The Court's ability to serve its gatekeeping role does not depend on the Government producing and disclosing to the defense an outline detailing every piece of evidence it will rely upon at trial in advance—let alone before a trial date has even been set. Indeed, the Courts of Appeals decisions cited above make this point exceptionally clear. Although certain district courts have exercised their inherent authority to require evidentiary outlines with respect

7

to particular aggravating factors, other courts have declined to do so where, as here, the defendant was afforded sufficient notice to prevent any risk of unfair surprise, and the victim is singular and the consequences of the murder readily identifiable. *See, e.g.*, *United States v. Candelario-Santana*, 368 F. Supp. 3d 316, 325 (D. Puerto Rico 2019) (denying request for informational outline because defendant failed to demonstrate any danger of surprise); *United States v. Montgomery*, 10 F. Supp. 3d 801, 822 n.7, 823 (W.D. Tenn. 2014) (refusing to exercise inherent authority to order Government to provide informational outline of aggravating factors); *United States v. Cooya*, 2011 WL 5878382 (M.D. Pa. Nov. 23, 2011) ("Courts have not, however, shown a willingness to order informational outlines each time a request for such outlines is made. Courts refuse to order such outlines where there is no danger of surprise at trial or a potential sentencing phase."). The same is true here, as the defendant cannot credibly claim surprise given the extensive information already in his possession. *See* Part III, *infra*.

This Court should not accept the defendant's invitation to alter the balance struck by Congress in the FDPA or re-write its procedures to ensure what the statute already provides – heightened procedural protection for the defendant. Due process and the law simply require what the Notice already sets forth. Because the Government has provided notice of its intent to seek the death penalty and the aggravating factors on which it intends to proceed, the Court should deny the defendant's request for the disclosure of additional information.

## III.    THE DEFENDANT HAS RECEIVED SUFFICIENT NOTICE OF EACH AGGRAVATING FACTOR

Denial of the defendant's motion as premature is particularly appropriate here given the extensive evidentiary detail regarding the Government's aggravating factors already contained in the discovery produced to date, which totals more than five terabytes of data, some of which is summarized in the detailed criminal Complaint filed in this case. To the extent defense counsel

seeks further direction, the Government is prepared to identify for them the specific discovery materials that support the aggravating factors, including by reference to the pertinent Bates numbers cited in this brief. *See, e.g.*, *Solomon*, 2007 WL 9702871, at *2 (when considering a defendant's request for additional information concerning aggravating factors a court should "consider all information that has been disclosed to the defendant in the course of the prosecution") (citing *United States v. Kenny*, 462 F.2d 1205, 1212 (3d Cir. 1972)). The defendant's characterization of the Government's Notice as "barebones," "sketchy," or "vague" is baseless and contradicted by the record. (Def. Mem. at 1, 3, 7, 8, 14). Far from offering a mere list of aggravating factors, the Government has provided substantial detail. The Indictment and the Complaint preceding the Notice set forth a comprehensive narrative of the murder, including photographic evidence of the crime, the defendant's movements in the days and weeks leading up to it, the steps he undertook in planning the attack, his chosen weapon, and the extensive efforts he took to facilitate his escape. In addition, the murder was captured on video and broadcast widely in various national media outlets, further underscoring that the factual circumstances of the offense have been detailed with unusual depth. Taken together with the expansive discovery produced in this case, these materials make clear that the defendant has more than enough information to appreciate the likely evidence that would be presented at the penalty phase of this case. While the Government has no legal obligation to do so, it has functionally already shared many of the "theories and facts" that would be pertinent to sentencing. (Def. Mem. at 9).

The discovery the Government has provided includes, among other things, video evidence capturing the murder itself, proof that the defendant stalked the victim and the surrounding neighborhood in the days and weeks before the murder, extensive writings authored by the defendant evidencing his preparation and motivation for the attack, witness statements and state

grand jury testimony, medical and forensic reports, and dozens of hours of security camera footage. Thus, the defendant is already in possession of the evidentiary support for the Government's aggravating factors and there is no risk of surprise. In short, the Government has given the defendant far more than the law requires, and, as demonstrated below, has provided adequate notice of each aggravating factor.[1]

### 1. Grave Risk of Death to Additional Persons

The Indictment charges that from on or about November 24, 2024 up to on or about December 4, 2024, the defendant traveled to New York City for the purpose of stalking and killing Brian Thompson. On December 4, 2024, at approximately 6:45 a.m., the defendant approached Thompson from behind on West 54th Street in midtown Manhattan and shot him multiple times in the back as Thompson attempted to enter the hotel where his company was hosting a conference. The Complaint, which was filed four months prior to the Indictment, described the specific circumstances of the murder and included a still photo of the security camera video that captured the incident. (Compl. ¶ 6a.). The photograph, and the originating video, show a female bystander standing only a few feet from Thompson as the defendant fired multiple shots.

The Government produced multiple hours of video of the defendant's actions before, during, and after the murder. (USAO_00011318-USAO_00011320; USAO_00011338; USAO_00011355). In addition to capturing the female bystander, the videos also depict multiple other individuals in close proximity to the shooting who were likewise placed in harm's way. (*Id.*) That circumstance is hardly surprising, given that the defendant chose to kill his victim on a public street in midtown Manhattan, directly adjacent to a major New York City hotel, during the early

---

[1] The evidence described herein is illustrative, not exhaustive, and is not intended to limit the scope of the evidence the Government may seek to introduce at the sentencing phase of trial.

morning hours when people were commuting to work. By discharging multiple gunshots in that location at that time, the defendant created a substantial and unjustifiable risk to bystanders and passersby.

### 2. Substantial Planning and Premeditation

To establish this factor, the Government must show that the defendant participated in a considerable and significant amount of planning using the plain meaning of those terms; that is, "more than the minimum amount sufficient to commit the offense." *United States v. Tipton*, 90 F.3d 861, 896 (4th Cir. 1996). As set forth in the Complaint and as evidenced throughout the discovery, the defendant's conduct demonstrates substantial planning and premeditation. On November 24, 2024 – ten days before the murder – the defendant traveled by bus from another state to New York City and checked into a Manhattan hostel using a forged driver's license with a false name. (Compl. ¶ 7). This step alone reflects advanced preparation and an effort to conceal his identity in anticipation of the crime. In preparing for the crime, the defendant took the time to write the words "Deny," "Depose," and "Delay" on the bullets he used—two of which were recovered at the scene of the murder as shell casings (because the bullets had been fired) and one of which was recovered as a live round. The act of inscribing words onto ammunition is not spontaneous. It demonstrates a level of planning that goes beyond a simple act of violence and reflects a heightened premeditation and calculation. When arrested, the defendant was found in possession of, among other things, a loaded privately manufactured 9mm pistol ("ghost gun"), fitted with a homemade silencer. Ballistics testing of the weapon confirmed that it had fired the shell casings recovered at the scene of the murder. (Compl. ¶ 8). The acquisition, retention, and concealment of this self-engineered weapon further underscore the planning the defendant undertook to carry out this killing.

The defendant was also found in possession of a notebook containing handwritten entries dating back to August 2024. Among them was an October 22, 2024 entry openly describing his intent to "wack" the CEO of a health insurance company at the company's investor conference. (*Id.*) Other entries revealed a hostility toward the health insurance industry and specific references to UnitedHealthcare and its CEO, reflecting a developed motive and careful consideration of a target.

Finally, surveillance video produced in Rule 16 discovery captured the defendant following the victim to his hotel in the days leading up to the murder. (USAO_3807-3817; USAO_4117). This surveillance activity was plainly designed to study the victim's movements and identify an opportunity to carry out the attack. Taken together, the defendant's early travel to New York under a false identity, possession of a loaded ghost gun, contemporaneous writings expressing intent to commit the murder, and pre-attack surveillance of the victim, leave no doubt that the crime was the product of substantial planning and premeditation.

Accordingly, the defendant's claim that the Government's Notice "simply repeats" statutory language and that the Government has failed to identify the acts that constitute planning and premeditation is meritless when read in light of the Complaint, Rule 16 discovery, and the contemporaneous documentation of the defendant's own words and conduct. (Def. Mem. at 10-11). These materials make plain which acts the Government will prove and how those acts demonstrate planning and premeditation. It identifies the victim, the timeline, and the specific conduct, use of a false identity, possession of an untraceable firearm, written declarations of homicidal intent, and targeted surveillance, that together establish the aggravating factor under 18 U.S.C. § 3592(c)(9). The Government's Notice is more than sufficient under the law and due

process principles, and the defendant has otherwise been provided with substantial additional detail about the Government's proof of this factor.

### 3. Victim Impact

The defendant's contention that the Government's Notice of Intent provides "no facts" in support of the non-statutory aggravating factor of victim impact is similarly misplaced. (Def. Mem. at 12-13). The facts of this case make clear why victim-impact evidence will be particularly probative. Thompson was not a random passerby. The defendant hunted Thompson down to kill him because Thompson was the CEO of a major health insurance company. That is, Thompson was the leader of a company in an industry that the defendant was fixated upon harming. Entries in the defendant's notebook dating back to August 2024 reveal a growing fixation on the health insurance industry and, specifically, on UnitedHealthcare. By October 22, 2024, the defendant was writing explicitly about his intent to "wack" a health insurance CEO at an investor conference. (Compl. ¶ 8). That fixation culminated in the surveillance of Thompson in the days and weeks leading up to his murder, and finally in the carefully planned killing itself which was carried out on a busy midtown Manhattan street at a time of day when others were present and exposed to risk.

The consequences of Thompson's murder are profound. He was a husband, a father, a colleague, and a leader whose death left a devastating void in his family, his community, and his workplace. At the penalty phase of this case, the Government will present evidence showing how Thompson's death affected his loved ones. The very fact that the defendant plotted for months to assassinate Thompson because of his professional role underscores that the effects of this crime extend beyond Thompson's immediate family to his friends, co-workers, and the broader community he led. This is precisely the type of victim-impact evidence that Congress authorized

the jury to consider under the FDPA. *See, e.g., United States v. Whitten*, 610 F.3d 168, 187-88 (2d Cir. 2010) ("a factfinder should be allowed to measure the 'specific harm' the defendant caused by committing the murder, [] a phrase broad enough to embrace the loss felt by friends or co-workers who were close to the victim.") (quoting *Payne v. Tennessee*, 501 U.S. 808, 825 (1991)). The law does not require the Government to disclose, at this stage of the case, which family members, friends, or colleagues will testify, or preview the precise nature of their loss. The Notice properly identifies the aggravating factor, and the facts already in the record demonstrate the relevance and seriousness of victim impact evidence in this case.

### 4. Future Dangerousness

The non-statutory aggravating factor of future dangerousness is fully warranted here because the evidence shows that the defendant represents an ongoing threat to the safety of others, whether in the community or within a custodial environment, and that his crime was motivated not by personal animus, but by a broader intent to send a message and inspire hostility toward an entire industry. The defendant's writings make clear that the murder of Brian Thompson was conceived not simply as an act against one individual, but as a strike against the healthcare industry as a whole. The defendant wrote for instance: "The target is insurance" because "it checks every box." (Compl. ¶ 8). "This investor conference is a true windfall … and – most importantly – the message becomes self evident." (*Id.*) Other notebook entries refer to how the murder would be "a real blow to the company financials." (USAO_10543- USAO_11308).

The defendant's capacity for future dangerousness is further demonstrated by the careful steps he took to prepare for the attack and plan his escape. He traveled from another state under a false identity, secured lodging with a forged identification, surveilled Thompson in the days before the murder, wore a surgical mask for days on end, nearly without exception, to hide his identity,

and armed himself with a homemade ghost gun. These actions show not only the deliberate planning of this murder but also the defendant's ability to deceive, to acquire lethal weapons through unlawful means, and to evade detection. Those same characteristics make him exceptionally dangerous in the future.

Just as importantly, and as discussed above, the context and execution of the murder strongly suggest that the defendant intended to influence or provoke broader reactions beyond the immediate killing. He wrote "Deny," "Depose," and "Delay," on the bullets he used to kill Thompson, knowing that the shell casings would likely be found by investigators and that this message—associated with criticism of the healthcare industry—would be widely disseminated in media coverage.[2] He assassinated the CEO of one of the largest health insurance companies in the country, on a busy midtown Manhattan street, during the morning commute. In doing so, he not only endangered multiple bystanders but also maximized the public visibility of his crime. The defendant wrote of the "message" he hoped this killing would convey. (Compl. ¶ 8). The murder was thus, by the defendant's own admission, calculated to resonate beyond this specific victim and to generate scorn, outrage, or fear toward the health insurance sector more broadly. Simply put, the defendant hoped to normalize the use of violence to achieve ideological or political objectives. Since the murder, certain quarters of the public—who openly identify as acolytes of the defendant—have increasingly begun to view violence as an acceptable, or even necessary,

---

[2] *See, e.g.*, Dan Mangan, 'Deny,' 'defend,' 'depose': UnitedHealthcare CEO killing shell casings had words written on them, CNBC (Dec. 5, 2024), *available at* https://www.cnbc.com/2024/12/05/deny-defend-depose-unitedhealthcare-ceo-shooting-shell-casing-thompson.html; *see also* Words on ammo in CEO shooting echo common phrase on insurer tactics: Delay, deny, defend, Associated Press (Dec. 5, 2024), *available at* https://apnews.com/article/unitedhealthcare-ceo-shooting-delay-deny-defend-depose-ee73ceb19f361835c654f04a3b88c50c.

substitute for reasoned political disagreement.[3] The defendant poses a continuing danger not only

in a personal capacity, but also because he has sought to influence others.[4] The factual support for

this aggravator is already within the defendant's possession: it includes his notebook and other

pieces of evidence produced in discovery, as well as facts that are in the public record.

### 5. The Cases Cited by the Defendant Are Distinguishable

Although the defendant relies on several district court cases in which the production of an

informational outline was ordered, those rulings were highly fact-specific and carry little

persuasive weight when contrasted with the contrary authority from the Circuit courts cited above.

Those cases also represent a minority position, particularly at this stage of the proceedings. The

vast majority of district courts have rejected motions for informational outlines (or bills of

particulars) relating to penalty phase evidence. (*See supra* pp. 4-8). Moreover, while there may be

some divergence among district court decisions, every Court of Appeals to have addressed the

---

[3] *See* 'Wanted' CEO posters and other threats emerge after Mangione arrest, NBC News (Dec. 11, 2024), *available at* https://www.nbcnews.com/news/us-news/wanted-posters-threats-mangione-arrest-unitedhealthcare-rcna183867. On July 28, 2025, Shane Tamura brought in assault rifle to a Manhattan office building, a short distance away from where Mangione had killed Thompson. Tamura shot and killed four people, including an off-duty police officer, an executive of a financial services firm, and a security guard, and he injured others, including an employee of the National Football League ("NFL"). Like Mangione, Tamura left behind a piece of evidence for investigators to find, blaming the NFL and football for causing chronic traumatic encephalopathy. Almost immediately, members of the public sympathetic to the defendant touted Tamura's actions as a laudable continuation of the defendant's philosophy. *See, e.g.*, Tracking Luigism Online, City Journal (Aug. 14, 2025), *available at* https://www.city-journal.org/article/wesley-lepatner-manhattan-shooting-shane-tamura-luigi-mangione (summarizing evidence that the defendant's supporters "claimed that Tamura was following in the footsteps of Mangione").

[4] Following his arrest, the defendant openly cultivated supporters. He has set up a website, on which he has directly addressed his supporters, and which includes a section for FAQ with questions like "May I send him items like books?" "Can I send Luigi photos?" and "What else can I send Luigi?" *See* luigimangioneinfo.com. The same website contains scanned images of an index—prepared by the defendant himself—exhaustively cataloguing all of the supportive letters he has received. These are actions for which the defense needs no disclosure—because they are the actions of the defendant himself.

issue, including the Fourth, Eighth, and Eleventh Circuits, has held that the Government is not required to provide an informational outline or bill of particulars for aggravating factors. *See, LeCroy*, 441 F.3d 914; *Higgs*, 353 F.3d 281; *Lee*, 274 F.3d 485; *Battle*, 173 F.3d 1343.

Notably, several of the cases cited by the defendant do not support the proposition he advances and are drawn from cases that are factually distinct from the instant case. For example, the defendant cites to the Court's decision in *United States v. Saipov*, 17 Cr. 722, Dkt. No. 482, (S.D.N.Y. Aug. 11, 2022) as an example of a court in this district ordering the Government to produce an informational outline of what it intends to prove at the capital phase of the defendant's case. However, the defendant misstates the holding in *Saipov*. Judge Broderick did not order the Government to provide an informational outline. In the circumstances of that specific case, the Government had previously agreed to provide such an outline similar to the one provided in *United States v. Bin Laden*, 126 F. Supp. 2d 290 (S.D.N.Y. 2001). The focus of the litigation surrounding the informational outline was timing and Judge Broderick's order simply expedited the timing of the Government's production of the outline. *See United States v. Saipov*, Case No. 17 Cr. 722, Dkt. No. 472 (Gov't Memorandum of Law in Support of Its Motion *In Limine*) at 29-35 (S.D.N.Y. Aug. 5, 2022). Ultimately the Government provided its outline several weeks prior to the scheduled trial date. Accordingly, *Saipov* holds little precedential value for the defendant's request in this case.

The defendant's reliance on *Bin Laden* is similarly misplaced. That case involved an extraordinary number of victims, and the Government's notice there contained only an "oblique reference" to the victims' injuries, harm, and loss. *Bin Laden*, 126 F. Supp. 2d at 304. By contrast, this case involves a single victim, and the scope of harm limited to the victim's family, friends, and co-workers, is both clear and substantial, particularly given the victim's role as CEO of a large national health insurance company.

The decision in *United States v. Llera Plaza*, 179 F. Supp. 2d 464, 472 (E.D. Pa. 2001) is also distinguishable. In *Llera Plaza*, the court confronted a complex indictment involving three defendants and fifteen murders committed over several years thereby introducing a vast web of factual intricacies to be navigated in evaluating the applicable aggravating factors. Here, however, the defendant is charged with a single murder of a single victim on a single day with a single weapon.

The other cases cited by the defendant similarly turn on their unique facts, often reflecting district courts granting limited requests for additional detail with respect to certain aggravating factors while denying others. (Def. Mem. at 8–9). None of these decisions is controlling, and none undermines the precedential weight of the Circuit court rulings cited above or the persuasive value of the many district court decisions rejecting similar requests. Indeed, at least one court in this district has expressly denied a motion for disclosure of penalty phase evidence. *See United States v. Williams*, 00 Cr. 1008 (NRB), 2004 WL 2980027, at *23 (S.D.N.Y. Dec. 22, 2004) (denying request for "written statement describing the proposed testimony of each victim impact witness").

Once the Court sets a trial date, and to the extent any genuine uncertainty remains in the leadup to trial, the need for further disclosures can be revisited. The defendant's request now is plainly premature and is otherwise without merit for the reasons detailed above.

In short, the case law does not support the defendant's position. The Notice here complies with the FDPA and provides the defendant with all that is legally required. In seeking additional particulars, the defendant overlooks the detailed information already set forth in the charging instrument and discovery. His motion should therefore be denied.

**CONCLUSION**

For all of the reasons set forth above, the defendant's motion should be denied.

Dated:  New York, New York
        August 27, 2025

                                        Respectfully submitted,

                                        SEAN S. BUCKLEY
                                        Attorney for the United States Acting Under
                                        Authority Conferred By 28 U.S.C. § 515


                            By:     _____/s/_____
                                    Dominic A. Gentile
                                    Jun Xiang
                                    Alexandra Messiter
                                    Thomas John Wright
                                    Assistant United States Attorneys
                                    Tel.: (212) 637-2200