UNITED STATED DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
UNITED STATES OF AMERICA                    ORAL ARGUMENT REQUESTED

                    v.                      25 Cr. 176 (MMG)

LUIGI MANGIONE,

                    Defendant.
--------------------------------------------------------X


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
LUIGI MANGIONE'S MOTION TO DISMISS COUNTS
THREE AND FOUR AND TO SUPPRESS EVIDENCE AND
STATEMENTS**

Karen Friedman Agnifilo
Marc Agnifilo
Jacob Kaplan
AGNIFILO INTRATER LLP
140 Broadway, Suite 2450
New York, NY 10005


Avi Moskowitz
Eylan Schulman
Christopher Neff
MOSKOWITZ COLSON
GINSBERG & SCHULMAN
80 Broad Street, Suite 1900
New York, NY 10004

**TABLE OF CONTENTS**

I.  ARGUMENT ...................................................................................................... 1

A.  COUNTS THREE AND FOUR OF THE INDICTMENT MUST BE
    DISMISSED FOR FAILURE TO STATE AN OFFENSE UNDER 18
    U.S.C. § 924(j) AND 18 U.S.C. § 924(c) ................................................... 1

    1.  Introduction and Summary of the Argument ............................................. 1

    2.  Legal Standards ....................................................................................... 4

        i.  Legal Standards on a Motion to Dismiss ........................................ 4

        ii. Approaches to "Crimes of Violence" and Predicate
            Offenses .......................................................................................... 5

            a.  What is a "Crime of Violence"? ......................................... 5

            b.  The Categorical and Modified Categorical
                Approaches ......................................................................... 6

    3.  Analysis .................................................................................................... 8

        i.  Sections 2261A(1) and 2261A(2) are Indivisible Statutes ........... 10

        ii. Neither Stalking Statute, Analyzed Using the Categorical
            Approach, Requires the Use or Threat of Physical Force ............. 13

        iii. Even if the Court Finds 18 U.S.C. § 2261A(1) and (2) to be
            Divisible Statutes, the Specific Subsections Charged in
            Counts One and Two Are Not Crimes of Violence ...................... 20

            a.  The Elements of § 2261A(1)(A) and 2261A(2)(A)
                Do Not Require Physical Force ......................................... 20

        iv. Counts One and Two do not Qualify as Predicate Crimes
            of Violence Because the Stalking Statutes Encompass
            Self-Harm, While the Elements Clause Requires Physical
            Force Against "The Person . . . Of Another" .............................. 23

B.  ALL EVIDENCE RECOVERED FROM MR. MANGIONE'S
    BACKPACK MUST BE SUPPRESSED BECAUSE LAW
    ENFORCEMENT FAILED TO OBTAIN A SEARCH WARRANT
    BEFORE SEARCHING THE BACKPACK ...................................................... 26

    1.  The Warrantless Search of Mr. Mangione's Backpack was Not a
        Valid Search Incident to a Lawful Arrest ................................................. 26

    2.  The Evidence Unlawfully Recovered from the Backpack is Not
        Admissible Under the Inevitable Discovery Doctrine .............................. 31

C.    MR. MANGIONE'S STATEMENTS SHOULD BE SUPPRESSED AS THEY WERE THE RESULT OF CUSTODIAL INTERROGATION WITHOUT *MIRANDA* WARNINGS ................................................................... 35

II.    CONCLUSION ............................................................................................................. 38

## TABLE OF AUTHORITIES

### <u>Cases</u>

*Arizona v. Gant,*
    556 U.S. 332 (2009)........................................................................................... 28

*Berkemer v. McCarty,*
    468 U.S. 420, 442 (1984)......................................................................................36

*Borden v. United States,*
    593 U.S. 420 (2021).................................................................................18, 21, 22

*Chimel v. California,*
    395 U.S. 752 (1969)..........................................................................26, 27, 28

*Descamps v. United States,*
    570 U.S. 254 (2013)...........................................................................................7, 10

*Florida v. Wells,*
    495 U.S. 1 (1990)....................................................................................................32

*Fulks v. United States,*
    875 F. Supp.2d 535 (D.S.C. 2010)........................................................................17

*Georgison v. Donelli,*
    588 F.3d 145, 155 (2d Cir. 2009)..........................................................................36

*Illinois v. Lafayette,*
    462 U.S. 640 (1983)................................................................................................32

*Johnson v. United States,*
    559 U.S. 133 (2010)..................................................................................................9

*Katz v. United States,*
    389 U.S. 347 (1967)................................................................................................26

*Leocal v. Ashcroft,*
    543 U.S. 1 (2004)....................................................................................................18

*Mathis v. United States,*
    579 U.S. 500 (2016)....................................................................................7, 10, 12

*McDonald v. United States,*
    335 U.S. 451 (1948)................................................................................................27

*Miranda v. Arizona*,
  384 U.S. 436 (1966)............................................................................6, 35

*Nix v. Williams*,
  467 U.S. 431 (1984)................................................................................33

*Portee v. United States*,
  941 F.3d 263 (7th Cir. 2019) ...............................................................9, 24

*Rhode Island v. Innis*,
  446 U.S. 291, 301 (1980)........................................................................35

*Shepard v. United States*,
  544 U.S. 13 (2005).....................................................................................7

*Singh v. Garland*,
  58 F.4th 34 (2d Cir. 2022) .....................................................................9, 18

*Thompson v. Keohane*,
  516 U.S. 99, 112 (1995)............................................................................36

*United States v. Abarca*,
  22-CR-20505, 2024 WL 1643174 (S.D. Fla. Mar. 26, 2024)..................13

*United States v. Bacon*,
   No. 18-75-LPS, 2021 WL 5051364 (Del. Nov. 1, 2021). ....................13

*United States v. Barraza*,
  576 F.3d 798 (8th Cir. 2009) ..................................................................17

*United States v. Bolten*,
  741 F. Supp.3d 260 (E.D. Penn. 2024) ..................................................24

*United States v. Bowers*,
  No. 18-292-RJC, 2022 WL 17718686 (Dec. 15, 2022)...........................4

*United States v. Brito*,
  771 F. Supp. 3d 157 (E.D.N.Y. 2025) ...............................29, 30, 31, 33

*United States v. Capers*,
  20 F.4th 105 (2d Cir. 2021) ......................................................................7

*United States v. Cantu*,
  964 F.3d 924 (10th Cir. 2020) ..................................................................8

*United States v. Carter,*
    489 F.3d 528, 534 (2d Cir.2007)................................................................35

*United States v. Carter,*
    7 F.4th 1039 (11th Cir. 2021) ...........................................................21, 22

*United States v. Chadwick,*
    433 U.S. 1 (1977)...................................................................................28

*United States v. Culbert,*
    453 F. Supp. 3d 595 (E.D.N.Y. 2020) .......................................................4

*United States v. Davis,*
    74 F.4th 50 (2d Cir. 2023) .......................................................................7

*United States v. Davis,*
    588 U.S. 445 (2019)..............................................................................3, 6

*United States v. DeFrance,*
    124 F.4th 814 (9th Cir. 2024) .................................................................15

*United States v. Degeare,*
    884 F.3d 1241 (10th Cir. 2020) ................................................................8

*United States v. Diaz,*
    854 F.3d 197 (2d Cir. 2017).....................................................................27

*United States v. Evans,*
    924 F.3d 21 (2d Cir. 2019)........................................................................8

*United States v. Forbes,*
    20-CR-06140-FPG, 2022 WL 4545256 (W.D.N.Y. Sept. 29, 2022) ......................5

*United States v. Garner,*
    28 F.4th 678 (5th Cir. 2022) ...................................................................22

*United States v. Goldberg,*
    756 F.2d 949 (2d Cir. 1985).....................................................................4

*United States v. Gonzalez,*
    905 F.3d 165 (3rd Cir. 2018) ..................................................................14

*United States v. Gorski,*
    852 F.2d 692 (2d Cir. 1988).............................................................28, 30

*United States v. Griffin*,
    17-CR-20639-TGB-MKM, 2022 WL 2071054 (E.D. Mich. June 8, 2022) ..........................13

*United States v. Hayes*,
    589 F.2d 811 (5th Cir. 1979) .................................................17

*United States v. Lighty*,
    03-457-PJM, 2023 WL 2932960 (D. Md. Apr. 13, 2023) ......................................18

*United States v. Linehan*,
    56 F.4th 693 (9th Cir. 2022) .................................................15

*United States v. Martinez*,
    991 F.3d 347 (2d Cir. 2021).................................................7

*United States v. McDuffy*,
    890 F.3d 796 (9th Cir. 2018) .................................................17

*United States v. Medunjanin*,
    99 F.4th 129 (2d Cir. 2024) .................................................6

*United States v. Mendez*,
    315 F.3d 132 (2d Cir. 2002).................................................32, 33

*United States v. Metzger*,
    233 F.3d 1226 (10th Cir. 2000) .................................................19

*United States v. Minners*,
    05-CR-0152-CVE-02, 2020 WL 4275040 (N.D. Okla. May 7, 2020) ......................12, 13, 22

*United States v. Montgomery*,
    635 F.3d 1074 (8th Cir. 2011) .................................................17

*United States v. Morillo*,
    No. 08 CR 676, 2009 WL 3254431 (E.D.N.Y. Oct. 9, 2009)...........................30-33

*United States v. Morris*,
    61 F.4th 311 (2d Cir. 2023) .................................................9

*United States v. Newton*,
    369 F.3d 659, 668 (2d Cir. 2004).................................................35

*United States v. Oslinger*,
    753 F.3d 939 (9th Cir. 2014) .................................................14

*United States v. Pastore,*
   83 F.4th 113 (2d Cir. 2023) .......................................................................................6

*United States v. Piche,*
   981 F.2d 706 (4th Cir. 1992) ....................................................................................17

*United States v. Plunkett,*
   2024 WL 4173806, (W.D. Va. Sept. 12, 2024)*, appeal dismissed*, No. 24-7093, 2025
   WL 2237443 (4th Cir. Aug. 6, 2025)........................................................... 13, 24-25

*United States v. Redd*,
   85 F.4th 153 (4th Cir. 2023) .....................................................................................8

*United States v. Roberts*,
   852 F.2d 671 (2d Cir. 1988).............................................................................. 32-33

*United States v. Rodriguez-Moreno*,
   526 U.S. 275 (1999)...................................................................................................5

*United States v. Ross,*
   No. 18-2800, No. 18-2877, 2022 WL 4103064 (8th Cir. Sept. 7, 2022)...............17

*United States v. Salas*,
   889 F.3d 681 (10th Cir. 2018) ...................................................................................9

*United States v. Sayer*,
   748 F.3d 425 (1st Cir. 2014)....................................................................................16

*United States v. Tabb*,
   949 F.3d 81 (2d Cir. 2020)........................................................................................8

*United States v. Taylor*,
   596 U.S. 845 (2022)......................................................................................... *passim*

*United States v. Thompson*,
   29 F.3d 62 (2d Cir. 1994) ........................................................................................32

*United States v. Tucker*,
   18 CR 0119, 2020 WL 93951 (E.D.N.Y. Jan. 8, 2020).............................................4

*United States v. White*,
   979 F.2d 539 (7th Cir. 1992). ..................................................................................19

## <u>Rules & Statutes</u>

U.S. Const., Amend. IV ...............................................................................26

18 U.S.C. § 16(a) ..................................................................................8, 9

18 U.S.C. § 924 ............................................................................... *passim*

18 U.S.C. § 924(c) ........................................................................... *passim*

18 U.S.C. § 924(c)(3) ....................................................................... *passim*

18 U.S.C. § 924(c)(1)(A) .........................................................................5

18 U.S.C. § 924(c)(3)(A) .................................................................. *passim*

18 U.S.C. § 924(e)(2)(B)(i) ......................................................................8

18 U.S.C. § 924(j) ........................................................................... *passim*

18 U.S.C. § 2261A ........................................................................... *passim*

18 U.S.C. § 2261A(1) ....................................................................... *passim*

18 U.S.C. § 2261A(2) ....................................................................... *passim*

18 U.S.C. § 2261(b) ............................................................................3, 20

18 U.S.C. § 1111 .....................................................................................5

Fed. R. Crim. P. 12(b)(3)(B) ...................................................................4

## <u>Other Authorities</u>

Modern Federal Jury Instructions- Criminal 63.03, 63-14. ..........................12

Modern Federal Jury Instructions-Criminal 63-18, 63-23 ...........................12

# I.    ARGUMENT

## A.    COUNTS THREE AND FOUR OF THE INDICTMENT MUST BE DISMISSED FOR FAILURE TO STATE AN OFFENSE UNDER 18 U.S.C. § 924(j) AND 18 U.S.C. § 924(c)

### 1.    Introduction and Summary of the Argument

Count Three—the only death eligible count in the indictment—and Count Four must be dismissed for failure to state an offense because the stalking crimes charged in Counts One and Two (the predicates for Counts Three and Four) are not "crimes of violence," as would be required to convict Mr. Mangione on Counts Three and Four.

Here, Count One charges Mr. Mangione with interstate stalking in violation of 18 U.S.C. § 2261A(1). That statute is divided into two subsections, criminalizing the conduct of whoever:

> travels in interstate or foreign commerce or is present within the special maritime and territorial jurisdiction of the United States, or enters or leaves Indian country, with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, and in the course of, or as a result of, such travel or presence engages in conduct that--
>
> > (A) places that person in reasonable fear of the death of, or serious bodily injury to--
> >
> > > (i) that person;
> > >
> > > (ii) an immediate family member … of that person;
> > >
> > > (iii) a spouse or intimate partner of that person; or
> > >
> > > (iv) the pet, service animal, emotional support animal, or horse of that person; or
> >
> > (B) causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person described in clause (i), (ii), or (iii) of subparagraph (A)

18 U.S.C. § 2261A(1).

Count Two charges Mr. Mangione with cyberstalking in violation of 18 U.S.C. § 2261A(2). Like § 2261A(1), § 2261A(2) is divided into two subsections, criminalizing the conduct of whoever:

with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, uses the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce to engage in a course of conduct that--

> (A) places that person in reasonable fear of the death of or serious bodily injury to a person, a pet, a service animal, an emotional support animal, or a horse described in clause (i), (ii), (iii), or (iv) of paragraph (1)(A); or

> (B) causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person described in clause (i), (ii), or (iii) of paragraph (1)(A)

18 U.S.C. § 2261A(2).

Relying on these counts, Count Three alleges that Mr. Mangione committed murder through the use of a firearm "during and in relation to crimes of violence . . . namely, the [§ 2261A] stalking offenses charged in Counts One and Two" of the indictment, in violation of 18 U.S.C. § 924(j). Count Four employs similar language, alleging that Mr. Mangione used and carried a firearm "during and in relation to crimes of violence . . . namely, the [§ 2261A] stalking offenses charged in Counts One and Two" of the indictment, in violation of 18 U.S.C. § 924(c).

"Crimes of violence" is a term of art defined by both statute and case law. For Counts Three and Four to be sustained, Count One and Count Two must be "crimes of violence" as a matter of law. However, as a matter of law, the stalking offenses charged in Count One and Count Two are not "crimes of violence" as defined by the elements clause of 18 U.S.C. § 924(c).[1] To constitute a "crime of violence" under § 924(c)(3), the crime must have as an element the use, attempted use, or threatened use of physical force against a person or the property of another (the "elements

---

[1]Section 924(j), charged in Count Three, imposes enhanced penalties for violations of § 924(c) that result in death and incorporates that section's definition of the term "crime of violence."

clause").[2]   Therefore, Counts Three and Four fail to state an offense and must be dismissed.

The stalking offenses charged in Counts One and Two do not satisfy the statutory definition of "crime of violence" as a matter of law for three principal reasons:

<u>First</u>, § 2261A(1) (charged in Count One) and § 2261A(2) (charged in Count Two) do not *require* the use of physical force. Rather, one subsection of each charged statute prohibits conduct that causes "substantial emotional distress." Substantial emotional distress does not require actual or threatened physical force. Therefore, under the "categorical approach," which requires courts to only look at the elements of a charged statute (but not the defendant's actual conduct) when determining whether an offense "categorically" constitutes the federal definition of a "crime of violence," the entire stalking statute fails to qualify as a crime of violence under § 924(c).

<u>Second</u>, while the statutes charged are indivisible, and so the categorical approach should be used, even if the Court finds that the statutes are divisible (and can thus be reviewed using the "modified categorical approach"), the specific subsections charged in the indictment still do not qualify as crimes of violence as they can be violated without the intentional use or threatened use of physical force. Instead, both offenses can be committed through conduct intended to "harass" or conduct intended to "intimidate" even if that conduct is not violent in nature. The indictment's allegation that "death resulted" under 18 U.S.C. § 2261(b) does not change the analysis, because that statute criminalizes even accidental death and does not itself require intentional use of force. It is not the indictment, but rather the statute, which must be analyzed. Accordingly, even under the "modified categorical" approach, neither Count One nor Count Two alleges a predicate "crime

---

[2]Although § 924(c)(3) also contains a "residual clause', that was struck down by the United States Supreme Court in 2019 under *United States v. Davis*, 588 U.S. 445, 470 (2019), as being unconstitutionally vague. Therefore, an offense can only qualify as a "crime of violence" under § 924(c) under subsection (A) the "elements clause."

of violence" under § 924(c).

Third, for a statute to qualify as a "crime of violence" under § 924(c), the statute must require that violent physical force be used or threatened against the person or property *of another,* an element not required by the charged statutes  Because neither stalking statute requires violence or threatened violence against the "person or property of another," neither offense is a "crime of violence" under § 924(c).

Since the stalking offenses charged in Counts One and Two are not "crimes of violence," they cannot serve as a predicate for § 924(j) or § 924(c) and the Court should therefore dismiss Counts Three and Four of the indictment.

## 2.    Legal Standards

### i.    Legal Standards on a Motion to Dismiss

This motion seeks dismissal of Counts Three and Four of the indictment under Rule 12(b)(3)(B). Because the Court is already well versed in this legal standard, we recite it here only briefly. The Court must "accept as true all of the allegations of the indictment." *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985). Whether an offense satisfies § 924(c)(3)(A)'s definition is a pure question of law. *Davis*, 74 F.4th at 52. If an indictment alleges, as a "crime of violence," an offense that does not meet the statutory definition, the count does not state an offense and pretrial dismissal is appropriate. Numerous Courts have dismissed counts for just this reason. *See, e.g.*, *United States v. Culbert*, 453 F. Supp. 3d 595, 596–97, 601 (E.D.N.Y. 2020) (dismissing § 924(c) count predicated on attempted Hobbs Act robbery); *United States v. Tucker*, 18 CR 0119, 2020 WL 93951, at *1 (E.D.N.Y. Jan. 8, 2020) (dismissing § 924(c) count predicated on attempted Hobbs Act robbery and conspiracy to commit Hobbs Act robbery); *Bowers*, No. 18-292-RJC, 2022 WL 17718686, at *5–*9 (Dec. 15, 2022) (dismissing §§ 924(c) and 924(j) counts predicated on an

offense that did not categorically require violent physical force); *United States v. Forbes*, 20-CR-06140-FPG, 2022 WL 4545256, at \*5 (W.D.N.Y. Sept. 29, 2022) (dismissing § 924(c) counts predicated on attempted Hobbs Act robbery in light of *Taylor*).

ii.        **Approaches to "Crimes of Violence" and Predicate Offenses**

The purely legal question raised by this motion depends on the definition of "crime of violence" and whether the stalking charges in Counts Three and Four qualify as such. This issue has generated numerous decisions at all levels of federal courts. We first define a "crime of violence." Then, we describe the two approaches that are used by courts to analyze whether a statute is a crime of violence—the "categorical" and the "modified categorical" analyses—that can determine whether predicate crimes qualify. Although this distinction can be difficult to untangle in some instances, that is not the case here because under either approach, the result is the same: Dismissal of Counts Three and Four because stalking is not necessarily a "crime of violence" under either analysis.

a.        **What is a "Crime of Violence"?**

To begin, § 924(c)(1)(A) prohibits using (or carrying or discharging) a firearm during or in relation to a "crime of violence." Section 924(j)(1) permits capital punishment when a defendant, in the course of a "crime of violence," "causes the death of a person through the use of a firearm . . . if the killing is a murder (as defined in [18 U.S.C. § 1111])." The "crime of violence" is known as the "predicate," and a § 924(j) count only states a claim if there is a proper 924(c) crime of violence predicate identified in the indictment. *See United States v. Rodriguez-Moreno*, 526 U.S. 275, 280 (1999).

So what crimes constitute "crimes of violence" such that they can serve as the predicate for § 924(j) offenses? Section 924(c)(3) provides the answer: It defines the term "crime of

violence" for purposes of § 924(c) (and thus for purposes of § 924(j)) as a felony offense that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another."  Section 924(c)(3)(A) is frequently referred to as the "elements clause" of the statutory definition.[3]

### b.    The Categorical and Modified Categorical Approaches

Under Supreme Court precedent and specifically in the Second Circuit, courts have held that in order to determine whether an offense is a "crime of violence" under § 924(c)(3)(A), the courts must first determine whether the statute is "divisible" or "indivisible" in order to know whether to apply the "categorical approach" or the "modified categorical approach." The categorical approach was described in *United States v. Medunjanin*, 99 F.4th 129, 134 (2d Cir. 2024). There, the court stated "'Under this approach, we do not consider the particular facts before us; rather, we identify the minimum criminal conduct necessary for conviction under a particular statute by looking only to the statutory definitions—*i.e.*, the elements of the offense.'" *Id.* (quoting *United States v. Pastore*, 83 F.4th 113, 118 (2d Cir. 2023)).

The categorical approach "does not require—in fact, it precludes—an inquiry into how any particular defendant may [have committed] the crime. The only relevant question is whether the federal felony [statute] at issue always requires the government to prove—beyond a reasonable doubt, as an element of its case—the use, attempted use, or threatened use of force." *United States v. Taylor*, 596 U.S. 845, 850 (2022).

---

[3]Section 924(c)(3)(B)—the "residual clause"—defines a "crime of violence" as a felony offense "that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." As noted above, in 2019 the Supreme Court voided the residual clause for vagueness. *United States v. Davis*, 588 U.S. 445, 470 (2019). So "[p]ost-*Davis*, a § 924(c) conviction may only be premised on a crime of violence as defined under § 924(c)(3)(A)'s elements clause." *United States v. Medunjanin*, 99 F.4th 129, 133 (2d Cir. 2024).

The facts of any particular case are—for the purposes of this inquiry—irrelevant. That is, whether a particular "defendant committed the charged predicate crime in a way that involved the use of force" does not matter. *United States v. Capers*, 20 F.4th 105, 117 (2d Cir. 2021) (quoting *United States v. Martinez*, 991 F.3d 347, 353 (2d Cir. 2021)). Instead, the only question is whether the predicate crime *must*, "in every instance, by its very definition, involve the use of force." *Id.*

If the statute even potentially encompasses conduct that does not *require* use of physical force, the offense is not a § 924(c) predicate. *Descamps v. United States*, 570 U.S. 254, 261 (2013); *United States v. Davis*, 74 F.4th 50, 54–57 (2d Cir. 2023). Whether anyone has ever been prosecuted under the relevant federal statute for conduct that falls outside of the "crime of violence" definition is irrelevant; indeed, it does not matter whether there is a realistic probability that such a prosecution might ever be brought. *United States v. Taylor*, 596 U.S. 845, 858–59 (2022). Post-*Taylor*, the only relevant question is whether the relevant federal statute criminalizes conduct that does not match the § 924(c) "crime of violence" definition. If the federal statute in question criminalizes *any* conduct that falls outside of the "crime of violence" definition, it can never qualify as a "crime of violence."

Where a statute is "divisible"—that is, the statute "comprises multiple, alternative versions of the crime"—courts apply the "modified categorical approach" by first determining which version of the crime was charged, and then whether that charged crime constitutes a qualifying offense. *Descamps*, 570 U.S. at 261–62; *see also Shepard v. United States*, 544 U.S. 13, 19–20, 26 (2005). "Elements are the constituent parts of a crime's legal definition—the things the prosecution must prove to sustain a conviction." *Mathis*, 579 U.S. 500, 504 (2016) (internal quotation marks and citations omitted). When a statute presents alternative elements, defining separate crimes that can be accomplished, it is divisible and may be subject to the modified

categorical approach. *Id.* at 505–06. By contrast, alternative "means" in a statute refer to statutory phrases, terms, or subsections that a jury need not unanimously find in order to convict. *Id.* Thus, when a statute has two disjunctive phrases, terms, or even subsections, they are alternative means if as a matter of law, it is enough that the jurors agree that one of the phrases, terms, or subsections was satisfied without unanimously settling on which was satisfied. *Id.* If the Court determines that either of the stalking statutes charged in Counts One and Two is divisible, it must determine, by reference to the indictment, which offense encompassed by the statute is charged in each count and then determine whether that offense is categorically a crime of violence as defined by the elements clause. If the charged offense criminalizes any conduct outside the definition set forth in § 924(c)(3)(A), that offense is not a crime of violence.

It is the government's burden to prove with certainty that a statute is divisible and sets out two or more offenses with alternative elements. If it is ultimately unclear whether a statute is divisible, then the court must assume that the statute is indivisible. *See United States v. Redd,* 85 F.4th 153, 165 (4th Cir. 2023); *United States v. Cantu,* 964 F.3d 924, 929 (10th Cir. 2020); *United States v. Degeare,* 884 F.3d 1241, 1248 (10th Cir. 2020).

### 3.    Analysis

In interpreting the "elements clause" of a statute such as § 924(c), courts frequently consider how other courts have interpreted the "elements clause" of similar statutes.[4] The analysis

---

[4]Several federal statutes have a similar or identical elements clause, which courts have interpreted in the same way. *See United States v. Tabb*, 949 F.3d 81, 84 (2d Cir. 2020) ("[T]he identical language of the elements clauses of 18 U.S.C. § 16(a) and ACCA [the Armed Career Criminal Act, 18 U.S.C. § 924(e)(2)(B)(i)] means that cases interpreting the clause in one statute are highly persuasive in interpreting the other statute, as well as in interpreting U.S.S.G. § 4B1.2.") (cleaned up); *United States v. Evans*, 924 F.3d 21, 29 n.4 (2d Cir. 2019) (noting that the similarities between § 924(c)(3)'s elements clause, the ACCA's elements clause, and § 4B1.2 of the

in those cases are persuasive and illustrative as to how the court should approach this issue in this case, as the elements clause analysis in those decisions reflect that the stalking charges alleged in Counts One and Two are not crimes of violence as defined by the clause.

First, the predicate statute, stalking, must have an element requiring that physical force be used "against the person or property of *another*." § 924(c)(3)(A) (emphasis added). Use of force against *oneself* or one's *own* property, for example, does not suffice. *See Portee v. United States*, 941 F.3d 263, 271 (7th Cir. 2019) (state intimidation offense that encompassed threatening self-harm did not satisfy ACCA elements clause); *United States v. Salas*, 889 F.3d 681, 683–84 (10th Cir. 2018) (same for federal arson offense that encompassed destroying one's own property). Second, "physical force" means "*violent* force—that is, force capable of causing physical pain or injury." *Johnson v. United States*, 559 U.S. 133, 140 (2010). The force required must be sufficient to cause "serious physical injury."   The statute requires more than the "slightest offensive touching" that constituted battery at common law; instead, "physical force" refers to "strong physical force" —a degree of force "strong enough to constitute power." *Id.* at 140–42 (internal quotation marks omitted). Third, the statute defining a predicate offense must require that a defendant's use of force be knowing and intentional. Offenses with a *mens rea* of recklessness, negligence, or strict liability with respect to the use of violent physical force against the person of another therefore do not qualify as predicate violent felonies. *See Singh v. Garland*, 58 F.4th 34 (2d Cir. 2022) ("The 'use of physical force' refers to intentional, rather than accidental, force.").[5]

---

Sentencing Guidelines makes an authority interpreting the elements clause of one statute persuasive in interpreting the others).

[5]*Singh* addressed the elements clause of the federal criminal code's general "crime of violence" definition, 18 U.S.C. § 16(a), which "is in all relevant aspects identical to the § 924(c) elements clause," *United States v. Morris*, 61 F.4th 311, 320 (2d Cir. 2023).

Citing factual allegations in an indictment that allege the intentional use of violent physical force to cause serious physical injury and death does not cure the technical requirement that the stalking statute be a "crime of violence," as it can be completed without any violence or physical force or injury whatsoever.

### i.    Sections 2261A(1) and 2261A(2) are Indivisible Statutes

As the Supreme Court explained in *Descamps* and *Mathis*, determining whether a statute having multiple subsections is divisible requires distinguishing between those clauses that create elements of the offense and those that merely establish means by which the offense can be carried out. *Descamps*, 570 U.S. at 271–74; *Mathis*, 579 U.S. at 504–505. Elements are those statutory phrases that a jury must find "unanimously and beyond a reasonable doubt" to convict the defendant. *Mathis*, 579 U.S. at 504. "Means," by contrast, are statutory phrases, terms, or subsections that a jury need not unanimously find in order to convict. *Id.* at 506. Thus, when a statute has two disjunctive phrases, terms, or even subsections, they are alternative means if, as a matter of law, it is enough that the jurors agree that one of the phrases, terms, or subsections was satisfied without settling on which. In other words, if the law does not require the jury to select one phrase, term, or subsection to the exclusion of the other in order to find guilt, then the terms are alternative means rather than elements.

Here, Count One charges Mr. Mangione with interstate stalking in violation of 18 U.S.C. § 2261A(1). That statute is divided into two subsections, criminalizing the conduct of whoever:

> travels in interstate or foreign commerce or is present within the special maritime and territorial jurisdiction of the United States, or enters or leaves Indian country, with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, and in the course of, or as a result of, such travel or presence engages in conduct that--
>
> > (A) places that person in reasonable fear of the death of, or serious bodily injury to--

> > (i) that person;
>
> > (ii) an immediate family member … of that person;
>
> > (iii) a spouse or intimate partner of that person; or
>
> > (iv) the pet, service animal, emotional support animal, or horse of that person; or
>
> (B) causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person described in clause (i), (ii), or (iii) of subparagraph (A)

18 U.S.C. § 2261A(1).

Count Two charges Mr. Mangione with cyberstalking in violation of 18 U.S.C. § 2261A(2). Like § 2261A(1), § 2261A(2) is divided into two subsections, criminalizing the conduct of whoever:

> with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, uses the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce to engage in a course of conduct that--
>
> > (A) places that person in reasonable fear of the death of or serious bodily injury to a person, a pet, a service animal, an emotional support animal, or a horse described in clause (i), (ii), (iii), or (iv) of paragraph (1)(A); or
>
> > (B) causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person described in clause (i), (ii), or (iii) of paragraph (1)(A)

18 U.S.C. § 2261A(2).

Each of these statutes is indivisible on its face because each statute criminalizes a single set of conduct. To the extent each statute has subsections, those subsections merely provide different ways to commit that singular crime. In addition to subsections (A) that require placing someone in reasonable fear of death or injury, subsection (B) of these statutes criminalizes causing someone "substantial emotional distress." Specifically, § 2261A(1) criminalizes conduct involving interstate travel if the conduct either places a person in reasonable fear or causes (or attempts to

cause or reasonably would be expected to cause) a person substantial emotional distress. Section 2261A(2) does the same for conduct involving interstate communications rather than interstate travel. Thus, each statute can be satisfied by showing that conduct caused a victim to have experienced either fear of death or injury to a person or their pet, or some other form of substantial emotional distress. As an examination of the model jury charges for these offenses demonstrates, a jury is not required unanimously to determine which of these two possible effects- a defendant's conduct had on the victim, so long as all of the jurors agree that the defendant's conduct resulted in fear of death or injury or substantial emotional distress of some other kind. *See* Sand, et al., Modern Federal Jury Instructions-Criminal 63-18 and 63-23. These statutes are therefore indivisible for the same reason as the hypothetical statute discussed in *Mathis,* which required "use of a deadly weapon" as an element and separately provided that knives, guns, bats, and similar weapons would all qualify. *Mathis,* 579 U.S. at 506. Similar to the list of qualifying weapons in that hypothetical statute, the statutes charged in Counts One and Two require that a victim experience "substantial emotional distress," of which "fear of death or serious bodily injury" are permissible—but not exclusive—forms. In short, each of the stalking statutes establishes a single offense, which can be committed by multiple means.

The Second Circuit has not held that stalking is a crime of violence. Accordingly, there is no binding precedent that stalking is a crime of violence. District courts, none of which are in the Second Circuit, have been split on this issue. In *United States v. Minners,* 05-CR-0152-CVE-02, 2020 WL 4275040, at \*4-\*8 (N.D. Okla. May 7, 2020)[6] the court found stalking "is not a 'crime

---

[6]*Minners* concerned the pre-2013 version of § 2261A(1), which included in one long sentence everything that now appears in two separate subsections (A) and (B) of the statute. However, as the model instructions explain, the 2013 amendment that broke the sentence into subsections was merely "clarifying" and did not alter the substance of the required elements. *See* 3 Modern Federal Jury Instructions-Criminal 63.03, Instruction 63-14, Comment.

of violence' under the elements clause" of § 924(c). Applying the "categorical approach," the court there found that the crime of stalking did not meet the elements clause and was not a crime of violence.

Since the decision in *Minners*, several district courts have found that stalking was a crime of violence. *See United States v. Abarca*, 22-CR-20505, 2024 WL 1643174, at *6 (S.D. Fla. Mar. 26, 2024); *United States v. Griffin*, 17-CR-20639-TGB-MKM, 2022 WL 2071054, at *3–*6 (E.D. Mich. June 8, 2022); and *United States v. Bacon,* No. 18-75-LPS, 2021 WL 5051364, at *12–*13 (Del. Nov. 1, 2021). These decisions each errantly conclude that the crime of stalking is divisible into separate crimes, rather than a single offense that can be committed in alternative ways. Indeed, even the government has taken the position that the crime of stalking is indivisible, that it can be violated through conduct intended to "harass" that causes "substantial emotional distress," and that is cannot therefore serve as a § 924(j) predicate offense. *United States v. Plunkett*, No. 4:04-CR-70083, ECF Doc. No 997 ("United States' Response to Petitioner's Motion For Relief Pursuant to Title 28, United States Code, Section 2255") at 10-11. There, the government wrote, "The body of Section 2261A does not appear divisible, meaning each of these elements create alternative means of committing a violation, not separate offenses." *Id.* at 10.

In the absence of Circuit precedent and given the split among different district courts, this court should conclude that the crime of stalking is not divisible and not a crime of violence.

### ii.    Neither Stalking Statute, Analyzed Using the Categorical Approach, Requires the Use or Threat of Physical Force

Assuming the court finds the stalking statutes indivisible, thus applying the "categorical approach" when analyzing them, neither of the stalking statutes, on their face and as reflected in the model jury instructions, has as an element *requiring* the use or threatened use of physical force. Thus, under the categorical approach, the inquiry should end there. Neither statute satisfies

-13-

§924(c)(3)'s elements clause, also sometimes referred to as the "force clause," and accordingly neither can be used as a predicate violent felony to support the § 924(j) and § 924(c) charges in Count Three and Four, which must therefore be dismissed.

The two stalking statutes have essentially similar elements to one another, differing only in the form of interstate nexus that is required, set forth in the first element of each statute. Section 2261A(1), requires that a defendant travel in interstate commerce, while § 2261A(2), requires a defendant to make use of a communication system of interstate commerce (i.e., the mails, wires, or internet). This first element obviously does not require the use or threatened use of physical force against the person or property of another.

The two stalking statutes have their remaining elements in common. The second element of each statute requires that the defendant travel with an intent to kill, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person or their pet.[7] Because this element can be satisfied by merely intending to harass, it obviously does not require the use of force or threat of physical force. Although not defined under the stalking statute, harassment has been defined as "conduct, or action (usu. repeated or persistent) that being directed at a specific person annoys, alarms, or causes substantial emotional distress in a person and serves no legitimate purpose." *See United States v. Oslinger,* 753 F.3d 939, 945 (9th Cir. 2014) (relying on Black's Law Dictionary definition of "harass" for purposes of the stalking statutes). Harassment, by definition, does not require the use or threatened use of physical force.

Furthermore, the second element of the stalking statutes only requires *an intent* to

---

[7]This element of the indivisible statutes is itself indivisible because these disjunctive terms (kill, harass, intimidate) are alternative means (not elements), and a jury is not required unanimously to agree on which term applies to the exclusion any other. *See United States v. Gonzalez,* 905 F.3d 165, 185 (3rd Cir. 2018).

harass—not any actual conduct in furtherance of harassment. As the Supreme Court held in *Taylor,* 596 U.S. at 853–54, an attempt to commit a crime of violence is not categorically a crime of violence. It logically follows, therefore, that the mere intent to commit a crime of violence (which is even less that an attempt to do so) does not categorically make it a crime of violence, and a completed act of harassment could satisfy the second element of the stalking statutes. *Cf., United States v. Linehan,* 56 F.4th 693, 707 (9th Cir. 2022) (accepting the government's concession that murder-for-hire is not a "crime of violence" because it only requires traveling with intent to kill, which is not a threat of physical force; collecting cases holding the same).

The third and final element of the stalking statutes requires that, in the course of, or as a result of, the defendant's interstate travel or presence (or his use of interstate communications), the defendant engages in conduct that causes, attempts to cause, or would reasonably be expected to cause substantial emotional distress to another person or the immediate family member, spouse or intimate partner, or pet of that person. "Fear of death . . . or serious bodily injury" to the victim or the victim's loved ones or animals, as described in Subsection A of each of the statutes, is only one form of the "substantial emotional distress" that would satisfy this element of § 2216A(1) and (2). As set forth in subsection B of the statutes, any other form of substantial emotional distress would also qualify.

Emotional distress is not defined under the statute, but Black's Law Dictionary defines it as "a highly unpleasant mental reaction (such as anguish, grief, fright, humiliation, or fury)." Of course, highly unpleasant mental reactions are not necessarily the product of physical force or threat of physical force. *See United States v. DeFrance*, 124 F.4th 814, 818 (9th Cir. 2024) (holding that "infliction of emotional anguish does not require the use of physical force as that term is defined by federal law"). Because this statute could be violated through emotional distress—which

-15-

does not require physical force or the threat of physical force—the statute is therefore not a crime of violence.

It is easy to fashion several hypothetical scenarios in which interstate conduct could cause substantial emotional distress without the threat of violence. For example, a defendant might use a facility of interstate communications to harass a religiously observant victim with unfounded accusations of sin, quotations of scripture, and realistic AI-generated depictions involving the victim's loved ones being tormented in hell. Even without a threat of physical force, such harassing conduct might reasonably be expected to cause the victim substantial emotional distress. Similarly, a defendant might post a sexually explicit video of a victim on the Internet, thereby causing his victim substantial emotional distress and violating the cyberstalking statute without engaging in or threatening physical force. *United States v. Sayer*, 748 F.3d 425 (1st Cir. 2014). Or a defendant might cross state lines in order to attempt to have a former romantic partner rekindle an unwanted relationship while repeatedly following them around their home and place of business in a misguided attempt to get back together. Even in the absence of any threat of physical force, the victim who is subjected to such a course of conduct reasonably might be expected to suffer substantial emotional distress. These examples demonstrate why the stalking statutes are not "crimes of violence" under the categorical approach even if the statutory language concerning fear of death or serious injury could be said to implicate, in some manner, a required degree of physical force.

The government may argue that the references to 18 U.S.C. § 2261(b) in each of Counts One and Two of the indictment effectively adds a fourth element of physical force, to each of the stalking charges—this notwithstanding that the stalking statutes charged here, on their face do not include such an element. This argument, if raised, would be without merit as § 2261(b) merely sets

-16-

forth the penalties applicable to violations of § 2261A, that enhances the penalty if a victim is injured or killed, (*i.e.*, "death results") or if a dangerous weapon is used. The "death results" element of § 2261(b) does not convert either of the stalking offenses into crimes of violence, because the "death results" penalty set forth in § 2261(b) applies even in cases involving unintentional or accidental deaths. Several statutes have a similar "death results" element, and courts have repeatedly held that those elements can be accomplished by a purely accidental death and do not require intentional application of physical force. *See United States v. Hayes,* 589 F.2d 811, 821 (5th Cir. 1979) ("No matter how you slice it, 'if death results' does not mean 'if death was intended.'"); *United States v. Piche,* 981 F.2d 706, 711 (4th Cir. 1992) (reiterating Circuit precedent that "resulting in death" occurs "foreseeably and naturally," not necessarily "directly and intentionally."); *United States v. McDuffy,* 890 F.3d 796, 797-98 (9th Cir. 2018) (finding that a death that occurs accidentally during a bank robbery satisfies the applicable "resulting in death" statute); *United Stats v. Ross,* No. 18-2800, No. 18-2877, 2022 WL 4103064, (8th Cir. Sept. 7, 2022) (government agreed that kidnapping resulting in death does not qualify as a 924(c) "crime of violence" because it can be committed with reckless use of force); *United States v. Montgomery,* 635 F.3d 1074, 1087 (8th Cir. 2011) (quoting *United States v. Barraza*, 576 F.3d 798, 807 (8th Cir. 2009)) ("resulting in death" clause applicable to kidnappings "requires only that 'the death of any person results' in the course of the kidnapping," not that it be intended); *Barraza,* 576 F.3d at 807 ("The statute does not require that the deaths result from voluntary and intentional conduct, only that 'the death of any person results' in the course of the kidnapping."); *see also Fulks v. United States,* 875 F. Supp. 2d 535, 588 (D.S.C. 2010) (kidnapping resulting in death "has no mens rea requirement.").

Accidental deaths of the kind covered by the "death results" clause are insufficient under

the elements clause of § 924(c) because predicate crimes of violence, by definition, require the intentional (and not reckless or negligent) application or threat of violent physical force to the person or property of the victim. *See Singh v. Garland*, 58 F.4th 34, 36 (2d Cir. 2022) ("The 'use of physical force' refers to intentional, rather than accidental, force."); *see also Borden v. United States*, 593 U.S. 420, 423 (2021) (plurality op.); *id.* at 446 (Thomas, J., concurring); *Leocal v. Ashcroft*, 543 U.S. 1, 9–10 (2004)*; cf.*, *United States v. Lighty,* 03-457-PJM, 2023 WL 2932960 (D. Md. Apr. 13, 2023) (accepting government's concession that kidnapping resulting in death has no *mens rea* requirement, and therefore, fails to qualify as a § 924(c) "crime of violence" in a death case).

Moreover, even if the "death results" clause of § 2261(b) created an additional element of the stalking statutes, that element could be met without the intentional use or threatened use of force. Indeed, minor modifications to the hypotheticals above are sufficient to show that the stalking statutes and § 2261(b)'s "death results" provision can both be met without the use or threatened use of physical force. For example, the cyberstalked religious individual suffers from high blood pressure. Tormented by her cyberstalker's harassing conduct, she suffers a fatal heart attack upon opening an email containing particularly upsetting quotations from scripture—this despite the harasser never having intended that she suffer any physical harm and never having made any threat of violence. Death has resulted from the harasser's interstate communications, but the harasser has not applied or threatened any intentional physical force. One can also easily imagine a scenario in which the individual whose former romantic partner has crossed state lines to incessantly implore her to resume their relationship might be struck by a car and killed while trying to flee his attentions, even if he had no intent to use or threaten physical force against her. Similarly, imagine the victim whose sexually explicit videos have been posted online without her

-18-

consent, taking her own life to avoid public embarrassment, even if the cyberstalker who posted the videos never intended or anticipated that she might suffer physical harm as a result of his postings. In this case, too, death has resulted without the intentional use or threat of physical force.

Importantly, the "death results" provision of § 2261(b) is too broad to convert a violation of either stalking provision into a predicate violent felony under § 924(c) even if it is considered to be a required element of either Count One or Count Two. This is so because the "death results" language in § 2261(b) applies whenever the victim dies, even if the defendant has not used violent physical force. Thus, in an analogous context, courts have applied sentencing enhancements for death or bodily injury that "resulted from" a defendant's offense conduct even when the defendant did not apply violent physical force—or indeed play any active role in the death. In *United States v. White*, the Seventh Circuit affirmed an upward departure under the Sentencing Guidelines where "death resulted" from the defendant's offense of transporting a minor interstate for purposes of prostitution, where the minor was found murdered after an appointment with a john. 979 F.2d 539, 541 (7th Cir. 1992). Even though there was no evidence that the defendant himself had murdered the minor, he had "put into motion a scenario" that resulted in her death. *Id.* at 544–45. And in *United States v. Metzger*, 233 F.3d 1226, 1227–29 (10th Cir. 2000), the Tenth Circuit upheld a Sentencing Guidelines enhancement for bodily injury that "resulted from" the defendant's conduct, where a police officer responding to a credit union robbery shot a bystander, mistakenly believing the bystander to be the robber, who had left the scene and was not present when the shooting occurred. In short, death can result from offense conduct that does not involve physical force by the offender.

In summary, the generic form of a § 2261A offense does not include a required element of physical force, as is required by § 924(c)'s elements clause. Accordingly, Counts Three and Four

must be dismissed.

### iii.    Even if the Court Finds 18 U.S.C. § 2261A(1) and (2) to be Divisible Statutes, the Specific Subsections Charged in Counts One and Two Are Not Crimes of Violence

If the Court finds that § 2261A(1) and (2) are divisible statutes, the modified categorical approach provides that the Court should look to the indictment to determine which of the divisible subsections of those statutes are charged in this case. Here, Count One charges Mr. Mangione with violating subsection (A) of § 2261A(1) and Count Two charges him with violating subsection (A) of § 2261A(2). Neither of these specific subsections charged in the indictment qualifies as a crime of violence under the elements clause of § 924(c). Accordingly, Counts Three and Four must be dismissed even if the Court concludes that the stalking statutes are divisible.

### a.    The Elements of § 2261A(1)(A) and 2261A(2)(A) Do Not Require Physical Force

As noted above, when a court addresses a divisible statute, it uses the modified categorical approach to determine which subsection of the divisible statute is alleged in the indictment. Even assuming § 2261A is divisible and that the indictment is alleging a violation of subsection (A), the Court should still conclude that subsection (A) is not a crime of violence. Specifically, the analysis concerning the first and second elements of the offenses (requiring a nexus to interstate commerce and the defendant's specific intent, respectively) remain the same. Only the third element differs, in that it requires proof that the defendant's course of conduct placed the victim in reasonable fear of the death or serious bodily injury of the victim, the victim's immediate family member, spouse or intimate partner, or the victim's pet, service animal, emotional support animal, or horse. If subsections (A) are divisible from subsections (B), no form of substantial emotional distress other than fear of death or serious bodily injury to those persons or animals will suffice to meet the third element.

Critically, removing other forms of emotional distress from the third offense element does not convert either stalking offense into a "crime of violence" because the statutes still do not require proof that that the defendant *intended* to place the victim in reasonable fear of death or serious bodily injury. Rather, it merely provides that *as a result of* the defendant's conduct, the victim *happens* to fear injury. For example, the third element of a subsection (A) violation of the interstate stalking statute could be met by showing that the defendant followed around an ex-romantic partner whom he previously assaulted, with the intent to harass her—not to threaten force or use force against her—yet, the victim reasonably believes that the defendant is about to physically harm her (due to prior physical violence). Under these terms, the defendant has no subjective intent to physically harm or threaten to harm the victim, yet subsection (A) is satisfied. Because subsection (A) does not require an intent to threaten the victim, it cannot qualify as a "crime of violence" under *Borden*, which requires the defendant to deliberately target the victim with physical harm or threat of physical harm.

Subsection (A) of the cyberstalking statute similarly can also be satisfied without proof of an intent to threaten force or use force. Therefore, a defendant who has no subjective intent to harm or threaten to harm the victim, the victim's family members, or the victim's animal still satisfies subsection (A) of the relevant statute. Thus, neither subsection (A) of § 2261A(1) nor subsection (A) of § 2261A(2) requires an intent to use or threaten physical force, and neither charged statute can qualify as a "crime of violence" under *Borden*, which requires the defendant to deliberately target the victim with physical harm or threat of physical harm.

Post-*Borden* caselaw is illustrative of this point. For example, in *United States v. Carter*, the Eleventh Circuit held that a Georgia aggravated assault statute (which criminalized "committing an act with a deadly weapon *which places another in reasonable apprehension of*

-21-

*immediately receiving a violent injury*") failed to qualify under the elements clause post-*Borden* because it did not require the defendant to intentionally threaten another with physical force. 7 F.4th 1039, 1045 (11th Cir. 2021) (emphasis added). Likewise, in *United States v. Garner*, the Fifth Circuit held that a Louisiana aggravated assault statute, which also criminalized "*placing of another in reasonable apprehension of receiving a battery,*" did not qualify under the elements clause post-*Borden* because it likewise did not require the defendant to intentionally threaten another with physical force. 28 F.4th 678, 683 (5th Cir. 2022) (emphasis added).

The decision in *United States v. Minners,* supra, is particularly instructive. In *Minners*, the district court held that the pre-2013 version of the text now codified at § 2261A(1)(A) failed to qualify as a "crime of violence" under the elements clause of § 924(c) because it did not require the defendant to threaten force. Specifically, the court reasoned:

> It is clear that, in its generic form, this crime can be committed without the use, attempted use, or threatened use of physical force against the person or property of another. In fact, there is no element of physical force in the statute or its elements. There is a travel element, which does not include the use, attempted use, or threatened use of physical force. There is an intent element, which, again, does not include the use, attempted use, or threatened use of physical force. Finally, there is a results element, which could or could not be committed with the use, attempted use, or threatened use of physical force. This is why, under the categorical approach, generically, interstate stalking could be committed without any use, attempted use, or threatened use of physical force. For example, the defendant may have had a prior relationship with the victim, so by merely telling the victim that the defendant will be in his or her area could cause the victim a reasonable fear of death or serious bodily injury. Or the defendant could merely have stalked the victim in a way that harassed the victim and caused the victim to reasonably fear for his or her life. However, this may or may not have been accomplished with the use, attempted use, or threatened use of physical force. As another example, the defendant could have, prior to the interstate stalking, used physical force against the victim, causing the victim to reasonably believe that physical force could be used against him or her again.

*Id*. at *6.

-22-

Because subsections (A) of the stalking statutes do not require the use or threatened use of violent physical force against the person or property of the victim, the offenses charged in Counts One and Two do not qualify as predicate violent felonies under the elements clause of § 924(c).

> **iv.** **Counts One and Two do not Qualify as Predicate Crimes of Violence Because the Stalking Statutes Encompass Self-Harm, While the Elements Clause Requires Physical Force Against "The Person . . . Of Another"**

The stalking statutes also fail to qualify as predicate crimes of violence because they encompass conduct that includes the use of force, or the threatened use of force, against the defendant himself, while § 924(c)(3)(A) encompasses only offenses that have as an element the use of force against the person or property "of another." Specifically, the plain text of § 2261A(1)(A) and 2261A(2)(A) make clear that both statutes can be violated by threatening self-harm, provided that the defendant is an immediate family member, spouse, or intimate partner of the victim. By way of illustrating this point, imagine, for example, that a defendant travels interstate to harass his estranged wife in hopes that she will return to him (or contacts her electronically using a facility of interstate communications), and in the process threatens to kill himself while placing a gun to his head if she does not agree to get back together with him. If the defendant has traveled interstate, or used the internet, this course of conduct meets the elements of both § 2261A(1)(A) and 2261A(2)(A). Moreover, it is also possible that this course of conduct also meets the "death of the victim results" requirement of § 2261(b). Imagine, for example, that as the defendant threatens self-harm in person, his estranged wife attempts to disarm him but the gun misfires and accidentally kills her. Or imagine that a defendant's estranged wife rushes out of the house after the defendant threatens suicide via internet videoconference, hoping to reach him

in time to avert his suicide attempt, only to be accidentally struck and killed by a drunk driver en route to his location. In these hypothetical scenarios, the victim's death has resulted from the defendant's intent to harm himself.

That the stalking statutes can be violated through threatened self-harm or unintentional death is fatal to the government's attempt to use them as predicate violent offenses under § 924(j). Indeed, in *Portee v. United States*, 941 F.3d 263 (7th Cir. 2019), the Seventh Circuit held that an Indiana intimidation statute could be violated by threatening self-harm in the course of resisting an arrest. *See also United States v. Bolten,* 741 F. Supp.3d 260, 286 (E.D. Penn. 2024) (holding that attempted armed robbery can be committed by threatening harm against "any" person—which includes the defendant himself). Likewise, § 2261A(1)(A) can be violated by threatening self-harm. Thus, in *United States v. Plunkett*, the district court confronted the question whether a defendant's conviction for interstate stalking in violation of § 2261A could form the predicate for a violation of § 924(j).[8] *United States v. Plunkett*, No. 4:04-CR-70083, 2024 WL 4173806, at *6 (W.D. Va. Sept. 12, 2024), *appeal dismissed,* No. 24-7093, 2025 WL 2237443 (4th Cir. Aug. 6, 2025). As the *Plunkett* court explained, the fact that § 2261A(1)(A) can be violated through self-harm or threatened self-harm disqualifies interstate stalking as a § 924(j) predicate offense, because "[b]y its terms, the [elements] clause does not reach the use of physical force against property owned solely by the defendant . . . Nor does the [elements] clause apply in situations in which defendants solely use or threaten to use force against themselves." *Id.* at *7 (cleaned up). As the district court further explained,

> [A]s was true in *Portee*, the court has no difficulty envisioning

---

[8]The version of § 2261A that was in force at the time of Plunkett's conviction—like the current version of § 2261A(1)(A)—did not include the "emotional distress" language that is included in the current version of § 2261A(1)(B). Accordingly, *Plunkett* remains persuasive even if the Court concludes that current § 2261A(1) is not divisible between its subsections.

situations that could satisfy all of the elements of interstate stalking but not necessarily involve the use, attempted use, or threatened use of physical force against the person of another. For instance, a woman's estranged husband could travel in interstate commerce with the intent to harass her and, in the course of doing so, threaten to shoot himself if she refused to meet with him. Similarly, a man's daughter could travel in interstate commerce with the intent to harass him and, in the course of doing so, threaten to take an overdose of pills if he did not agree to do something that she demanded of him. Both situations would satisfy the elements of § 2261 A(1) since they involve (1) travel in interstate commerce, (2) the intent to harass another person, and (3) the effect of placing that person in reasonable fear of fatal or serious bodily injury to a spouse or immediate family member. However, these hypothetical situations would not satisfy the force clause of § 924(c)(3) since they involve threats of self-harm by the perpetrator of the harassment rather than the "threatened use of physical force against the person or property <u>of another</u>." 18 U.S.C. § 924(c)(3)(A) (emphasis added).

Because a person's immediate family member or intimate partner could commit interstate stalking in violation of § 2261A by, among other elements, threatening to physically harm themselves, rather than another person, the court concludes that the offense is not categorically a crime of violence under the force clause of § 924(c)(3). And since the residual clause of § 924(c)(3) is no longer valid as a result of the Supreme Court's decision in *Davis*, interstate stalking cannot serve as the predicate crime for [a] § 924(j) offense

*United States v. Plunkett*, 2024 WL 4173806, at *7.

Like the version of § 2261A at issue in *Plunkett*, §§ 2261A(1)(A) and (2)(A) can be violated through physical force against the defendant himself. Neither statute requires that physical force be used or threatened against the person or property of the victim. Accordingly, neither Count One nor Count Two qualifies as a predicate violent felony under § 924(j). Counts Three and Four, therefore, must be dismissed.

-25-

B.   **ALL EVIDENCE RECOVERED FROM MR. MANGIONE'S BACKPACK MUST BE SUPPRESSED BECAUSE LAW ENFORCEMENT FAILED TO OBTAIN A SEARCH WARRANT BEFORE SEARCHING THE BACKPACK**

1.    **The Warrantless Search of Mr. Mangione's Backpack was Not a Valid Search Incident to a Lawful Arrest**

Altoona law enforcement failed to follow fundamental Fourth Amendment case law (and basic police procedure) by failing to obtain a search warrant before searching through Mr. Mangione's backpack and the closed containers within the backpack. Police conducted this warrantless search even though there were no exigent circumstances as Mr. Mangione was already in handcuffs, the backpack was on a table over six feet away and Mr. Mangione was separated from this table by a wall of armed officers. As confirmed by body-worn camera footage, the entire search of the backpack was done well after it was secured and moved far from Mr. Mangione's grabbable area.

The Fourth Amendment protects individuals from unreasonable searches and seizures by the government. U.S. Const. amend. IV. ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."). Building on the Fourth Amendment's protections, the Supreme Court has noted that warrantless searches are per se unreasonable. *See, e.g.*, *Katz v. United States*, 389 U.S. 347, 357 (1967) ("Over and again this Court has emphasized that the mandate of the (Fourth) Amendment requires adherence to judicial processes, and that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment— subject only to a few specifically established and well-delineated exceptions." (quotation, citation and footnotes omitted)); *Chimel v. California*, 395 U.S. 752, 762–63 (1969) ("The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals

nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals." (quoting *McDonald v. United States*, 335 U.S. 451, 455–56 (1948)).

One recognized exception to the warrant requirement is a search conducted by law enforcement incident to a lawful arrest. *See*, *e.g.*, *United States v. Diaz*, 854 F.3d 197, 205 (2d Cir. 2017) ("The search-incident-to-arrest doctrine is an exception to the general requirement that an officer must obtain a judicial warrant supported by probable cause before conducting a search.").

In *Chimel v. California*, the Supreme Court set out the rationale and limitations for searches incident to a lawful arrest:

> When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area within his immediate control—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.
>
> There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant. The adherence to judicial processes mandated by the Fourth Amendment requires no less.

*Chimel*, 395 U.S. at 762–63 (quotations and footnote omitted); s*ee also id.* at 768 ("The search here went far beyond the petitioner's person and the area from within which he might have obtained either a weapon or something that could have been used as evidence against him. There

was no constitutional justification, in the absence of a search warrant, for extending the search beyond that area. The scope of the search was, therefore, 'unreasonable' under the Fourth and Fourteenth Amendments and the petitioner's conviction cannot stand.").

Forty years later, in *Arizona v. Gant*, the Supreme Court again explained the *Chimel* court's rationale for limiting searches incident to a lawful arrest to only the arrestee's person and the area within his immediate control:

> In *Chimel*, we held that a search incident to arrest may only include "the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." Ibid. That limitation, which continues to define the boundaries of the exception, ensures that the scope of a search incident to arrest is commensurate with its purposes of protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy. *See ibid.* (noting that searches incident to arrest are reasonable "in order to remove any weapons [the arrestee] might seek to use" and "in order to prevent [the] concealment or destruction" of evidence (emphasis added)). If there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the rule does not apply.

*Arizona v. Gant*, 556 U.S. 332, 339 (2009) (quoting and citing *Chimel*); *see also United States v. Chadwick*, 433 U.S. 1, 15 (1977) ("[T]he search was conducted more than an hour after federal agents had gained exclusive control of the footlocker and long after respondents were securely in custody; the search therefore cannot be viewed as incidental to the arrest or as justified by any other exigency.").

Relying on the limitations set by the Supreme Court for searches incident to a lawful arrest, the Second Circuit has found searches unreasonable when, such as in this case, law enforcement searches a defendant's bag when the defendant has been handcuffed and the bag was not within the defendant's "immediate control." For example, in *United States v. Gorski*, the FBI arrested the defendant and his co-conspirator at a bus station as part of a drug sting operation. *Gorski*, 852 F.2d

-28-

692, 693–94 (2d Cir. 1988). When the defendant was stopped, he was carrying a black vinyl bag. *Id.* at 694. An agent took the black bag from the defendant, who was then frisked and arrested in the presence of several armed agents. *Id.* Without obtaining a warrant, an agent opened the bag and recovered a kilogram of cocaine. *Id.*

In finding the search not justified as a search incident to a lawful arrest, the district court made the following ruling:

> [T]he bag belonged to [the conspirator]. It was turned over to [the defendant]. At the scene of the arrest, it had been taken from [the defendant], both defendants were placed under arrest and handcuffed, and the bag was placed on the ground, all in the presence of several agents, all of whom had their guns drawn. The bag was thus not accessible to either defendant. It was not mobile in the sense that the bag was going nowhere other than with the agents to the Federal Building. There was neither a risk of a defendant getting to a weapon in the bag nor a risk of a defendant destroying or absconding with evidence from the bag. Though the government argues that the search was lawful as incident to the arrests, presumably as security procedure, that claim cannot stand. The facts at the time of the search suggest no exigency in the form of a risk of either harm to the agents or loss of evidence.

*Id.* at 695.

Agreeing with the district court's analysis on this issue, the Second Circuit noted that the "warrantless search was not justified by exigent circumstances since the bag was inaccessible to the suspected drug dealers and there was not the slightest danger that [the luggage] or its contents could have been removed before a valid search warrant could be obtained." *Id.* (quotation omitted).

Another analogous case is *United States v. Brito*, where the FBI and NYPD arrested the defendant on the street for robbing a bank two months earlier. *Brito*, 771 F. Supp. 3d 157, 162–64 (E.D.N.Y. 2025). Prior to the defendant's arrest, his backpack was closed, zipped and secured on the defendant's shoulders. *Id.* at 174. Before searching the defendant's backpack, law enforcement removed the backpack from the defendant's shoulders, and three officers handcuffed the defendant's hands behind his back. *Id.* at 164, 174. Officers started searching the backpack in the

-29-

defendant's presence and continued to search through it even after the defendant was removed from the scene by other officers. *Id.* Under these circumstances—which are nearly identical to the facts of this case—the court ruled that the defendant's backpack was not within his immediate control and that, therefore, the government failed to establish that the warrantless search of the backpack was incident to a lawful arrest. *Id.* at 174. In reaching this conclusion, the court noted that it "follows that the search-incident-to-arrest doctrine does not provide carte blanche to search an arrestee's backpack, but instead authorizes such searches, outside of the automobile context, only where the backpack is within the arrestee's immediate control." *Id.* at 175.

Another example is *United States v. Morillo*, where NYPD officers stopped the defendant for riding his bicycle on the sidewalk. *Morillo*, No. 08 CR 676 (NGG), 2009 WL 3254431, at *1 (E.D.N.Y. Oct. 9, 2009). As an officer exited his vehicle and approached, the defendant fled on his bicycle before hitting a pothole and crashing. *Id.* After a foot chase, an officer tackled the defendant and knocked the defendant's backpack off his shoulders during an ensuing struggle. *Id.* The defendant was handcuffed, and the officers took the defendant and his backpack to their police car. *Id.* While one officer searched the defendant's person near the back passenger side door, another officer searched through the defendant's backpack at the rear of the car. *Id.* As a result of the warrantless search, the officers recovered a loaded handgun in the defendant's backpack. *Id.*

Applying the Second Circuit's standard in *Gorski*, the district court ruled that the search of the defendant's backpack was not valid as "'there was no reasonable possibility' that [the defendant] could have gained access to his backpack" given, *inter alia*, that it was out of the defendant's reach while he was handcuffed and in the possession of law enforcement. *Id.* at *5.

The rulings in *Gorski*, *Brito* and *Morillo* all support the finding that the warrantless search of Mr. Mangione's backpack cannot be justified as a search incident to a lawful arrest. There can

-30-

be no disagreement that, at the time law enforcement started searching Mr. Mangione's backpack, he was in handcuffs and surrounded by police officers while the bag was many feet away. Moreover, even before Mr. Mangione's arrest, the backpack was not within his immediate control or grabbable area because Patrolman Detwiler had moved it to another table approximately six feet away, roughly nine minutes earlier, and there was a human wall of police officers strategically standing between Mr. Mangione and the backpack. In addition, even before the arrest, the scene was police-controlled as there were ten or more officers in the back of the McDonald's. Nevertheless, despite the lack of any exigency, officers began searching through his backpack. There was certainly no exigency once Mr. Mangione was removed from McDonald's, yet law enforcement continued to search the backpack in the restaurant without a warrant. Under the federal caselaw discussed above, the search was not justified as a search incident to a lawful arrest and the recovered contents of the backpack should therefore be suppressed.

### 2. The Evidence Unlawfully Recovered from the Backpack is Not Admissible Under the Inevitable Discovery Doctrine

While the law is clear that law enforcement's search of Mr. Mangione's backpack was not justified as a search incident to a lawful arrest, the government will likely nevertheless argue that the evidence recovered from the backpack is admissible under the inevitable discovery doctrine because the Altoona Police Department may claim that they subsequently conducted an inventory search of the backpack at the precinct. In doing so, the government will likely rely on *Brito* and *Morillo* for the proposition that evidence recovered from the warrantless searches of a backpack will be admissible if the government can establish that the seized evidence would have inevitably been discovered pursuant to a valid inventory search. *See Brito*, 771 F. Supp. 3d at 171–72 ("The initial search of [the defendant's] backpack was not incidental to his arrest. The fruits of the search, however, are admissible because the contents of [the defendant's] backpack would have been

-31-

inevitably discovered pursuant to a valid inventory search."); *Morillo*, 2009 WL 3254431, at *5 ("[T]he gun is admissible because it would have been inevitably discovered in a valid inventory search.").

These courts relied on *United States v. Mendez*, where the Second Circuit addressed the legal question whether the evidence seized in that case would be admissible "under the inventory search exception to the Fourth Amendment's warrant requirement, under the inevitable discovery exception to the Fourth Amendment's exclusionary rule, or under some combination of the two." *Mendez*, 315 F.3d 132, 136–37 (2d Cir. 2002).

The Supreme Court has recognized the inventory search exception to the Fourth Amendment rule against unreasonable searches and seizures by ruling that "it is not 'unreasonable' for police, as part of the routine procedure incident to incarcerating an arrested person, to search any container or article in his possession, in accordance with established inventory procedures." *Illinois v. Lafayette*, 462 U.S. 640, 648 (1983). To comply with the Fourth Amendment, however, the police must conduct the inventory search "in good faith pursuant to 'standardized criteria . . . or established routine.'" *United States v. Thompson*, 29 F.3d 62, 65 (2d Cir. 1994) (quoting *Florida v. Wells,* 495 U.S. 1, 4 (1990)). Notably, "an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4 (1990)). Accordingly, while a "police officer may be allowed sufficient latitude to determine whether a particular container should or should not be opened," the "individual police officer must not be allowed so much latitude that inventory searches are turned into a purposeful and general means of discovering evidence of crime." *Id.* (quotation omitted).

Under the doctrine of inevitable discovery, "evidence that was illegally obtained will not be suppressed 'if the government can prove that the evidence would have been obtained inevitably'

even if there had been no statutory or constitutional violation." *United States v. Roberts,* 852 F.2d 671, 675–76 (2d Cir. 1988) (quoting *Nix v. Williams,* 467 U.S. 431, 447 (1984)).

By merging the concepts of inventory searches and inevitable discovery, the Second Circuit in *Mendez* noted that illegally obtained evidence will not be suppressed if the government can establish that the evidence would have ultimately been discovered "in the course of a valid inventory search conducted pursuant to standardized, established procedures." *Mendez*, 315 F.3d at 137–38. To rely on this mix of inevitable discovery through a valid inventory search to admit otherwise illegally obtained evidence, the government must establish the following three elements:

> (1) that the government had legitimate custody of the property being searched so that an inventory search would have been justified; (2) that when the police in the police agency in question conducted inventory searches, they did so pursuant to established or standardized procedures; and (3) that those inventory procedures would have inevitably led to the discovery of the challenged evidence.

*Id.* at 138 (quotations omitted); *see also Brito*, 771 F. Supp. 3d at 177 (listing the *Mendez* factors); *Morillo*, 2009 WL 3254431, at *9 (same).

Here, the government cannot establish that the evidence illegally recovered from Mr. Mangione's backpack would have inevitably been recovered through a valid inventory search. Even assuming the government could establish the first and third of the *Mendez* requirements, the government cannot establish the second requirement, *i.e.*, that the inventory search was conducted pursuant to established or standardized procedures. To date, the government has not provided any discovery or information demonstrating that the Altoona Police Department had an established or standardized procedure for general inventory searches of a defendant's bag or backpack that was seized during his arrest.

Moreover, in the analogous context of inventory searches of impounded vehicles, the Altoona Police Department procedure is clear that if, "during an inventory search, evidence of a

crime is discovered, the officer shall stop the inventory search and secure a search warrant prior to continuing." (Exhibit 1: Altoona Police Department General Order 1.2.3(C)(5(c)). Here, Patrolwoman Wasser discovered evidence of a crime—a loaded gun magazine—while rummaging through Mr. Mangione's backpack at McDonald's. Nevertheless, in violation of standard police procedure, Patrolwoman Wasser continued to search through the backpack without obtaining a search warrant. That Patrolwoman Wasser's continued warrantless search violated standard procedure is also evident from her fellow officer's statement at the McDonald's that, "at this point we probably need a search warrant for it." This officer's statement, which was made after Patrolwoman Wasser recovered the loaded gun magazine, indicates that this officer believed, consistent with the established procedure for the Altoona Police Department, that Patrolwoman Wasser should have obtained a search warrant before continuing to search through the backpack. Patrolwoman Wasser ignored this warning—and police procedure—by continuing to search through the backpack at the McDonald's.

Additionally, Patrolwoman Wasser violated police procedure again while searching through the backpack at the precinct. Specifically, once Patrolwoman Wasser "found" the gun in the backpack at the precinct, police procedure required her to obtain a search warrant before continuing her search. She did not. Rather, she continued to search through the backpack and only obtained a warrant hours later.

Because the government cannot establish that the searches at the McDonald's or later at the precinct were valid inventory searches pursuant to established or standardized procedures, the evidence illegally recovered from Mr. Mangione's backpack must be suppressed.

**C.    MR. MANGIONE'S STATEMENTS SHOULD BE SUPPRESSED AS THEY WERE THE RESULT OF CUSTODIAL INTERROGATION WITHOUT *MIRANDA* WARNINGS**

In *Miranda v. Arizona*, 384 U.S. 436, 467 (1966), the Supreme Court recognized that "without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." To protect an individual's Fifth Amendment right against self-incrimination, the *Miranda* court required that law enforcement must provide an individual with certain warnings when the individual is in custody and subject to interrogation. *See id.* at 467–68 ("At the outset, if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent.").

"The purpose of the Miranda warning is to ensure that the person in custody has sufficient knowledge of his or her constitutional rights relating to the interrogation and that any waiver of such rights is knowing, intelligent, and voluntary." *United States v. Carter,* 489 F.3d 528, 534 (2d Cir.2007). "If a suspect is not so warned, the prosecution is barred from using statements obtained during the interrogation to establish its case in chief." *United States v. Newton*, 369 F.3d 659, 668 (2d Cir. 2004).

In the *Miranda* context, "interrogation" refers "not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (footnotes omitted). That standard is met in this case. As demonstrated in the body-worn camera footage, when Patrolman Detwiler initially approached Mr. Mangione, he already believed that he was the New York shooter. When

asking Mr. Mangione if he had been to New York recently, Patrolman Detwiler was seeking to elicit an incriminating response. This question was obviously important enough that Patrolman Detwiler asked it numerous times—including after telling another officer that he was "100% sure" that Mr. Mangione matched the New York suspect. In asking this question, Patrolman Detwiler knew it was likely to elicit an incriminating response because there was nothing about their interaction or being in McDonalds that related to New York, other than the shooting.

*Miranda*'s custody prong is met here as well. A person is in custody for *Miranda* purposes if a reasonable person in the same situation would "have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995); *see also Georgison v. Donelli*, 588 F.3d 145, 155 (2d Cir. 2009) (noting that custody "is determined by ascertaining whether that individual is 'subjected to restraints comparable to those associated with a formal arrest'" (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)).

There can be no doubt that Mr. Mangione was in custody when questioned by law enforcement. When first approaching Mr. Mangione, Patrolmen Detwiler and Frye deliberately and strategically positioned themselves in a way to prevent Mr. Mangione from leaving from the back of the McDonald's. In addition, before walking out of the McDonald's, Patrolman Detwiler made certain to position Patrolman Frye closer to Mr. Mangione to prevent his exit. Patrolman Detwiler also directed other armed officers where to stand in order to limit Mr. Mangione's movements. From the time they first approached Mr. Mangione, the officers intentionally placed themselves in such a way to ensure Mr. Mangione could not leave. By intentionally blocking Mr. Mangione's ability to move past them, the patrolmen made clear to Mr. Mangione—or anyone else who was in his position—that he was not free to leave. Mr. Mangione's inability to leave was

made even clearer when additional armed officers entered McDonald's and positioned themselves to prevent him from leaving.

An objective person in Mr. Mangione's position would also have believed that he was not free to leave because the significant uniformed, armed police presence in the McDonald's was disproportionate with Patrolman Detweiller's statement that the police were there because Mr. Mangione had been sitting at the McDonald's for 40 minutes. A trivial offense such as loitering or trespass would not require such a significant police reaction. Rather, the number of officers at McDonald's limiting his movement would indicate to any objective person that the officers were there to prevent him from leaving.

Despite Mr. Mangione's inability to leave, Patrolman Detwiler continued to question Mr. Mangione without *Miranda* warnings—even after another officer instructed Patrolman Detwiler to inform Mr. Mangione that he was under official police investigation and to read Mr. Mangione his rights. Moments later, another officer asked Mr. Mangione twice why he lied about his name—all while being surrounded by nine uniformed police officers blocking Mr. Mangione's exit from McDonald's.

Given law enforcement's custodial interrogation without *Miranda* warnings, counsel moves to suppress all of Mr. Mangione's statements to law enforcement at the McDonald's.[9]

---

[9]The government has not yet identified which, if any, of Mr. Mangione's statements at McDonald's they intend to introduce at trial. All of these statements are recorded on law enforcement's body-worn cameras, which counsel has reviewed.

## II.    CONCLUSION

For the reasons stated above, this Court should dismiss Counts Three and Four of the indictment, suppress the evidence recovered from law enforcement's warrantless search of Mr. Mangione's backpack at the McDonald's and suppress Mr. Mangione's statements to law enforcement at the McDonald's that were obtained through custodial interrogation without *Miranda* warnings.

Respectfully submitted,

_____
Karen Friedman Agnifilo
Marc Agnifilo
Jacob Kaplan
AGNIFILO INTRATER LLP
140 Broadway, Suite 2450
New York, NY 10005


_____/s/_____
Avi Moskowitz
Eylan Schulman
Christopher Neff
MOSKOWITZ COLSON
GINSBERG & SCHULMAN
80 Broad Street, Suite 1900
New York, NY 10004

## <u>CERTIFICATION</u>

The undersigned hereby certifies that the Memorandum of Law in Support of Luigi Mangione's motion dismiss Counts Three and Four and to suppress evidence and statements complies with this Court's October 9 2025, Order authorizing counsel to file an oversized brief in this matter. The word count, exclusive of the caption, tables, and signature blocks, is 12,696 words according to the word-processing system used to prepare the document.

Dated: October 10, 2025

_____
Karen Friedman Agnifilo
Marc Agnifilo
Jacob Kaplan
AGNIFILO INTRATER LLP
140 Broadway, Suite 2450
New York, NY 10005