UNITED STATED DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
UNITED STATES OF AMERICA

               v.                        25 Cr. 176 (MMG)

LUIGI MANGIONE,

                  Defendant.
-------------------------------------------------------X

**DEFENDANT LUIGI MANGIONE'S REPLY IN SUPPORT OF HIS MOTIONS CHALLENGING THE CONSTITUTIONALITY OF THE DEATH PENALTY, MOVING TO DISMISS COUNTS THREE AND FOUR AND MOVING TO SUPPRESS EVIDENCE AND STATEMENTS**

Karen Friedman Agnifilo
Marc Agnifilo
Jacob Kaplan
AGNIFILO INTRATER LLP
140 Broadway, Suite 2450
New York, NY 10005


Avraham C. Moskowitz
Eylan Schulman
Christopher Neff
MOSKOWITZ COLSON
GINSBERG & SCHULMAN
80 Broad Street, Suite 1900
New York, NY 10004

# TABLE OF CONTENTS

I.   THE NOTICE OF INTENT SHOULD BE STRICKEN BECAUSE PREJUDICE
     HAS BEEN ESTABLISHED ............................................................................... 1

     A.   The Attorney General's Association with Ballard Partners and Ballard's
          Association with UHC Violated Mr. Mangione's Due Process Rights ................. 3

     B.   The Attorney General's Three Public Statements Concerning Her Opinion
          of Mr. Mangione's Guilt and the Merit of Seeking the Death Penalty
          Against Him Are Presumed to Interfere with the Due Administration of
          Justice ................................................................................................................ 8

     C.   Where A Death-Eligible Defendant Has Been Prejudiced by the Conduct of
          a Government Official, a District Court Has the Authority to Issue an
          Appropriate Remedy ....................................................................................... 16

     D.   The Appropriate Remedy in This Case ............................................................. 17

II.  THE INTERSTATE STALKING STATUTES ARE NOT PREDICATE CRIMES
     OF VIOLENCE ............................................................................................... 18

     A.   Subsections A and B of Section 2261A(1) are Indivisible from One
          Another, as are Subsections A and B of Section 2261A(2) ................................ 18

          1.   Subsections A and B are indivisible because they merely establish
               different means of committing the same offense ...................................... 18

          2.   Subsections A and B are not divisible by "victim category" .................... 22

          3.   Because Subsections B can be violated through conduct causing
               emotional distress, the indivisible interstate stalking statutes
               categorically fail to qualify as crimes of violence. ................................... 24

          4.   Even if Sections 2261A(1) and (2) are divisible, Subsections
               2261A(1)(A) and (2)(A) do not constitute crimes of violence. ............... 25

          5.   Sections 2261A(1)(A) and (2)(A) can be violated through reckless
               conduct and therefore are not categorically crimes of violence under
               *Borden* ................................................................................................... 25

          6.   Sections 2261A(1)(A) and (2)(A) are not categorically crimes of
               violence because they can be violated through threatened self-
               harm .......................................................................................................... 30

III.    MR. MANGIONE'S MOTION TO SUPPRESS SHOULD BE GRANTED .................. 34

    A.    Search Incident to Lawful Arrest .......................................................... 34

    B.    Search for a Bomb ................................................................................. 39

    C.    Inevitable Discovery through an Inventory Search ............................... 41

IV.    CONCLUSION .................................................................................................. 43

# TABLE OF AUTHORITIES

## Cases

*Bank of Nova Scotia v. United States*,
    487 U.S. 250 (1988).................................................................................14

*Berger v. United States*,
    295 U.S. 78 (1935)....................................................................................6

*Borden v. United States*,
    593 U.S. 420 (2021).................................................................25, 27, 28, 29

*Bordenkircher v. Hayes*,
    434 U.S. 357 (1978)...................................................................................6

*Chimel v. California*,
    395 U.S. 752 (1969).................................................................................35

*Commonwealth v. Williams*,
    305 A.3d 89 (Pa. Super. 2023)................................................................35

*Commonwealth v. Wright*,
    742 A.2d 661 (1999).................................................................................35

*Crooks v. Harrelson*,
    282 U.S. 55 (1930)...................................................................................32

*Dunlop v. Bachowski*,
    421 U.S. 560 (1975)...................................................................................7

*Florida v. Wells*,
    495 U.S. 1 (1990).....................................................................................42

*Gregg v. Georgia*,
    428 U.S. 153 (1976).................................................................................14

*Illinois v. Somerville*,
    410 U.S. 458 (1973).................................................................................14

*Loc. No. 82, Furniture & Piano Moving, Furniture Store Drivers, Helpers,
Warehousemen & Packers v. Crowley*,
    467 U.S. 526 (1984)...................................................................................7

*Marshall v. Jerrico, Inc.*,
　　446 U.S. 238 (1980)................................................................6, 7

*Martinez v. Sessions*,
　　892 F.3d 655 (4th Cir. 2018) ................................................21

*Shipley v. California*,
　　395 U.S. 818 (1969)................................................................35

*United States v. Bailey*,
　　444 U.S. 394 (1980)................................................................27

*United States v. Barrett*,
　　102 F.4th 60 (2d Cir. 2024) ...................................................34

*United States v. Barrett*,
　　145 S. Ct. 1307 (2025)............................................................34

*United States v. Cantu*,
　　964 F.3d 924 (10th Cir. 2020) ...............................................24

*United States v. Cole*,
　　No. 2023-cr-0016, 2025 WL 2592515 (D. V.I. Sept. 7, 2025)................16

*United States v. Costanza-Galdomez*,
　　 No. SAG-22-409, 2025 WL 1712436 (D. Md. June 18, 2025) ............16

*United States v. Cushnie*,
　　No. 14 CR 119, 2014 WL 7447149 (S.D.N.Y. Dec. 31, 2014) ............38

*United States v. Dangleben*,
　　No. 3:23-cr-0072, 2025 WL 2647195 (D. V.I. Sept. 15, 2025)............16

*United States v. Daugerdas*,
　　892 F.3d 545 (2d Cir. 2018)....................................................32

*United States v. Davis*,
　　588 U.S. 445 (2019)................................................................16

*United States v. Degeare*,
　　884 F.3d 1241 (10th Cir. 2020) ..............................................24

*United States v. Elias*,
　　No. 23 Cr. 6626, 2025 WL 2857883 (2d Cir. Oct. 8, 2025)................34

*United States v. Elkins*,
    No. 23-cr-247 (N.D. Tex.) ...................................................................................19

*United States v. Elkins*,
    No. 24-10753, 2025 WL 3537272 (5th Cir. Dec. 10, 2025)..................................19, 24, 25, 29

*United States v. Garg*,
    No. 21cr-045 (W.D. Wash.)............................................................................. 18-19

*United States v. Graves,*
    925 F.3d 1036 (9th Cir. 2016) ........................................................................ 21-22

*United States v. Littrell*,
    478 F. Supp. 2d 1179 (C.D. Cal. 2007) .................................................................16

*United States v. Lopez-Matias,*
    522 F.3d 150 (1st Cir. 2008)........................................................................14, 16

*United States v. Merrell*,
    No. 3:20-CR-46-1, 2025 WL 2911170 (N.D. W. Va. Oct. 7, 2025) ......................................16

*United States v. Osinger*,
    753 F.3d 939 (9th Cir. 2014) ........................................................................ 19-20

*United States v. Peguero,*
    34 F.4th 143 (2d Cir. 2022) ...........................................................................34

*United States v. Perez,*
    22 U.S. 579 (1824)...................................................................................14

*United States v. Plunkett*,
    No. 4:04-cr-70083 (W.D. Va.)..........................................................................18

*United States v. Redd*,
    85 F.4th 153 (4th Cir. 2023) .......................................................................21, 24

*United States v. Rosado-Rosario*,
    No. 97-049, 1998 WL 28273 (D.P.R. Jan. 15, 1998) .....................................................16

*United States v. Schreiber*,
    191 F.3d 103 (2d Cir. 1999)........................................................................31-32

*United States v. Shakir*,
    616 F.3d 315 (3d Cir. 2010).........................................................................38

*United States v. Sjodin*,
   139 F.4th 1188 (10th Cir. 2025) ........................................................................27

*United States v. Spurlock*,
   782 F. Supp. 3d 987 (D. Nev. 2025) ..................................................................16

*United States v. Taylor*,
   596 U.S. 845 (2022) ...................................................................................... 28-29

*Veile v. Martinson*,
   258 F.3d 1180 (10th Cir. 2001) ................................................................... 19-20

*Yates v. United States*,
   574 U.S. 528 (2015) ...........................................................................................33

## Rules & Statutes

18 U.S.C. § 924(c) ..............................................................................24, 25, 30

18 U.S.C. § 2261A(1)(A) ................................................................... *passim*

18 U.S.C. § 2261A(2)(A) ..............................................................19, 25, 26, 29

18 U.S.C. § 2261A(1)(B) ...............................................................................19

18 U.S.C. § 2261A(2)(B) ..............................................................19, 24, 25, 29

18 U.S.C. § 2261(b) ................................................................................ 27-29

28 U.S.C. § 2071 ..............................................................................10, 11

S.D.N.Y. Local Criminal Rule 23.1 ................................................... *passim*

H.R. Conf. Rep. No. 115-1072 ......................................................................22

164 Cong. Rec. H9823-01 .............................................................................22

## Other Authorities

Public Financial Disclosure Report, Hon. Pam Bondi, U.S. Office of Gov't Ethics (Jan. 2,
2025) ........................................................................................................................3

## REPLY MEMORANDUM

Defendant's reply memorandum addresses three issues. First, the government has failed to rebut the defendant's factual assertions of prejudice as presumed by Local Rule 23.1 and as established by the actions of the Attorney General and others. Second, stalking is not a crime of violence. Third, defendant's motion to suppress evidence should be granted.

## I.    THE NOTICE OF INTENT SHOULD BE STRICKEN BECAUSE PREJUDICE HAS BEEN ESTABLISHED

The defense's motion challenging the constitutionality of the death penalty as applied to this case focused on the unprecedented, repeated and prejudicial actions of the Attorney General. Here, the Attorney General herself has violated the Rules of this Court and Department of Justice procedures. The Attorney General personally directed line prosecutors to seek the death penalty in a public press release delivered via social media, and then appeared on national television to claim that, based on her own experience as a capital crimes prosecutor, Mr. Mangione deserved to be executed.

The defense previously argued that the Attorney General took these unusually personal and prejudicial actions to ensure that the Mangione case was the first death-eligible case of the new administration. Since the filing of the defense's original submission, however, the defense has uncovered an additional reason why the Attorney General took a personal interest in this case, which potentially explains why she herself ordered the line prosecutors to seek the death penalty.

Prior to her appointment as Attorney General, Ms. Bondi was listed as a partner at the lobbying firm Ballard Partners. In turn, Ballard Partners lists UnitedHealth Group[1] ("UHG") as a regular client of the firm. The Attorney General derived and continues to receive personal benefits

---

[1] UnitedHealth Group (UHG) is the parent company and diversified health care entity, whereas UnitedHealthcare (UHC) is the dedicated insurance division and UHG's largest subsidiary.

from Ballard in the form of a profit-sharing plan from Ballard's professional association with all of its paying clients, including UHG. These benefits—along with the financial benefits the Attorney General derived from Ballard while she was a partner and while the partnership divided up revenue from UHG—show that the Attorney General has a personal and financial interest in the work Ballard has done on UHG's behalf. Further, as the Chairperson of Ballard Partner's Corporate Regulatory Compliance practice, the Attorney General knew or should have known that UHG, the largest and richest health care company in the world with annual revenue of about $400,000,000,000 (four hundred billion dollars), was one of her partnership's clients, and that she personally financially profited from Ballard's lucrative relationship with UHG.

When Ms. Bondi left Ballard Partners to become the Attorney General in 2025, the very first defendant she personally selected to be executed was the man accused of killing the CEO of her former client. The Attorney General's financial connection to UHG represents a conflict of interest that should have caused her to recuse herself from making any decisions on this case. Her failure to do so clearly violated the due process rights of Mr. Mangione and provides yet another reason why the Notice of Intent should be stricken.[2]

---

[2]This reply is limited to the due process implications of the Attorney General's actions personally directing the Department of Justice to seek the death penalty for the alleged murder of her former client's CEO. The defense will move separately to address the profound conflict of interest implications of this situation. As part of that motion, we will seek discovery, including but not limited to: all communications between UHG, UHC, and Ballard Partners with any employee or representative of the U.S. Government relating to this matter; the terms of Ms. Bondi's compensation from Ballard, including the revenues that Ballard derived from UHG and UHC; how that compensation was divided among Ballard partners (including the Attorney General); all information and communications touching on the relationship between the Attorney General and her clients UHC and UHG both while the Attorney General was employed by Ballard and since she has assumed her office; and any direction the Attorney General has provided to any other Department of Justice employee regarding this matter, UHG, UHC, and/or Ballard since she has assumed office.

A. **The Attorney General's Association with Ballard Partners and Ballard's Association with UHC Violated Mr. Mangione's Due Process Rights**

Ballard Partners is a lobbying firm specializing in government and public affairs. The firm was created in Tallahassee, Florida (the Attorney General's home state) in 1998. The firm has since expanded to Washington, D.C., Boston, Chicago, Los Angeles, Honolulu, Tel Aviv, Istanbul, Nigeria and Saudi Arabia. The firm has a close relationship with the President of the United States and the current administration. The founder of Ballard Partners served as the 2016 Trump campaign's Florida chair, as a Trump-pledged Florida electoral college elector, and as vice chairman of President Trump's inaugural committee.

After serving as the Attorney General of Florida, the Attorney General joined Ballard Partners in January 2019. In November of 2019, she left briefly to represent President Trump in impeachment proceedings and returned to Ballard in January 2020. She continued as a listed partner with Ballard Partners until the very day of her confirmation as the Attorney General by the United States Senate on February 4, 2025. In addition to being listed as a partner, the Attorney General was the Chairperson of Ballard's Corporate Regulatory Compliance Practice. In a publicly-filed Financial Disclosure Report, the Attorney General stated that she "will continue to participate in (a Ballard Partners) defined contribution plan" even after becoming Attorney General of the United States. Accordingly, the Attorney General currently has some of her personal wealth in a financial contribution plan administered by Ballard.

UHG has been a client of Ballard Partners for several years and remains a firm client. Indeed, Ballard's website includes UHG as a current client of the firm. It appears that UHG was a client of Ballard from at least as early as 2023. In 2024, UHG paid Ballard Partners at least

$250,000 for lobbying services. In 2025 so far, this amount increased by 80% to about $450,000.[3] These figures alone indicate that following the murder of the UHC CEO in December of 2024, UHG almost doubled its lobbying efforts by the very firm that had previously employed the Attorney General.

Because the Attorney General was continuing to work at Ballard Partners as a listed partner during the years when Ballard was taking money from UHG, she would have derived personal revenue—both directly as income and through Ballard's profit-sharing plan—that originated with UHG. To this extent, the Attorney General personally and financially profited from Ballard's connection to UHG, and she continues to do so.

On January 14, 2025, the Attorney General signed and delivered a letter to the Designated Ethics Official with the Department of Justice. Among other representations, the Attorney General stated:

> Upon confirmation, I will resign from my position with Ballard Partners. Pursuant to the impartiality regulation at 5 C.F.R. Sec. 2635.502, for a period of one year after my resignation, I will not participate personally and substantially in any particular matter involving specific parties in which I know Ballard Partners is a party or represents a party, unless I am first authorized to participate, pursuant to 5 C.F.R. Sec. 2635.502(d). In addition, I will not participate personally and substantially in any particular matter involving specific parties in which I know a former client of mine is a party or represents a party for a period of one year after I last provided services to the client, unless I am first authorized to participate, pursuant to 5 C.F.R. Sec. 2635.502(d).

During the first several months of 2025, the Attorney General's prior firm, Ballard Partners, intensified its lobbying efforts on behalf of its client, UHG, with the U.S. Government. During this same period, specifically on April 1, 2025, the Attorney General took the remarkable and

---

[3]Based on information derived from the Center for Responsive Politics (OpenSecrets.org), UHG ranked 12th among Ballard Partners' 174 clients in 2024. Although full data is not yet available, in 2025 UHG has nearly doubled the amount spent on lobbying with Ballard Partners.

unprecedented step of personally and publicly ordering line prosecutors to seek the death penalty against the man accused of killing UHC's CEO.

Therefore, in addition to the reasons set forth in our original memorandum, the defense moves to strike the Notice of Intent and to dismiss the indictment because the Attorney General has violated the due process rights of Mr. Mangione by seeking the death penalty for Mr. Mangione in connection with his alleged actions against the CEO of one of her former firm's clients. The Attorney General's past and present financial interest in Ballard Partners, which continues to lobby the government on behalf of UHG and UHC, implicates Mr. Mangione's due process rights because the very person empowered to seek his death has a financial stake in the case she is prosecuting.

The Attorney General has a personal financial interest in continuing to service her partnership, the sizeable financial investment she continues to have in that partnership, and the interests of a lucrative and wealthy client of that partnership. This personal financial interest caused her to engage in conduct that no prior Attorney General has ever engaged in: premediated, purposeful and fatally prejudicial statements and actions that directly led to the death penalty indictment in this case and the filing of the Notice of Intent.

In addition, the Attorney General represented to the Department of Justice, as a condition of her being considered for the post of U.S. Attorney General, that she would not personally and substantially involve herself in any matter involving a client of Ballard Partners for a year after her Senate confirmation on February 4, 2025. Yet the Attorney General engaged in the actions that are the subject of this motion less than two months into her tenure as Attorney General when she ordered line prosecutors to seek to execute the man she believed killed the CEO of her former

-5-

firm's client. It is hard to imagine something more personal and substantial than the U.S. Attorney General personally ordering prosecutors under her control to secure a death-eligible indictment.

The Attorney General's personal financial interest in Ballard, and Ballard's receipt of money from UHC/UHG, violated the due process rights of Mr. Mangione. Any criminal defendant, let alone one whom the government is trying to kill, is due a criminal process that is untainted by the financial interests of his prosecutors.

"[T]he breadth of discretion that our country's legal system vests in prosecuting attorneys carries with it the potential for both individual and institutional abuse. And broad though that discretion may be, there are undoubtedly constitutional limits upon its exercise." *Bordenkircher v. Hayes*, 434 U.S. 357, 365 (1978). Indeed, the Supreme Court has stated plainly that "[w]e do not suggest . . . that the Due Process Clause imposes no limits on the partisanship of administrative prosecutors. Prosecutors are also public officials; they too must serve the public interest. In appropriate circumstances the Court has made clear that traditions of prosecutorial discretion do not immunize from judicial scrutiny cases in which the enforcement decisions of an administrator were motivated by improper factors or were otherwise contrary to law." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 249 (1980) (citing *Berger v. United States*, 295 U.S. 78, 88 (1935)).

The Supreme Court has specifically cited the exact kind of problem that the Attorney General has created here as one of the "improper factors" that can deprive a defendant of Due Process. "A scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions." *Marshall*, 446 U.S. at 249–50.

Moreover, the Supreme Court is also clear that issues like the one the Attorney General has caused here are reviewable by the Courts and are not simply questions of prosecutorial discretion.

*See, e.g.*, *Dunlop v. Bachowski*, 421 U.S. 560, 567 n.7 (1975), *overruled on other grounds by Loc. No. 82, Furniture & Piano Moving, Furniture Store Drivers, Helpers, Warehousemen & Packers v. Crowley*, 467 U.S. 526 1984) ("We agree with the Court of Appeals, for the reasons stated in its opinion, that there is no merit in the Secretary's contention that his decision is an unreviewable exercise of prosecutorial discretion.").

In *Marshall*, the Court was faced with a scenario in which the financial interest at issue was based on an overall enforcement scheme. The Court therefore observed that "[i]n this case, we need not say with precision what limits there may be on a financial or personal interest of one who performs a prosecutorial function, for here the influence alleged to impose bias is exceptionally remote." 446 U.S. at 250. But, in a footnote, the Court was careful to note that "different considerations might be held to apply if the alleged biasing influence contributed to prosecutions against particular persons, rather than to a general zealousness in the enforcement process." *Id.* at n.12.

This is precisely the situation that the Attorney General has created here. Perhaps the Attorney General's personal and ongoing financial interest in Ballard is the reason why she disregarded longstanding Department of Justice policies and procedures in rushing to announce that she would seek to put Mr. Mangione to death. Perhaps her firm's close relationship with the employer of the deceased was the reason that the Attorney General chose to make the public comments that violated Local Rule 23.1. We do not yet know because we have not yet received discovery on these issues. Whatever the Attorney General's motivations, though, her actions in a case in which she has a financial stake have violated Mr. Mangione's right to due process.

**B.    The Attorney General's Three Public Statements Concerning Her Opinion of Mr. Mangione's Guilt and the Merit of Seeking the Death Penalty Against Him Are Presumed to Interfere with the Due Administration of Justice**

Even aside from the due process implications of the Attorney General personally ordering the death penalty of the man accused of killing her former client's CEO (and the conflict of interest created by this situation, which we will address separately), the Attorney General's public statements about Mr. Mangione and the merits of the death penalty case are presumptively prejudicial. The government spills much ink on how the defense did not prove that the Attorney General's remarks actually prejudiced the grand jury or would prejudice Mr. Mangione in connection with these proceedings.

We dispute the government's blithe assessment on two primary grounds. First, by seemingly ignoring our request to screen the grand jurors for prejudice and by proceeding with a grand jury presentation while Judge Ramos was clearly considering the defendant's motion, the government intentionally evaded any opportunity to identify and potentially cure grand juror prejudice. The procedure requested by the defense of having the prosecutors screen or poll grand jurors for exposure to the Attorney General's public statements was reasonable and narrowly tailored to the issue being addressed.[4] The government should not be permitted to ignore the very procedure that would have detected prejudice in time enough to cure it, and then claim months later that the defense failed to show prejudice. Second, the Attorney General's campaign to shape

---

[4]The defense has never been informed of what, if any, procedure the government followed with grand jury witnesses in screening grand jurors. In any event, the defense should have been consulted on any such procedure as it was the defense who brought this issue up to the government and to the Court (Judge Ramos) and because it is the defendant who has the most to lose from the prejudice at issue.

public opinion is unprecedented, historic, damaging, and prejudicial on its face. The government fails to address either of these points.

Even though the prejudice to Mr. Mangione is clear from the Attorney General's actions and the due process implications of her demonstrated conflict of interest, the Court need not reach a factual conclusion as to the issue of prejudice because the local rules presume prejudice under exactly this situation. Local Rule 23.1(d), which was not addressed or so much as mentioned by the government in its opposition, provides that "(s)tatements concerning the following subject matters presumptively involve a substantial likelihood that their public dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice within the meaning of this rule: … (7) any opinion as to the accused's guilt or innocence or as to the merits of the case or the evidence in the case."

First, the government does not dispute that the Attorney General is a "lawyer participating in or associated with the investigation." After all, the Attorney General's April 1, 2025, press release commenced the grand jury investigation leading to the indictment. So, plainly she is a lawyer participating in the investigation, and the government does not argue otherwise. Nor could it: Because only the Attorney General herself can authorize the death penalty in a federal case, she is the single person responsible for making all final death penalty decisions and thus, by definition, must be "participating in or associated with the investigation."

Second, the government does not dispute that after the Attorney General called for a grand jury investigation to seek the death penalty based on two specific statutory factors, she publicly stated: (i) that "Luigi Mangione's murder of Brian Thompson – an innocent man and father of two young children – was a premeditated, cold blooded assassination that shocked America"; and (ii) "after careful consideration, I have directed federal prosecutors to seek the death penalty in this

case as we carry out President Trump's agenda to stop violent crime and Make America Safe Again"; and (iii) "I was a capital prosecutor. I tried death penalty cases throughout my career. If there was ever a death case, this is one"; and (iv) that Mangione "is charged with hunting down a CEO, a father of two, a married man. Hunting him down and executing him"; and (v) "I was receiving death threats for seeking the death penalty for someone who is charged with an execution of a CEO."[5] The government's only response is that this may amount to "a technical violation of Local Rule 23.1."

The government likewise does not dispute that the Attorney General's statements were within the scope of Local Rule 23.1(d). For instance, the government does not contest that her statements were opinions. Clearly, they were. The government does not contest that the statements were related to Mr. Mangione's guilt or the merits of the death penalty case. Clearly, they were. Accordingly, there is no factual dispute that the Attorney General's public statements were opinions about the guilt of Mr. Mangione, the strength of the evidence, and the merit of the death penalty case. As a result, there is a substantial likelihood that the Attorney General's public statements interfered with a fair trial and otherwise prejudiced the due administration of justice, pursuant to Local Rule 23.1.

In its Opposition, the government looks to distinguish between what it calls "actual prejudice" and the prejudice contemplated by a violation of Local Rule 23.1(d), arguing that "actual prejudice" is the only thing that matters. Local Rule 23.1(d), however, says the opposite. As with all federal courts, the District Court in the Southern District of New York is empowered by Title 28, United States Code, Section 2071 to "prescribe rules for the conduct of their business."

---

[5] The Attorney General repeatedly stated publicly that the victim was "a CEO" but never mentions he was the CEO of her client.

Section 2071(a) provides that "(s)uch rules be consistent with Acts of Congress and rules of practice and procedure under Section 2071(a) of this title."  Section 2071(b) provides that rules of a District Court "shall be prescribed only after giving appropriate public notice and an opportunity to comment."  Consistent with Section 2071, Local Rule 23.1(d) was duly prescribed by this Court, after comment by all parties, including the U.S. Attorney for this District, to pertain to situations exactly like this one:  Where a lawyer associated with a case (here not just any lawyer, but the Attorney General) makes public statements of opinions of the guilt of a criminal defendant and the merits of the government's case. In such instances, all parties appearing before this Court agree that prejudice need not be proven in such a situation. Rather, prejudice is established by virtue of the local rule based on the nature of the public comments.

For this reason, the government's refrain that the defense failed to prove actual prejudice is irrelevant. Our local rules contemplated that while it may be difficult or impossible to prove prejudice through, for instance, interviews or monitoring social media communications, the due administration of justice can still be prejudiced. Prejudice can take many forms and can clearly exist even though not proven through traditional means. Certainly, it can take the form of a grand juror being swayed by a public statement. It can also take the form of grand jurors agreeing with a political sentiment that Luigi Mangione should be executed to "Make America Safe Again." Or, it can take the form of an eventual trial juror, or members of the public, who, based on the Attorney General's public statements, believe that the safety of America somehow depends on executing Mr. Mangione.

But these are not the only forms of prejudice. Prejudice can also take the form of a lawyer on a case spouting personal opinions on the guilt of a defendant or the merits of executing him. The "due administration of justice" is adversely impacted when a lawyer on a case, especially our

country's Attorney General, appears on television and assures the country that she was a capital crimes prosecutor and if there was ever a death penalty case, this one is it. The prejudice to the due administration of justice stems from her position as the top law enforcement official in the United States, the lawyer in charge of the Department of Justice, the sole person who decides when the federal government seeks to execute someone and when it does not. So, when the Attorney General tells the world that in her opinion, Luigi Mangione should be executed, her opinion is unlike anyone else's because only she can actually make that happen. Also, her opinion carries the weight of the authority of her office and of the Department of Justice as an institution. This is a bell that can never be unrung. These are public statements about cases that can never be fully managed or neutralized. This prejudice is of course not limited to the grand jury. It extends to the public and to potential trial jurors. The Attorney General's multiple public statements reached the widest of audiences and were repeated countless times in press reports and on social media, including accounts reaching millions of Americans managed by the government.

        This is why all lawyers associated with cases pending before this court have made a commitment to abide by our local rules. These rules provide that when any lawyer involved in a case makes statements of the type the Attorney General made here, prejudice need not be proven; rather prejudice is presumed from the particular circumstances of and surrounding the statement.

        While the government ignored the presumption of prejudice in our local rule, the nature of this presumption is critical. A presumption is defined as "a legal inference or assumption that a **<u>fact exists</u>** because of the known or proven existence of some other fact or group of facts." Black's Law Dictionary. (emphasis added). Presumptions of course are common in federal law and, of themselves, can be the sole basis to conclude that a certain fact is true, or that, as the very definition states, the fact exists. For instance, because criminal defendants are presumed innocent, they must

-12-

be acquitted unless the government proves guilt beyond a reasonable doubt. A defendant may walk free solely by force of the presumption. Also, certain types of federal offenses carry the presumption of incarceration before trial, requiring a trial judge to incarcerate a defendant in the absence of any other facts. A defendant, who has not been convicted of any crime, can be held in prison without bail solely because of a presumption.

The presumption of prejudice to the administration of justice under Local Rule 23.1(d) works the same way and carries the same factual force. A presumed fact is not a lesser fact than one proven by other means. It is a fact just the same. As the definition says, it is a fact that exists. In this case, Rule 23.1(d) provides that prejudice exists so long as the predicate facts are established. In other words, the defense does not have to prove prejudice to show that prejudice in fact exists. Rather we just have to prove that (i) the Attorney General is a lawyer associated with this case, (ii) that she publicly stated an opinion, (iii) concerning the guilt of Mr. Mangione or the merits of seeking the death penalty in his case. Each of these predicate facts have been conceded by the prosecution. Those predicate facts have now been proven. As a result, this court must conclude that there in fact has been prejudice to the administration of justice in connection with Mr. Mangione's case. This prejudice is now a fact, just like any fact.

So, when the government seeks to distinguish something it calls "actual prejudice" from the prejudice created by a factual presumption, this is a distinction without a difference. The prejudice presumed by Rule 23.1(d) is actual prejudice.

In contemplating the meaning of the term "prejudice" under the local rule, the term is plainly contextual. What may be prejudicial in one case, may not be in another. This is a death penalty case. The term prejudice means something different when the person the Attorney General is prejudicing is the same one she is trying to execute. The U.S. Court of Appeals for the First

-13-

Circuit has held that the amount of prejudice required to bring about a sanction in a death penalty case is lower than in a non-death penalty case, stating "(w)e do believe that when the stakes are so high, a smaller quantum of prejudice may justify a sanction." *United States v. Lopez-Matias*, 522 F.3d 150 (1st Cir. 2008). That the First Circuit required a lesser degree of prejudice to justify striking a notice of intent is consistent with the Supreme Court's statement that "when a defendant's life is at stake, courts are required to be particularly sensitive to insure that every safeguard is observed," *Gregg v. Georgia*, 428 U.S. 153 (1976), and that "in capital cases especially, Courts should be extremely careful how they interfere with any of the chances at life, in favor of the prisoner." *Illinois v. Somerville*, 410 U.S. 458 (1973) (quoting *United States v. Perez*, 22 U.S. 579, 580 (1824)).

For this reason, this Court need not require clear prejudice, or extreme prejudice, or anything of the sort. In the words of the First Circuit, "**some prejudice**" is enough in a death penalty case. *United States v. Lopez-Matias*, 522 F.3d 150 (1st Cir. 2008) (emphasis added). Based on the presumption of prejudice of Local Rule 23.1 alone, and the facts that have been proven to trigger this presumption, this standard of "some prejudice" has been easily met and surpassed.

Having no answer to the presumption of prejudice provided by Local Rule 23.1(d), the government ignores the issue completely and attempts to recast the Attorney General's actions as an error, claiming that errors alone in grand jury proceedings do not permit courts to dismiss indictments. *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988). The definition of error is "an act or condition or ignorant or imprudent deviation from a code of behavior" or "an act involving an unintentional deviation from truth or accuracy." Merriam-Webster's New Collegiate Dictionary.

-14-

The Attorney General's five public statements over the course of three days were not errors. They are not "unintentional deviations" or something uttered in ignorance. They were just the opposite. They were part of an intentional and purposeful scheme to do two things. First, avenge the death of the CEO of her former firm's client and send the explicit message that when someone kills such a CEO, she will use her new position as Attorney General to exact the most serious punishment possible. Second, use the Mangione case as the first where the new administration would seek a death sentence as a way of rolling out a new aggressive death penalty policy to shame the previous administration. In the words of the Attorney General herself in her "First Day Memorandum, "(t)his shameful era ends today. Going forward, the Department of Justice will once again act as the law demands – including by seeking death in appropriate cases and swiftly implementing those sentences in accordance with the law."

The Attorney General's stated plan was to end one era and commence another, specifically one where the death penalty will be swiftly and decisively pursued. Her actions in this case are the clear execution of her stated plan. Leveraging the heavy media coverage around the Mangione case, including the leaks, the perp walk, and the public commentary about the state of health care in America, the Attorney General took the unprecedented and strategic step to commence a Southern District of New York grand jury investigation by way of a public press release. She followed this up by creating an Instagram page and posting additional false and prejudicial information about the case. She followed this up with a national television appearance lobbying for Mr. Mangione to get the death penalty by referencing her own experience as a capital crimes prosecutor.

-15-

C.   **Where A Death-Eligible Defendant Has Been Prejudiced by the Conduct of a Government Official, a District Court Has the Authority to Issue an Appropriate Remedy**

There are at least seven District Court decisions, five from 2025 alone, striking a Notice of Intent. *See*, e.g., *United States v. Spurlock*, 782 F. Supp. 3d 987 (D. Nev. 2025); *United States v. Costanza-Galdomez*, No. SAG-22-409, 2025 WL 1712436 (D. Md. June 18, 2025); *United States v. Cole*, No. 2023-cr-0016, 2025 WL 2592515 (D. V.I. Sept. 7, 2025); *United States v. Dangleben*, Case No. 3:23-cr-0072, 2025 WL 2647195 (D. V.I. Sept. 15, 2025); *United States v. Merrell*, No. 3:20-CR-46-1, 2025 WL 2911170 (N.D. W. Va. Oct. 7, 2025); *United States v. Littrell*, 478 F. Supp. 2d 1179 (C.D. Cal. 2007), and *United States v. Rosado-Rosario*, No. 97-049, 1998 WL 28273 (D.P.R. Jan. 15, 1998). In addition, as noted, there is at least one Circuit Court Decision that held that a District Court may properly strike a notice of intent upon a finding of "some prejudice." *United States v. Lopez-Matias*, 522 F.3d 150 (1st Cir. 2008).

As a result, the government's argument that the Attorney General's decision to seek the death penalty is presumptively unreviewable is not born out in the caselaw. District Courts historically have closely reviewed death penalty decisions, as they must under decades of Supreme Court precedent, and have not hesitated, especially recently, to set aside the Executive's death penalty decisions when they are inconsistent with a defendant's constitutional or statutory rights, or in violation of a Court's local rule (*see Rosado-Rosario*, 1998 WL 28273, at *3–*4), or disruptive of the Court's trial calendar.

These cases demonstrate the critical role of the Court in the administration of justice in death penalty cases. Far from being passive observers in the separation of powers balance, Courts in death penalty cases have the most solemn of responsibilities to maintain the integrity of the process that may conceivably end with the execution of a person. This judicial responsibility is at

-16-

its utmost when there are detailed, factual assertions that the Executive Branch has intentionally violated a defendant's due process rights and the rules of a Court that ensure fairness to the process.

### D.    The Appropriate Remedy in This Case

If the Court concludes that the Attorney General's death penalty decision and her actions concerning this case may have been influenced, in whole or in part, by her past or present financial relationship to Ballard Partners and its client, UHG/UHC, or that the Attorney General had a conflict of interest in this case, this case should be dismissed. In determining the appropriate remedy, the defense requests two things. First, we will be seeking discovery of the extent of the connection between the Attorney General and Ballard Partners as it concerns Ballard's relationship with UHG/UHC, and how this relates to the Attorney General's personal interest in advancing the interests of either Ballard Partners and UHG/UHC. Second, we will be seeking sworn direct testimony of all individuals with personal knowledge of the relevant matters.

If the Court concludes that the Attorney General's past or present financial relationship to Ballard Partners and its client, UHG/UHC played no role, directly or indirectly, in her actions and her decisions, and that there was no conflict of interest by the Attorney General, but that the Attorney General's public statements were prejudicial, the appropriate remedy is to strike the Notice of Intent.

## II.     THE INTERSTATE STALKING STATUTES ARE NOT PREDICATE CRIMES OF VIOLENCE

### A.     Subsections A and B of Section 2261A(1) are Indivisible from One Another, as are Subsections A and B of Section 2261A(2)

#### 1.     Subsections A and B are indivisible because they merely establish different means of committing the same offense

Each of Sections 2261A(1) and 2261A(2) establishes a single offense, which can be committed by multiple means. Each of these statutes contains a single offense with alternative means (not alternative elements) that criminalizes a form of emotional distress. One of these means criminalizes the act of causing or attempting to cause emotional distress while another means criminalizes a more severe form of emotional distress—the act of placing someone in a reasonable fear of death or serious bodily injury. Even though each of these alternative means is contained within a separate subsection of Sections 2261A(1) and 2261(A)(2), they are still, nonetheless, two subsections of a single, indivisible crime.

On at least two prior occasions, the government has conceded that one or both of Sections 2261A(1) and 2261A(2) lays out a single, indivisible offense. The concession was made explicit in *United States v. Plunkett*, in which the government admitted that the defendant's "interstate stalking charge is no longer categorically a crime of violence" following *United States v. Davis*, 588 U.S. 445 (2019). *See United States v. Plunkett*, No. 4:04-cr-70083 (W.D. Va.), ECF Doc. No. 997 ("United States' Response to Petitioner's Motion for Relief Pursuant to Title 28, United States Code, Section 2255") at 10–11. Similarly, in *United States v. Garg*, the government proposed (and the Court delivered) a jury instruction treating both subsections of Section 2261A(2) as together establishing a single offense. *United States v. Garg*, No. 21cr-045 (W.D. Wash.), ECF Doc. No. 849 at 49 (government's proposed instruction); ECF Doc No. 881 at 24 (instruction as delivered).

-18-

In that same case, the government conceded that the single offense established by Section 2261A(2), as charged, does not constitute a crime of violence under a categorical approach. *United States v. Garg*, ECF Doc. No. 997 at 9 n.1.[6] Notwithstanding its earlier concessions, the government now argues that Subsections A and B of each Section are distinct from one another. That argument should be rejected.

In Mr. Mangione's opening brief, the defense argued, in part, that the stalking statutes are indivisible between Subsections A and Subsections B because the conduct criminalized in Subsections A (placing a person in reasonable fear of injury) is merely a form of emotional distress (criminalized in Subsections B). *Compare* 18 U.S.C. § 2261A(1)(A) and 2261A(2)(A) *with* 18 U.S.C. § 2261A(1)(B) and 2261A(2)(B). In turn, both Subsections A and B are merely different means—rather than elements of proving emotional distress. In response, the government counters that "conduct that causes reasonable fear of death or bodily injury need not be conduct that causes substantial emotional distress." (Opp. Br. at 67.) But this claim fails as a matter of simple logic. Substantial emotional distress is "understood by persons of common intelligence" to encompass a broad swath of emotional responses, including "mental distress, mental suffering, or mental

---

[6]Similarly, in *United States v. Elkins*, No. 23-cr-247 (N.D. Tex.), the government proposed a jury instruction treating both subsections of Section 2261A(2) as together establishing a single offense. ECF Doc. No. 55 at 6 (government's proposed instruction). On December 10, 2025, the Fifth Circuit issued an opinion summarily concluding, without significant analysis, that Sections 2261A(2)(A) and (B) are divisible from one another. *United States v. Elkins*, 2025 WL 3537272, No. 24-10753 (5th Cir. Dec. 10, 2025). The court further held, in a reasoned determination, that the offense defined by Subsection B is not categorically a crime of violence even though the victim's death resulted from the course of interstate conduct that occurred in that case. *Id.* The Fifth Circuit mandate has not issued and *Elkins* accordingly remains subject to rehearing and revision. To the extent that *Elkins* is persuasive, this Court should reject the *Elkins* court's erroneous summary determination concerning divisibility, which is incorrect for all of the reasons set forth herein, and should accept the court's well-reasoned conclusion that Subsection B is not categorically a crime of violence even when death results.

anguish, and includes depression, dejection, shame, humiliation, mortification, shock, indignity, embarrassment, grief, anxiety, worry, fright, disappointment, nausea, and nervousness, as well as physical pain." *United States v. Osinger*, 753 F.3d 939, 945 (9th Cir. 2014) (quoting *Veile v. Martinson,* 258 F.3d 1180, 1189 (10th Cir. 2001)). One can easily imagine circumstances in which a person feels humiliation, shock, indignity, or anxiety without also fearing death or disfigurement, but it is impossible to imagine a situation in which a reasonable person fears death or bodily injury without consequently experiencing anxiety, worry, nervousness, or fright. Put simply, a person who is placed in reasonable fear of death or bodily injury, to herself or to a loved one, necessarily experiences substantial emotional distress.

The government's argument that Subsections B of the statute could be satisfied through conduct causing "that person" to "anticipate with apprehension" that a family member will be seriously injured or killed even if the victim herself feels no emotional distress about the possibility fails for two reasons. (Opp. Br. at 69.) First, taking as correct the government's argument that the statute creates an objective test, whether the victim actually feels emotional distress is not relevant, provided that a reasonable person would be distressed—and a reasonable person would experience substantial emotional distress when "anticipating with apprehension" that her immediate family member will be killed. Second, the legislature was concerned that stalkers exercise control over their victims by threatening their loved ones. If a stalker makes a threat against a person whom the stalking victim does not care about—whether a family member or a stranger—then the stalking victim is not victimized and the statute therefore would not apply.

The Court should find that the statute is indivisible even if it does not accept the defense argument that fear of death or injury is a form of emotional distress. Indeed, courts have found that statutes are indivisible even when the two ways of committing the statute criminalize entirely

-20-

different conduct—*i.e.*, even when the conduct in one way of committing the crime is not subsumed in the other. For example, in *United States v. Redd*, the Fourth Circuit found that the Maryland first degree assault statute was indivisible between two subsections—even though the two separate subsections criminalized two altogether different ways of committing the crime: one subsection required intentional serious physical injury whereas the other subsection required reckless assault with a dangerous weapon (without any physical injury requirement). *United States v. Redd*, 85 F.4th 153, 165–68 (4th Cir. 2023). The conduct criminalized in one subsection was not merely one form of committing the other. Yet, the Fourth Circuit found that the two very different methods of committing first degree assault were alternative means of committing the single indivisible offense of first-degree assault.

Likewise, the Fourth Circuit found that the many different subsections in the Maryland theft statute (which criminalized several very different types of conduct) were alternative means of a single, indivisible offense even though the different forms of theft were not subsumed in each other. *Martinez v. Sessions*, 892 F.3d 655, 659 (4th Cir. 2018).

This Court should come to the same conclusion here with respect to the stalking statutes, particularly because the central purpose of the stalking statutes at issue here is to protect that person who is stalked—whether that is accomplished by prohibiting conduct that causes emotional distress or creates reasonable fear of injury to the person stalked or his family member. Both subsections accomplish the same purpose—they protect the stalking victim from threats. Therefore, Subsections A and B set forth alternative means of committing a single indivisible offense. *Cf.*, *e.g.*, *United States v. Graves*, 925 F.3d 1036, 1040–41(9th Cir. 2016) (finding prison contraband statute indivisible where various subsections concerning different types of contraband drugs were intended to address the same smuggling problem—not to address possession of

different types of drugs). Like the various types of drugs set forth in the prison contraband statute at issue in *Graves*, the various persons who can be threatened with harm or distress under the interstate stalking statute are alternative means, and the statute is therefore indivisible.

###    2.    Subsections A and B are not divisible by "victim category"

The government next argues that Subsections A and B of each Section (2261A(1) and 2261A(2)) codify separate offenses because the subsections relate to different "victim categories." (Opp. Br. 69–70.) The government's argument is belied by both the structure of the statute and the legislative history. On its face, the statute addresses harms to a single person, identified in Sections 2261A(1) and (2) as "another person" and subsequently referred to in the subsections of each section as "that person." The immediate family members, intimate partners, and animals associated with "that person" are not themselves potential victims under the statute. They are instrumentalities through which an offender can cause harm to "that person" in violation of the statute.

The legislative history also evidences that the sole "victim" the statute seeks to protect is the stalking victim, referred to as "another person" in 2261A(1) and 2261A(2), *i.e.*, the same person who is subsequently referred to as "that person" in 2261A(1)(A) and (2)(A). Thus, when the legislature added the (1)(A)(iv) clause concerning pets, service animals, emotional support animals, and horses to the statute in 2018, it explained that the change was necessary because "victims of domestic violence often may be reluctant to leave an abusive relationship out of fear for the safety and welfare of their companion animals." H.R. Conf. Rep. 115-1072; 164 Cong. Rec. H9823-01, 2018 WL 6506036, at H10024. In other words, the new section was intended to extend further protections to the stalking victim, not to create a new protection for animal "victims." The legislature did not view the animals in question as "victims" under the statute, which was intended to protect "that person" whose affection and concern for an animal might be taken advantage of

-22-

by a stalker. Indeed, animals are not generally recognized as potential victims of criminal offenses in the federal system, belying the government's theory that the inclusion of animals in Subsections A, and their exclusion from Subsections B, evidences that those subsections are divisible from one another. [7]

Later in its brief, in an effort to evade the conclusion that Subsections A can be violated through a threat of self-harm, the government expands on its "category of victims" argument by asserting that Subsection A is further divisible depending on whom the defendant threatens to harm or causes emotional distress. Under the government's theory, the interstate stalking statute sets forth as many as fourteen separate offenses. If a defendant travels interstate with the relevant intent and, in the course of or as a result of that travel, a victim fears her own death, that is a different Section 2261A(1) offense than occurs when the victim fears the death of her immediate family member, which is a different offense than occurs if the victim fears the death of her spouse or intimate partner, which is a different offense than if the victim fears the death of her pet or service animal. The government further says that all of those offenses are also distinct from the offense that would result if the defendant caused emotional distress to the person, which is distinct from the offense of causing emotional distress to the person's spouse or intimate partner, which is a different offense from causing emotional distress to the person's family member. And an equal

---

[7]The significance the government attaches to the omission of animals from Subsections B is somewhat baffling. There is no objective way to determine whether conduct would reasonably be expected to cause an animal to suffer emotional distress, and indeed no consensus exists as to whether animals experience emotions in the way humans do. It therefore makes sense that the legislature did not attempt to criminalize conduct tending to cause a victim's animals emotional distress. Accordingly, and because the legislature was concerned only about "that person" who is protected by the statute, and about the effect conduct aimed at an animal might have on that person, the statue was drafted to cover physical, but not emotional, threats to that person's animal companions.

proliferation of disparate offenses would result if the same analysis were applied to interstate communications causing fear or distress under Section 2261A(2). The Court should reject this argument and the absurd results it would lead to. No court has ever held that Section 2261A (or any similarly structured statute) is divisible to the absurd extent the government suggests.

In short, each of the two stalking sections (Section 2261A(1) and Section 2261(A)(2)) are indivisible between subsections A and B and between victim categories. Notably, the government bears the burden of establishing with certainty that the statute is divisible between the A and B subsections and between the categories of victims. To the extent that it remains unclear whether the statutes are divisible in the manner the government suggests, this Court must assume that the statutes are indivisible. *See United States v. Redd,* 85 F.4th 153, 165 (4th Cir. 2023); *United States v. Cantu,* 964 F.3d 924, 929 (10th Cir. 2020); *United States v. Degeare,* 884 F.3d 1241, 1248 (10th Cir. 2020).

> ### 3.    Because Subsections B can be violated through conduct causing emotional distress, the indivisible interstate stalking statutes categorically fail to qualify as crimes of violence.

Because Sections 2261(A)(1) and 2261(A)(2) are indivisible, this Court must next determine whether each of these statutes can be violated by *any* means that fails to constitute a crime of violence. If so, then each statute categorically fails to qualify as a crime of violence under the § 924(c) force clause. The answer is easy here. Indeed, even the government concedes that Subsections B of each of 18 U.S.C. Section 2261A(1) and (2)—one means of violating each of these statutes—can be violated through conduct intended to harass that results in emotional distress (even when the death of the victim results) rather than the intentional use (or threat of) physical force required under the § 924(c) force clause. The case law soundly supports this concession. Indeed, the Fifth Circuit recently found exactly as such. *See Elkins*, 2025 WL 3537272, at *3–*4

(finding that Section B of 2261(A)(2) (even when death results) fails to qualify as a "crime of violence" upon explaining that the "least serious conduct that would support a conviction under § 2261A2(B) [even one that results in death] is that the defendant, 'with intent to ... harass [or] intimidate,' uses one of the means described 'to engage in a course of conduct that ... would be reasonably expected to cause substantial emotional distress…").[8] Accordingly, because Sections 2261A(1) and 2261A(2) are indivisible and each can be committed via a means that fails to satisfy the § 924(c) force clause, each statute categorically fails to constitute a crime of violence.

### 4.    Even if Sections 2261A(1) and (2) are divisible, Subsections 2261A(1)(A) and (2)(A) do not constitute crimes of violence.

The offenses charged in Counts 1 and 2 are not crimes of violence even if the relevant subsections of the statute are divisible into "fear of death" offenses and "substantial emotional distress" offenses as the government urges. This is so for two principal reasons. First, Subsection A of each statute can be violated through reckless conduct, and the Supreme Court has held that a scienter of recklessness cannot satisfy the Elements Clause. *Borden v. United States*, 593 U.S. 420, 423 (2021). Second, Subsection A of each statute can be violated by threatened self-harm.

### 5.    Sections 2261A(1)(A) and (2)(A) can be violated through reckless conduct and therefore are not categorically crimes of violence under *Borden*

Starting with the first point, as discussed in Mr. Mangione's opening brief, Subsections 2261A(1)(A) and 2261A(2)(A) fail to qualify as a "crimes of violence" under the force clause post-*Borden* because they can be violated without purposefully placing another in fear of physical

---

[8]The Fifth Circuit in *Elkins,* gave as a hypothetical a defendant who published his ex-girlfriend's nude images and videos online causing her such severe emotional distress that she takes her own life. Such conduct does not require the use or threatened use of force. It would be a violation of the stalking statute but not a crime of violence.

injury or death (even when death results). This is so because, in relevant part, Subsection A of each statute merely requires that the defendant engage in conduct that happens to place a person "in reasonable fear" of death or serious bodily injury. However, such conduct does not require intentionally putting someone in fear of injury (i.e., purposefully threating physical force) even when death results. For example, this non-purposeful conduct can be accomplished in the following two ways:

- **Example One:** A defendant who uses interstate communications to tell his former spouse he will discontinue child support and alimony payments unless she comes to meet him to talk things through. He never threatens violence and has never struck or threatened her in the past, and he has no intent to do her physical harm. He has no intention of discontinuing payments no matter what happens; instead, the threat is intended merely to harass his former spouse. He also has no idea that the daughter he shares with her has recently fallen ill. The stalking victim understands that if payments cease, she will need to get a job and will be unable to stay home and care for her sick child. She reasonably fears that if that happens, her daughter will suffer serious bodily injury from the recently diagnosed illness. For that reason, she agrees to meet her stalker. On her way to meet him, she is killed in an unforeseeable traffic accident. In this hypothetical, (1) the defendant has, with the intent to harass, used an interstate communications facility; (2) the victim has been placed in reasonable fear of serious injury to an immediate family member; and (3) the victim's death has resulted—satisfying all the elements of Section 2261A(2)(A). But the defendant has neither purposefully used nor threatened physical force and has thus not committed a crime of violence.

- **Example Two:** A jilted lover (who five years ago used physical force against the victim) travels across state borders in order to harass the victim, specifically by following the victim on her walk home from work begging the victim to come back to him (but not with any intent to create fear of physical injury in her). While following her, the defendant reassures her that he does not want to harm her in any way. Rather he just wants her to come back home. Nonetheless, the victim reasonably fears physical injury from the defendant's harassment (due to the previous use of force). As a result, she runs across the street to get away from him and in the process a car accidentally hits and kills her. In this hypothetical, (1) the defendant has traveled interstate with the intent to harass; (2) the victim has been placed in reasonable fear of serious bodily injury; and (3) the victim's death has resulted—satisfying all the elements of Section 2261A(1)(A). But the

defendant has neither purposefully used nor threatened physical force and thus has not committed a crime of violence.

In each of the hypotheticals above, the defendant has not made "a deliberate choice of wreaking harm on another, rather than mere indifference to risk." *Borden*, 593 U.S. at 438. Neither has he "consciously desire[d] [the] particular result" that flowed from his choice to harass his former spouse, *id.* at 426, nor acted with knowledge that the result would occur even if he did not necessarily desire it, *id.* at 432. In short, the hypothetical stalkers have not acted with either intent to do harm or knowledge that harm would likely result, but they have nevertheless violated 18 U.S.C. § 2261A, and the death of his former spouse has resulted in violation of 18 U.S.C. § 2261(b). Accordingly, Sections 2261A(1)(A) and (2)(A)—even when coupled with Section 2261(b) (the death results provision)—are not crimes of violence under *Borden*, which requires, at a minimum, that a defendant be "aware that [a] result is practically certain to follow from [her] conduct." 593 U.S. at 426 (quoting *United States v. Baile*y, 444 U.S. 394, 404 (1980)). The fact that the defendant in each of the hypotheticals intentionally made contact with the victim is not enough to constitute the "intentional" or "knowing" use or threat of force under *Borden*. *See United States v. Sjodin*, 139 F.4th 1188, 1203 (10th Cir. 2025) (holding that the California assault statute, which "merely requires an intent to do the act that results in harm," "simply spans too wide on the 'culpability spectrum' to constitute a crime of violence" under *Borden*). The government's arguments to the contrary do not work.

***First***, although the government does not dispute that Subsection A of Section 2261A(1) and 2261A(2) can be violated without purposefully putting the victim in fear of physical injury, the government asserts that the subsection necessarily requires the defendant to *know* that his actions will be reasonably perceived as a threat of physical force. (Opp. Br. at 76.) Thus, the

government argues that *Borden*'s scienter requirement is met. But in so arguing, the government ignores the demanding nature of the knowledge requirement under *Borden*—which as referenced above, requires, that the defendant know with "*practical certain[ty]*" that his actions are going to be perceived by a reasonable person as a threat of force or going to result in the use of force. 593 U.S. at 426. As the Supreme Court explained, this stringent standard is satisfied, for example, "when a getaway driver sees a pedestrian in this path but plows ahead anyway, knowing the car will run him over." *Id.* at 432. Under these circumstances, a practical certainty obviously exists that physical injury is going to be inflicted on the passenger. But in stark contrast, in the hypotheticals above, it is wildly speculative to conclude that a defendant who has expressed no intent to physically harm the victim or her family and has no intent to do so has with *practical certainty* conveyed a threat of force. It goes without saying that the *Borden* knowledge element is not satisfied under Section A.[9]

**Second**, the government agrees that the death results provision (18 U.S.C. § 2261(b)(1)) standing alone can be committed with an unintentional, accidental death. But the government argues that when the provision is coupled with the reasonable fear of injury element in Subsection A of §§2261A(1) and 2261A(2), it necessarily follows that the death will also be intentional, thereby satisfying *Borden*'s purposeful scienter requirement. To the contrary, as the two

---

[9]The government's citation to several unpublished, summary district court decisions in support of its argument that the *Borden* mens rea requirement is satisfied are utterly unpersuasive. Those cases either (1) rely on the now-defunct realistic probability test (which required the defendant to present an actual case that was prosecuted based on conduct that fails to constitute a crime of violence in order to prevail on an argument that an offense fails to qualify as a crime of violence, but which the Supreme Court abandoned in *Taylor*) or (2) they summarily hold that the stalking statutes require an intentional threat without any meaningful analysis and any real discussion of the hypotheticals discussed above.

hypotheticals discussed above make plain, a death can result accidentally from the unintentional actions of the defendant under §§2261A(1) and 2261A(2).

Tellingly, the government does not argue that a Subsection B "emotional distress" violation would constitute a crime of violence if charged in tandem with Section 2261(b), belying its argument that conduct causing fear of injury is categorically violent if death results. The government is wise not to make that argument, because the courts that have considered it have soundly rejected it. As the Fifth Circuit explained as recently as this month:

> The fact that the death of the victim results as a consequence of a stalking offense defined under subsection (B) does not change our analysis. The penalty provision in § 2261(b) permits the imposition of a life sentence "if death of the victim results." It does not require that the stalker use or attempt to use or threaten to use physical force to cause the death of the victim. For example, the victim could experience such severe emotional distress from the publication of nude images and sex videos of her that she commits suicide. Her death would result from the stalking without the use, threatened use, or attempted use of physical force by the stalker.

*United States v. Elkins*, 2025 WL 3537272, at *4 (finding that Section 2261A(2)(B) can be satisfied through reckless conduct and is therefore not a crime of violence under *Borden*). Likewise, this Court should reject the government's argument that charging the "death results" provision of Section 2261(b) alongside a substantive Section 2261A(1)(A) or (2)(A) charge creates an element requiring intentional force. Turning back to the above-discussed hypotheticals, they demonstrate that conduct can both place a person in reasonable fear of death or injury and result in accidental death without satisfying *Borden*'s purposeful mens rea requirement. Although these hypotheticals may seem unlikely, they are possible under the elements of Section 2261A(1)(A) and 2261A(2)(A). Therefore, the statutes categorically fail to qualify as crimes of violence. That a prosecution under these facts may not be probable is irrelevant to this analysis. *United States v. Taylor*, 596 U.S. 845, 858–60 (2022).

To the extent the government invites the Court to examine the indictment and determine that in this specific case "the Government has alleged that the same fear-causing conduct in fact caused the victim's death," (Opp. Br. at 78), the Court should reject that invitation as incompatible with the categorical and modified categorical approaches, which permit a court only, at most, to determine which specific statutory offense is charged but forbid inquiry into the facts.

### 6. Sections 2261A(1)(A) and (2)(A) are not categorically crimes of violence because they can be violated through threatened self-harm

As argued in Mr. Mangione's opening brief, Sections 2261A(1)(A) and (2)(A) also fail to qualify as a crimes of violence because they can be violated through threatened self-harm (even when death results to the victim), while a crime of violence under Section 924(c)(3)(A) must have as an element the use of force against the person or property "of another." The following hypothetical demonstrates as such:

> A defendant travels across state borders in order to harass the victim (specifically, his wife) with the intent to follow her around until she comes back to him. In the process, he approaches his wife and threatens to kill himself (by pointing a gun to his head) if his estranged wife does not return to live with him. As he is doing so, the spouse attempts to take the gun away from his head. The gun misfires and kills the estranged spouse. This conduct satisfies all the elements of Section 2261A(1)(A): (1) the defendant has traveled in interstate with the intent to harass; (2) the victim (the wife) has been placed in reasonable fear of serious bodily injury to her spouse (the defendant); and (3) the victim's (the wife's) death has resulted—satisfying all the elements of Section 2261A(1)(A). But the defendant has not threatened force against the person of another, thus has not committed a crime of violence.

The government's arguments to the contrary don't work.

*First*, the government repeats its argument that the stalking statutes are divisible by "victim categories" and thus, the Court can look to the indictment under the modified categorical approach. Applying that approach here, because the indictment alleges that Mr. Mangione placed another

person in reasonable fear of death or injury, the government argues that Mr. Mangione's threat-of-self-harm argument must be rejected. But for all the reasons already discussed above, Section 2261A is indivisible by victim category. And because one means by which this indivisible statute can be violated is by putting the victim in fear of reasonable injury to the defendant himself (when the defendant is a family member, spouse, or intimate partner of the victim), the statute categorically fails to qualify as a crime of violence.

**Second,** the government argues that even if the stalking statute is indivisible by victim category (i.e., the type of victim), the statute still precludes threat of self-harm by the stalker because "read naturally, and in context, subclauses (i) and (ii) encompass third parties bearing some close relation to the stalking victim rather than the defendant himself – *i.e.*, people or animals that the [victim] might hold dear." (Opp. Br. at 85.) But the government's argument is disconnected from reality. Stalking victims and other victims of domestic violence often hold their victimizers dear; indeed, the affections victims often feel for perpetrators is a substantial obstacle in prosecuting such cases. It is not uncommon for an abuser to manipulate a victim by threatening self-harm, and there is no principled basis to read Section 2261A as excluding such threats.

**Third,** the government argues that it would be absurd to conclude that the stalking statutes criminalize threat of self-harm because such conclusion would mean the statute criminalizes innocent behavior. But the statute does no such thing. The government's argument overlooks that even when a defendant threatens self-harm he is engaging in conduct to harass someone else. The threat of self-harm is only an instrument used to harass another person—the victim. Therefore, there is nothing absurd about the statute. And it is important to note that the absurdity doctrine is only satisfied in very rare circumstances when the interpretation of the statute shocks the conscience or is incompatible with common sense. *United States v. Schreiber*, 191 F.3d 103, 106

(2d Cir. 1999); *cf. Crooks v. Harrelson*, 282 U.S. 55, 60 (1930) (plain meaning may be avoided in "rare and exceptional circumstances" where the result is absurd and "the absurdity [is] so gross as to shock ... common sense") That demanding standard is certainly not met here, and the Court should give the statute its plain meaning: a threat of harm to a family member is a threat to a family member, even if the family member is also the perpetrator.

**Fourth,** the government argues that the stalking statutes cannot be violated through threatened self-harm because one cannot logically attempt to cause oneself substantial emotional distress. In support, the government cites to the statutory canon which provides "that language used in one portion of a statute should be deemed to have the same meaning as the same language used elsewhere in the statute." *United States v. Daugerdas,* 892 F.3d 545, 556 (2d Cir. 2018). According to the government, the terms "immediate family member" and "spouse or intimate partner," must be read to exclude the stalker himself in the context of the emotional distress subsections, because it is difficult to imagine conduct through which a person can attempt to cause himself substantial emotional distress. If one cannot attempt to cause oneself emotional distress, the government reasons, then the statute cannot possibly be read as criminalizing an attempt to cause oneself emotional distress. And if the emotional distress subsections cannot be read to encompass emotional self-harm, the government argues, then the bodily injury subsections also should not be read to encompass physical self-harm.

In other words, the government is arguing that if the "immediate family member," "spouse," or "intimate partner" cannot be the defendant himself for purposes of the emotional distress subsection (Subsection B), then the same holds true for the reasonable fear of serious bodily injury or death subsection (Subsection A). But the government's statutory interpretation

argument fails, because it is well-settled that identical language within different subsections of the same statute can have different meaning:

> We have several times affirmed that identical language may convey varying content when used in different statutes, sometimes even in different provisions of the same statute. . . .Most words have different shades of meaning and consequently may be variously construed. . . . Where the subject matter to which the words refer is not the same in the several places where [the words] are used, or the conditions are different, or the scope of the legislative power exercised in one case is broader than that exercised in another, the meaning well may vary to meet the purposes of the law, to be arrived at by a consideration of the language in which those purposes are expressed, and of the circumstances under which the language was employed.

*Yates v. United States*, 574 U.S. 528, 537–38 (2015). It makes sense here that even if the emotional distress subsection cannot be violated by threatening self-harm, the reasonable fear of physical injury subsection can. In enacting the stalking statute, Congress broadly wanted to protect victims from harassment—through whichever means it occurs (whether self-threats or otherwise). That purpose can be achieved by giving the statutory terms "immediate family member," "spouse," and "intimate partner," their plain meaning. That one cannot logically attempt to cause oneself substantial emotional distress is no reason to read the statute in a manner that would fail to protect victims from harassment in the form of threatened physical self-harm.

In arguing that the terms "family member," "spouse," and "intimate partner" necessarily have exactly the same scope in Subsections B as in Subsections A, the government comes close to conceding indivisibility. With one shared definition of family member, spouse, and intimate partner, the two subsections clearly set forth a single, indivisible offense. If that's the case, then the stalking statute categorically fails to qualify as a crime of violence because it has at least one means—causing emotional distress (even when death results)—that everyone agrees does not satisfy the crime of violence definition because it can be committed without the intentional use of physical force.

**Fifth,** the government cites *United States v. Elias*, No. 23 Cr. 6626, 2025 WL 2857883 (2d Cir. Oct 8, 2025) and *United States v. Barrett*, 102 F.4th 60, 81 (2d Cir. 2024) for the proposition that courts have rejected a similar "self-harm" argument under the Hobbs Act robbery statute. But neither of those cases addressed the argument on its merits; instead, both cases turned on the "longstanding rule that a panel of our [c]ourt is bound by the decisions of prior panels until such times as they are overruled either by an *en banc* panel of our [c]ourt or by the Supreme Court." *United States v. Barrett*, 102 F.4th 60, 82 (2d Cir. 2024), *cert. granted in part,* 145 S. Ct. 1307 (2025) (quoting *United States v. Peguero*, 34 F.4th 143, 158 (2d Cir. 2022)) (alterations in original). Thus, because a prior panel of the Second Circuit had found that a substantive Hobbs Act robbery is categorically a crime of violence, the *Barrett* and *Elias* courts were barred from revisiting that determination—even though the original panel had not considered the self-harm argument raised in those cases. By contrast to the Hobbs Act, the Second Circuit has never analyzed whether interstate stalking is categorically a crime of violence and no precedent forbids this Court from considering Mr. Mangione's argument that 2261A can be violated through threatened self-harm.

Instead, this Court should follow the district court's decision in *Plunkett*—the only directly-on-point case which held that Section 2261A can be violated by threatening self-harm.

## III.    MR. MANGIONE'S MOTION TO SUPPRESS SHOULD BE GRANTED

In its response, the government claims that the contents of Mr. Mangione's backpack are admissible under several theories. As argued below, none of these theories are persuasive.

### A.    Search Incident to Lawful Arrest

The government claims that the Altoona officers were justified in searching through Mr. Mangione's backpack at the McDonald's because it was a search incident to a lawful arrest. This

argument fails, however, because a search incident to a lawful arrest is limited to the "arrestee's person and the area within his immediate control—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." *Chimel v. California*, 395 U.S. 752, 763 (1969).[10] As is demonstrated from the body-worn camera footage, law enforcement moved Mr. Mangione's backpack outside of his immediate control approximately 17 minutes before he was arrested. Moreover, at the time of the search, Mr. Mangione was rear cuffed and separated from his backpack by at least five officers, with another seven officers in the immediate area in the back of the McDonald's.

That the backpack was not in Mr. Mangione's immediate control at the time of his arrest was further established by the testimony of Altoona officers at the recent suppression hearing conducted in state court. For example, Lieutenant Tom Hanelly—the highest-ranking law enforcement member at the McDonald's where Mr. Mangione was arrested—testified that he did not tell officers to move Mr. Mangione further away from his backpack at the time of the search because he did not believe it was plausible that Mr. Mangione could access his backpack while rear cuffed and surrounded by officers:

---

[10]Despite Altoona law enforcement's claims otherwise at the state suppression hearing, this is also the rule under Pennsylvania law, which limits a search incident to arrest to the person arrested and "the area within his immediate control." *See*, *e.g.*, *Commonwealth v. Williams*, 305 A.3d 89, 97 (Pa. Super. 2023) ("The search incident to arrest exception allows arresting officers, in order to prevent the arrestee from obtaining a weapon or destroying evidence, to search both the person arrested and the area within his immediate control." (citation and quotation omitted)); *Commonwealth. v. Wright*, 742 A.2d 661, 665 (1999) ("A warrantless search incident to an arrest is valid 'only if it is substantially contemporaneous with the arrest and confined to the immediate vicinity of the arrest.'" (quoting *Shipley v. California,* 395 U.S. 818, 819 (1969)). While "[t]he parameters of a search incident to arrest includes containers and clothing," it is limited to containers and clothing "that are in the arrestee's possession at the time of his arrest." *Commonwealth v. Williams*, 305 A.3d at 97. Because Mr. Mangione did not have possession of his backpack at the time of this arrest, law enforcement's warrantless search cannot be justified as a search incident to a lawful arrest under Pennsylvania law.

> Q.      And Mr. Mangione was formally arrested and searched ultimately by Officers Frye and Detwiler, correct?
>
> A.      Yes.
>
> Q.      And at the time that he was formally arrested and taken into custody, Officers Frye and Detwiler searched Mr. Mangione, did a more in-depth search of his, of his clothing, correct?
>
> A.      Yeah, they removed his outer layers of clothing to conduct a more thorough search.
>
> Q.      And at that time you did not tell anyone to move the backpack further away from Mr. Mangione while they were conducting that search, correct?
>
> A.       That is correct.
>
> Q.      And you didn't tell Officers Frye and Detwiler to move Mr. Mangione away from the backpack and do the search elsewhere, right?
>
> A.      Correct.
>
> Q.      Because you had no concern that he could access it, correct?
>
> A       Yeah, I didn't think that was plausible.
>
> Q.      Because he was cuffed and he was rear-cuffed, correct?
>
> A.      He had been cooperative up till that point.
>
> Q.      And he was in handcuffs, correct?
>
> A.      He was in handcuffs, yes.

(Hr. at 1010.)[11]

Similarly, Sergeant Jon Burns—the second-highest ranking law enforcement officer at the McDonald's—testified that Mr. Mangione was not in control of his backpack at the time of the arrest and search:

> Q.      At the moment when Officers Wasser and Fox were going through the backpack, Mr. Mangione was not in control of his backpack, was he?
>
> A.      That is correct.
>
> Q.      He wasn't holding it, right?
>
> A.      No.
>
> Q.      In fact, he was handcuffed, so he couldn't reach it, right?
>
> A.      Yes.
>
> Q.      And there are officers between him and the backpack, right?
>
> A.      Yes.

(Hr. at 1088.)

---

[11]If requested, counsel will provide the Court with the full transcript of the state suppression hearing.

Another officer, Patrolman Samuel McCoy, started searching Mr. Mangione at the time of his arrest. As with Lieutenant Hanelly and Sergeant Burns, McCoy also testified that Mr. Mangione was separated from his backpack and surrounded by officers at the time of his arrest and the search:

> Q.    And at the time when Mr. Mangione is being searched, it is you, Detwiler and Frye searching him, correct?
> A.    Yes.
> Q.    There's Fox and Wasser doing the backpack, correct?
> A.    Yes, sir.
> Q.    And these other officers that you mentioned, Hanelly, Crist, Burns, Trent, Miller, they are all in that area, correct?
> A.    I believe they are still at the McDonald's, yes.
> Q.    At this point, again, he is rear-cuffed, right?
> A.    Yes. It is our policy that unless it is a female that is actively pregnant, they are to be cuffed behind their back.
> Q.    And there are several officers around him, correct?
> A.    Yes, sir.
> Q.    So you weren't concerned that Mr. Mangione was going to kick off his sneakers, evade the officers and try to open up the backpack with his feet, were you?
> A.    No, because we had good body positioning.
> Q.    And you were separating him from his backpack, correct?
> A.    Correct.

(Hr. at 1154–55.)

Given the body-worn camera footage and the law enforcement testimony at the state suppression hearing establishing that the backpack was not in Mr. Mangione's immediate control at the time of his arrest, there is no basis for the government to argue that the backpack search at the McDonald's was legal as a search incident to a lawful arrest.

Nevertheless, the government argues that "'handcuffs are not fail-safe' and neither the use of handcuffs nor the presence of law enforcement officers eliminate the possibility of defendant gaining access to items in his vicinity." (Opp. Br. at 97.) Although this may be true in some cases, it is not true here. As noted above, the body-camera footage and the suppression hearing testimony

-37-

irrefutably confirm that, at the time of the arrest and search, Mr. Mangione was rear cuffed, was separated from his backpack by several feet and was surrounded by three officers while two other officers searched his backpack and while there were seven other officers in the back of the McDonald's.

Moreover, the cases cited by the government in support of its argument are readily distinguishable. In *United States v. Shakir*, the defendant was holding his bag at the time of the arrest and dropped the bag on the floor at his feet before he was handcuffed and guarded by two officers. *Shakir*, 616 F.3d 315, 316, 319 (3d Cir. 2010). Notably, the record in *Shakir* is not clear whether the defendant was front or rear cuffed. Here, in contrast, Mr. Mangione's bag was several feet away from Mangione at the time of his arrest and the search, he was rear cuffed and was surrounded by three officers who were searching him and two officers who were searching his backpack, while there were an additional seven officers in the vicinity of the arrest and search. Accordingly, here, unlike in *Shakir*, there was no "reasonable possibility that the arrestee could access a weapon or destructible evidence in the container or area being searched." *Id.* at 321.

In *United States v. Cushnie*, the defendant's wallet, car keys and cellphone were within two to three feet away from the defendant. *Cushnie*, No. 14 CR 119, 2014 WL 7447149, at *2 (S.D.N.Y. Dec. 31, 2014). In upholding the search, the district court concluded that, even though the defendant was handcuffed, "there remain[ed] a reasonable possibility that [the defendant] could access a weapon or destructible evidence in the . . . area [within his immediate control]"—an area in which his cell phone, car keys, and wallet were found." *Id.* at *11 (quoting *Shakir*, 616 F.3d at 321)). Notably, the *Cushnie* court failed to articulate whether the defendant was front or rear cuffed. Moreover, the items in *Cushnie* were not contained in a zippered backpack that was several feet away and separated from the defendant by several officers. On the other hand, in this case,

-38-

there was no reasonable possibility that Mr. Mangione could have evaded the numerous officers surrounding him and opened his zippered backpack while rear cuffed. Accordingly, law enforcement's search of Mr. Mangione's backpack at the McDonald's cannot be justified as a search incident to a lawful arrest.

### B.    Search for a Bomb

The government next claims that, even if the backpack search at McDonald's was not justified as a search incident to a lawful arrest, the search was still proper "because the Altoona Police Department officers could have reasonably believed that the backpack may have contained 'some immediately dangerous instrument.'" (Opp. Br. at 97.) In making this argument, the government relies on Patrolwoman Wasser's statement that she was searching the backpack at the McDonald's to make sure there was no bomb in the bag before taking it to the station. (*Id.* at 98–99.)

Contrary to the government's argument, the totality of the circumstances demonstrates that Wasser's claim about a bomb was a blatantly false and pretextual justification for conducting an evidentiary search. Most notably, the body-worn camera footage establishes that this was a search for evidence, not a search for a bomb or dangerous instrument. For example, one of the first items that Patrolwoman Wasser took out of the backpack was a bag too small to carry a bomb. As Wasser acknowledged at the suppression hearing, she did not believe that there could be a bomb inside that small bag. (Hr. at 679.) Nevertheless, Wasser opened the bag and removed the phone and passport that were inside. Rather than returning the passport to the bag and continuing her search (as one would expect if this were a search for a bomb), Wasser instead gave the passport to other officers at the McDonald's to assist in the Altoona's false statement/forgery investigation and the NYPD's NYC shooting investigation. Wasser then removed an envelope (also too small to contain

-39-

a bomb), which she examined before returning it to the backpack. Wasser also searched through a wallet that she removed from the backpack—another item that was obviously not a bomb or dangerous instrument.

Additionally, during the search, Patrolman Fox used a knife to slice open a small cardboard container too small to contain a bomb, a fact that Patrolman Fox admitted during the hearing:

> Q.    Did you think there was a bomb wrapped up in that card stock that you opened with the knife?
> A.    No, I could tell it was some type of data chip, I just wasn't sure.

(Hr. at 893.) Despite knowing that this container did not contain a bomb, Patrolman Fox nevertheless opened the container hoping to recover evidence to support the NYPD investigation into the NYC shooting.[12]

That this "bomb search" was pretextual is further demonstrated by the fact that, once Patrolwoman Wasser found the loaded gun magazine in the backpack, Patrolman Fox stated to Wasser, "now that we found that, let's just take it back to the precinct." If this truly were a search for a bomb, officers would have continued searching the backpack before taking it to the precinct, especially considering that neither Wasser nor Fox had searched a third compartment in the backpack for a bomb. Instead, because this was an evidence search, Altoona officers stopped

---

[12]Patrolman Fox's admission that he searched the cardboard container despite knowing it was not a bomb is not surprising given his earlier testimony that the main reason he was searching the bag was because he was conducting a search incident to lawful arrest. (*See* Hr. at 892 ("Like I said, the bomb threat is always there in the back of my head no matter what bag I am searching. I am searching his bag incident to arrest. The threat of a bomb is also there or threat of any device that can harm human life, but that's not the sole reason I am searching that bag, I am searching that bag incident to arrest.").) As demonstrated above, there was no legitimate basis to search the backpack incident to a lawful arrest.

searching at the McDonald's once they found incriminating evidence and took the backpack to the precinct.

### C.    Inevitable Discovery through an Inventory Search

The government lastly claims that even if the backpack was improperly searched, the evidence should nevertheless be admissible because the evidence would "inevitably been discovered pursuant to an inventory search in light of the defendant's arrest." (Opp. Br. at 99.) This argument relies on the government's claim that Patrolwoman Wasser conducted an inventory search of Mr. Mangione's backpack at the station. (*Id.* at 100.) However, the suppression hearing evidence makes clear that Patrolwoman Wasser's search of Mr. Mangione's backpack was a search for evidence and not an inventory search. First, Wasser started this search on a metal folding chair in the corner of the intake section of the precinct where there was no room to empty the numerous items from the backpack and take inventory. Second, this search consisted of Patrolwoman Wasser reopening the same backpack compartment that she had started searching at the McDonald's before immediately closing that compartment and opening the front compartment of the backpack—which she claims she had never searched at the McDonald's or during her 11-minute drive to the precinct without her body camera on—as if she was specifically looking for the gun. This is consistent with an evidence search, not an inventory search.

Third, after finding the gun, Patrolwoman Wasser continued the evidence search in a hallway at the precinct. During this search, Patrolwoman Wasser removed all items from the backpack without taking any inventory. All Patrolwoman Wasser did during this search was separate items of evidence from personal items, before placing the personal items back into the backpack without making a list or inventory of any of the items that were removed from the backpack. As described by Sergeant Jon Burns (who was present for part of Wasser's search in

-41-

the hallway): "The search was merely to remove any contraband or suspected weapons and items like that." (Hr. at 1098.) That is not the procedure for an inventory search. While law enforcement and the government attempt to portray this search as an "inventory search," the testimony regarding this search demonstrates that it was a search for evidence, not to produce an inventory. As the Supreme Court ruled, however, "an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence," and that an "individual police officer must not be allowed so much latitude that inventory searches are turned into a purposeful and general means of discovering evidence of crime." *Florida v. Wells*, 495 U.S. 1, 4 (1990)). Given that Patrolwoman Wasser's purpose in searching the backpack was to separate evidentiary items from personal items—without taking any inventory of what was actually in the backpack—this search cannot be considered an inventory search and cannot be the basis to admit the backpack evidence under the doctrine of inevitable discovery.

## IV.     CONCLUSION

For the reasons stated herein and in Mr. Mangione's memoranda dated September 20, 2025, and October 11, 2025, the indictment should be dismissed, the government should be precluded from prosecuting this matter as a death penalty case, and the evidence unlawfully seized and statements obtained in violation of *Miranda* must be suppressed.

Respectfully submitted,

_____
Karen Friedman Agnifilo
Marc Agnifilo
Jacob Kaplan
AGNIFILO INTRATER LLP
140 Broadway, Suite 2450
New York, NY 10005

_____/s/_____
Avi Moskowitz
Eylan Schulman
Christopher Neff
MOSKOWITZ COLSON
GINSBERG & SCHULMAN
80 Broad Street, Suite 1900
New York, NY 10004

-43-

## **CERTIFICATION**

The undersigned hereby certifies that the Reply Memorandum of Law in Support of Luigi Mangione's motions challenging the constitutionality of the death penalty, moving to dismiss counts three and four and moving to suppress evidence and statements complies with this Court's December 19, 2025, Order authorizing counsel to file an oversized brief in this matter. The word count, exclusive of the caption, tables, and signature blocks, is 14,139 words according to the word-processing system used to prepare the document.

Dated: December 19, 2025

_____
Karen Friedman Agnifilo
AGNIFILO INTRATER LLP
140 Broadway, Suite 2450
New York, NY 10005