Q19HManC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA,
 3
                v.                        25 Cr. 176 (MMG)
 4
     LUIGI MANGIONE,
 5
                                          Conference
 6              Defendant.
     ------------------------------x
 7                                        New York, N.Y.
                                          January 9, 2026
 8                                        11:10 a.m.

 9
     Before:
10
                     HON. MARGARET M. GARNETT,
11
                                          District Judge
12

13                        APPEARANCES

14   JAY CLAYTON
          United States Attorney for the
15        Southern District of New York
     BY:  DOMINIC A. GENTILE
16        JUN XIANG
          ALEXANDRA S. MESSITER
17        THOMAS JOHN WRIGHT
          Assistant United States Attorneys
18
     AGNIFILO INTRATER LLP
19        Attorneys for Defendant
     BY:  MARC ANTONY AGNIFILO
20        KAREN FRIEDMAN AGNIFILO
          JACOB KAPLAN
21        -and-
     MOSKOWITZ COLSON GINSBERG & SCHULMAN LLP
22   BY:  AVRAHAM C. MOSKOWITZ
          EYLAN SCHULMAN
23        CHRISTOPHER R. NEFF
          PARESH PATEL
24
     Also Present:
25   Sofia Agnifilo, Defense
```

Q19HManC

1          THE DEPUTY CLERK:  United States v. Luigi Mangione,

2    case No. 25 Cr. 176, counsel, please state your appearances for

3    the record, starting with the government.

4          MR. GENTILE:  Good morning, your Honor.  Dominic

5    Gentile, Jun Xiang, Alexandra Messiter, and Thomas John Wright,

6    for the United States.

7          THE COURT:  Good morning.

8          MS. FRIEDMAN AGNIFILO:  Good morning.  Karen Friedman

9    Agnifilo, Marc Agnifilo, Paresh Patel, Avi Moskowitz, Jacob

10   Kaplan, Eylan Schulman, Chris Neff on behalf of Luigi Mangione.

11   Also at counsel table is Sofia Agnifilo.

12         THE COURT:  All right.  Good morning, everyone.  You

13   can all be seated.

14         MS. FRIEDMAN AGNIFILO:  Good morning, your Honor.

15         THE COURT:  So, just a couple of housekeeping matters

16   before we begin, and that's we do have a live feed to an

17   overflow room.  I just want to tell all counsel and

18   Mr. Mangione that the audio is very sensitive on the feed to

19   the overflow room.  So if you need to confer with one another

20   or, Ms. Friedman Agnifilo, if you need to confer with your

21   client, even if you think you're whispering, it's very

22   important that you mute your microphone and any microphones

23   that are near you if you need to confer in a way that should be

24   private between counsel or between counsel and Mr. Mangione.

25         We have a full house here today, so some of you may

Q19HManC

1    not be familiar with how we do things here.  But this is a

2    federal courtroom.  It's very important that decorum be

3    maintained.  What does that mean?  That means there's not to be

4    any outburst from the gallery.  No one is to stand unless

5    they're instructed to stand.  There's a small number of you

6    that are allowed to have electronic devices with you.  I would

7    just ask everyone who's in that category to take a moment, make

8    sure those devices are fully on silent.  If any device makes

9    any noise during the proceeding, the device will either be

10   confiscated or you will be removed or both.  So just take a

11   moment to do that.

12        I apologize.  Like everyone in New York City, I seem

13   to be getting over a cold.  So I apologize for my raspy voice,

14   and a cough drop may have to be employed.

15        Pending before the Court, and our purpose for being

16   here today, are a number of defense motions: first, a motion to

17   order the government to provide additional information on the

18   aggravating factors it intends to prove at any potential death

19   penalty phase; second, a motion to strike the notice of intent

20   to seek the death penalty on a variety of grounds, both

21   constitutional and otherwise; third, a motion to dismiss Counts

22   Three and Four, which, in sum and substance, charge the

23   defendant with discharging a firearm in furtherance of a crime

24   of violence and committing murder with a firearm in furtherance

25   of a crime of violence on the ground that the charged predicate

Q19HManC

1   crimes of stalking do not qualify as crimes of violence as a

2   matter of law; and, fourth, motions to suppress statements the

3   defendant made at the time of his arrest and to suppress the

4   contents of his backpack seized at the time of his arrest.

5          I know we had discussed last time we were together

6   setting a trial date at this conference, but because the

7   outcome of the defendant's motion to dismiss Counts Three and

8   Four will significantly affect the timeline of any trial in

9   this matter, I don't think we can do that today.  And just to

10  add a little more color to that and explanation for the public

11  that is here, if I were to grant the defendant's motion to

12  dismiss those two counts, the defendant would still be facing a

13  potential sentence of life imprisonment, but this case would no

14  longer be capital eligible under federal law, which would, of

15  course, moot a number of the defendant's other motions and make

16  scheduling and conducting the trial significantly easier.

17  However, if I were to grant that motion, the government would

18  have the right to appeal that decision to the Second Circuit,

19  which could materially delay any trial on the remaining counts.

20  If I were to deny the defendant's motion to dismiss, I would

21  then proceed to decide his motions addressed to the potential

22  death penalty in this case, and then we would reconvene

23  promptly to set a date for the start of jury selection and for

24  the start of the trial.

25          So given the pivotal importance of the motion to

Q19HManC

1    dismiss Counts Three and Four, I have instructed counsel to be

2    prepared to argue that motion and to answer my questions today.

3            Now, before we turn to that, I just want to spend a

4    little bit of time on the suppression motions.  The defendant

5    originally filed two suppression motions: one to suppress his

6    statements made to law enforcement officers at the McDonald's

7    restaurant in Altoona, Pennsylvania, where he was arrested, and

8    one to suppress the contents of his backpack seized from the

9    McDonald's at the time of his arrest.

10           As to the first motion, in light of the government's

11   representation that it would only seek to offer at trial two

12   statements the defendant made identifying his name as Mark or

13   Mark Rosario and, in reliance on that representation, the

14   defendant has informed me that he intends to withdraw his

15   motion to suppress his statements, I just want to confirm with

16   you, Ms. Friedman Agnifilo, that that is still the defendant's

17   intent.

18           MS. FRIEDMAN AGNIFILO:  Yes, your Honor.

19           THE COURT:  All right.  So, accordingly, that motion

20   is denied as moot.

21           Turning to the second motion, in my December 31 order,

22   while I noted that I did not need oral argument on the legal

23   issues in the motion, I did ask counsel to provide the Court

24   with their views as to whether an evidentiary hearing was

25   necessary to address the government's arguments regarding two

Q19HManC

exceptions to the warrant requirement urged by the government:
a valid inventory search or the doctrine of inevitable
discovery or, of course, any other aspect of the defendant's
motion to suppress the contents of his backpack.

          I also asked counsel if they believed an evidentiary
hearing was necessary to identify the specific facts that were
either disputed or unknown but necessary to resolving the
motion.  In response, the government asserted that no hearing
was required because, at a minimum, the inevitable discovery
exception concerns a question of law that can be decided by the
Court on the present undisputed record.  The defendant,
however, asserts that a hearing is necessary, primarily, as I
understand, for three reasons: first, that there's a disputed
question of fact as to whether the backpack falls within the
Altoona Police Department's written policy on inventory
searches; second, because a hearing would illuminate whether
the Court can consider Government Exhibit 5 in deciding the
first question, because Exhibit 5 is an undated document from
training materials for probationary officers in the
Altoona Police Department; and, third, because the Court should
look at the actions actually taken during the purported
inventory search by Altoona police officers and determine that
those actions exceeded the bounds of a proper inventory search
primarily by reading some of the contents of a journal found in
the defendant's backpack.

Q19HManC

1        I'd like to take those in reverse order.  So starting

2   from the third issue, I don't see a basis for a hearing on that

3   issue because the *Mendez* factors specifically contemplate an

4   assessment of the hypothetical search that would have been done

5   pursuant to established procedures rather than looking at what

6   officers actually did.  In other words, what *Mendez* teaches and

7   the cases citing it in the circuit, is that the court has to be

8   very careful not to conflate the inventory search exception and

9   the inevitable discovery exception.  And here, looking at

10  inevitable discovery, what officers actually did is of limited,

11  if any, relevance.

12        And as to the contents of the journal, the government

13  also points out in their letter that later search warrants

14  allowed for access to the contents of the journal, and those

15  warrants were obtained without reliance on those contents to

16  establish probable cause to search the journal.

17        So without even getting into the government's waiver

18  argument in its January 8 letter, I don't see a basis for a

19  hearing on that particular issue.

20        Mr. Agnifilo, is there anything additional you would

21  like to say on that particular argument?

22        MR. KAPLAN:  Judge, just briefly.

23        THE COURT:  If you could identify yourself for the

24  record.

25        MR. KAPLAN:  Jacob Kaplan.

Q19HManC

1              In *Mendez*, the court was determining whether, if the

2      policy and procedures were followed, the evidence would be

3      recovered.  The purpose for our argument is to say is that if

4      those policies were followed in this case, they still would not

5      have had permission to go ahead and read the contents of the

6      journal.  It's no different if they recovered a laptop or a

7      phone.  Just based on the inventory rules which will allow them

8      to inventory the fact that they recovered it, that would not

9      give them permission to go and open the laptop or open the

10     phone.  It's no different here than the journal.  The inventory

11     procedure would allow them to mark the fact that they recovered

12     a journal.  It would not give them, under their guidelines, the

13     right to go ahead and read the journal, read the contents of

14     the journal.  So under *Mendez*, I would say——

15             THE COURT:  Let me just stop you for a minute because

16     I certainly understand that, but I think the point that I'm

17     trying to make is that, fine, they did that, and it appears

18     undisputed that some of the officers did read some of the

19     contents of the journal.  But the government is not relying on

20     the fact that those officers read through some parts of the

21     journal in the course of making their inventory search; rather

22     for the contents, they've explicitly said that those contents

23     were permissible by a court-authorized search warrant, the

24     affidavit of which made no mention of the contents of the

25     journal.

Q19HManC

1          So the question for the exclusionary rule is, what are

2     we trying to deter?  And normally, as I understand *Mendez* and

3     the other inventory search cases, there's kind of a presumption

4     that something improper has happened, right?  The only reason

5     you get to an inevitable discovery exception or inventory

6     search exception is because, at some point prior to that, the

7     evidence has been obtained in a way that arguably exceeds the

8     bounds of the Fourth Amendment.

9          So, given the government's argument about the journal

10    specifically, why do I need an evidentiary hearing to find out

11    in my own court, under oath, what those Altoona officers did

12    with the journal?

13          MR. KAPLAN:  To the extent that the government is

14    relying on this concept of inevitable discovery through a

15    search warrant, which they mention as a footnote, the question

16    would be——and what the Court needs to decide——is whether or not

17    there was enough evidence——enough allegations in the search

18    warrant absent the allegations relating to the search of the

19    backpack, because they've not provided the Court with the

20    search warrant, right?  If the Court reviews the search

21    warrant, the Court will see that they actually did reference

22    the illegal search of the backpack.

23          THE COURT:  Right, but we have to take each piece of

24    evidence separately, right?  So I understand the search warrant

25    referenced items recovered from the backpack, but as to the

Q19HManC

1  journal specifically, the government has represented that the

2  affidavit did not discuss anything that was written in the

3  journal that arguably should not have been read in the course

4  of an inventory search.

5           MR. KAPLAN:  But that's not the question.  The

6  question is, in the search warrant, absent reference to the

7  illegal search of the backpack——forget the contents.  The

8  question would be, is there enough in the search warrant?  Once

9  you take out all the references to the illegal search of the

10 backpack——forget the contents of the journal, the actual

11 illegal search of the backpack——whether or not there's enough

12 left in that search warrant to justify a probable cause for

13 them to search the backpack and the journal.  So it's two

14 separate, really, issues here.

15          THE COURT:  Right.  But you're assuming that there's

16 no other valid exception that would apply to any aspect of the

17 backpack search because the government, yes, in a footnote,

18 argued that everything in the backpack would be inevitably

19 discovered because of the warrants, and I should parse the

20 warrant to remove any reference to its contents.  But what I'm

21 asking about now is just specifically about the journal.  I

22 don't think there's any dispute that the journal, the contents

23 of the journal, are not referenced in the search warrants

24 obtained by the government or by the Manhattan District

25 Attorney's Office.  Is that correct?

Q19HManC

1          MR. KAPLAN:  So in the search warrant——which, again,

2     the Court has not been provided with the search warrant——but in

3     the search warrant——

4          THE COURT:  I can solve that problem.

5          MR. KAPLAN:  Yes, hopefully, we can.

6          In the search warrant, there is reference to the fact

7     that law enforcement did obtain pictures of what was inside the

8     journal.  In other words, the Altoona Police Department took

9     pictures of every page of the journal.  They gave that to

10    federal law enforcement.  Federal law enforcement reviewed

11    those pictures.  And what they're saying is, yeah, we reviewed

12    it, but nothing in this warrant is relying on those contents,

13    right?  That's the assertion that they made.

14          You know, what my point is and what our point is is

15    that the Court can't simply focus on the contents of the

16    journal.  The Court should focus on whether, when we remove the

17    illegal nature, the illegal information that they had——in the

18    total search warrant, is there enough probable cause to support

19    it?  Only then, only if the Court finds that there was enough

20    probable cause absent not just the contents of the journal but

21    the contents of the backpack, if the Court determines that,

22    then the Court can say, OK, it's a valid search warrant.  That

23    valid search warrant will allow them to search the contents of

24    the journal.  But the Court can't jump to the final step and

25    say, well, they didn't rely on the journal contents; therefore,

Q19HManC

1    the search warrant's OK.  That's not the concern.  The concern

2    is they relied on the contents of the backpack, which, at the

3    end of the day, we have very good arguments to show that that

4    was illegal.

5        THE COURT:  Right.  But in analyzing any suppression

6    issue, don't I have to address each piece of evidence that the

7    government might want to offer at the trial?  I mean, because,

8    really, this is what—the only relevance of this question is if

9    the government has evidence that they intend to offer at trial

10   against Mr. Mangione, right?  So what officers did or didn't do

11   might be relevant to a civil lawsuit, but the question that a

12   suppression motion has to decide is, as to each piece of

13   evidence that the government might seek to offer at trial,

14   should that evidence be suppressed?

15       So I definitely understand that you have arguments

16   that that would lead to the conclusion, if I accepted them,

17   that the entirety of the contents of the backpack should be

18   suppressed.  I understand that.  But in terms of the analysis

19   and the need for any kind of evidentiary hearing, am I correct

20   that, assuming that I rule for the government on either

21   inventory search or inevitable discovery for everything else,

22   other than the contents of the journal, and then the government

23   is relying on the search warrants that were obtained, and I've

24   already decided that everything else was lawfully seized and

25   does not need to be suppressed, then isn't the proper question

whether the contents of the journal were used to obtain the

search warrant?  And if they were, and I excise any reference

to that, if I think the search warrants still establish

probable cause, that that would be kind of a two-step

inevitable discovery for the journal?

MR. KAPLAN:  If the Court would follow that process by

which it would find that the contents of the backpack—forget

the journal, the contents of the backpack—would be admissible

under inevitable discovery plus inventory search, then I guess

what the Court is arguing or saying is that they, therefore,

can rely on the contents of the backpack in support of the

search warrant.

THE COURT:  Well, that's my question to you, if you

have a disagreement with how I have set out the analysis.

MR. KAPLAN:  So I think if the Court would find that,

based on the inevitable discovery based on the inventory

search, right, which I think the Court should have a hearing

on—

THE COURT:  Right we're going to get to that in a

minute.  One thing at a time.

MR. KAPLAN:  So, yes, if the Court finds that, then I

would agree with the Court's analysis that once the Court has

found that the contents of the backpack would be OK based on

some other reason and the only issue would be the contents of

the journal, then the Court would have to look at the warrant

Q19HManC

1    to see whether, taking out any reference——because there are

2    references to the journal——if there's probable cause.  So I

3    would agree with the Court on that.

4            THE COURT:  All right.  That's very helpful.  Thank

5    you.

6            Mr. Gentile, I don't mean to leave the government out

7    of this.  Is there anything on that specific issue that you'd

8    like to add, or Ms. Messiter?

9            MR. GENTILE:  Ms. Messiter's going to handle that

10   issue.  Thank you, Judge.

11           THE COURT:  Ms. Messiter, on that particular question,

12   anything that you'd like to add?

13           MS. MESSITER:  No.  As your Honor suggested, the

14   government is not relying on the inventory search or inevitable

15   discovery doctrines as to the contents of the notebook, but

16   rather on a traditionally authorized search warrant allowing

17   the government to search those contents.  And that warrant

18   application expressly disclaims reliance on the contents of the

19   notebook.  None of those contents were included in the warrant,

20   and so they weren't before the judge making the probable cause

21   analysis there.

22           And so, just as your Honor has suggested, as long as

23   there are, as we submit that there are, valid exceptions as to

24   which the other contents of the backpack fall, that warrant

25   would cover the contents of the notebook, and no hearing would

Q19HManC

1    be necessary on that front.

2              THE COURT:  All right.  Thank you, Ms. Messiter.

3              MR. KAPLAN:  This may be a technical point, but it

4    seems the government is relying on inevitable discovery through

5    a search warrant.  So I think it's incorrect to say that

6    they're just relying on the search warrant.  In their own

7    motion papers, in the footnote they say it's inevitable

8    discovery because of the search warrant.  So they're marrying

9    the two together.  It's not independent, just a search warrant.

10             THE COURT:  Well, yes, I understand that.  I

11   understand that.  For many of these issues, there's multiple

12   steps required.  So thank you for raising that, but I think I

13   do understand that point.

14             But while I have you, Ms. Messiter, as to the second

15   argument, whether Exhibit 5 could be considered by the Court

16   without an evidentiary hearing, so let me just ask you whether

17   the government intends to rely on Exhibit 5 for your inevitable

18   discovery arguments or whether you think Exhibit 6 is

19   sufficient for that?

20             And just for those following along, Exhibit 5 is an

21   undated document from the Altoona Police Department related to

22   training of probationary police officers.  Exhibit 6 are

23   general orders from the Altoona Police Department.

24             Ms. Messiter.

25             MS. MESSITER:  Your Honor, Exhibit 6 is sufficient, in

Q19HManC

```
1    the government's view, to rely on to establish that the Altoona

2    Police Department had an inventory search procedure pursuant to

3    which all items taken from those arrested or detained would be

4    searched.

5            That said, your Honor, we do think that Exhibit 5,

6    it's clear from the face of the document, which sets forth

7    operational procedures, that it is the current procedures of

8    the department.  However, your Honor, we do think——

9            THE COURT:  I'm sorry to interrupt you, Ms. Messiter,

10   but on what basis am I supposed to know that that document

11   reflects the current procedures of the Altoona Police

12   Department or, more importantly, those that were in place in

13   December of 2024?

14           MS. MESSITER:  Your Honor, the document is headed at

15   the top "Custodial Arrest Procedures:  Summary, Misdemeanor,

16   and Felony Offenses," and the specific provisions on which we

17   are relying is within a section entitled "Operational

18   Procedures."  And so we think it is clear from the face of the

19   document that these were the procedures in place for the police

20   department.

21           THE COURT:  Well, I mean, I'm just struggling with

22   that a little bit, Ms. Messiter.  Because while I certainly

23   accept the government's representation, I can't make an

24   evidentiary finding based solely on the government's

25   representation, I think.  And it would be common for police
```

Q19HManC

1    departments to revise procedures, to have old things in a

2    drawer that have been superseded by other procedures, and so I

3    just want to press you a little bit on the basis on which I can

4    accept the government's representation that that document

5    reflects procedures that were in place in December of 2024.

6        MS. MESSITER:  So, your Honor, we would again

7    reiterate that we do think, to be clear, that the general

8    orders are sufficient to resolve the questions at issue.  If

9    your Honor needed further fact-finding as to the dates during

10    which this custodial arrest procedures document was in effect,

11    the government could, of course, call a single witness from the

12    Altoona Police Department, limited to that question of, was

13    this document the procedures in effect during the relevant time

14    period?  But, again, we don't think that exercise is necessary

15    because we think that the general orders are sufficient for

16    resolving the questions before the Court.

17        THE COURT:  Thank you, Ms. Messiter.

18        On that issue, Mr. Kaplan, anything you'd like to add?

19        MR. KAPLAN:  I agree with the Court about Exhibit 5.

20    But about the general orders, I would just say it's unclear

21    from just reading the face of the general orders that it would

22    apply to both the search——inventory search of the defendant's

23    person as well as any belongings he may have had.

24        THE COURT:  We're going to get to that.  That's

25    question number one.  But, again, just one thing at a time.

Q19HManC

1           So specifically on the things——my conversation with

2     Ms. Messiter about Exhibit 5, is there anything you'd like to

3     add about that?

4           MR. KAPLAN:  Just what we added in our filing, that

5     when it comes to guideline 3.1, it says specifically that it's

6     meant to govern this situation, and there's no equivalent thing

7     with Exhibit 5.  So, here, we know that 3.1 applies to this

8     situation.  There's no basis for us——for the Court to find,

9     absent an evidentiary hearing, that Exhibit 5 would do the

10    same.

11          THE COURT:  All right.  So now getting to, I think,

12    the meat of the question about a hearing, a need for a hearing,

13    and this is the first argument that I identified, so——you're up

14    again, Mr. Kaplan.  So just stay on your feet.

15          So I have a number of questions:  Exhibit 6, which

16    contains general order 3.1.10 of the Altoona Police

17    Department——I'm just turning to it now——says, and I'm going to

18    quote from the government:  "A documented, itemized inventory

19    of all items taken from the detainee must be completed at the

20    time of booking."

21          Here's the difficulty I'm having:  Based on the

22    factual record recited by both the government and the defendant

23    and my own review of the body-worn camera footage from the

24    McDonald's restaurant, it seems to me that it is undisputed

25    that the backpack was next to Mr. Mangione while he was sitting

1    down at a table in the public seating area of the McDonald's.

2    Am I correct so far?  That's undisputed, right?

3        MR. KAPLAN:  It was next to him at the beginning.  At

4    one point it was, yes.

5        THE COURT:  Yes.  Second step, I think it's undisputed

6    that officers initially moved the——during the initial

7    conversation, police officers moved the backpack out of

8    Mr. Mangione's immediate reach to a nearby table.  Am I

9    correct?  That's an undisputed fact, right?

10        MR. KAPLAN:  That is correct.

11        THE COURT:  OK.  Third step, during the course of this

12    initial encounter, the officers asked Mr. Mangione if the

13    backpack was his, and he said yes, it was, correct?

14        MR. KAPLAN:  That's correct.

15        THE COURT:  This encounter ultimately culminates

16    roughly 15 to 20 minutes later with Mr. Mangione's detention

17    and arrest.  The backpack, additional clothing that was removed

18    from him as well are all taken to the police station, correct?

19        MR. KAPLAN:  Correct.

20        THE COURT:  So given those undisputed facts——and I

21    should just ask, Ms. Messiter, does the government agree with

22    the factual recitation I've set forth?

23        MS. MESSITER:  Yes, your Honor.

24        THE COURT:  So I'm a little bit confused by the

25    argument in your January 6 letter that the backpack isn't

1    clearly within the category of "all items taken from the

2    detainee."  Because the backpack is clearly his person

3    property, right?  No one disputes that.  He said it was his.

4    It's with him when he's arrested in a public place.  The police

5    took it from his custody and control in a single course of

6    conduct that culminated in his arrest.  He's being detained and

7    then arrested, and the police have to safeguard his personal

8    property.

9           So what am I missing from that, my recitation of these

10   events?  What is disputed?

11          MR. KAPLAN:  Yes, so two things, two areas, which I

12   think the Court needs to focus on:  The Court's been citing

13   3.1.10 of the general orders.  If you look at 3.1.9, which is

14   right before it, it's talking specifically about searches of

15   the defendant's person——a detainee's person.  They're clearly

16   not talking about other property, backpacks or anything,

17   referring to——

18          THE COURT:  But it's in a separate section of the

19   orders talking about what happens when the prisoner is in the

20   police station.

21          THE DEFENDANT:  Yes, but that's the second point I'm

22   making, which is at the state suppression hearing, when this

23   issue came up and we asked officers about this, their testimony

24   was that 3.1.10 would cover anything that he had on him or——or

25   that he had at the time of his arrest.  It is our position that

1    at the time of his arrest, the backpack had been moved ten feet

2    away.  There'd been a number of officers in between then.  He

3    did not have custody or control of the backpack.  And if the

4    Court's going to read "from the defendant" to be so broad,

5    well, what's stopping them from going into his car?  It belongs

6    to the defendant also, so it's from the defendant.  So I'm

7    trying to limit——

8           THE COURT:  I don't think that's right, Mr. Kaplan,

9    because, I mean, he's being removed from a public place.  What

10   if he has a wallet with credit cards and hundreds of dollars in

11   cash sitting on the table at the McDonald's, and while the

12   police are talking to him, they move everything they haven't

13   searched away from his immediate grab area, which they're

14   entitled to do for their own safety and public safety?  Are

15   they supposed to leave the wallet——they can't take the wallet?

16   Or what about car keys or house keys or a cell phone that's

17   sitting on a park bench next to a person who's about to be

18   arrested?

19           I take your argument that they can't then——if a

20   defendant is arrested in his home, in a secured area, the

21   police are not permitted to just take anything they see.  They

22   can't, like, go into a locked car and say, well, this is his

23   property that's near him at the time of arrest.  But I don't

24   think it's really disputed that if you're arrested in a public

25   place, the police are supposed to safeguard your personal

Q19HManC

 1    property.

 2            So I guess I'm just not—even looking at the testimony

 3    that you cited from the state hearing, the quote that's in that

 4    letter—I'm quoting from page 2 of your January 6 letter:

 5    Sergeant Jon Burns of the Altoona Police Department testified

 6    that this order pertained to inventorying property that was

 7    taken from the detainee's person and "any property that he had

 8    with him at the time of being detained or arrested."  And just

 9    in terms of ordinary English, I just am not following the

10    argument that the backpack is not personal property that he had

11    with him at the time of being detained or arrested.

12            MR. KAPLAN:  So I'm making the distinction between

13    personal property that he has on him versus personal property

14    that was no longer on him.  It was in a different area,

15    different section over here.  It's not as simple as it was on

16    the table in front of him.  This was ten feet away at the

17    point—the time of his arrest.  If the Altoona parole guide

18    wanted to say specifically that they can go into backpacks and

19    stuff, they could have said that.

20            THE COURT:  It's not about going into the backpack;

21    it's about taking the backpack to the police station so that an

22    inventory search can be done.  Let's not talk right now about

23    whatever they did with the backpack in the McDonald's.  That's

24    a separate issue.  The question is this general order, which

25    relates to inventory searches, that happens once they have the

Q19HManC

1    backpack in the police station.  So as to that question, it's

2    his personal property in a public place that is with him at the

3    time he's approached by police.  No one else can take custody

4    of it.  He's by himself, and the police have to——I mean, the

5    difficulty I'm having, being sort of quite experienced with

6    what happens when someone is arrested, is I don't understand

7    the argument that there has to be some additional proof before

8    they can safeguard, when a defendant is being arrested in a

9    public place, the valuable personal property that he says is

10   his——a wallet, a cell phone, a bag, a purse, keys.

11           And just in the ordinary English meaning of "property

12   that is with him at the time of his detention or arrest," what

13   would a hearing——what might come out at a hearing that would

14   change that analysis?

15           MR. KAPLAN:  Yes, based on just the reading of the

16   patrol guide, the Court is right, it may give them the

17   opportunity to safeguard the property, but in order to go ahead

18   and inventory and actually go through the property, I think

19   that what 3.1.10 is talking about is not property that was not

20   on the defendant.  And I would agree with the Court.  They

21   would be allowed to safeguard it.  They can take it.  But I'm

22   saying that I don't think under 3.1.10 that would allow them to

23   actually inventory and go through it.  I think there are two

24   separate issues:  Can they safeguard it?  Yes.  Can they

25   actually go through it as part of inventory?  That's not what

1   3.1.10 is doing.  And the purpose of the hearing would be to

2   have actual testimony.  We don't have to guess.  We don't have

3   to speculate.  We would have actual testimony from people in

4   the Altoona Police Department as to what their general

5   understanding is about these guidelines and whether or not

6   these guidelines would apply in this sort of situation.  And to

7   the extent that there was a state court hearing in which this

8   came up, it's not the same as the Court conducting its own

9   hearing and viewing actual witnesses.

10          THE COURT:  No, I understand.  But it was your letter

11  that pointed me to that testimony, so I'm just following up

12  about what I think the plain meaning of that testimony is if

13  I'm to rely on it at all.

14          MR. KAPLAN:  I put it out there so the Court would

15  know what the purpose of a hearing would be.  We have testimony

16  about this——at a hearing on this we would have actual testimony

17  from an officer in front of your Honor discussing these issues

18  and the parameters of their answering of 3.1.10.

19          THE COURT:  OK.  Understood.  Thank you, Mr. Kaplan.

20          Ms. Messiter, anything you'd like to say about that?

21          MS. MESSITER:  No, your Honor.  In our view, the

22  policy is clear on its face.  The documented itemized inventory

23  of all items taken from the detainee must be completed.  It's

24  of no moment that a preceding section deals separately with

25  searches of the person, of the detainee.  That's not what we're

1    relying on here.  And we certainly agree that the arguments

2    presented by the defense here would lead to absurd results by

3    which either the police officers would have to leave the

4    property of arrestees wherever they happened to find it at the

5    time the person was arrested, or the property is somehow no

6    longer the defendant's property and therefore is, I suppose,

7    abandoned, in which case these arguments don't really arise

8    anyway.  So we think that this policy is clear on its face and

9    there is no hearing that's needed in this regard.

10              THE COURT:  All right.  Thank you both very much.

11              At present, I don't think a hearing is necessary.  I

12   want to give some additional thought to the arguments that the

13   defendant has made today.  And so if, upon reflection, I change

14   my view, I'll let you know promptly, and we'll schedule that

15   within the next couple of weeks.

16              All right.  So turning to our main task today, which

17   is to hear argument on the defendant's motion to dismiss Counts

18   Three and Four, I understand, Ms. Friedman Agnifilo, that

19   Mr. Patel is going to be making that argument for the

20   defendant.

21              MS. FRIEDMAN AGNIFILO:  Yes, your Honor.  Thank you

22   for accepting our *pro hac vice* motion on behalf of Mr. Patel.

23              THE COURT:  I'm happy to do that.

24              Mr. Patel, welcome.  We're happy to have you here as a

25   guess from Maryland.  Given the length of time, I think it

Q19HManC

1   would make more sense for you to speak from the lectern, if

2   that's all right.

3           MR. PATEL:  That would be great.  Thanks, your Honor.

4           THE COURT:  I've allotted 30 minutes to each side for

5   this argument.  And since it's your motion, Mr. Patel, would

6   you like to reserve any time for rebuttal?

7           MR. PATEL:  Yes, your Honor.  Can I reserve four

8   minutes for rebuttal, please?

9           THE COURT:  Just for everyone's planning and for the

10  sake of the court reporters, my expectation will be that we'll

11  take a brief break after Mr. Patel's argument before the

12  government argues, in case anyone needs a break and to give our

13  court reporters a brief rest.

14          Just before you start, Mr. Patel, I want to tell you,

15  in fairness, that you can use your time however you want.  You

16  should expect me to interrupt you a lot because I have many

17  questions.  But I just want to advise you, don't spend much

18  time on the divisibility of the statute between——

19          MR. PATEL:  I understand, your Honor.

20          THE COURT:  ——subpart A and B of parts 1 and 2.

21  Again, I'm happy to hear you, and you can use your time however

22  you want.  But it's only fair to tell you that I think it's

23  pretty clear that the statute is divisible and into at least

24  those four crimes.  So subpart——part 1 into subparts A and B,

25  part 2 into subparts A and B.  But, again, I'm happy to let you

Q19HManC

1   try to convince me otherwise, but I want you to use your time

2   in the way that would be most helpful to you and to the Court.

3   So that's my just starting advice, not to spend a lot of your

4   time on that issue.

5        MR. PATEL:  Thank you, your Honor, and that wasn't my

6   plan today.  I think that there's three arguments that we've

7   made, and the first one is about the divisibility.  So each

8   statute is indivisible and has at least one means, the

9   emotional distress subsection, that never qualifies.  That's

10  the first point.

11       THE COURT:  And I think the government doesn't——at

12  least as to whether subpart B of either part would qualify, I

13  don't think the government——I understand the government to be

14  conceding that the substantial emotional distress way of

15  committing this crime would not qualify.  So I think that's one

16  place of agreement.

17       MR. PATEL:  That's my understanding.  OK.  Yes.

18       Where I want to spend my time, your Honor, is on this

19  second argument that, even if the stalking statutes are

20  divisible between subsection B, the emotional distress

21  subsection, and subsection A, the reasonable fear of injury

22  subsection——that's what I'm going to call it.  There's so many

23  words here——it still fails to qualify as a crime of violence

24  because it can be committed by a threat of self-harm, i.e., by

25  the defendant threatening force against himself.

Q19HManC

1          And then the third argument is that subsection A fails

2     to qualify as a crime of violence because it does not require

3     the purposeful or knowing threat of force.  But, again, like I

4     said, your Honor, what I want to really focus on today is that

5     second argument on the threat of self-harm, because I think

6     that's the easiest way, that's the cleanest way, for the Court

7     to give relief to Mr. Mangione today, because that argument is

8     supported by the plain language of the statute, directly

9     on-point authority, *United States v. Plunkett*, and there are no

10    cases to the contrary that exist.  So, your Honor, I will start

11    with that argument.

12          So turning to that argument, the plain language of

13    subsection A criminalizes the act of placing the stalking

14    victim in fear of injury to a family member, to a spouse, or

15    intimate partner of that stalking victim, which is referred to

16    as "that person" in the statute.  Because family member,

17    spouse, or intimate partner can be the defendant himself, your

18    Honor, this subsection A fails to qualify as a crime of

19    violence under the force clause, which, as you know, requires

20    threat of force against the person of another.

21          Now, your Honor, the two courts have agreed with us.

22    We have *United States v. Plunkett*, which is the written

23    decision, and then there's *U.S. v. Ali II*, and the government

24    referenced that.  I looked it up yesterday.  There's not a

25    written decision yet, so we just have the oral decision right

Q19HManC

1    now.  But my understanding is that the court is going to

2    wholesale adopt the *Plunkett* analysis, and, again, I just want

3    to repeat, there's no authority to the contrary.  Now, your

4    Honor, you should join that chorus because in *Plunkett*——I think

5    this is really key——the court explained that it had no

6    difficulty envisioning situations that could satisfy all the

7    elements of interstate stalking but not necessarily involve the

8    use, attempted use, and threatened use of physical force

9    against a person.  Now, I understand in *Plunkett* one difference

10   was there wasn't the death results factor, but that——

11           THE COURT:  Let's put a pin in that, and we'll circle

12   back to the death-resulting question.

13           MR. PATEL:  Yeah.  But, your Honor, what I wanted to

14   say is that there are very plausible ways here in which this

15   can happen, in which there can be a threat of self-harm.  We've

16   given some examples, and I don't think it changes with the

17   death results.  So I'm happy to give you more examples.

18           THE COURT:  No, I mean, I think the examples are sort

19   of self-evident.  It's relatively easy to imagine, in a literal

20   reading, in a domestic violence context, where an estranged

21   spouse or partner——or even a stranger, but I think more likely

22   a stranger wouldn't be within your example, right, because they

23   need to be one of the proxy individuals identified in the

24   romanette subparts.

25           MR. PATEL:  Absolutely.

 1          THE COURT:  So an estranged husband or partner who

 2    gets the victim to do what they want in the past and in the

 3    charged incident by threatening, I'll kill myself if you don't,

 4    I'll cut myself, I'll jump off this bridge, I'll crash this car

 5    right into the, you know, abutment.  So I don't think I need

 6    the examples.  I think there's a couple of issues that I think

 7    would be helpful to address, and maybe we'll start with the

 8    death-resulting issue, because I guess my first question is, do

 9    you agree that, as charged here, death resulting is an element

10    of the offense that must be proven to a jury beyond a

11    reasonable doubt?

12          MR. PATEL:  Your Honor, I am not disputing that.

13          THE COURT:  OK.  I didn't think you were, but it's

14    always good to make sure.

15          MR. PATEL:  Yeah.  Thank you.

16          THE COURT:  So assuming yes, does that element charged

17    here affect the crime of violence analysis, and if so, how

18    should it affect my thinking?  And if you could just talk a

19    little bit about *Tsarnaev* and *Runyon* and the views of those

20    courts that, in talking about those predicate crimes, their

21    conclusion was that death resulting made it impossible to

22    commit the crime as charged without the use of violence.

23          MR. PATEL:  Well, your Honor, yes, I'm happy to talk

24    about *Tsarnaev* and *Runyon*.  One thing to keep in mind, the

25    landscape was very different when *Runyon* came out.  *Runyon*

Q19HManC

1    relies on the realistic probability, right?  Since then we have

2    clear law, *Taylor v. United States*, which said we do no longer

3    rely on realistic probability for federal offenses, and *Elkins*

4    said that too.  In fact, in *Runyon II*, the Court said we can

5    imagine a situation, right, where death would result——and that

6    was, I believe, a conspiracy to murder for hire resulting in

7    death——but they really hinged the opinion on the realistic

8    probability.  So I don't think that case is apposite here.

9               THE COURT:  Can I just press you a little bit, while

10   we're talking about Taylor and realistic probability.

11              MR. PATEL:  Yes.

12              THE COURT:  Would you agree with me that there's two

13   ways to think about what the realistic probability test means

14   in *Taylor*'s context, right?  One way is the kind of test that

15   had grown up that is very clearly rejected in *Taylor*, which is

16   the notion that a defendant has a burden to show that there's a

17   realistic probability that his case——or some imagined

18   hypothetical case——that there's a realistic probability that

19   such a case would be charged and prosecuted and kind of some

20   empirical showing that that was a real danger that the court

21   had to worry about.  In *Taylor*, I agree with you, *Taylor* very

22   clearly says that, absolutely not, no defendant is required to

23   do that, and in fact, that's not even a relevant inquiry.

24              I think the question that is maybe left unanswered by

25   *Taylor* is whether realistic probability is viable still in the

Q19HManC

1    sense of where older statutes don't use the exact words of the

2    crime of violence definition, that a court has to look at the

3    words that are used and ask itself, do these words mean——given

4    the laws of physics and the nature of human interaction, do

5    these words mean that you couldn't do these words; it's a

6    practical impossibility to do these words without using,

7    attempting, or threatening to use violence?

8         MR. PATEL:  Your Honor, if it's an impossibility, I

9    agree with you, but if it is plausible, if there's any way that

10   it's plausible and it could be prosecuted, then the government

11   loses.  In fact, in *Taylor* itself, the court turned to

12   hypotheticals.  That's the way that we have to do the inquiry

13   now, because, you know, the government keeps saying, oh,

14   farfetched, this and that.  Even if it's farfetched, if it can

15   happen, if it's plausible, that's why *Taylor* really changed the

16   landscape.

17        But I want to go back to *Tsarnaev* and then *Runyon*,

18   too, because we have a very different situation.  Setting aside

19   the realistic probability problem that——they relied on that, in

20   *Runyon II*, I believe there was an intent to murder because it

21   was a conspiracy to murder for hire.  OK?  And so that's why

22   they really relied on that intent and said, you know, when

23   somebody's intending to murder somebody, we don't see a

24   realistic probability that, even though the death-results prong

25   doesn't require, doesn't have a mens rea, that it could happen

Q19HManC

 1    in a way where it's not intentional.  And the same thing in

 2    *Tsarnaev*, right, the crime——forgetting exactly what it was, but

 3    it was——

 4              THE COURT:  Placement of an incendiary device or

 5    arson.

 6              MR. PATEL:  Yes.  In fact, in *Tsarnaev*, they relied on

 7    that.  That intent was really important because *Tsarnaev* also

 8    found that there was another offense that was reckless, right,

 9    that didn't have that intent, right?  But here, your Honor, the

10    only intent is the intent to harass.  So where do we get

11    intentional murder from intent to harass?

12              THE COURT:  Right.  Of course, the statute speaks of

13    intent to kill, injure, harass, or intimidate.  But I agree

14    with you that, based on the case law, harass is kind of the

15    least serious way of committing the crime.

16              MR. PATEL:  Absolutely.

17              THE COURT:  And that's what we have to focus on.

18              MR. PATEL:  Yeah.  So, your Honor, getting to the

19    death results part, I think here it's very plausible that death

20    would result.  If a defendant is putting a gun to his head,

21    right, and he's out in public and——let's say there's a

22    drug-addicted brother who's demanding money from the victim,

23    and then she's like:  No, I'm not going to give you the money.

24    I'm not going to give you the money.  I'm not going to give you

25    the money.  And then he says, OK.  I'm just going to kill

Q19HManC

 1    myself because he's stressed out, he's mentally ill, he's

 2    addicted, he needs his drugs.  She tries to wrestle the gun

 3    from him——that's very plausible——and the gun misfires and it

 4    kills her, or there's a first responder, there's a police

 5    officer around who sees that, and tries to take the gun away

 6    from him, and then it misfires and it hits a pedestrian——or,

 7    your Honor, we know these things happen, what happened in

 8    Minnesota recently, right?  A police officer sometimes see

 9    things differently.  And they may see the gun and they may try

10    to shoot him, and then the sister gets in the way and gets

11    shot.  So it's really plausible here what we're talking about.

12        THE COURT:  As I read *Elkins* being the most recent

13    example, there seems to be a developing consensus that, at

14    least for this statute, the death resulting——there's no

15    intentionality required in order for the government to convict

16    a defendant on the death resulting enhancement, I'll call it.

17        MR. PATEL:  Yes.  There's no case——

18        THE COURT:  A jury does not have to find any intent or

19    even purposeful action that produces that on the part of the

20    defendant.  It's just probable cause.

21        MR. PATEL:  And particularly in this situation where I

22    think you agree with me that it's very plausible that this

23    threat of self-harm, it happens.  You know, it's a very common

24    occurrence as——

25        THE COURT:  I agree with you, it happens.  The

Q19HManC

1    question is whether that is intended to be covered by the

2    statute.  Yes, but I agree with you that it could happen.

3          MR. PATEL:  Right.  And if that could happen, then I

4    think it's easy to get to the accidental death happening too.

5    So, you know, for that very reason, I think the *Plunkett*

6    decision, combined with what I just talked about with death

7    results, combined with the *Ali* decision, your Honor, you don't

8    need to tread new water here.  Like, it's already there for

9    you, I think.  This is the cleanest way to give relief to

10   Mr. Mangione.

11         Now, what I'd like to talk about is some of the

12   government's arguments.

13         THE COURT:  Yes, I was going to say I know the

14   government's primary response falls into two categories: one

15   meaning that the romanette parts are divisible, and then the

16   second meaning that reading the statute to apply to self-harm

17   is unnatural and could result in criminalizing conduct that is

18   not criminal.

19         MR. PATEL:  I will talk about all of that.  So, first,

20   your Honor, I just want to say sometimes, when it benefits the

21   government, they take another position.  So in *U.S. v. Garg*

22   that's cited to in our brief, in the Western District of

23   Washington, the government agreed to a jury instruction which

24   clumped all of those terms together in a single element.  So

25   the way it went to the jury, the jury didn't have to be

Q19HManC

1    unanimous on either of those.  And you know what, your Honor?

2    That benefits the government, right?  Because if we have six

3    jurors who are——who believe that the crime happened, but it was

4    with respect to a family member, and we have six jurors who

5    think it was with respect to the stalking victim, right, and

6    then they can't decide which one unanimously, but they all

7    agree that a crime happened, well, then the defendant gets to

8    go free.  That doesn't benefit the government.  That doesn't

9    benefit the stalkee.  So that's just one thing to keep in mind

10   about this concession.

11        But, your Honor, their change of heart here also has

12   no legal support.  The government cites to cases in which

13   courts have held that statutes with very particular subsections

14   were divisible or they cite to cases where the different

15   phrases were about varying substantive conduct, but we don't

16   have any of that here, your Honor.  What we have are a bunch of

17   terms, people, and it's all within one subsection.  But more

18   importantly, your Honor, these terms all refer back to a

19   singular victim——the stalking victim, right?  This is all about

20   the stalking victim.  That's what we're trying to protect here.

21   And the entire statute focuses on ways in which that person,

22   the stalkee, is harmed when that person is put in reasonable

23   fear of injury to his family, when that person is put in

24   reasonable fear of injury to his spouse, when that person is

25   put in reasonable fear of injury to his intimate partner.  So

Q19HManC

1    it's all going back to the stalking victim.

2             And one thing I find very helpful here too, your

3    Honor, on A it says "places that person in reasonable fear of

4    the death of or serious bodily injury to"——and then what do we

5    have?  An em dash.  The em dash means that everything is going

6    back to that, the stalking victim on A, because that's who this

7    statute is trying to protect.  It's not trying to protect the

8    family member or the intimate——there's different statutes for

9    that.

10            But even more compelling, your Honor, is——I was

11   looking at the definitions yesterday of "spouse" and I was

12   looking at the definitions of "immediate family member."  Well,

13   guess what?  They overlap because spouse includes the word

14   "spouse," and then you go to the immediate family member of an

15   individual, and it includes spouse again.  So it's not even

16   differing conduct, and that's a very telling sign that we have

17   an indivisible offense here.

18            Additionally, your Honor, when——I think that B helps

19   us here too, Section B, because the Section B clumps them all

20   together in one sentence, right, that's indicative of

21   alternative means, and then they refer back to A.  So it can't

22   be that one subsection has alternative means and one has

23   alternative elements.  That wouldn't make any sense.  So I

24   think, when we look at all of that, it's really helpful.

25            But in addition to that, your Honor, also, I think the

Q19HManC

1    legislative or the statutory history also helps us here,

2    because in 2018 Congress added the pet service animal,

3    emotional support animal language.  They didn't do that to

4    protect the animal.  Again, that was emphasizing the singular

5    nature, like to protect the stalking victim.  Because what

6    Congress said is because victims of domestic violence often may

7    be reluctant to leave an abusive relationship out of fear for

8    the safety and welfare of their companion animals.

9            THE COURT:  I think the idea is that the categories

10    represent people that are, in essence, proxies for the targeted

11    victim, a way to get to the targeted victim through some proxy

12    person: their child, their new partner, a beloved pet.

13            MR. PATEL:  But like you just said, they're a proxy

14    for who?  For the victim.  That's what this statute's about.

15    And if we're trying to protect the victim, then what do we

16    want?  We want them to be alternative means.  So if a jury is

17    in conflict about which way this happened, then the jury can

18    still convict so that a defendant doesn't go free, your Honor.

19    So, actually, it would help them in this case if they had

20    alternative elements and not alternative means.

21            THE COURT:  So talk a little bit, Mr. Patel, about the

22    government's second argument that the reading that would

23    include a reading that would include self-harm is counter to

24    the purpose of the statute and an unnatural reading of the

25    statute as a whole, and also risks criminalizing conduct that

1    is innocent or is not criminal.

2           MR. PATEL:  Right.  Your Honor, so I think what

3    they're——it's going to look at *Elonis v. United States*, right?

4    That case was very different because in that case——and I wrote

5    a 28——I don't know what you guys call it here, sorry.

6           THE COURT:  A supplemental letter.  I did read it

7    yesterday.

8           MR. PATEL:  This is not appellate court, but anyways,

9    I think——so, you know, let me talk a little bit about *Elonis*

10   first.  *Elonis* was the case where at issue was the threat

11   statute under 18 U.S.C. 875.  There, there was no scienter at

12   all, like no——nothing.  And so the court said that to make sure

13   that we're not criminalizing innocent conduct, we have to read

14   a mens rea into it, right?  But as a *Flory* court said, the

15   Eleventh Circuit said, we don't have that problem here because

16   we have an intent to harass, and you travel in interstate

17   commerce with an intent to harass.  So there's already criminal

18   conduct here.  You're not criminalizing innocent conduct.

19          Also, your Honor, if somebody's putting a gun to his

20   head and saying, like, if you don't give me money, I'm going to

21   kill myself, or, if you don't give me drugs, I'm going to kill

22   myself, you're manipulating the victim.  There's still somebody

23   being victimized.  That's not innocent behavior.  That is

24   criminal behavior.  So, your Honor, the innocent——I don't get

25   that argument in the context of this statute.

Q19HManC

1        THE COURT:  What about the government's argument about

2   the purpose of the statute is not intended, essentially, to

3   give protected status to a defendant engaged in this activity

4   and it's intended to protect victims?

5        MR. PATEL:  Well, your Honor——

6        THE COURT:  Their sort of unnatural reading argument.

7        MR. PATEL:  Right.  Your Honor, but, again, here it is

8   to protect the victim because it's often the case that the

9   victim is being victimized by the——like, a relative, right?

10  And that's what *Plunkett* was talking about.  So if it's to

11  protect the stalkee, right, the person being victimized, then

12  this should be included in there because there's lots of

13  situations where you have a family member that's going to

14  manipulate the person being stalked.  So it's not an unnatural

15  reading at all.

16        And, your Honor, in order to say that an

17  interpretation is absurd, it has to shock the conscience.  It

18  doesn't shock the conscience here because you're trying to

19  protect the person being victimized, and the person being

20  victimized, that can happen with a family member, with a

21  spouse, with an intimate partner.  So there's nothing strange

22  about reading a threat of self-harm into this statute.  It

23  exists and it should exist because the ultimate goal here is to

24  protect the victim, the stalking victim.

25        THE COURT:  Well, unless there's something else you

Q19HManC

1    want to say about self-harm, Mr. Patel, I think we should move

2    on to talk about——

3           MR. PATEL:  Mens rea.

4           THE COURT:  ——the mens rea argument.

5           MR. PATEL:  Yes.

6           THE COURT:  I guess my sort of starting question is is

7    there a way for a defendant to cause reasonable fear of serious

8    bodily injury or death that doesn't involve at least the

9    implicit threat of physical force?

10           MR. PATEL:  So can I give you an example, a better one

11    than we gave in our brief?

12           So imagine a brother travels from New Jersey to hike

13    with his sister in a New York State park——so that's the

14    interstate travel part, right——intending to harass her for his

15    money for the drug habit.  He's addicted to drugs.  He needs

16    drugs, so he's like, OK, I'm going to go on this hike with my

17    sister, and I'm going to harass her when I'm there on this

18    mountain cliff.  And he does so while they're on a narrow

19    precipice of the steep cliff, screaming, gesticulating wildly

20    because he's upset that she's not going to give him the money.

21           Now, she reasonably fears for her own death or serious

22    injury because he's, you know——but he doesn't want to harm his

23    sister, and he doesn't think he's doing anything to put her in

24    fear of injury, right?  But she feels——because sometimes, your

25    Honor, there's divergence of views, right, between the victim

Q19HManC

```
 1    and the person being victimized.  So that can happen.  So
 2    that's a situation that could happen.  And then she gets
 3    distracted and falls off the cliff and dies.  So then there's
 4    death resulting from that situation where all the elements of
 5    subsection A are met and the death results provision, because
 6    the brother traveled in interstate commerce with an intent to
 7    harass the victim and, in the course of the travel, engaged in
 8    conduct that placed the victim in reasonable fear of injury and
 9    death resulted.  But you have an accidental death, and you
10    don't have an intentional or knowing threat of force.  So
11    that's an example.
12         THE COURT:  I think I'm very familiar with the *Flory*
13    decision in which——applying to subsection B, but focused on
14    this part about what does a defendant have to do to cause the
15    result, whether it's substantial emotional distress or fear of
16    injury.  So understanding that the *Flory* court has said that,
17    essentially, no mens rea is required, the government does not
18    have to ask a jury to find beyond a reasonable doubt any level
19    of intent related to that cause——I mean, that effect, excuse
20    me.  But in the government's brief, they argue that, even after
21    *Borden*, the kind of traditional criminal law concept that
22    criminal statutes should be read to presume at least a mens rea
23    of knowledge, what is your response to that argument?  How
24    should I be thinking about that question?
25         MR. PATEL:  So I think, again, we have to go back to
```

Q19HManC

1    *Elonis*, right, and I think *Flory* addressed this.  So if you

2    have a situation where there's no mens rea, right, then you may

3    have to add an additional mens rea.  But that's not the problem

4    here because we do have an intent to harass.  So I think there

5    is no additional mens rea that needs to be added here to

6    separate wrongful behavior from innocent conduct.

7            THE COURT:  So let's talk about these other district

8    court cases, Mr. Patel, because recognizing that they have——go

9    ahead——

10           MR. PATEL:  Oh, I'm sorry.  I wanted to talk——

11           THE COURT:  ——before we go to that.

12           MR. PATEL:  ——also about——I think this is so

13   compelling when we look at the statutory history, because

14   congress knew how to write an intent element into——or an intent

15   element——or intent mens rea into the reasonable fear of injury

16   prong, and they did right beforehand, and then they took it

17   out.  That is really compelling evidence that they didn't want

18   it in there anymore, and that makes sense because they want to

19   make the statute as broad as possible to protect the stalking

20   victim.  So I think that is really, really compelling evidence.

21           I'm sorry I interrupted you.

22           THE COURT:  No, that's OK.  Like I said, I have many

23   questions, but I also want to make sure that you have time to

24   make the points you want to make.

25           MR. PATEL:  Yes.

Q19HManC

|   |   |
|---|---|
| 1 | THE COURT:  But just recognizing the views of other |
| 2 | district courts——and, certainly, magistrate judge opinions from |
| 3 | other districts are not binding on me in any way. |
| 4 | MR. PATEL:  Absolutely. |
| 5 | THE COURT:  ——but it nonetheless is the case, as far |
| 6 | as I can tell, that there are at least five——sorry, at least |
| 7 | four district court decisions from other circuits that have |
| 8 | looked at this statute and said it is a crime of violence, and |
| 9 | that would include *Johnson*, *Ali I*——both from Southern District |
| 10 | of Florida——the *Bacon* case from Delaware and *Griffin* from |
| 11 | Eastern District of Michigan.  And if you could just kind of |
| 12 | walk me through, Mr. Patel, to the extent you haven't already |
| 13 | addressed it, why you think I should reject the reasoning of |
| 14 | those cases. |
| 15 | MR. PATEL:  Yes.  I think all of those cases are |
| 16 | deeply flawed for several reasons.  So, your Honor, these cases |
| 17 | don't use the word "realistic probability," but that's what |
| 18 | they're doing.  They use the word "legal imagination."  Where |
| 19 | does that come from?  That comes from *Duenas-Alvarez*, which is |
| 20 | all about realistic probability.  So maybe they're not using |
| 21 | the words "realistic probability," but that's, in effect, what |
| 22 | they're doing.  So that's one problem with these cases. |
| 23 | In the *Griffin* case, too, also it was a very strange |
| 24 | analysis.  They just said, oh, anytime death results, like, you |
| 25 | know, that just means that now there's going to be——it changes |

Q19HManC

everything, without even explaining it.  I think they cited to

*Tsarnaev*, right, maybe, but there really was no other

explanation.  But I think I've given you an example where death

can result in this situation, so I——

THE COURT:  Let's talk about *Bacon* because I think the

analysis in *Bacon*, the Delaware opinion, is arguably the most

thoughtful.  And the court in *Bacon* says, on this question I

asked a little while ago, whether, when you put all of these

things together, is at least the threat of force implicit in

all parts of the statute put together?  And the *Bacon* court

says, well, if you intentionally set out to kill, injure,

harass or intimidate, then you do things that, in fact, have

the effect of creating reasonable fear of serious bodily injury

or death.  That all of those things put together must

necessarily involve at least a threatened use of physical

force.  And what's your response to that analysis?

MR. PATEL:  So I gave you the hypothetical.  I think

that there can be a divergence.  So the way I look at it is

intent to harass, that's where you look at the defendant's

perspective, right?  And then you look at reasonable fear of

injury; that's from the victim's perspective, right?  So that

situation where you have the brother gesticulating, like angry

because he's not getting the money from his sister, but he

loves his sister, he doesn't think that he's doing anything to

harm——he would never harm his sister, and so in that mindset he

Q19HManC

1    can't imagine a situation where he's putting his sister in

2    reasonable fear of injury.

3            THE COURT:  And the argument is that in that——if a

4    case of your hypothetical went to trial, your argument is that

5    the government would want a jury instruction or be entitled to

6    a jury instruction that says all you need to find is that the

7    victim objectively had a reasonable fear of serious injury?

8            MR. PATEL:  Absolutely.  That's what they'd be asking

9    for.

10           THE COURT:  The government is not required to prove

11   that the defendant knew or intended to cause that result?

12           MR. PATEL:  Right, right.

13           THE COURT:  OK.

14           MR. PATEL:  Exactly, your Honor.

15           Does the Court have——oh, the one thing I wanted to

16   address, too, the government says, oh, this *Minners* case is

17   garbage.  That was different.  That was different language.  I

18   think that's really exaggerating how different the statute was

19   at that time, because the statute at that time didn't have the

20   "engaging in conducting" language.  So you just had to travel

21   and, in the course of the travel, you placed somebody in

22   reasonable fear of injury, whereas now there's the engaging in

23   conduct that places somebody in reasonable fear of injury.

24           But I don't think that changes the analysis because,

25   like the example I gave you, yes, the brother's engaging in

Q19HManC

conduct——like, he's gesticulating, he's whatever, and that
happens to place the victim in reasonable fear of injury.  So I
just think that the *Minners* case, I agree, I don't think the
hypotheticals were the best there.  I think I've given you
better ones than that, but there is a court that has recognized
that this can happen.

So I think one thing, too, in some of these cases——the
bad cases, I call them.  There's not this——they haven't
considered the hypothetical that I gave you.  I don't even know
if that was put before them.  And the other thing is in those
cases, they didn't look at the legislative——the statutory
history that we've given you.  They didn't look at the *Flory*
decision, right, which, by the way, the Second Circuit has
approvingly cited to.

THE COURT:  Right, although I looked at that——

MR. PATEL:  I know it's a bit different.

THE COURT:  The citation is not quite for the point
that I think is really the heart of our issue here.

But I know I have kept you over your time, Mr. Patel,
but I just have a couple of other questions that I want to ask
you.

There are other criminal statutes that use similar
language about fear of injury.  And I think, most notably,
Hobb's Act robbery, one of the ways you can accomplish a
robbery is by creating a fear of injury, which is very similar

Q19HManC

1    language to what we have here.  And the courts have

2    consistently held that a completed Hobbs Act robbery, even if

3    accomplished by fear of injury, is a crime of violence.  And so

4    why is this statute and the language here that talks about

5    reasonable fear of injury, why should I view that differently

6    than courts have viewed that language in the Hobbs Act?

7         MR. PATEL:  So, your Honor, in those cases, I think

8    there's——"intimidation," I believe, is the language that's

9    used.  Also, I think those cases are different where you're

10   talking about robbery where here have an intent to harass,

11   right, and then happens to place somebody in reasonable fear of

12   injury.  Actually, there's two cases I wanted to talk about

13   that where you have this "reasonable fear of injury" language.

14   It's almost identical to what we have.  It was in the *Carter*

15   case——this was a Georgia assault statute——and then the Garner

16   case from the Fifth Circuit.  It was also a Louisiana statute.

17   And the exact language we're talking about, the "reasonable

18   fear of injury," was in those cases, in those statutes, and the

19   Court said, look, all that requires is that the defendant

20   intentionally engaged in the act that happens to put somebody

21   in fear of injury.

22        THE COURT:  I apologize, Mr. Patel.  I'm not expecting

23   you to track the Second Circuit's summary orders, but there was

24   a summary order this fall, in September, in a case called

25   *U.S. v. Williams*——

Q19HManC

```
 1              THE DEFENDANT:  Yeah.

 2              THE COURT:  ——addressing the Vermont simple assault

 3    statute which also uses the "fear of imminent serious bodily

 4    injury" language.  Now, that statute, the full language is

 5    "attempt by physical menace to put another in fear of imminent

 6    serious bodily injury."

 7              MR. PATEL:  Yeah, "by physical menace," I think, makes

 8    that different.  I'm not familiar with that case, but also,

 9    your Honor, I think you have to keep in mind——again, we have to

10    go back to the statutory history, which we don't have this with

11    the Hobbs Act robbery, where Congress contemplated the intent

12    language.  They put it in there, "intent to place somebody,"

13    and then they took it out.  That, to me, is really powerful.

14    It has to be.

15              THE COURT:  All right.  We've gone over your time,

16    Mr. Patel, but I'm still going to give you your four minutes on

17    rebuttal.

18              MR. PATEL:  Thank you.

19              THE COURT:  Anything else you'd like to say before we

20    take a break?

21              MR. PATEL:  No, that's it.  Thank you.

22              THE COURT:  All right.  Thank you very much.

23              All right.  So it's 12:20.  We'll just take a

24    ten-minute break.  We'll resume at 12:30 with the government's

25    arguments.  Thank you.
```

Q19HManC

1          (Recess)

2          THE COURT:  You can all be seated.  Thank you.

3      OK.  Mr. Gentile.

4          MR. GENTILE:  Your Honor, as you can see, the

5   prosecution team has divided its responsibilities.  Mr. Xiang

6   is going to handle the crime of violence argument.

7          THE COURT:  OK.  Great.

8      Mr. Xiang, you want to use the lectern?

9          MR. XIANG:  Yes, your Honor.

10         THE COURT:  So I'll just begin, Mr. Xiang, I think the

11  great difficulty for the government is that the statute is

12  written, it seems to me, intentionally as broadly as possible

13  to cover a wide range of conduct, and that's a very

14  understandable and laudable goal of Congress, given the history

15  of domestic violence in this country, in that prior to some of

16  these statutes, there was essentially a world in which a woman

17  could go to the police and say:  He is calling me at all hours

18  of the day and night.  He's sending flowers, unwanted things,

19  to my work, to my home.  When I come out of the grocery store,

20  I see that his car is there and follows me home, and you've got

21  to do something, and the typical police response would be that,

22  well, there isn't anything we can do, right?  If he actually

23  tries to hurt you, you can get a restraining order, and if he

24  actually tries to hurt you or get inside the house, then you

25  should call 911, and then we'll do something.  But until that,

1    until he actually tries to hurt you, there's nothing we can do.

2              And to a significant degree, I think, the statutes

3    that are at issue here were designed and have been revised

4    multiple times over the years to try to create a remedy and a

5    law enforcement option before anyone is actually hurt or dead,

6    right?  And that goal and that statutory design, if I'm right,

7    is really in a lot of tension with what the Supreme Court is

8    telling me I have to do to conclude that this crime can be a

9    predicate for a 924(c).

10             So I guess, first, I'll invite you to tell me why I'm

11   wrong about that kind of framing, if there's something you want

12   to say particularly about that, and then we can start from

13   there wherever you'd like to start.

14             MR. XIANG:  Sure, your Honor.  So I would certainly

15   agree with the first part of your Honor's framing as to the

16   purposes of the statute and its revisions over time, and I

17   would agree with your Honor that the sort of scenario that your

18   Honor described about, well, I'm receiving all of these threats

19   or communications that I perceive to be threatening, and the

20   police saying, well, he hasn't followed through on them;

21   therefore, we can't do anything, that's something that the

22   statute is intended to address.  However, I would say, sticking

23   with that just core or heartland scenario for a second, that

24   comes within the elements clause, right?  Because, keep in

25   mind, the elements clause is not solely about the actual use of

Q19HManC

1    force; it is also about the attempted or threatened use of

2    force.  And as we've argued and as the Supreme Court made clear

3    in *Borden*, it need not even be about the intentional or

4    purposeful threatened, attempted, or actual use of force; it

5    would be sufficient if there is the knowing, right, knowing but

6    not purposeful, attempted threatened or actual use of force.

7    And so I would say that, actually, the fact that the statute

8    wants to cover those scenarios is not in tension with the

9    notion that it fall under——that it categorically fall under a

10   crime of violence.

11          But I think the other point I want to make here real

12   quick, your Honor, is that even though the statute has been, of

13   course, broadened, the government's position is not all aspects

14   of the statute are crimes of violence.  As your Honor pointed

15   out, there is no dispute between the parties that what we call

16   the emotional distress subsections of the statute are not

17   crimes of violence.  And I would say that part of the

18   broadening of the statute is to cover that aspect, right, where

19   the conduct by the stalker does not rise to the level of

20   someone reasonably fearing I'm about to die or suffer serious

21   bodily injury, something less than that is what that was

22   intended to cover.  And I think, as the Court suggested early

23   on——and there wasn't much argument because it seems like we're

24   all seeing where this is headed——those parts of the statute

25   are, at a minimum, divisible.  So I think that would be my

Q19HManC

1    response to your Honor's thematic point.

2            THE COURT:  Before we move on, just very briefly on

3    divisibility, what is your response to the defense argument

4    that you should be bound by concessions that the government may

5    have made in *Plunkett*, the case in the Western District of

6    Virginia, or in *Garg*, the case in the Western District of

7    Washington, about divisibility?

8            MR. XIANG:  We don't agree.  Individual positions

9    taken by individual AUSAs in other districts do not bind our

10   office, do not bind this prosecution.  There's no indication

11   that those positions reflected any sort of considered opinion

12   by, for example, the Solicitor General or the Criminal

13   Appellate Division.  And as your Honor knows from looking at

14   those submissions, one of those, the one in *Plunkett*, was a

15   response to a 2255 in which the AUSA basically said, with no

16   analysis at all or engaging with any of the relevant statutes

17   or any of the relevant authority, it appears the statute is not

18   divisible.  And the one in *Garg* is——it was a jury instructions

19   issue, and I think later on it was a footnote in the context of

20   a sentencing submission about restitution, and the divisibility

21   issue came up in the context of that footnote.

22           So, needless to say, in neither of those cases was the

23   issue sort of teed up in quite the way it is here, and in any

24   event, it does not bind the government in this prosecution.

25           THE COURT:  OK.  Well, I mean, I have my order of

Q19HManC

```
 1    questions, but I don't know—I don't want to control things too
 2    much, Mr. Xiang, from what you'd like to talk about.  But just
 3    to stay kind of in the order that I was focusing on with
 4    Mr. Patel, just to close off a few things that I think aren't
 5    disputed, right, I know the government has argued that death
 6    resulting is an element of the offense that must be proven to a
 7    jury beyond a reasonable doubt.  That's right, correct?
 8              MR. XIANG:  That's correct, your Honor.
 9              THE COURT:  And assuming that, what's the government's
10    view about how a case that has charged death resulting as an
11    element, what weight should I give to that?  What role should I
12    give to that charge in assessing whether the predicate crime is
13    a crime of violence?
14              MR. XIANG:  So the government's position is this:  We
15    are not making the argument, Judge, look at this element.  This
16    is the thing that satisfies the elements clause.  We're not
17    making that argument.  What we are saying is what the cases
18    invite the Court to do in categorical analysis is to look at
19    the minimum conduct necessary to satisfy all of the elements,
20    and under *Mathis*, a penalty-enhancing provision like 2261(b)(1)
21    counts as an element.  And so what we're saying is, in
22    considering whether the other elements require the government
23    to prove the actual threatened or attempted use of force, it's
24    further constrained by the fact that, as charged here, there's
25    this additional death resulting element; that is, as we're
```

Q19HManC

1    thinking through about the plausibility of——or whether these

2    hypos work or don't work, these hypos must necessarily include

3    some story about the death resulting because that's something

4    that the government's going to need to prove anyway.

5         THE COURT:  And, again, just in terms of trying to

6    narrow what is in dispute, do you agree that, at least for this

7    statute, the death that results need not have been intended by

8    the defendant; it can be an accident or something that arises

9    from reckless conduct?

10        MR. XIANG:  We agree with that, your Honor.

11        THE COURT:  All right.  I thought so, but I'm just

12   trying to close things down.

13        So maybe, if it's all right with you, Mr. Xiang, let's

14   start with the defense argument about self-harm.

15        MR. XIANG:  Sure.  And if it's all right with the

16   Court, I'd first like to start with what I'll call the

17   romanette divisibility argument.

18        THE COURT:  Sure.

19        MR. XIANG:  Look, I think our argument that the

20   romanettes are divisible largely tracks our arguments and the

21   case law for why the reasonable fear of death and bodily injury

22   subsection is divisible from the emotional distress, which

23   is——what the Second Circuit has largely said in these types of

24   cases is, look, it's not really dispositive, but if it's a

25   disjunctive list, and if the items on that disjunctive list are

Q19HManC

1    separately enumerated, meaning with letters or romanettes or

2    whatever, that's a very strong signal that Congress intended

3    these to be elements rather than means.  And I think the

4    primary response from the defense today has been, no, no, no,

5    they're means rather than elements because they're intended to

6    achieve kind of a common statutory purpose, right, the

7    protection of victims.

8         THE COURT:  I mean, in order for something to be

9    divisible, one of the tests for divisibility is to ask whether

10   you could be separately charged in the same indictment with

11   multiple crimes based on a separation between whatever the

12   thing is that we're asking, if it's divisible.  And I think

13   that the government is on pretty firm ground, as I said at the

14   outset with Mr. Patel, with regard to subpart——parts 1 and 2

15   and within those subparts A and B because on that question, do

16   you have a multiplicity or double jeopardy argument, courts

17   have been uniform, as far as I can tell, in saying, no, you can

18   be charged in the same instrument with multiple crimes for the

19   same course of conduct as to those four parts.

20        But I have a somewhat greater difficulty imagining——

21   let's take a scenario where the threat at issue or the

22   defendant's conduct at issue is a threat to, like, I swear I'll

23   burn down this house, and I don't care if I kill everyone

24   inside.  And inside the house is the estranged romantic

25   partner, maybe her new partner, and a child or the family pet.

Q19HManC

It's difficult for me to imagine that that scenario is then
chargeable in three separate counts as three different crimes
because that threat does——I think would place the former
partner in reasonable fear of serious bodily injury or death to
herself, to the new partner who she knows is also in the house,
and to the dog.

          And so what's your response on that?  If a threat or
course of conduct is directed at multiple people that are in
these enumerated categories, to think that that is chargeable
as separate crimes for each person who might——who the victim
might fear is at risk of injury or death?

          MR. XIANG:  So your Honor is right that the natural
consequence of the government's position here is that the
romanettes are chargeable as separate counts, and that if they
were charged in a single count, that that count would be
multiplicitous.  I think on the hypo that your Honor mentioned,
I think the government has a different intuition, which is
actually those would be chargeable separately.  And the same
way, for example, that in the context, say, of a gang shooting,
right, where someone sprays a whole bunch of gunfire and three
people are killed.  It is not only common practice but legally
necessary that each of those murders be charged separately even
though it's a single course of conduct.  And I would say that
if that house burning scenario were charged separately, the
government's burden would be different, right, because the

Q19HManC

1    government's——the other aspect of the government's

2    argument——and this goes to the mens rea point a little bit——is

3    that there needs to be——the statute should fairly be read that

4    the defendant at least knows or intends that the defendant be

5    placed in reasonable apprehension.  So as to the different

6    occupants of the home——

7        THE COURT:  Right, we'll get to that issue because I

8    think that's fairly in dispute.  But I think your intuition is

9    correct in the sense——like take the *Elkins* case, right, where

10   the issue there was a defendant had targeted for harassment

11   both a long-ago romantic partner, if I'm remembering correctly,

12   like a girl he had briefly dated in high school——they are now

13   adults——and her husband, and both of them were the target of

14   the harassment, right?  And the *Elkins* court, the Fifth

15   Circuit, says the unit of prosecution is the intended victim of

16   the harassment or intimidation.  And in that case both the

17   woman and her husband——like multiple counts were charged with

18   both the woman and her husband identified as the targeted

19   victim.

20       So I agree with you as to that, that it's possible,

21   where the harassment is intentionally directed at multiple

22   people such that each of those people falls into the "that

23   person" definition, that that's the unit of prosecution, and

24   they could be charged in multiple counts.  I think the

25   difficulty is on the divisibility question, imagining a

Q19HManC

1    situation where there's only one "that person."  There's the

2    targeted victim of the harassment or intimidation, and then the

3    question is the last element can be satisfied if that victim

4    fears, reasonably fears, bodily injury to herself or any one of

5    a list of other people.  And that seems to me a little bit

6    different than a situation like *Elkins* where the defendant is

7    intentionally targeting his harassing or intimidating behavior

8    at more than one person who——and each of those people then

9    qualifies as a person who can be an identified victim.

10          Does that make sense?  Are you following me,

11   Mr. Xiang?  Does it make sense what I'm asking?

12          MR. XIANG:  I think so, your Honor.  Let me respond in

13   a couple ways.

14          THE COURT:  OK.

15          MR. XIANG:  First, this is, I think, pretty clear.

16   This degree of divisibility, the argument that the government

17   is advancing, the government recognizes is not really an

18   argument that has been teed up in this way before.  And so it's

19   not surprising that, say, in jury instructions in other

20   prosecutions that this granularity or slicing the onion this

21   fine hasn't been done before.  So if it wasn't in *Elkins*, I

22   think that's probably why it wasn't.

23          But if your Honor's concern is, well, what if there's

24   just a single unitary conduct that occurs, but it has

25   ramifications for reasonable apprehension as to different of

Q19HManC

1    the categories?  I guess the government's response to that is,

2    well, that's not unusual in criminal statutes.  And returning

3    to the gang example——I'm just familiar with gang examples——say

4    this is a gang hit against the intended occupant of a house,

5    right, or a residence.  And so what they're trying to do is

6    they're trying to kill that person, and they toss a grenade in,

7    right, and the thing blows up and it kills three or four other

8    people.  We wouldn't say, well, the unit of prosecution is the

9    tossing of the grenade.  The unit of the prosecution are the

10   people who get harmed by it.  And I think just to go back to——I

11   think there is a connection between this point and the mens rea

12   point.

13          THE COURT:  I was just going to ask you that question,

14   Mr. Xiang.  Some of this analysis, right, I wouldn't say turns

15   on, but is influenced by this other question that we kind of

16   put to the side for the moment about what is the mens rea that

17   the government's required to prove for this "cause reasonable

18   fear of serious bodily injury."

19          MR. XIANG:  Right.  So the government's answer to

20   that, just to preview that part of the argument, is that the

21   defendant needs to know that his conduct will place the

22   interstate stalking victim in reasonable fear of death or

23   serious bodily injury to those various enumerated categories.

24   And so as to his knowledge of the reasonableness of the fear as

25   to any specific category, that is a different element on which

Q19HManC

the government bears the burden of proving beyond a reasonable

doubt, and therefore, those are separate crimes under the

*Mathis* analysis.

THE COURT:  How do you square that argument with the

Eleventh Circuit ruling in *Flory* in which they said very

explicitly——again, it was at the substantial emotional distress

prong, but it's the same statutory structure, right, the

subparts A and B are about the effect that your behavior

produces in a victim——and in *Flory* the one Eleventh Circuit

says quite clearly——there a different kind of argument was

advanced, right, not accidental, but the defendant had a

cognitive impairment such that the defense wanted the jury

instructed that the defendant had to intend or at least know,

have purposeful awareness, knowledge, that what he was doing

would cause substantial emotional distress.  And the Eleventh

Circuit said no, for that, for the relationship between the

defendant's actions and the effect that makes out the last

element, the government is not required to prove even

knowledge.  If they've proved intent to harass, intimidate,

kill, or injure, the travel or interstate communications and a

course of conduct, then it is enough that we then turn to the

effect on the victim with no mens rea required for that

element.

MR. XIANG:  So, look, your Honor, we recognize there's

some tension between what *Flory* says and our position.  What I

Q19HManC

1    will say is there's other legal kind of layers in *Flory* that

2    influence that analysis that are not present here, right?  That

3    was a case about a threat, right, true threats and the First

4    Amendment, and that aspect of the analysis.  I believe what the

5    court said there is, look, part of what we're not interested in

6    doing is displacing the specific intent that's enumerated by

7    statute with the kind of true threat-type language.

8         THE COURT:  Right, a desire to try to create a

9    distinction between the place where the true threats analysis

10   is supposed to be applied and then the rest of the statute.

11        MR. XIANG:  Correct, your Honor.  Look, at bottom,

12   what *Flory* is, right, is simply a decision about the adequacy

13   of the jury instructions.  I mean, at a certain level, that's

14   what that aspect of the decision was about.  And I think on

15   this footnote 8 of that decision is instructive because—and

16   I'll just read it very quickly—the Eleventh Circuit says:

17        "Notably, the court's jury charge defining the

18   subjective intent to harass or intimidate required the specific

19   intent for purpose of causing an adverse reaction in a specific

20   person or of putting a person in fear or apprehension of injury

21   inflicted by a particular person.  Thus, in addition to the

22   requirement that the content of the message had to be a true

23   threat, the court charged that Flory must have had the specific

24   intent to cause an adverse emotional reaction or to cause

25   fear."

Q19HManC

            Now, obviously, *Flory* was about the emotional distress
subsection, so we can kind of strike or ignore that language,
but if one strikes that language and says, look, part of why
we're comfortable with this is because the district court, the
trial court, in fact, charged that Flory must have had the
specific intent to cause fear.  Well, that's not their
argument, right?  Their argument is the reasonable apprehension
piece is basically strict liability.  They're basically saying,
look, as long as there's interstate travel and subsequent to
the interstate travel there's conduct, the foreseeability that
that conduct would cause reasonable apprehension or fear in the
victim of death or serious bodily injury, that doesn't matter.
Even if that were completely unforeseeable, you'd be on the
hook under 2261A, and the government's view is that's just not
a natural reading of the statute.

            THE COURT:  Let me give you a hypothetical.  Let's say
I'm the estranged spouse of a woman, and I've been trying to
guilt her to talk to me about some aspect of our divorce
proceedings: the alimony, whether we ought to——whether she will
withdraw certain allegations against me.  And I've tried.  I've
emailed.  I'm calling, maybe to an extreme, and she doesn't
respond and won't talk to me.  So one day I drive my car to the
public street where her house is, and I park my car on the
public street.  So I'm not on her property but entirely
blocking the driveway, and I'm texting.  Like, I'm sitting out

Q19HManC

1    here, and I'm staying here until you agree to talk to me about

2    this issue.  Let's say my prior communications have been

3    sufficient to amount to intent to harass.

        Unbeknownst to me, inside the house is my former

5    wife's child who has severe asthma, and the stress of the

6    situation prompts an asthma attack in the child.  And my

7    estranged wife now does, because of my actions, reasonably fear

8    that the child might be seriously injured or die.  And let's

9    take it one step further and imagine, in fact, the child does

10   die.  Is that course of conduct sufficient to meet every

11   element of a 2261A(1)(A) charge?

12           MR. XIANG:  No, your Honor.

13           THE COURT:  Why not?

14           MR. XIANG:  Because I have not knowingly engaged in

15   conduct that I know will place the victim in reasonable fear of

16   death or serious bodily injury.

17           THE COURT:  But where is that "knowingly" coming from,

18   right?  Because it's not in the statute.  I think we all agree

19   that it's not in the statute.  There's no words there that you

20   can read that get you there.  So why should I read those words

21   into the statute?

22           MR. XIANG:  OK.  So this is the *Elonis* point, right,

23   and I think what the *Elonis* line of cases——and this goes all

24   the way back to *Morrisette* and cases like that——is that where a

25   statute is silent as to the state of mind that accompanies an

Q19HManC

1   actus reus, what courts do is not say, all right, well, there's

2   no state of mind requirement here.  What courts must do is read

3   into the statute a sufficient state of mind requirement that

4   would distinguish innocent conduct from culpable conduct.  And

5   I think the defendant's primary response to this is, well,

6   there is an intent requirement; it's this intent to harass

7   requirement.

8        But that doesn't work, and here's why:  Number one, if

9   we look dramatically at the statute, that specific intent

10  requirement modifies solely the word "travels," right?  It's

11  travels in interstate or foreign commerce, etc., etc., comma,

12  with intent to kill, injure, harass, etc., close comma, and in

13  the course of or as a result of such travel or presence engages

14  in conduct——so there's a separate word "engages" that

15  grammatically is not modified by the specific intent

16  requirement, and then that's what leads to reasonable fear of

17  death and serious bodily injury.

18       THE COURT:  Right, and I think courts have generally

19  agreed, and I think it's a natural reading, the course of

20  conduct has to be some purposeful conduct and more than one

21  event, right, and that it has to be purposeful.  I think the

22  gap that you're trying to bridge, right, because *Taylor* and

23  *Davis* and *Delligatti* all tell me that I have to identify the

24  element that is——requires the use, attempted use, or threatened

25  use of physical force.

Q19HManC

1          So I think, really, so much of the action, right, is

2     right where we are talking about right now, which is what is

3     the bridge, whether primarily a mens rea bridge, between my

4     purposeful conduct and the effect that is produced by that

5     purposeful conduct, which is either that a person is placed in

6     reasonable fear of death or serious bodily injury or that I'm

7     causing substantial emotional distress, which is not at issue

8     here, but——

9          MR. XIANG:  Yes, I think the bridge is the *Elonis*

10    principle that you have to include mental state requirements

11    that distinguish between innocent and non-innocent conduct.

12         And just to jump real quick back to your Honor's

13    originally hypo, that does not strike the government as a

14    crime, what your Honor has described, and the government can

15    certainly construct other hypos like that, right, where there

16    is interstate travel with an intent to harass, and say it's

17    established by journals or whatever, and say——say, the stalker

18    checks into a hotel, right?  It's not a hotel near the victim.

19    It's not——just check into a hotel.  Interstate travel.  Before

20    I start my course of harassment tomorrow, I'm going somewhere

21    to stay, and the victim sees the defendant, right, check into

22    the hotel.  And we can construct, for purpose of the hypo, all

23    sorts of historical facts that make it reasonable for the

24    victim to fear, oh, he's come back to town to kill me.  I don't

25    think the statute reaches that conduct, right?  Because

Q19HManC

1   basically what we're talking about at that point—forget about

2   *Borden* and *Leocal* and negligence and reckless, that's straight

3   up strict liability, and that is not something that, absent

4   very clear congressional intent, should be the natural

5   interpretation of this Court.

6          And I really want to make this point about the *Elonis*

7   problem does not get solved simply if there is a specific

8   intent.  Here's a pretty simple statute that I think

9   illustrates that.  Say a state passes a statute that says

10  whoever transports, with intent to earn fee, cocaine shall be

11  guilty of a crime, right?  And what is the mens rea that needs

12  to apply to knowledge that cocaine is being transported?

13  Because, on the face of that statute, a regular cab driver who

14  picks up a fare with the intent to earn a fee, right, and the

15  passenger ends up being a drug trafficker who's arrested by the

16  DEA on the back end, that cab driver would be guilty of this

17  offense, and no court would interpret the statute that way,

18  right?  The court would say there's a knowledge requirement as

19  to the drugs.

20         THE COURT:  But, Mr. Xiang, isn't that sort of like

21  right at the argument that Mr. Patel was making about his

22  interpretation of *Elonis*?  The difficulty you have in that

23  hypothetical is that until—the thing that tips innocent lawful

24  conduct into criminal conduct is the driver's knowledge that

25  the passenger has cocaine and that the purpose of the trip is

Q19HManC

1    transporting the cocaine.  Here, I think Mr. Patel's argument

2    is that their interpretation of the statute doesn't create an

3    *Elonis* problem because, even with the kind of strict liability

4    like if you——if you have purposeful conduct that produces a

5    certain effect, you're on the hook.  There's no *Elonis* problem

6    because you already have engaged in conduct that is

7    criminalized in various ways, in all kinds of state and federal

8    statutes, which is engaging in purposeful conduct with an

9    intent to harass or intimidate.

10             MR. XIANG:  So I would disagree with that, your Honor.

11             THE COURT:  OK.

12             MR. XIANG:  I think if we're going to map those

13   analogies on, I think what your Honor's saying, look, the

14   intent as to the drugs does all the work in that drug, right,

15   hypothetical drug statute.

16             THE COURT:  At least in terms of dividing innocent

17   from criminal conduct.

18             MR. XIANG:  Understood.  I guess what the government

19   would say is that the intent to harass cannot do all the work.

20   Pretend there was a version of 2261A that just stopped at the

21   travel, whoever travels with the intent to harass, you know,

22   the enumerated categories, shall be guilty of a felony.  That's

23   an edgy statute, right?  That's just someone traveling who does

24   nothing post-travel, does nothing vis-a-vis the victim, but

25   harbors dark and malicious thoughts in the course of travel.

Q19HManC

1    That's not what 2261A is about, right?  The travel element is

2    in some sense—you know, it's the federal nexus hook to where

3    the action is, which is the conduct vis-a-vis the victim.  So

4    to say that, well, there's this intent requirement that does

5    the work as to the travel, and so don't worry about the *Elonis*

6    issue as to the conduct doesn't make sense.  What we're trying

7    to get at is intentional targeted conduct vis-a-vis the victim.

8         And going back to my hypo from before, you can

9    construct hypos where the defendant has engaged in conduct

10   that, due to weird Rube Goldberg-like circumstances, leads to

11   some fear by the victim, or even death, that are completely

12   unforeseeable and could not possibly be foreseeable to the

13   person who traveled.  I don't think the statute is meant to get

14   at that.

15        THE COURT:  So assuming that you're correct and that I

16   should read the statute to require at least knowledge that my

17   purposeful conduct would place a reasonable person in fear of

18   serious bodily injury or death, does that necessarily mean

19   that, in the language of *Taylor*, that the government is

20   required—that in order to find someone guilty of this crime,

21   to convict them a jury is required to find beyond a reasonable

22   doubt that they used, attempted to use, or threatened the use

23   of violence—of physical force?

24        If I accept your view that you have to at least have

25   knowledge that your actions would cause a reasonable person to

Q19HManC

1    fear, is there any way to accomplish that?  Like, could the

2    government prove that case without requiring a finding that a

3    defendant used, threatened, or attempted the use of physical

4    force?

5             MR. XIANG:  No, we couldn't.  There's no delta, and

6    that's why we succeed under the categorical approach.  I mean,

7    every one of the hypos that the defense has offered, including

8    the hiking hypo today, they all fail for one of two reasons.

9    And depending on—the devil's in the details.  Depending on

10   what set of facts, details can be tinkered, it could be one of

11   the two:  Either it's the case that it wouldn't be reasonable

12   for the victim, all things considered, to fear death or serious

13   bodily injury, right—and the word "reasonable" is doing a lot

14   of work there—but also death or serious bodily injury as

15   opposed to being generically scared or harassed or emotional

16   distraught.  Either that's not reasonable or there are facts

17   that make belief and fear from the victim reasonable, in which

18   case those same facts are the facts that make it so that the

19   defendant at least knows that that is—that that reaction from

20   the victim are the natural consequences of his actions.

21             And *Borden*, of course, reminds us that it sort of

22   doesn't matter whether the defendant intends subjectively in

23   his heart to follow through, right?  And he could even—I think

24   in the reply brief they say what if he really reassures her,

25   hey, I'm not about to kill you?  That actually legally doesn't

Q19HManC

         1    matter.  What the legal inquiry there is, based on what the

         2    defendant, all the facts that he knows, including all their

         3    backstory and history and all of that, does he know that the

         4    victim's reaction, the belief as to the conduct that's

         5    occurring, is that it would be reasonable for the victim to

         6    fear death or serious bodily injury?  And if that's the case,

         7    then the defendant is at least knowingly engaged in the actual,

         8    attempted, or threatened use of force.  He's not intending the

         9    threatened use of force, but he's knowingly engaging in conduct

        10    that he knows, from the victim's perspective, constitutes a

        11    threatened use of force and that's sufficient to satisfy the

        12    elements clause.

        13          THE COURT:  And you'd agree with me, Mr. Xiang, that

        14    if I were of the view that that element could be satisfied with

        15    recklessness or negligence, that under *Borden*, it's game over.

        16          MR. XIANG:  It's game over, yes, your Honor.

        17          THE COURT:  OK.  I thought you would concede that.  I

        18    just wanted to make sure.

        19          I guess part of what——just to make sure I understand

        20    your argument, Mr. Xiang, it's sort of the flip side of a

        21    question I think I put to Mr. Patel where a number of the other

        22    district court cases kind of, in an analysis that I think is

        23    maybe not necessarily correct, but they look at, when you put

        24    all of these things together, all the parts of the statute

        25    together, there's no way for that entire course of behavior to

1    happen without at least the threat, the implied threat, that

2    force will be used.  And first, I guess do you think that's

3    right; and, second, do you think that I'm permitted to do that

4    under Supreme Court precedent?  Do I have to go element by

5    element and identify where is the element that could

6    potentially satisfy the crime of violence definition and

7    analyze that element in isolation, or am I permitted to look

8    at, well, when you put all of these elements together, you end

9    up at place X?

10             MR. XIANG:  You can look at all the elements together,

11   and here's why, your Honor.  I think the formulation—and I

12   apologize, I don't have the precise cite here—a common

13   formulation, including in the Second Circuit, is what is the

14   minimum conduct that the government needs to prove in order to

15   prove up the statute?  The minimum conduct is conduct that

16   includes all the elements.  And I think part of what your Honor

17   is getting at is, well, what if the thing that makes it a crime

18   of violence is split across different elements or is the kind

19   of interstitial space, shall we say, between two elements?  And

20   the government's view is that's good enough, right?  I don't

21   think the analysis turns on whether the crime of violence kind

22   of qualifying piece of the statute is in one element or a

23   couple different elements.

24             An analogy that we've been thinking through to think

25   this through—and I know this is silly—say we're not talking

Q19HManC

about crimes of violence and say, you know, a statute is a
certain kind of crime.  If it requires, as an element, that you
own a square, right, and say the statute under consideration
is, well, element one is that you have a four-sided shape.
Element two is that that four-sided shape has sides of equal
length.  And element three is that that four-sided shape have
four right angles.  I don't think it would make sense to say,
look, it's not categorically a square because the square-making
thing is split across three elements as opposed into one
element.

As your Honor knows, how courts list elements, whether
a particular statute has three elements, five elements, that
can even vary across jury instructions.  There's no magic to
that.  I think the analysis——and I think the Second Circuit and
I believe the Supreme Court cases make clear——is what we're
looking at is what the bare minimum conduct that the government
must prove in order to carry its burden as to the statute?
Obviously, because it's categorical, not just in this case but
in any case.  So in a divisible statute where we've charged the
death resulting, it's going to include all the elements,
including the death resulting element.

So to go back to the original original question, the
government's not saying the death resulting element is doing
all the work by itself, but it certainly should be taken into
account in that kind of all-elements analysis.

Q19HManC

1          THE COURT:  I know I've taken you over your time also,

2     Mr. Xiang, but I have a few more questions just to the question

3     that I put to Mr. Patel about *Taylor* and the effect of *Taylor*

4     on the realistic probability test.  And I think when I was

5     pressing Mr. Patel on this, I sort of said, well, you know,

6     there's—what *Taylor* clearly is prohibiting, I think, is a

7     version of realistic probability that puts a burden on a

8     defendant to identify instances or to demonstrate that the

9     hypothetical that wouldn't require the use of force is

10    something that was likely to be prosecuted, such that a court

11    needs to worry about the situation.  And I think it arguably

12    leaves open the question of whether a different way that courts

13    have used realistic probability, which is this kind of—the

14    hypotheticals exercise basically.  Can you imagine a way,

15    consistent with the laws of physics and normal human

16    interaction, where a scenario—a factual scenario—could play

17    out that would be prosecutable regardless of what any

18    particular AUSA might think about the merits of the case?  So

19    what is your view on that?  What is the teaching of *Taylor*, and

20    what should I think remains of the realistic probability test?

21          MR. XIANG:  So the government is certainly not relying

22    on the realistic probability test in the way—in the way

23    forbidden by *Taylor*.  And the government's not taking the view

24    that, well, some of these hypos are too farfetched; therefore,

25    ignore them in the categorical analysis test.  I mean, we've

1    been happy to indulge all the hypos.  The hypos fail not

2    because they're farfetched but because they don't accomplish

3    what they need to accomplish in order to count as a

4    counterexample, right, which is to simultaneously be conduct

5    that fails the elements clause, but that also puts the victim

6    in reasonable fear.  I mean, that's the government's position,

7    not that the hypos are too convoluted and off the wall.

8         I do think what——I don't know that I would call this

9    the realistic probably test, but I do think what remains fair

10   game is for courts, in considering the scope of the statute and

11   how the statute should be interpreted in terms of what it

12   criminalizes and what it does not, to think about what makes

13   sense.  So the sort of arguments, for example, that the

14   government has made to address the self-harm separate from

15   divisibility, is the arguments about, look, on their reading,

16   these things would be crimes.  These things are obviously not

17   crimes.  They love to talk about examples of people blowing

18   their brains out with a gun.  Let's set those aside, right?

19   Some of the government's hypos are not farfetched at all,

20   right?  Someone with a terminal illness saying to a

21   spouse——maybe this is to hurt the spouse, to harass, to cause

22   emotional pain——look, the only reason I was going through with

23   these painful medical treatments to keep myself alive were

24   because of our marriage, and so if you're not going to get back

25   together with me, I see no reason to do that.  That

Q19HManC

conversation meets——on their self-harm argument meets literally

every single element of the statute, and I don't think

anyone——and this is not about realistic probability, but about

what makes sense in interpreting the statute——I don't think

anyone would interpret 2261A reaching that conduct, and they've

never responded to, by the way, that argument in their papers

or today.

Realistic probability also——again, not the doctrine

instead itself but that mode of thinking——is relevant to what's

the logical upshot of their *Plunkett* self-harm argument?  Well,

it means not only that there's a problem with 2261A; it means

that there's a problem with all these other statutes which we

list in our brief, which are statutes criminalizing literal

murders and assassinations and kidnappings of high-up

government officials.  And in many of those statutes, the

statutes protect not only the government official but the

government official's family.  And so, on their view, all those

statutes are no good because it's possible for a member of

those government officials' families to be, say, a kind of

troubled child who says, in a way that sometimes happens with

troubled children, you know, if X, Y, and Z are not X, Y, and

Z, I'm going to take a bottle of pills; I'm going hurt myself.

Clearly, (a) that's not what those statutes were

intended to cover, that type of factual scenario.  Not that

those factual scenarios are not realistic; they are realistic.

Q19HManC

1    But the separate analysis is should the statute be interpreted

2    to cover that kind of conduct?  And (b) it would be

3    extraordinary if, as a result of their argument, not only is

4    the Court finding that 2261A, a statute that Congress clearly

5    intended to protect, to the maximum extent possible, interstate

6    stalking, domestic violence victims, among others, that those

7    other statutes are no good as crimes of violence and can't

8    serve as 924(c) or 924(j) predicates.  That's an extraordinary

9    result and a reason not to read the self-harm possibility in

10   the way that they suggest.

11        THE COURT:  Well, I mean, if absurdity were the test,

12   we wouldn't be here.  We wouldn't be where we are, I think,

13   with this doctrine, right?  Because I think any reasonable

14   observer of the application of the Supreme Court's doctrine on

15   categorical approach for these crimes would say that it

16   produces absurd results.  So I don't know how much weight I can

17   give to the idea that the real-world consequences would be

18   absurd.

19        Let me ask you just a couple more questions,

20   Mr. Xiang, and then I want to be fair to Mr. Patel.

21        Setting aside, for the moment, your argument that a

22   defendant has to intend or know that his conduct will place the

23   victim in reasonable fear, if I don't agree with that, and many

24   of the other cases—*Johnson*, *Ali*, *Bacon*, *Griffin*—don't really

25   engage with that question and, rather, they do more of a like,

Q19HManC

1    well, I am thinking about the ways that this crime could be

2    committed, and I just think any way that it could realistically

3    be committed would have to involve at least an implied threat

4    of violence.  And my question is, isn't that, in part, what

5    *Taylor* prohibits?  Justice Gorsuch in *Taylor* has a lot of

6    criticism for what he views as efforts by the government to

7    backdoor what the residual clause used to accomplish.  Let me

8    look at the ways this crime is typically accomplished and

9    assess whether the ways that people do this crime in real life

10   create a substantial risk of force.  And in *Taylor*, the court's

11   opinion is extremely critical of those arguments that the way

12   to think about this is to look at the ways the crime is

13   typically committed, and that rather a very strict textualist

14   approach, element by element, what are the words of the

15   statute, is what is required.

16          And so, again, setting aside the point, if I don't

17   agree with you that a defendant has to intend or know the

18   reasonable fear, do you think the *Taylor* court would look at

19   these cases——*Johnson*, *Ali*, *Bacon*, and *Griffin*——and say they're

20   doing it wrong?  That's maybe not a fair question to put to

21   you, Mr. Xiang, but, I mean, do you understand my——the analysis

22   they seem to be undertaking seems to me the analysis that was

23   criticized heavily in *Taylor*.

24          MR. XIANG:  So I don't know that I would quite agree

25   with that.  And, look, your Honor's certainly right that they

Q19HManC

did not go into the level of statutory parsing that we're going

through in this case, but I think, in fairness to those courts,

they did fundamentally the right analysis, right, which

is—actually, with one or two exceptions.  There's variations

in terms of the language of those decisions—but the core

decisions, say, *Johnson*, right, that type of decision, those

judges say, look, I can't think of an example, right, which is

exactly the categorical approach question, not—I can't think

of a realistic example—or I can think of an example, but it's

not realistic.  But I can't think of an example in which the

defendant places the victim in reasonable fear and causes death

and it's not intentional, attempted, or threatened use of

force.  Look, did they kind of go into this whole *Elonis*

question about, well, what is the mens rea that attends to the

word "engages"?  They didn't articulate it in quite that way

but I think that is the analysis that they're engaged in.

        Look, your Honor is, of course, right that *Taylor* was

very clear about we're not doing the residual clause thing

anymore, and to be clear, that's not the government's position

here.  The government's not saying, has not argued, and should

not be interpreted as arguing, look, it would be ridiculous if

2261A were not a crime of violence; therefore, find it to be a

crime of violence.  That's the old style of argument.

        I think what we are saying is, separate from the

categorical approach question about looking at the elements and

Q19HManC

1  the language of the statute, there's also an *Elonis* principle.

2  Before you even get to, is this a proper predicate, you have to

3  be interpreting what does the underlying statute require or not

4  require, and that's the question that *Elonis* gets to, which is

5  when interpreting certain statutes, there may be unarticulated

6  mens rea requirements that need to be read into the statute for

7  it to make sense.  And that's not an absurdity argument about

8  the categorical approach; that's a different thing.  That is an

9  absurdity argument about just meat-and-potatoes statutory

10  interpretation, which is something that pre- and post-*Taylor*

11  courts must do because we have to instruct the jury, for

12  example, properly as to what the government needs to prove and

13  not prove.

14        And, for example, in this case, the government is

15  prepared to consent to, and I think would propose, jury

16  instructions that require the government to prove that the

17  defendant knew or intended to place the victim in reasonable

18  fear of death or serious bodily injury.  That is consistent, in

19  the government's view, with what the statute on its face and

20  logically requires, because otherwise you're going to have

21  these scenarios of strict liability causation, like the hotel

22  checking-in scenario that I mentioned or the one your Honor

23  mentioned where, whatever the intent in his head, driving

24  outside and saying, I'm right outside, and that's setting off

25  an asthma attack or a death from an asthma attack.  That's not

Q19HManC

what the statute was intended to capture.  It's intended to

capture targeted activity toward the victim, right?  That was

what *Borden* was trying to police, right?  On one end,

negligence and recklessness, which are about irresponsibility

as to risk.  Ultimately, that's what those states of mind are:

I'm engaging in risky behavior, and I'm being legally

irresponsible about the risk that I'm putting out there in the

world, but not specifically targeting specific victims.  And

that's why it doesn't fall under the elements clause and the

word "against."  But, on the other side, knowledge and purpose,

I am targeting the victim.  And I think it's very difficult to

conceive of 2261A as having a *Borden* problem where the

prerequisite to the statute is that there is a specific victim

that the stalker is intending to victimize.

THE COURT:  All right.  Before you sit down,

Mr. Xiang, and I give Mr. Patel his chance, can you just

briefly address the argument in the defendant's January 8

supplemental letter and that Mr. Patel made about Congress

stripping the words "intend to cause" out of this, the pairing

of action and effect when the statute was amended in 2013.

MR. XIANG:  So I don't think it's fair to characterize

what Congress did as stripping anything out.  I mean, when the

government looks at the statute, it was structured

fundamentally differently.  I mean, the current statute has a

sort of branching four-part structure with (1)(A), (1)(B),

Q19HManC

1    (2)(A) and (2)(B), and at least when the government read

2    current version of that statute, it looked different.  And

3    also, just as a matter of logic, the government agrees that

4    that prior statute satisfies the elements clause and has the

5    requisite intent requirement.  It doesn't follow from the fact

6    that the current language of the statute is different that, at

7    least the divisible subsections of the statute that the

8    government has charged here, that they remain crime of violence

9    because they continue to require at least knowledge, if not

10   intent, that the defendant's conduct would cause reasonable

11   fear of death or serious bodily injury.

12          THE COURT:  All right.  Thank you, Mr. Xiang, very

13   much.

14          Mr. Patel.

15          MR. PATEL:  Thank you, your Honor.

16          OK.  So, first of all, I just wanted to start where my

17   colleague left off.  It's really difficult for them here to say

18   that there's——or to get the Court to say that there's an

19   intentional mens rea because, again, that legislative history

20   is really important.  They knew how to put that in there, and

21   just because there's different subsections now——there were

22   different subsections then——just because the structure's

23   different, it's bizarre.  It would have taken one word to say

24   "intentionally put somebody in fear of injury," and they didn't

25   do that.

Q19HManC

```
 1              And also, I'm not understanding, how do you get all
 2     the way to knowing, right?  Like, why isn't it reckless?  Why
 3     isn't it negligent?  That wouldn't make it strict liability.
 4     So even if they're right that something else had to be put in
 5     there, I don't understand, when the Congress had intent in
 6     there and they take it out and now we're just going to go
 7     almost to that again because, again, what Borden said is
 8     knowledge.  Knowledge is a practical certainty that the
 9     defendant knows the consequence of his action.  And so, in
10     fact, I encourage you to go back and look at what Borden said
11     about knowledge.  What the court said is that there's a very,
12     very fine line between knowledge and intentional conduct, and
13     the court said most of the time it's going to be
14     inconsequential because it's so close, right?
15              So the example that was given in Borden is there's a
16     getaway driver.  He sees a pedestrian in the street, and he
17     still goes forth and runs into him.  That's almost certainty,
18     right?  He knows.  And so it's basically he's deliberately
19     targeting harm effectively.  So that's the type of knowledge
20     that they were talking about, and I don't know how the
21     government gets there when there's not a single word in the
22     statute.  So maybe at most—give them the benefit of the
23     doubt—why isn't it reckless?  Why does it have to get to
24     knowledge?  I just don't know where they get that argument
25     from, your Honor.
```

Q19HManC

```
 1          And also, one other thing I wanted to address is this
 2   parade of horribles that this is going to result in, like,
 3   other statutes having the same consequences.  The ones they
 4   cite in their brief—it's 18 U.S.C. 115—it says threat to
 5   assault, kidnap, or murder, and it looks like it's indivisible.
 6   And you can't kidnap yourself, so I don't think that's going to
 7   happen there.  The other one they cite also says threats to
 8   kill, kidnap, or inflict bodily harm.  Well, you can't kidnap
 9   yourself, so I don't think that works either, your Honor.
10          THE COURT:  Can you just address, Mr. Patel,
11   Mr. Xiang's argument about Flory and that Flory justifies the
12   jury instructions that explicitly told the jurors that they did
13   not have to find that the defendant knew that his actions would
14   cause the statutory effect?  And I think Mr. Xiang's argument,
15   in part, was that in the context of Flory, because Flory
16   involved only communications and therefore true threats
17   doctrine had to be applied, that there already was, kind of in
18   the package of what the jury was being asked to do, a finding
19   of knowingly creating a fear of injury.
20          What do you make of that argument that I shouldn't
21   take from Flory that, in the context of the subpart of the
22   statute that's at issue here, where a true threats inquiry
23   doesn't have to happen, that Flory doesn't necessarily mean
24   that the proper instruction here would be an instruction that
25   the defendant doesn't have to know or intend the statutory
```

Q19HManC

1    effect of his actions?

2          MR. PATEL:  Well, I mean, I think what *Flory*'s making

3    clear is that you don't need anything more than was put in the

4    jury instructions, right?  And what was put into the jury

5    instructions, I think, was—the instruction that was given is a

6    true threat is a serious threat, not idle talk or careless

7    remark or something said jokingly, that is made under

8    circumstances that would place a reasonable fear—person in

9    fear of being kidnapped, killed, or physically injured.  So,

10   again, they were referring back to the reasonable person

11   standard.  They weren't saying that it had to be knowingly.  It

12   wasn't in there in the jury instruction.  That's the way I read

13   it, your Honor, so I don't think that's of consequence there.

14         Let me see if I have anything else to add.

15         Oh, the other thing I just wanted to point out, your

16   Honor, is, like, the government saying, oh, well, we can take

17   different positions.  We're different United States Attorney's

18   Offices.  But it's one Department of Justice.  And also, if you

19   find today, your Honor, that the statute is divisible between

20   subsections or even between the different people enumerated in

21   subsection A, then if I was the defendant in *U.S. v. Garg*, I'm

22   going to say my conviction's invalid.  These guys, you know,

23   think it's an element.  And it was not a unanimous verdict

24   then.  So that's going to be the consequence with all the cases

25   where they have agreed that it's indivisible when it benefits

Q19HManC

1    them.  Well, if I was a defendant, I'm going to call up these

2    guys and say, OK, let's get your conviction vacated now because

3    there's a decision by a very smart judge who says that it's

4    wrong.

5              THE COURT:  I don't know that anyone would say that,

6    but thank you, Mr. Patel.

7              MR. PATEL:  Anyways, that's my argument, your Honor.

8    Thank you.

9              THE COURT:  All right.  Thank you very much.  Thank

10   you all.

11             So, obviously, as you can tell by the time expended, I

12   think this is a difficult issue and one that much in this case

13   turns on.  So I'm not going to rule on the motion while we're

14   here together.  I want to think about it and issue a written

15   decision.  But I would like to set a next conference date on

16   the presumption that all of the pending motions that have to be

17   resolved will have been decided by then and so that we're in a

18   position to talk about next steps.  I would propose Friday,

19   January 30, at 11 a.m. if all counsel are available at that

20   time.

21             Mr. Gentile?

22             MR. GENTILE:  That works for the government.

23             MS. FRIEDMAN AGNIFILO:  Yes, your Honor, that works

24   for the defense too.

25             THE COURT:  OK.  So we'll set a next conference date.

Q19HManC

1    Again, that will be Friday, January 30, at 11 a.m.  And of

2    course, if, on reflection, I think an evidentiary hearing is

3    needed, I'll reach out to counsel promptly, and we'll schedule

4    that within the next couple of weeks.

5         Mr. Gentile, while, of course, time will automatically

6    be excluded under the statute during the time the motions

7    remain pending, in the event that the decisions issue well

8    before our next scheduled conference, does the government seek

9    to exclude time under the Speedy Trial Act from today until——

10        MR. GENTILE:  We do, your Honor.

11        THE COURT:  ——January 30?

12        MR. GENTILE:  We do, your Honor, yes.

13        THE COURT:  On what basis?

14        MR. GENTILE:  On the basis of allowing the defendant

15   and his counsel to continue to review the voluminous discovery

16   that we've produced so far to date and also to contemplate any

17   other additional motions they may seek to make.

18        THE COURT:  Ms. Friedman Agnifilo, does the defendant

19   consent to the extension of time?

20        MS. FRIEDMAN AGNIFILO:  Yes, your Honor.

21        THE COURT:  I will exclude the time from today until

22   January 30.  I find the ends of justice served by excluding

23   such time outweigh the interests of the public and the

24   defendant in a speedy trial because the capital-eligible status

25   of this matter renders it unusually complex and because the

Q19HManC

1    potential outcome of the pending motions will require

2    significant consideration by counsel for both the government

3    and the defense of appropriate next steps in this matter,

4    including the possibility of interlocutory appeal or,

5    alternatively, an assessment of the time needed to prepare for

6    a capital trial.  Accordingly, time's excluded.

7        Mr. Gentile, anything further from the government?

8        MR. GENTILE:  Yes, your Honor.  With respect to

9    scheduling, before your Honor took the bench today and even

10   during the break, both parties conferred.  We were prepared to

11   propose a set of dates for trial and pretrial deadlines.  We

12   understand what the Court said at the beginning of the

13   proceeding.  However, we do want to let the Court know

14   that—and I'll let defense counsel speak for themselves—that

15   we feel it's important to set a date even if it's something

16   that has to be moved at some point.

17       The government, and I'm sure defense counsel as well,

18   has a number of witnesses that are traveling from out of state.

19   We have people—we have expert witnesses that we're going to

20   look to talk to and schedule different matters with them.  So

21   if we could put something on the schedule now, even if it has

22   to be moved eventually because of the Court's ruling in one way

23   or the other, I think that's the parties' preferred course of

24   action.

25       THE COURT:  OK.  Well, tell me what you had in mind.

1    Just talking about the——I do think that if it's going to be a

2    capital trial, I think the preferred course of action, one that

3    I've described with the jury department already, is that we set

4    a date for the beginning of jury selection and then a firm date

5    for the start of the trial so that we're able to tell

6    prospective jurors this is when the trial will begin rather

7    than, as has happened in some other cases where we're telling

8    jurors that the trial will begin when jury selection is over.

9    I don't think that's advisable.  So I'm not sure, Mr. Gentile,

10   what the nature of your discussion was, but why don't you tell

11   me what the parties have in mind.

12       MR. GENTILE:  Certainly, Judge.  And we considered

13   that very issue that the Court just pointed out.  Our proposal

14   is to begin jury selection on the 1st of September, with a

15   noncapital trial to begin in early October, October 12.  Should

16   it be a capital trial, we would propose continuing the jury

17   selection and the voir dire, and all of that, and with trial

18   scheduled to begin in early January.

19       THE COURT:  Well, to the extent I can control the

20   process, I don't intend jury selection to take three months in

21   this case.  I'm well aware of the time that jury selection took

22   in the *Saipov* case, but I don't think, given the procedures I

23   intend to use, that we need three months.  But the parties'

24   suggestion is very much in line with what I had in mind.  I

25   think what I had in mind was one of two alternatives: either

Q19HManC

|  | beginning the jury selection process in July with the |
| 1 | |
| 2 | expectation that we'd start trial in mid-September or, |
| 3 | alternatively, beginning the jury selection in September with |
| 4 | the expectation that we'd begin trial potentially the first |
| 5 | week of December, if it's a capital trial. |
| 6 | So it sounds like we're——I assume, Ms. Friedman |
| 7 | Agnifilo, that you think June or July to begin jury selection |
| 8 | is too soon if it's a capital trial? |
| 9 | MS. FRIEDMAN AGNIFILO:  Yes, your Honor. |
| 10 | THE COURT:  OK.  And I think, on reflection, given the |
| 11 | pretrial filings that would need to be made, if we are |
| 12 | proceeding as a capital trial, that that probably is a little |
| 13 | bit compressed.  So while I won't give a specific date while |
| 14 | we're here in court, because I do want to look at the calendar |
| 15 | and look back at my notes of my discussion with the jury |
| 16 | department, I'm happy, if both parties consent, to issue a |
| 17 | scheduling order that bakes in an alternative for a capital or |
| 18 | noncapital trial on the merits, with the expectation that we'll |
| 19 | begin the jury selection, if not September 1, it may make more |
| 20 | sense to begin September 8——it's a very late Labor Day this |
| 21 | year, Monday, September 7——but, generally, in the first working |
| 22 | week of September, and then with a trial to begin later in the |
| 23 | fall or in the early winter. |
| 24 | So let me just look at the specific dates, but it |
| 25 | sounds like we're all kind of very much on the same page as to |

Q19HManC

1    how we might proceed, and I'm happy to, at the parties'

2    request, issue that scheduling order so that everyone can plan

3    the remainder of their year.

4              MR. GENTILE:  Thank you, Judge.

5              THE COURT:  OK.  Anything else, Mr. Gentile, from the

6    government?

7              MR. GENTILE:  Not from the government, Judge, no.

8              THE COURT:  Ms. Friedman Agnifilo, anything else the

9    defendant would like to raise?

10             MS. FRIEDMAN AGNIFILO:  No, your Honor.  Thank you

11   very much.

12             THE COURT:  All right.  Thank you all very much.  I

13   found this——oh, yes, Mr. Moskowitz.

14             MR. MOSKOWITZ:  Judge, just with respect to the start

15   date of a capital trial, in addition to counsel, we have

16   mitigation specialists, jury specialists that are engaged.  So

17   the January date that we were proposing to start was

18   considering their schedules.  They're involved in the Gendron

19   which is going to begin over the summer in Buffalo and likely

20   to last, if not through the end of the year, close to that.  So

21   that was the reason we were suggesting a January start date for

22   a trial.

23             THE COURT:  OK.  So just to make sure I understand,

24   Mr. Moskowitz, the January sort of trial on the merits if it's

25   a capital trial is not based on an assumption that it will take

Q19HManC

1  us three months to select a jury, but rather ensuring that,

2  when the trial on the merits begins, all necessary personnel

3  are available?

4              MR. MOSKOWITZ:  That's correct, your Honor.

5              THE COURT:  OK.  That's very helpful.  Thank you.

6              So, again, as I was saying, thank you all very much.

7  I found this very helpful.  I'm always appreciative of

8  excellent advocacy just as a matter of craft, and so I have

9  enjoyed this.  I found it very helpful, and I'm very

10 appreciative of the time you've given.

11             And with that, we are adjourned.  Mr. Mangione is to

12 remain in the custody of the Marshals Service.

13             Thank you all.

14             (Adjourned)

15

16

17

18

19

20

21

22

23

24

25