UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

LUIGI NICHOLAS MANGIONE,

Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  1/30/2026

25-CR-00176 (MMG)

**OPINION & ORDER**

MARGARET M. GARNETT, United States District Judge:

Defendant Luigi Nicholas Mangione is charged in a four-count indictment with interstate travel for the purpose of stalking Brian Thompson, causing his death, in violation of 18 U.S.C. §§ 2261A(1)(A) and 2261(b)(1) (Count One); use of electronic communication systems for the purpose of stalking Brian Thompson, causing his death, in violation of 18 U.S.C. §§ 2261A(2)(A) and 2261(b)(1) (Count Two); murder of Brian Thompson through use of a firearm during and in relation to the stalking crimes charged in Counts One and Two, in violation of 18 U.S.C. § 924(j) (Count Three); and use of a firearm, which was brandished, discharged, and equipped with a silencer, during and in relation to the stalking crimes charged in Counts One and Two, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), (ii), (iii) and (c)(1)(B)(ii) (Count Four). Dkt. No. 21. The crimes charged in Counts Three and Four require that the stalking crimes in Counts One and Two meet the federal statutory definition of a "crime of violence" as a matter of law. The Defendant has moved to dismiss Counts Three and Four on the ground that this requirement is not satisfied. For the reasons set forth below, the motion is GRANTED.

This case will proceed to trial on Counts One and Two, which charge the Defendant with causing Brian Thompson's death under two federal stalking laws. The potential maximum punishment for each of those offenses is life in prison without parole. Count Three is a capital-

1

eligible offense, on which the Government filed a notice of intent to seek the death penalty. Consequently, the chief practical effect of the legal infirmities of Counts Three and Four, and this Court's decision that they must be dismissed, is solely to foreclose the death penalty as an available punishment to be considered by the jury that will otherwise determine, at trial, whether to convict the Defendant for causing Brian Thompson's death.

## INTRODUCTION

The question before the Court is whether, under the relevant statutes and Supreme Court precedent, the crimes charged in Counts One and Two are "crimes of violence." The Court would be remiss not to note at the outset the apparent absurdity of the inquiry. The Defendant is charged with selecting a stranger to be killed based on his employment; carefully planning the killing, including identifying where and when the selected victim would be most vulnerable; traveling across multiple states to carry out that killing; and then gunning the victim down on a public street in midtown Manhattan, using a handgun equipped with a silencer.[1] No one could seriously question that this is violent criminal conduct. And yet, over the course of the last two decades or so, the Supreme Court has embarked upon a legal journey, explained herein, that now requires lower courts to engage in an analysis totally divorced from the conduct at issue and centered on the hypothetically least serious conduct that the charged crime could possibly cover. This is typically shorthanded as the "categorical approach." Whatever the merits of that approach in contexts that require the assessment of past state criminal convictions (e.g., the removal criteria in the Immigration and Nationality Act or the sentencing enhancements in the Armed Career Criminal Act), it has proven a poor fit for Section 924(c) and 924(j), where the

---

[1] Of course, these charges remain to be proven at trial. In any event, neither the seriousness of the charges nor the strength of the evidence are legally relevant to resolving the present motion, as explained further below.

defendant's alleged conduct is encompassed within the indictment and full fact-finding (whether by a jury or by the court) can occur, with procedural protections for the defendant. It has produced questionable results that defy common sense, *see, e.g.*, *United States v. Lung'aho*, 72 F.4th 845, 847, 851 (8th Cir. 2023) (arson is not a "crime of violence" under Section 924(c)) [2]; *United States v. Walker*, 934 F.3d 375, 379 (4th Cir. 2019) (kidnapping is not a "crime of violence"), and, equally importantly, has proven increasingly difficult for lower courts to apply with any confidence or consistency. These are not new observations. *See, e.g.*, *United States v. Taylor*, 596 U.S. 845, 863–72 (2022) (Thomas, J., dissenting) (decrying the current state of the Supreme Court's categorical approach jurisprudence and urging a revival of the residual clause or a return to a constitutionally-permitted conduct-based analysis).

However, regardless of its own views, a district court is duty-bound to follow binding Supreme Court precedent. The analysis contained in the balance of this Opinion may strike the average person—and indeed many lawyers and judges—as tortured and strange, and the result may seem contrary to our intuitions about the criminal law. But it represents the Court's committed effort to faithfully apply the dictates of the Supreme Court to the charges in this case. The law must be the Court's only concern.

In this case, Count Three is charged under one of the few murder statutes available under federal law: 18 U.S.C. § 924(j).[3] That statute requires the Government to prove beyond a

---

[2] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and omissions, and adopt alterations.

[3] Most murders are charged under state law, in state courts. Federal prosecutors, and thus federal courts, have jurisdiction only over those murders that can be charged under a handful of federal criminal statutes created by Congress. Section 924(j), murder through use of a firearm while engaged in another specified type of federal crime, is one such statute. Count Four charges a related statutory subsection, Section 924(c), which criminalizes the use, carrying, and possession of a firearm during one of those federal crimes, but stops short of murder. The analysis in this Opinion as to Count Three applies equally to Count Four, even though the latter does not charge murder.

reasonable doubt that the charged murder was committed "during and in relation to" a different federal crime, and that different federal crime must be a "crime of violence." 18 U.S.C. § 924(c). "Crime of violence" is defined under federal law as a crime that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 924(c)(3)(A). Here, the specifically alleged predicate "crimes of violence" are the stalking crimes charged in Counts One and Two.

In his motion to dismiss Counts Three and Four, the Defendant argues that (i) the question of whether the stalking crimes in Counts One and Two are "crimes of violence" as a matter of law must be analyzed using the "categorical approach"; (ii) Section 2261A is not "divisible" into separate criminal units and accordingly the "modified categorical approach" does not apply; (iii) even if the "modified categorical approach" did apply, neither Section 2261A(1)(A) nor 2261A(2)(A) requires the Government to prove, as an element, the use, attempted use, or threatened use of physical force; and (iv) because the stalking statutes encompass threats to self-harm (so long as the perpetrator is a family member or intimate partner of the stalking victim), they do not necessarily require using force "against the person of another" as required by the definition of "crime of violence." Dkt. No. 59-2 ("Mot.") at 5–18. In response, the Government (i) agrees that, for Counts Three and Four to stand, Counts One and Two must meet the statutory definition of "crimes of violence"; (ii) agrees that the categorical approach to that inquiry is mandated by Supreme Court precedent; (iii) contends that, at a minimum, Section 2261A is divisible into four distinct criminal units (2261A(1)(A), 2261A(1)(B), 2261A(2)(A), and 2261A(2)(B)), and thus the "modified categorical approach" must be used to analyze only the specific crimes charged here (which are 2261A(1)(A) and 2261A(2)(A), combined with the penalty provision in 2261(b)); (iv) argues that both of those

crimes require the Government to prove beyond a reasonable doubt that a defendant used, attempted to use, or threatened to use physical force against the person of another; (v) to support that argument, that the Court should read a *mens rea* of at least knowledge into the key element of the statute; and (vi) that the statute cannot be read to include self-harm. Dkt. No. 71 ("Opp.") at 59–60, 65, 74, 80, 82.

Each of these arguments is analyzed at length below, but, in sum, the Court finds (i) that the stalking statute is divisible into four distinct crimes; (ii) that accordingly the "modified categorical approach" must be used; (iii) that neither of the charged stalking crimes necessarily requires the Government to prove use of force as the Supreme Court has defined it, in large part because the only element that could potentially satisfy that standard can be committed recklessly, which does not meet the standard; (iv) the penalty element of "death resulting" does not change the analysis because it likewise does not require the necessary *mens rea*; and, finally, (v) in the alternative, the pertinent element can be satisfied through threats of self-harm and thus the requirement that the "use of physical force" be "against the person of another" is not met. For all of these reasons, the stalking offenses charged in Counts One and Two are not "crimes of violence" as a matter of law, and Counts Three and Four must be dismissed.

## DISCUSSION

## I. LEGAL STANDARD ON A MOTION TO DISMISS

"Since federal crimes are solely creatures of statute," a defendant may move to dismiss any count in an indictment "on the ground that it fails to allege a crime within the terms of the applicable statute." *United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012); *see also* Fed. R. Crim. P. 12(b)(3)(B)(v). A pretrial motion to dismiss generally may not resolve questions about the sufficiency of the Government's evidence, and a court must assume that the allegations

in the indictment are true. *See United States v. Benjamin*, 95 F.4th 60, 64 (2d Cir. 2024); *United States v. Sampson*, 898 F.3d 270, 278–79 (2d Cir. 2018). But where a defendant moves to dismiss an indictment "solely upon an issue of law, and not fact," a court may resolve the legal dispute before trial. *United States v. George*, 223 F. Supp. 3d 159, 163 (S.D.N.Y. 2016).

The Defendant's Motion raises a purely legal dispute as to whether either Count One or Count Two satisfies the statutory definition of "crimes of violence," such that they can, as a matter of law, serve as the predicate offense for Counts Three and Four. *See Aleynikov*, 676 F.3d at 76 ("The sufficiency of an indictment and the interpretation of a federal statute are both matters of law . . . .").

## II. WHAT IS A "CRIME OF VIOLENCE"?

### A. The Statutory Scheme

Counts Three and Four are both charged under Section 924 of the federal criminal code, which sets forth various laws that criminalize use of firearms in connection with another federal crime that is a "crime of violence."[4] Count Four is charged under Section 924(c), which criminalizes the use, carrying, or possession of a firearm during and in relation to any federal crime of violence, and contains escalating penalties if the firearm is brandished or discharged. *See* 18 U.S.C. § 924(c)(1)(A). Count Three is charged under Section 924(j), which criminalizes causing the death of a person through the use of a firearm in the course of violating Section 924(c), and contains escalating penalties if the resulting death would constitute murder under federal law, in which case the penalty can include any punishment up to life imprisonment or death. *Id.* § 924(j). In other words, both Count Three and Count Four depend by statute on the

---

[4] A "drug trafficking crime" may also serve as a Section 924(c) predicate instead of a crime of violence, *see* 18 U.S.C. § 924(c)(1)(A), but that provision is not relevant here because the Government relies only on purported crimes of violence.

commission of an underlying "crime of violence" that is independently cognizable under federal law and that the Government must prove beyond a reasonable doubt, as an element of the Section 924 offense.

Section 924(c) defines "crime of violence" as an "offense that is a felony" and "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." *Id.* § 924(c)(3)(A).[5] Put differently, crimes of violence under Section 924 must be felonies that <u>by definition</u> involve force.[6] Although the statutory language does not define "physical force," the Supreme Court has held that it means "<u>violent</u> force—that is, force capable of causing physical pain or injury to another person." *Johnson v. United States*, 559 U.S. 133, 140 (2010).[7] This force can be direct or indirect. *See Delligatti v. United States*, 604 U.S. 423,

---

[5] The statutory language passed by Congress also includes an alternative definition of "crime of violence," commonly referred to as the "residual clause," that included any felony that "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 924(c)(3)(B). In 2019, the Supreme Court held that the residual clause was unconstitutionally vague. *See United States v. Davis*, 588 U.S. 445, 470 (2019). As a result, an offense now qualifies as a crime of violence under Section 924 only if it satisfies the first definition, commonly referred to as the "elements clause."

[6] For simplicity, when referring to Section 924(c)'s force requirement, the Court will abbreviate the phrase "use, attempted use, or threatened use of physical force against the person or property of another" to "use of force" or simply "force" in contexts where the distinctions between different aspects of "force" are not relevant. In other contexts, the additional words will prove crucial. A case might hinge, for example, on what constitutes a threat of force, what distinguishes physical force from non-physical force, or what establishes that a user of force has specifically targeted the person or property of another. The Court will address such questions, where relevant, in the course of its analysis.

[7] The body of law relevant to Section 924(c)'s "crime of violence" definition also includes cases interpreting similar provisions in other statutes. For example, Section 16 provides a nearly identical definition of "crime of violence," *see* 18 U.S.C. § 16(b), and is directly relevant to a section of the Immigration and Nationality Act, which allows deportation of aliens who commit crimes of violence. *See, e.g., Sessions v. Dimaya*, 584 U.S. 148, 153 (2018). Section 924(e), commonly known as the Armed Career Criminal Act ("ACCA"), uses similar terms to define "violent felony." 18 U.S.C. § 924(e). ACCA mandates a 15-year mandatory prison sentence when a person convicted of illegally possessing a firearm has three or more prior violent felony convictions, which has led to a plethora of cases deciding whether a defendant's prior convictions qualify as a "violent felony." *See, e.g., Borden v. United States*, 593 U.S. 420, 424 (2021). The Supreme Court has noted the substantial similarities among these statutes, and it commonly borrows its analysis of one definition when interpreting another. *See, e.g., Taylor*, 596 U.S. at 850 (citing cases interpreting ACCA and Section 16 and holding that the definition in Section 924(c) demands a similar inquiry); *Davis*, 588 U.S. at 459 (opining that construing the "virtually

430 (2025).  In addition, Supreme Court caselaw requires that the element that satisfies "use of force" must be committed with a mental state that is greater than recklessness.  *Borden v. United States*, 593 U.S. 420, 432–34 (2021).

### B.  The "Categorical Approach" and the "Modified Categorical Approach"

#### 1.    The Categorical Approach

"'To determine whether an offense is a crime of violence' under the elements clause, courts employ what has come to be known as the 'categorical approach.'"  *United States v. Pastore*, 83 F.4th 113, 118 (2d Cir. 2023) (quoting *Hill*, 890 F.3d at 55), *aff'd sub nom., Delligatti*, 604 U.S. at 423.  This inquiry does not ask whether the particular defendant used force or violence in committing the specific crime he is charged with.  Indeed, such an inquiry is expressly precluded, and the real-life facts of a particular case must be ignored.  *Taylor*, 596 U.S. at 850.  Rather, the "only relevant question is whether the federal felony at issue *always* requires the government to prove—beyond a reasonable doubt, as an element of its case—the use, attempted use, or threatened use of force."  *Id.* (emphasis added).

The rationale behind the categorical approach is not exactly intuitive.  It begins with the Supreme Court's holding that "offense" as used in Section 924(c) has only its abstract meaning, meaning it refers to a "generic crime."  *See Davis*, 588 U.S. at 456–59.  So when Section 924(c)(3)(A) states that "the term 'crime of violence' means an <u>offense</u> that is a felony and has as an element the use, attempted use, or threatened use of physical force against the person or property of another," it does not call for an examination of "the specific acts in which an

---

identical" definitions of Sections 16 and 924(c) differently "would make a hash of the federal criminal code").  Accordingly, courts in the Second Circuit look to cases interpreting these "similarly worded" statutes when analyzing cases under Section 924(c).  *United States v. Evans*, 924 F.3d 21, 29 n.4 (2d Cir. 2019) (quoting *United States v. Hill*, 890 F.3d 51, 56 (2d Cir. 2018)).

offender engaged on a specific occasion." *Id.* at 456 (quoting *Nijhawan v. Holder*, 557 U.S. 29, 33–34 (2009)). Instead, the inquiry is limited to whether an offender has been charged with a crime that, as defined in general for all possible cases, inherently meets the force requirement, such that the government must always prove, beyond a reasonable doubt, as an element of its case, that force was used, attempted, or threatened.

A court undertaking the categorical approach must "identify the minimum criminal conduct necessary" to meet the elements of a particular offense and then evaluate whether that least-serious hypothetical conduct—not the defendant's actual conduct—necessarily involves force. *Pastore*, 83 F.4th at 118. At times the inquiry is relatively straightforward, because the statutory definition of the crime in question contains words that on their face have an equivalent meaning to "use of physical force against another". More commonly, the process resembles a sort of stress test, where the task is to probe the boundaries of the offense to find examples of conduct that might fail the definition of "crime of violence" but nonetheless satisfy all of the elements of the offense. If this inquiry reveals that the offense could, in at least one conceivable factual scenario, be committed without force, then the offense is not a crime of violence in any case, regardless of how obviously violent a particular defendant's alleged conduct may be, because the government could prove that hypothetical case to a jury and secure a valid conviction without having proved that that hypothetical defendant used force. *Delligatti*, 604 U.S. at 426; *id.* at 455 (Gorsuch, J., dissenting).

### 2.    The Modified Categorical Approach

Some crimes can be committed in multiple ways. For example, the federal kidnapping statute can be violated by seizing, confining, inveigling, decoying, abducting, or carrying away and holding a person for ransom. 18 U.S.C. § 1201(a). The categorical approach demands that a court conduct the crime of violence inquiry using the least serious or least violent way of

committing the crime—the minimum conduct necessary to be convicted. *United States v. Jones*, 878 F.3d 10, 17 (2d Cir. 2017) (a court must "look to 'the least of the acts' proscribed by the statute") (quoting *Johnson*, 559 U.S. at 137). Conducting this inquiry is easiest when a defendant is charged under a statute that clearly defines a single crime based on one "indivisible" set of elements. *Mathis v. United States*, 579 U.S. 500, 504–05 (2016). Sometimes, however, a "statute sets out one or more elements of the offense in the alternative," effectively defining multiple separate crimes—some of which might satisfy the crime of violence definition, and some of which might not. *Descamps v. United States*, 570 U.S. 254, 257 (2013). For example, a battery statute might contain one part that covers mere unwanted touching and another part that covers the intentional infliction of bodily harm. Even where the more serious of the two options is the basis for a defendant's charge, under the categorical approach the offense might fail because it <u>could</u> be committed under the less serious option. If a statute with multiple alternatives is "divisible" into, in effect, separate crimes, a court may employ the "modified categorical approach" to determine whether it may disregard the uncharged alternative formulations of the statutory crime. *Mathis*, 579 U.S. at 505–06, 513.

Whereas the categorical approach forbids courts to look beyond the statutory definition of the charged offense, if a court determines that a charged statute is divisible into multiple different crimes, the modified categorical approach allows courts to consider "a limited class of documents," including the indictment, to determine what crime, with what elements, the defendant has been charged with. *Id.* at 505–06, 513. If the indictment specifies the relevant alternative set of elements, the court proceeds with the categorical approach as if that set of elements were a standalone statute. *Stuckey v. United States*, 878 F.3d 62, 67 (2d Cir. 2017). Thus, the modified categorical approach serves merely as "a tool for implementing the

categorical approach" in certain cases. *Descamps*, 570 U.S. at 262. The modified categorical approach likewise does not permit consideration of the defendant's actual conduct. *Mathis*, 579 U.S. at 513–14.

### 3.    Elements v. Means

Not everything in a statute is an "element" of the crime. "Elements are the constituent parts of a crime's legal definition—the things the prosecution must prove to sustain a conviction." *Mathis*, 579 U.S. at 504. Statutes often include verbiage beyond the bare elements, "spell[ing] out various factual ways of committing some component of the offense." *Id.* at 506. These "legally extraneous circumstances" are called "means." *Id.* (quoting *Descamps*, 570 U.S. at 270). To convict a defendant of a crime, a jury must unanimously conclude that the Government has proven each element of the charged crime beyond a reasonable doubt, but jurors need not agree unanimously on statutory words that are only means. *Id.*

When applying the modified categorical approach, the difference between elements and means is crucial for determining whether a statute can be separated into multiple crimes. The modified categorical approach applies only to the extent a statute is divisible, and a statute is divisible only to the extent it lists alternative elements, not means. A fact always qualifies as an element, which must be found unanimously by a jury beyond a reasonable doubt, if it changes the statutorily prescribed punishment for the crime. *Id.* at 518.

### III. THE FEDERAL STALKING STATUTE IS DIVISIBLE INTO FOUR SEPARATE CRIMES

The indictment in this case identifies the interstate stalking offenses charged in Counts One and Two as the predicate crimes of violence required for Counts Three and Four. Just one of them needs to qualify as a crime of violence for Counts Three and Four to survive. As set out above, the first step in answering this question is to determine whether the stalking statute is divisible, and, if so, to what degree.

Both offenses are defined in Section 2261A of the criminal code, which provides:

> Whoever—
>
> (1) travels in interstate or foreign commerce . . . with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, and in the course of, or as a result of, such travel or presence engages in conduct that—
>
>> (A) places that person in reasonable fear of the death of, or serious bodily injury to—
>>
>>> (i) that person;
>>>
>>> (ii) an immediate family member (as defined in section 115) of that person;
>>>
>>> (iii) a spouse or intimate partner of that person; or
>>>
>>> (iv) the pet, service animal, emotional support animal, or horse of that person; or
>>
>> (B) causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person described in clause (i), (ii), or (iii) of subparagraph (A); or
>
> (2) with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person . . . uses . . . any electronic communication system of interstate commerce . . . to engage in a course of conduct that—
>
>> (A) places that person in reasonable fear of the death of or serious bodily injury to a person, a pet, a service animal, an emotional support animal, or a horse described in clause (i), (ii), (iii), or (iv) of paragraph (1)(A); or

12

> > (B) causes, attempts to cause, or would be reasonably
> > expected to cause substantial emotional distress to a
> > person described in clause (i), (ii), or (iii) of paragraph
> > (1)(A),

> shall be punished as provided in section 2261(b) . . . .

*Id.* § 2261A.

Subsections (1) and (2) each provides an alternative basis for federal jurisdiction: subsection (1) criminalizes stalking through interstate travel (charged in Count One) ("Travel Stalking"), and subsection (2) criminalizes stalking though any electronic communication system of interstate commerce (such as the internet or texting) (charged in Count Two) ("Cyberstalking"). The Government and the Defendant agree that subsections (1) and (2) define two different crimes and thus Section 2261A is divisible into at least the two separate crimes of Travel Stalking and Cyberstalking, *see* Mot. at 10–11; Opp. at 66–67; Dkt. No. 76 ("Reply") at 18.

Aside from the different jurisdictional threshold, subsections (1) and (2) of Section 2261A are largely the same. Both require that a defendant's interstate travel or use of interstate communications be undertaken with a certain malicious intent toward another person: "to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate" that person. And both require that a defendant engage in conduct that produced a certain result, either: (A) placing the targeted person in reasonable fear of death or serious bodily injury to themselves or to any of a list of proxies such as an immediate family member, partner, or pet; or (B) causing substantial emotional distress to the targeted person, or to one of the proxies (or attempting to cause or reasonably being expected to cause such emotional distress). The Court will refer to the subsections (A) as the "Reasonable Fear" subsections and to the subsections (B) as the "Emotional Distress" subsections. Travel Stalking and Cyberstalking both

carry the penalties defined in an adjacent section of the criminal code, Section 2261.[8] If "death of the victim results" from the offense, the defendant may be sentenced to life in prison. *Id.* § 2261(b)(1).[9]

The question of whether Travel Stalking and Cyberstalking are further divisible by resulting harms (*i.e.,* into (1) Travel Stalking–Reasonable Fear; (2) Travel Stalking–Emotional Distress; (3) Cyberstalking–Reasonable Fear; and (4) Cyberstalking–Emotional Distress), as the Government argues, is crucial to the crime of violence inquiry, because if the statute is not further divisible, the Emotional Distress subsections would be the "least serious" formulation of the crime. Because the Government concedes that the Emotional Distress subsections would not qualify as crimes of violence, that would end the inquiry. *See* Dkt. No. 92 ("Oral Arg. Tr.") at 52:14–17.

The Court has little difficulty concluding that the stalking statute is further divisible by the resulting harm provisions, as urged by the Government. First, subsections A (Reasonable Fear) and subsections B (Emotional Distress) define alternative elements. The Reasonable Fear subsections cover any conduct that "places [the victim] in reasonable fear of the death of or serious bodily injury to [the victim or to related persons or animals]." 18 U.S.C. § 2261A(1)(A), (2)(A). The Emotional Distress subsections cover any conduct that "causes, attempts to cause, or

---

[8] Section 2261 applies where the stalking victim is an adult, as is alleged here. If the victim is a child, Section 2261B applies instead, which adds five years to the maximum penalties prescribed by Section 2261. *See* 18 U.S.C. § 2261B.

[9] Lower maximum sentences apply in other circumstances: up to twenty years in prison "if permanent disfigurement or life threatening bodily injury to the victim results"; up to ten years in prison "if serious bodily injury to the victim results or if the offender uses a dangerous weapon during the offense"; and up to five years in prison "in any other case," unless the offense constitutes sexual abuse, in which case an alternative penalty scheme may apply. *See id.* § 2261(b)(2)–(5). The Government and the Defendant agree that these alternative penalties are divisible, and thus the only relevant penalty provision for the crime of violence inquiry here is the "death results" element. *See* Opp. at 77–78; Dkt. No. 92 ("Oral Arg. Tr.") at 30:08–35:10.

would be reasonably expected to cause substantial emotional distress to [the stalking victim or to a related person]." *Id.* § 2261A(1)(B), (2)(B).  These provisions set forth two alternative elements with distinct requirements, not merely two different ways to complete some other, unspecified element of the stalking statutes.  *See United States v. Elkins*, 161 F.4th 899, 905 (5th Cir. 2025).

The Defendant counters that anyone who reasonably fears death or serious bodily injury would necessarily also feel substantial emotional distress, and that if one alternative is essentially a complete subset of the other, then that typically indicates means rather than elements.  *See* Reply at 18–20.  But it requires a strained reading of Section 2261A to treat "fear of death or bodily injury" as merely an example of "substantial emotional distress."  Defendant's interpretation would make each Reasonable Fear subsection a pointless inclusion, since the Emotional Distress subsections would cover the universe of prohibited harms.  Under ordinary statutory interpretation rules, a court "does not lightly assume Congress adopts two separate clauses in the same law to perform the same work."  *Taylor*, 596 U.S. at 857.

Furthermore, by their structure and text, the Reasonable Fear subsections and the Emotional Distress subsections address different harms and require different proof.  Sections 2261A(1) and (2) each present their Reasonable Fear and Emotional Distress provisions in parallel subsections, with no indication that both subsections belong to some overarching elemental category (in contrast to the nearby references to killing, injuring, harassing, or intimidating another person, for example, which are textually linked to an overarching element of the necessary animating "intent" of the perpetrator).  The subsections have other relevant differences as well.  Under the Reasonable Fear subsections, the stalking victim is the only person whose fear matters, and the fear must be objectively reasonable.  It suffices that the

victim reasonably fears the death of a family member, a partner, or a pet, but the mental states or

knowledge of those third-party proxies are irrelevant. Meanwhile, the Emotional Distress

subsections have no required reasonableness limitation, and the element can be satisfied by the

emotional distress suffered directly by the third-party proxies (excluding the animals), including

attempts to cause such distress. These distinct legal requirements signify alternative elements,

not means, because they establish different "things the prosecution must prove to sustain a

conviction." *Mathis*, 579 U.S. at 504.

Accordingly, Section 2261A is divisible into four crimes: (1) 2261A(1)(A) (Travel

Stalking–Reasonable Fear); (2) 2261A(1)(B) (Travel Stalking–Emotional Distress)

(3) 2261A(2)(A) (Cyberstalking–Reasonable Fear); and (4) 2261A(2)(B) (Cyberstalking–

Emotional Distress). *Accord United States v. Ali*, No. 24-CR-20341, 2025 WL 2938420, at *2

(S.D. Fla. Oct. 16, 2025); *United States v. Johnson*, No. 24-CR-20110, 2025 WL 1520055, at *6

(S.D. Fla. May 7, 2025), *report and recommendation adopted*, No. 24-CR-20110, 2025 WL

1517219 (S.D. Fla. May 28, 2025); *United States v. Abarca*, No. 22-CR-20505, 2024 WL

1643174, at *6 (S.D. Fla. Mar. 26, 2024), *report and recommendation adopted*, No. 22-CR-

20505, 2024 WL 1637343 (S.D. Fla. Apr. 16, 2024); *United States v. Bacon*, No. 18-CR-00075

(LPS), 2021 WL 5051364, at *12 (D. Del. Nov. 1, 2021).

The Government also argues that the two Reasonable Fear subsections ((1)(A) and

(2)(A)) are further divisible into subsections (i), (ii), (iii), and (iv). That is, the Government

contends that each Reasonable Fear subsection splits into separate crimes according to whose

death or injury the victim fears: (i) their own; (ii) their immediate family member's; (iii) their

partner's, or (iv) their pet's. *See* Opp. at 83. The Court cannot join in this extra step; these

"romanette" subsections identify alternative means for satisfying the fear of death or bodily injury element, rather than alternative elements necessary for further divisibility.

The Government correctly notes that when provisions "are set apart by the disjunctive phrase 'or,' in separate sections and subsections," "it is at least indicative" of divisible elements. Opp. at 62 (quoting *Colotti v. United States*, 71 F.4th 102, 113 (2d Cir. 2023)).  But unlike the Reasonable Fear and Emotional Distress subsections, the provisions in subsections (i) through (iv) fall under a single, overarching element: placing the targeted victim in a qualifying state of fear.  And all four provisions work exactly the same way—they identify different qualifying objects of the victim's mental state of fear.  Just as a perpetrator may use a deadly weapon (the element) by employing various kinds of instruments (the means), *see Mathis*, 579 U.S. at 506, a stalker's conduct may place the victim in a qualifying state of fear (the element) by targeting various categories of people and animals (the means).

The Government's position also clashes with Section 2261A's logic.  If subsections (i) through (iv) were divisible, each subsection would create an independently chargeable offense.  But it makes little practical sense that a single course of conduct would constitute a varying number of stalking offenses depending solely on whose death the victim feared (particularly since, as discussed below, a defendant need not intend this particular result to satisfy the element).  It also makes little textual sense.  For example, a victim's spouse is a qualifying person under both subsections (ii) and (iii), s*ee* 18 U.S.C. § 115(c)(2) (defining "immediate family member" to include a spouse), yet no reasonable construction of the statute would permit a single course of conduct that caused fear of injury to the victim's husband to be charged as two separate crimes, once for his role as an immediate family member and a separate count for his role as spouse.

Along similar lines, finding that subsections (i) through (iv) are divisible as separate elements would necessarily require a jury to unanimously agree on which subsection the defendant violated, which finds no support in the law.  The harm element in the Reasonable Fear subsections centers on the targeted victim's fear of death or bodily injury, not on the precise object of that fear.  Subsections (ii), (iii), and (iv) introduce third-party proxies, but they do not shift focus from the victim.  Rather, they evince Congress's recognition that a stalker may seek to coerce a victim not only by targeting the victim directly but also by exploiting the victim's relationships with loved ones.  But treating those subsections as alternative elements on which the jury must have unanimity cuts the other way, potentially hindering prosecutions where the stalker uses vague threats or instills diffuse fears.  If, for example, a man sends messages to his ex-girlfriend threatening to kill her "precious little baby" if she does not take him back, is a jury meant to return a not-guilty verdict if six of its members believe the victim only feared the death of her child, and the other six believe she only feared the death of her beloved dog?  The Court thinks not.  Subsections (i), (ii), (iii), and (iv) merely define alternative means, and they provide no basis for dividing sections 2261A(1)(A) and (2)(A) further.

IV.    **THE MODIFIED CATEGORICAL APPROACH APPLIES**

Because Section 2261A is divisible, the modified categorical approach applies and demands inspection of the Indictment.  Count One charges the Defendant under Sections 2261A(1)(A) and 2261(b)(1), which criminalize Travel Stalking–Reasonable Fear, with death resulting.  *See* Dkt. No. 21 at 1.  Count Two charges the Defendant under Sections 2261A(2)(A) and 2261(b)(1), which criminalize Cyberstalking–Reasonable Fear, with death resulting.  *See id.* at 2.  Consequently, in conducting the "crime of violence" analysis, the Court need not consider the Emotional Distress subsection, and the only relevant elements are those that comprise the

18

Reasonable Fear versions of Travel Stalking and Cyberstalking, plus the element that death of the stalking victim results. The Court must then ask whether, to prove either of those two crimes, the Government must "prove—beyond a reasonable doubt, as an element of its case—the use, attempted use, or threatened use of force," *Taylor*, 596 U.S. at 850, applying the limitations on "force" imposed by the Supreme Court. *See, e.g., Johnson*, 559 U.S. at 140 ("The phrase 'physical force' means *violent* force—that is, force capable of causing physical pain or injury to another person."); *Borden*, 593 U.S. at 430–32 ("The phrase 'use of physical force against the person of another' . . . covers purposeful and knowing acts, but excludes reckless conduct.").

## V. NEITHER CHARGED STALKING OFFENSE IS A "CRIME OF VIOLENCE" BECAUSE ANY "FORCE" ELEMENT CAN BE COMMITTED THROUGH RECKLESS CONDUCT

### A. Identifying the Relevant Element

The Defendant argues that the crimes charged in Counts One and Two cannot be qualifying "crimes of violence" as a matter of law either because no element requires the use, attempted use, or threatened use of force, or to the extent any element does, it is one that can be committed through conduct that is merely negligent or reckless, which falls below the level of intent or knowledge necessary to constitute the use of force under Supreme Court precedent. *See* Mot. at 13–19. To determine whether the Defendant is correct, we must begin by reviewing the elements of Travel Stalking–Reasonable Fear, with death resulting, and Cyberstalking– Reasonable Fear, with death resulting. The elements are essentially identical, with the exception of the different jurisdiction-triggering elements. As that difference is not material to the crime of violence inquiry, the Court will discuss the two crimes together.

The first element of both crimes is that the perpetrator must travel interstate (or use an interstate electronic communication service) "with intent to kill, injure, harass, or intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate" his or her intended

victim.  Neither party disputes that kill/injure/harass/intimidate/place under surveillance with intent are alternative <u>means</u> of committing the first element.  Similarly, neither party seriously disputes that intent to "harass" is the least-serious or least-violent way of committing these crimes or that this least-serious version of the first element (traveling or using the internet with intent to harass) can be committed without the use of force.  *See* Oral Arg. Tr. at 33:12–33:18, 68:18–25.  This also accords with the caselaw and with the Court's own analysis.  *See Ali*, 2025 WL 2938420, at *4 (restricting the court's analysis of the first element to the "intent to harass"); *United States v. Plunkett*, No. 04-CR-70083, 2024 WL 4173806, at *7 (W.D. Va. Sept. 12, 2024) (same).  Accordingly, this element cannot qualify the charged stalking offenses as "crimes of violence."

The next element requires the perpetrator to "engage in conduct" "in the course of, or as a result of" the interstate travel (Travel Stalking) or "engage in a course of conduct" using the interstate communication service (Cyberstalking).  Section 2266 defines "course of conduct" to mean "a pattern of conduct composed of two or more acts, evidencing a continuity of purpose," 18 U.S.C. § 2266(2), and although Travel Stalking requires only engaging "in conduct," courts have noted "the distinction is one without a difference," *United States v. Oury*, 19-CR-00080, 2020 WL 555377, at *3 (S.D. Ga. Feb. 4, 2020) ("While there is no requirement of multiple acts of internet stalking (for example), § 2261A(1) requires *both* an act of travel *and* conduct placing a person in reasonable fear of death or serious bodily injury.").  Nothing in this element requires that the conduct in question use force, and the Government does not dispute that a range of acts can satisfy this element, including non-violent acts such as driving to a particular place or placing a telephone call.  *See, e.g., Taylor*, 596 U.S. at 851 (holding that proving acts that are a "substantial step" towards completing a robbery do not require the Government "to prove that

the defendant used, attempted to use, or even threatened to use force against another person or his property"). So, again, this is insufficient to meet the legal requirements for "crime of violence."

Next, the statute requires that the perpetrator's conduct or course of conduct "places [the intended stalking victim] in reasonable fear of the death of, or serious bodily injury to" the stalking victim themselves or to a list of third-party proxies for that victim, such as his or her family member, intimate partner, or pet. 18 U.S.C. § 2261A(1)(A), (2)(A).[10] The Government argues that this element, or this element in combination with, or as a modifier to, the required conduct/course of conduct, necessarily requires that the Government prove the use, attempted use, or at least threatened use of force. *See* Opp. at 77. The Government concedes that the statute does not use those words, or even analogous words, but rather argues that the conclusion is justified because it is impossible to imagine a perpetrator's conduct that would place the stalking victim in reasonable fear of serious bodily injury or death that did <u>not</u> involve the use, attempted use, or threatened use of physical force. *Id.* But even assuming for these purposes that the Government is correct about that as a factual matter, that does not end the inquiry.

**B. More Than Recklessness in Use of Force is Required**

Both the Government and the Defendant agree that a use of force element that can be satisfied through negligent or reckless conduct does not qualify as the kind of "force" required to make out a "crime of violence" under Supreme Court precedent. *See* Mot. at 9; Opp. at 79.

---

[10] The "victim fear" portion of this element has both a subjective and an objective component. The Government must prove both that the stalking victim actually felt fear, however momentary, and also that that fear was objectively reasonable. In other words, that a hypothetical reasonable person in the position of the victim would be fearful. *See, e.g., United States v. Wills*, 346 F.3d 476 (4th Cir. 2003).

Negligence and recklessness are two levels of culpable mental state, or *mens rea*, where the fault lies in the actor's "insufficient concern with a risk of injury." *Borden*, 593 U.S. at 427. Negligence, the lowest level of culpability, involves the "failure to perceive" a risk. *Id.* One level higher, recklessness involves "the conscious disregard of a substantial risk of harm." *Voisine v. United States*, 579 U.S. 686, 699 (2016). Many crimes—but not all—require a higher degree of mental fault, either knowledge or purpose. A person "acts knowingly when he is aware that a result is practically certain to follow from his conduct, whatever his affirmative desire." *Borden*, 593 U.S. at 426. And a "person acts purposefully [or intentionally] when he consciously desires a particular result." *Id.* Different elements of a criminal statute can have different *mens rea* requirements—for example, to be found guilty of illegal possession of a firearm by a felon, 18 U.S.C. § 922(g)(1), a defendant must purposefully or intentionally possess the firearm, but no *mens rea* at all is required for the element that the firearm in question be "in or affecting commerce." *Rehaif v. United States*, 588 U.S. 225, 227, 230 (2019).

In *Borden*, the Supreme Court held that conduct cannot qualify as the "use of physical force against the person of another" to satisfy the "crime of violence" inquiry unless the actor has a sufficient *mens rea* relevant to that use of force. 593 U.S. at 432–34 (plurality opinion).[11] *Borden* did not precisely delineate the relevant threshold, but it explicitly decided that

---

[11] *Borden* dealt with the definition of "violent felony" under the Armed Career Criminal Act ("ACCA"), which almost exactly matches the definition of "crime of violence" in Section 924(c)—the only difference is Section 924(c)'s definition covers the "use of physical force against the person <u>or property</u> of another," a distinction not relevant here. As noted above, the Supreme Court has repeatedly held that the inquiry applicable to ACCA, Section 16 of the INA, and to Section 924(c) is the same, for all purposes relevant to this Opinion. Neither party disputes that principle, nor that the rule announced in *Borden* applies to this case.

recklessness, or mental states less culpable than recklessness such as negligence or no *mens rea* at all, fall short.[12]

### C. The Reasonable Fear Element Does Not Depend on the Perpetrator's Subjective Intent, or, at a Minimum, Can Be Satisfied With Mere Recklessness

Because the Government relies on the "places in reasonable fear" element as the component of the stalking offenses that could arguably require the use of force (whether by itself or in conjunction with the death-resulting element, discussed below), the Government rightly concedes that if conduct committed recklessly satisfies the reasonable fear element, then the stalking offenses are not "crimes of violence" as a matter of law. *See* Oral Arg. Tr. at 71:13–16. Because the statute itself is silent on the mental state of the defendant that must be proven for this element, the Defendant argues that reckless conduct does, indeed, suffice. Mot. at 15–18. The Government, by contrast, asks the Court to read into the statute a requirement that the reasonable fear element requires a mental state of at least knowledge. Opp. at 79. The Court declines to do so.

Although the reasonable fear element requires conduct that has the result of placing a victim in fear of serious bodily injury or death, it does not require an intent to cause that result,

---

[12] A four-justice plurality focused on the phrase "against the person of another" and determined that it signifies an action's "conscious object." *Id.* 429–31. The plurality therefore concluded that the requirement that force be used against the person of another "demands that the perpetrator direct his action at, or target, another individual." *Id.* at 429. Reckless conduct "is not aimed in that prescribed manner" and acts that might qualify as the use of force cannot satisfy the "crime of violence"/"violent felony" threshold if a mental state of recklessness or below as to those acts is sufficient for conviction. *Id.* In a concurring opinion, separate from the plurality, Justice Thomas focused instead on the phrase "use of physical force" and concluded that it "has a well-understood meaning applying only to intentional acts designed to cause harm." *Id.* at 446 (Thomas, J., concurring) (quoting *Voisine*, 579 U.S. at 713 (Thomas, J., dissenting)). The combined reasoning of the plurality and Justice Thomas established a majority holding that use of physical force against the person of another "covers purposeful and knowing acts, but excludes reckless conduct." *Id.* at 432, 446. Although *Borden* dealt with ACCA's definition of "violent felony," neither party disputes that this further constraint on the kind of force needed applies equally to Section 924(c)'s definition of "crime of violence." *See also United States v. Williams*, No. 24-2696-CR, 2025 WL 2784100, at *2 n.2 (2d Cir. Sept. 30, 2025).

or even knowledge that such a result will occur. *See* 18 U.S.C. § 2261A(1)(A), (2)(A). We must, of course, begin with the language of the statute itself, and the Government concedes that Section 2261A contains no *mens rea* language for these elements. *See* Opp. at 71, 80. In contrast, the statute does specify that the required interstate travel or use of an interstate communication facility be undertaken with the mental state of an "intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person." *See* 18 U.S.C. § 2261A(1), (2).

The Eleventh Circuit's decision in *United States v. Fleury* contains a thorough analysis of the *mens rea* required for the "results" elements of Section 2261A, and the Court finds it persuasive. *See United States v. Fleury*, 20 F.4th 1353, 1371 (11th Cir. 2021). In *Fleury*, the defendant appealed his conviction for Cyberstalking–Emotional Distress. *See id.* at 1360–61. As discussed above, the four distinct crimes defined by Section 2261A share a like structure with three elements: (1) a jurisdictional action, taken with intent to kill, injure, harass, or intimidate a particular victim; (2) engaging in conduct; (3) that causes a specified result (either the stalking victim's reasonable fear or injury or death to herself or a proxy, or substantial emotional distress for the victim or a proxy). Like the Reasonable Fear subsection, the Emotional Distress subsection contains no express *mens rea* requirement for the result produced by the perpetrator's conduct. *See* 18 U.S.C. § 2261(A)(2)(B) (reaching any "course of conduct that . . . causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress" to a qualifying person).

The defendant's course of conduct in *Fleury* involved sending disturbing "taunting and harassing" internet messages to the friends and family of victims of the school shooting at Marjorie Stoneman Douglas High School in Florida. *Id.* at 1359. At trial, the jury was

instructed that it could not return a guilty verdict unless it found that the defendant made a threat "under circumstances that would place a reasonable person in fear of being kidnapped, killed, or physically injured" and that the messages in fact caused their recipients substantial emotional distress. *See id.* at 1369–70.[13]  The jury was not instructed on any required *mens rea* other than the intent to harass or intimidate. *Id.*  On appeal, Fleury argued that his conviction should be overturned because the jury should have been told that, to convict him, they had to find that he sent the offending messages with the <u>subjective intent</u> to make the recipients feel threatened, or, at a minimum, with the conscious and subjective <u>knowledge</u> that such a result would follow.[14] *See id.* at 1369.  The Eleventh Circuit rejected this argument, *id.* at 1371, and concluded that the consequences of the conduct (*i.e.* the results or feelings the conduct produced in the victims, such as fear of injury or substantial emotional distress) did not have any *mens rea* requirement, and that *Elonis v. United States*, 575 U.S. 723 (2015), did not require more, because the problem identified in *Elonis* was addressed in Section 2261A by the requirement that the defendant travel or use the internet with the "intent to harass or intimidate." *See id.* at 1372.

Because of the parallel structure of the Reasonable Fear crimes and the Emotional Distress crimes, the Eleventh Circuit's analysis in *Fleury* of what the defendant must know or

---

[13] Because Fleury only sent written communications to his victims, in order to comport with the First Amendment the Government was required to prove that the communications represented "true threats," which would not be required in a case that included non-expressive acts.  The trial court used the widely accepted definition of "true threats" to instruct the jury: "A 'true threat' is a serious threat—not idle talk, a careless remark or something said jokingly—that is made under circumstances that would place a reasonable person in fear of being kidnapped, killed or physically injured." 20 F.4th at 1469.  The "true threats" language is similar to the statutory language for the reasonable fear element.

[14] Part of the defense offered at trial was that, due to his autism spectrum disorder, Fleury had difficulty understanding the emotions of others and thus may have been incapable of appreciating, much less intending, the extreme (and reasonable) fear and substantial emotional distress the victims experienced. *See Fleury*, 20 F.4th at 1360.

intend about the "results" elements in Section 2261A fits the question in this case equally well, compelling the conclusion that the reasonable fear element likewise does not depend on the subjective intent or knowledge of the defendant.  Indeed, the Government's own conduct in Section 2261A cases in this District supports the conclusion that the jury in a Section 2261A case does not need to make <u>any</u> finding about the defendant's mental state regarding the results of his conduct to convict.  *See, e.g.*, Hon. Jed. S. Rakoff, Jury Charge, *United States v. Dennis*, No. 20-CR-00623 (S.D.N.Y. 2021) (omitting any instruction to the jury that the defendant had to know or intend the victim's reactions); Government's Proposed Requests to Charge at 8–15, *United States v. Dennis*, No. 20-CR-00623 (S.D.N.Y. Oct. 4, 2022), Dkt. No. 93 (omitting any request to so charge the jury); *United States v. Dennis*, 132 F.4th 214 (2d Cir. 2025) (noting Government did not request such an instruction); Hon. Denise L. Cote, Jury Charge, *United States v. Torres*, No. 20-CR-00608 (S.D.N.Y. 2021) (same); Government's Proposed Requests to Charge at 13–18, *United States v. Torres*, No. 20-CR-00608 (DLC) (S.D.N.Y. June 15, 2021), Dkt. No. 61 (same).[15]

Nonetheless, the Government now argues that the "'engages in conduct' element requires a scienter of at least knowledge [of the results produced]," Opp. at 80, and that the Court should read that *mens rea* into the statutory text.  The Government further argues that such an

---

[15] The Government argues, at n.12 of its Opposition, that if the Court grants the Defendant's motion, law enforcement will be deprived of "a critical tool to vindicate and protect victims of intimate-partner violence" because they cannot bring Section 924(c) or 924(j) charges when a perpetrator uses a gun, or shoots or kills his victim, and also existing convictions under those offenses could be jeopardized. First, of course, the Court must faithfully apply the law and if such application produces undesirable results, the recourse is to higher courts to reconsider their precedents or to Congress.  Second, the Government ignores the consequences of adopting its proposed formulation that the reasonable fear element requires subjective knowledge or intent on the part of the defendant.  The Court is aware of no case that has so instructed a jury, and there are numerous cases where juries have not been so instructed. If juries were in fact required to find such subjective knowledge or intent on the part of the defendant to cause a particular result in order to convict, the burden on prosecutors in future cases would be higher and all of those prior convictions would potentially be in jeopardy.

emendation by the Court is necessary under *Elonis*, because without it the statute risks criminalizing innocent conduct.  *Id.*  But because Section 2261A already requires that a defendant undertake a purposeful act (travel or use of a communication facility) with the intent to kill, injure, harass, or intimidate (all criminally culpable acts), and because, as to the conduct-producing-results element of the statute, a *mens rea* no greater than recklessness is sufficient to separate innocent from wrongful acts, the Government's argument fails.

An overriding presumption in the law is that "wrongdoing must be conscious to be criminal."  *See Ruan v. United States*, 597 U.S. 450, 457 (2022) (quoting *Elonis*, 575 U.S. at 734).  For a given offense, the *mens rea* "necessary to make a person criminally responsible for his or her acts" is known as "scienter."  *Id.* at 458.  When criminal statutes are "silent on the required mental state—meaning statutes that contain no *mens rea* provision whatsoever—" the presumption of scienter may compel courts to impute the "*mens rea* which is necessary to separate wrongful conduct from otherwise innocent conduct."  *Id.*

The Government relies on *Elonis* to argue that the Court must read into Section 2261A a requirement that a defendant <u>knowingly</u> places the victim in fear.  *See* Opp. at 80–81.  In *Elonis*, the Supreme Court imputed a scienter requirement into a federal statute criminalizing the transmission of "any communication containing any threat . . . to injure the person of another."  575 U.S. at 726 (quoting 18 U.S.C. § 875(c)).  The statute contained no explicit *mens rea* at all, making it unclear whether a conviction required proof that the sender of the communication knew the communication contained a threat.  A jury convicted Elonis based on instructions that "the Government need prove only that a reasonable person would regard Elonis's communications as threats."  *Id.* at 740.

The Supreme Court reversed the conviction, holding that the instructions improperly disregarded Elonis's mental state and instead hinged criminality on what was effectively a negligence standard. *Id.* at 737–38. Because "'the crucial element separating legal innocence from wrongful conduct' is the threatening nature of the communication," the *Elonis* Court opined that a scienter requirement "must apply to the fact that the communication contains a threat." *Id.* at 737 (quoting *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 73 (1994)). Criminalizing the transmission of communications—an otherwise innocent act—based only on how the recipient might react, without considering the sender's subjective state of mind as to the content or purpose of the communications, the Court held, "is inconsistent with 'the conventional requirement for criminal conduct—*awareness* of some wrongdoing.'" *Id.* at 738 (quoting *Staples v. United States*, 511 U.S. 600, 606–07 (1994)).

*Elonis* provides no help to the Government here because Section 2261A already has a *mens rea* element delineating the culpable conduct that Congress intended to criminalize. Unlike the statute in *Elonis*, which specified no *mens rea* whatsoever, Section 2261A explicitly requires a specific "intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person," and that the jurisdictional element be undertaken with this express (and plainly criminal) intent. 18 U.S.C. § 2261A(1), (2); *see also Fleury*, 20 F.4th at 1371 ("No [*Elonis*] problem exists here because the cyberstalking statute required proof that the defendant acted with the intent to harass or intimidate."). Quite simply, traveling with an illicit intent is culpable conduct, *see United States v. Murphy*, 942 F.3d 73, 82 (2d Cir. 2019) ("[T]he critical fact that renders the defendant's conduct criminal is the intent with which the act was done, so while it is no crime to travel between states, to do so with the evil intent described

28

in § 2241(c) will subject a person to the punishment prescribed by Congress."), as is harassment, which is criminalized under numerous state and federal statutes.

It is neither anomalous nor problematic that Section 2261A criminalizes unintended consequences of culpable conduct. *See X-Citement Video, Inc.*, 513 U.S. at 72 n.3 ("Criminal intent serves to separate those who understand the wrongful nature of their act from those who do not, but does not require knowledge of the precise consequences that may flow from that act once aware that the act is wrongful."). Under Section 2261A, a person engages in culpable conduct when he travels or uses interstate communication with the necessary malicious and criminal intent, and undertakes some conduct that furthers that intent. There is no risk that such a perpetrator somehow becomes innocent if his conduct happens to cause harm only accidentally or causes more or different harm than intended. Accordingly, it is not necessary to import a scienter into the results element to "separate wrongful from innocent acts." *Ruan*, 597 U.S. at 458. When a statute "includes both objective and subjective elements," a court need not impute a *mens rea* into the objective elements when the subjective element—here, the specific intent to kill, injure, harass, or intimidate—suffices to separate innocent and wrongful acts. *United States v. Wynn*, 827 F.3d 778, 785 (8th Cir. 2016) (quoting *United States v. Turner*, 720 F.3d 411, 420 (2d Cir. 2013) (holding that an offense under 18 U.S.C. § 115(a)(1)(B) for threatening a federal employee with intent to retaliate requires no proof of intent to threaten)).

The Supreme Court has contemplated only two scenarios that may require courts to read a scienter requirement into a statute: (1) where a statute "contain[s] no *mens rea* provision whatsoever," which calls for imputing "that *mens rea* which is necessary to separate wrongful conduct from otherwise innocent conduct"; and (2) where a statute "includes a general scienter provision," which calls for distributing that same *mens rea* to the "other statutory terms that

separate wrongful from innocent acts." *Ruan*, 597 U.S. at 458.  Neither situation is applicable here.  Section 2261A already includes a specific scienter provision for the state of mind with which a defendant must travel or use a communication facility, and the Government's argument does not suggest that scienter should be distributed to the later elements but rather seeks to impute a <u>different</u> specific scienter to one of the other elements.  It has identified no precedent for doing so, and indeed there is ample reason to reject it as a legal principle.  "[C]ourts do not read additional scienter requirements into statutes that unambiguously specify the requisite *mens rea*—*i.e.*, when Congress expressly delineates what combination of acts and mental states a given statute is intended to prohibit."  *United States v. Hunt*, 573 F. Supp. 3d 779, 795 (E.D.N.Y. 2021), *aff'd*, 82 F.4th 129 (2d Cir. 2023).  And even if there were a reason to impute a *mens rea* element, there is no reason at all to assume that a mental state of knowledge would be the minimum required.  For all the reasons discussed above, and elaborated further below, recklessness would be more than sufficient to separate innocent and wrongful acts, given that the prerequisite intent to kill, injure, harass, or intimidate another person creates responsibility for at least the foreseeable consequences of the defendant's conduct.

### D.    The Death Results Element Does Not Change this Analysis, as it Likewise Has No Specific Intent Requirement

As part of Counts One and Two, the Defendant is charged with a particular penalty provision attached to Section 2261A, which raises the maximum sentence to life imprisonment if the death of the victim results from the charged stalking conduct.  *See* Dkt. No. 21 at 1–2 (charging Defendant under 18 U.S.C. § 2261(b)(1)).  The Defendant concedes that this penalty provision is an element that must be proven beyond a reasonable doubt to a jury, and so the modified categorical approach requires that the Court evaluate the hypothetical crime as one that satisfies this element.  *See* Oral Arg. Tr. at 30:07–15.  As to this element, the Government

concedes that the death can be an accident or the consequence of reckless conduct, so long as the defendant's actions "cause" the death. *See id.* at 55:5–10. Consistent with that concession, the Second Circuit has held that a "death results" element requires only but-for causation, meaning that the Government need only prove that "but for" the defendant's actions in committing the charged crime, the death would not have occurred. Under this test, the death of the victim need not be foreseeable to the defendant and certainly need not be the defendant's desired or intended outcome. *See United States v. Felder*, 993 F.3d 57, 70 (2d Cir. 2021) (death results penalty provision in carjacking statute); *United States v. Harden*, 893 F.3d 434, 447–48 (7th Cir. 2018) (observing that every federal court of appeals to address the issue has held that proximate cause is not required for the "death results" element of unlawful distribution of a controlled substance).[16] Because the resulting death can be caused accidentally, and certainly negligently or recklessly, the "death results" element cannot supply the necessary use of force to convert the charged stalking offenses into "crimes of violence."

### E. Analyzing the Elements in Combination Rather than Separately Does Not Change the Conclusion

Regardless of the mental state, or lack thereof, required by the "death results" element or reasonable fear element in isolation, the Government next argues that viewing all of the elements together and in conjunction shows that the charged stalking crimes cannot be committed without the use, attempted use, or threatened use of force at some level above recklessness. The

---

[16] To be sure, there may be situations where a victim's death or other harms are so attenuated from a defendant's conduct that, even where but-for causation is satisfied, justice may require the imposition of a proximate cause standard. *See, e.g.*, *Burrage v. United States*, 571 U.S. 204, 210 (2014) (noting as a general principle that in some situations proximate or "legal" cause may be required, but reaching only the requirement of but-for causation for death resulting from drug distribution); *Paroline v. United States*, 572 U.S. 434, 445 (2014) ("A requirement of proximate cause thus serves, *inter alia*, to preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity."). But even the proximate cause standard, were it to be applied here, would not require knowing or intentional causing of death.

31

Government concedes, as it must after *Taylor*, that this inquiry cannot be one of reasonable probability or plausibility or empirical likelihood of prosecution. Rather, a hypothetical scenario—in which the crime can be factually committed without the use, attempted use, or threatened use of force at some level above recklessness—need only be "possible" (that is, consistent with the laws of physics and the nature of human interaction). *See* Oral Arg. Tr. at 74:21–75:07; *see also Elkins*, 161 F.4th at 907 (noting that the "'realistic probability' test has no place in [the section 924(c)] analysis"); *United States v. Green*, 67 F.4th 657, 669 (4th Cir. 2023) ("In *Taylor*, the Supreme Court clarified that the realistic probability test is an inappropriate way to determine whether a predicate offense satisfies § 924(c)'s elements clause."). In other words, an exercise in hypotheticals is useful or determinative only insofar as it produces an example illustrating that an offense could be completed without force—because such an example necessarily shows that force must not be an element of the offense. Apart from that potential use of hypotheticals, the categorical approach must focus on a crime's definition, as expressed through its elements. And if the definition is missing the necessary component of force, the Court need not worry whether it is difficult to imagine the absence of force in a real-life case. That was the job of the residual clause, which is now long gone.

In making this "holistic" argument, the Government joins a handful of district courts in other circuits in arguing that there is no conceivable "example of conduct that places the victim in reasonable fear of death or serious bodily injury <u>and</u> that causes the victim's death <u>and</u> that does not involve the threatened, attempted, or actual use of force." Opp. at 77; *see also United States v. Bacon*, No. CR 18-00075 (LPS), 2021 WL 5051364, at *13 (D. Del. Nov. 1, 2021) (noting that the defendant had "not articulated any plausible scenario in which a victim could reasonably have such a fear without at least the threat of physical force"); *United States v.*

*Griffin*, No. 17-CR-20639 (TGB) (MKM), 2022 WL 2071054, at *6 (E.D. Mich. June 8, 2022)

("Ultimately, except for far-fetched hypotheticals involving the forbidden application of 'legal

imagination,' the Court fails to see how an offender acting with the intent to kill, injure, or

harass, can 'engage in conduct that places a person in reasonable fear of death or serious injury,'

and from which conduct death does indeed result, without the use or threatened use of physical

violence."); *United States v. Ali*, No. 24-CR-20341, 2025 WL 2938420, at *4 (S.D. Fla. Oct. 16,

2025) (dismissing "far-fetched hypotheticals" and holding that "it's impossible to conceptualize

an instance where an individual engages in a 'course of conduct' that puts someone in

'reasonable fear of the death of or serious bodily injury' to himself or another without engaging

in conduct that, at minimum, threatens the use of physical force to a person") (quoting *United*

*States v. Johnson*, No. 24-CR-20110, 2025 WL 1520055, at *10 (S.D. Fla. May 7, 2025), *report*

*and recommendation adopted*, No. 24-20110-CR, 2025 WL 1517219 (S.D. Fla. May 28, 2025)).

Respectfully, the Court cannot join this group.  None of the cited cases conduct the

rigorous analysis now required by *Taylor*, with its focus on elements and its express rejection of

efforts to backdoor the now-invalidated residual clause of Section 924(c) by musing about the

way a crime is generally committed, 596 U.S. at 857–58; nor do any of them wrestle with the

requirement imposed by *Borden* that the element or *actus reus* that satisfies the force

requirement must be committed with a mental state greater than recklessness.  But even putting

aside for the moment whether such a holistic analysis that rejects conduct deemed too "far-

fetched" is even permissible as an analytical frame after *Taylor*, the Court also disagrees that it is

impossible to imagine how a defendant could commit the charged crimes without the legally

required use of force.  The key point is the one made above: the statute does not require as an

element that the defendant have the subjective intent (or even knowledge) to place the victim in

fear. Consequently, to cause reasonable fear with conduct that nonetheless is undertaken with a specific intent to harass, all it takes is a difference in perspectives between the offender and the victim. And to cause a death, all that is required is an unintended sequence of events that makes an already bad situation take an irretrievable turn for the worse.

In sum, a defendant could complete the charged Travel Stalking and Cyberstalking offenses through only reckless conduct that falls short of the legal definition of "use of force against the person or property of another." A hypothetical case proves the point. Suppose a man travels across state lines with the intent to harass an ex-lover that he believed had been unfaithful to him during their relationship. Nothing about the man's history with the victim suggests a propensity for violence, and he harbors no intention of causing fear. Rather, he seeks only to "turn the tables" and humiliate the victim. He fantasizes about achieving a sense of closure by ultimately confronting the victim and relishing the sight of her shame and embarrassment, or, hopefully, her guilt and remorse for her past conduct. The man starts with indirect tactics. He travels from the neighboring state where he now lives to secretly post signs at the victim's workplace reading "[Victim] is a slut and a cheater" and also sends an anonymous mass email to all of her co-workers with the same message. He pays a sketchy friend-of-a-friend to follow the victim, with instructions to occasionally shout "Cheater!" or to talk loudly with other patrons about her past infidelity when she is out with friends at a bar; and to text him updates on the victim's whereabouts and mental state so that he can best plan his own in-person confrontation. So far, so good—the defendant has traveled and used the internet with the intent to harass, and has engaged in more than one act in the course of doing so.

The man is confident in his own mind that his planned course of conduct does not go "too far" and veer into any kind of violence or threat of violence. But what if the victim sees things

differently?  In all kinds of circumstances, the man may unknowingly place the victim in reasonable fear by consciously disregarding a substantial likelihood that his actions would produce that result.  He may, for instance, wrongly assume the victim will readily attribute the anonymous messages to him, ignoring that his anonymous accusations of cheating could conjure fears of potential violence from other actors.  Perhaps the man knows but disregards the fact that another intimate partner, also suspicious of infidelity, had recently threatened the victim with violence, or that an unstable coworker had promised physical retribution after accusing the victim of using underhanded tactics to win a coveted promotion.  Or he might discredit or ignore warnings from his friend that his shady henchman has a history of erratic behavior, leading to a rougher treatment of the victim than the man intended.

Or maybe the man simply lacks awareness and good sense, as stalkers generally do.  Based on an amicable history with the victim, he may assume the victim has no reason to perceive his actions as threatening.  But he may fail to recognize that his conduct departs so wildly from accepted norms that any existing benefit of the doubt would almost certainly give way to an updated presumption that he had gone off the deep end.  He might, for example, trespass into private places to leave notes or post signs at the homes of the victim's friends and family.  The man's only intent is to maximize humiliation, and maybe get an apology, but from the victim's perspective, one that is objectively reasonable, the man has unintentionally conveyed an ominous warning that she may be in serious danger and there is no place to hide.

If that's not enough, suppose the facts get worse.  Ready for his big face-to-face moment, the man eventually relays a final anonymous message: "We need to talk."  He then drives to the victim's house, parks on the street out front, and sits in his car while waiting for the victim to come home.  Ten minutes later, he spots the victim's car approaching from the rear, and, at the

same time, the victim takes note of an unfamiliar car parked in the street ahead. The man begins to open the car door, and the victim deduces that the person must be the anonymous harasser, ready to pounce. In a panic, the victim turns the car around and begins driving toward the nearest police station. The man starts his car and follows close behind, anxiously seeking the final confrontation of his fantasy. The victim apprehends that a chase has begun, and the panic grows. Distracted and having accelerated too quickly trying to catch up to the victim, the man loses control of his car after the victim abruptly brakes to make a left turn. Through her side window in the middle of the turn, the victim can see the man's vehicle barreling straight toward her at speed, seemingly (to her) intending an inevitable direct impact with her car. If she did not previously fear serious bodily injury or death from the conduct up to now, she certainly does at that moment. The cars in fact collide, and the victim is mortally injured and dies at the hospital shortly thereafter.

The facts of this hypothetical case satisfy every element of Travel Stalking and Cyberstalking as charged in Counts One and Two. The man traveled and used the internet with an intent to harass the victim. He engaged in a course of conduct that placed the victim in reasonable fear of death or bodily injury, certainly by the time the victim apprehended the car crash, if not far earlier. And as a result of that course of conduct, the victim died. Yet at no point did the man engage in conduct that, under the rule of *Borden*, constitutes the "use, attempted use, or threatened use of physical force against the person or property of another." At worst, he acted recklessly as to the effect of his actions. Every threat the victim possibly perceived was the unintended result of the man's disregard of a risk, as was the victim's death.

The hypothetical does not strike the Court as especially implausible (not that that counts for anything under *Taylor*). To the contrary, the hypothetical case illustrates the characteristic

36

nuances of stalking, as well as the rationales for a broad definition of the crime. *See* Oral Arg.

Tr. at 50–51.

## VI.    IN THE ALTERNATIVE, THE CHARGED STALKING OFFENSES CANNOT QUALIFY AS CRIMES OF VIOLENCE BECAUSE THEY CAN BE ACCOMPLISHED THROUGH THREATS OF SELF-HARM

The Defendant's final argument is that, because the "romanette subsections" listing the

third-party proxies for the victim are only means, and because a perpetrator may fall within one

of those categories and commit the crime by placing the stalking victim in reasonable fear that

the perpetrator will harm themselves, the crimes cannot be "crimes of violence" as a matter of

law. Mot. at 23–25. This argument follows from the requirement that, to be a crime of violence,

the defendant must use, threaten, or attempt "physical force against the person or property <u>of</u>

<u>another</u>." 18 U.S.C. § 924(c)(3)(A) (emphasis added). The Court agrees that the reasonable fear

element could be satisfied by a threat to inflict self-harm, which cannot satisfy the requirement

for use of force "against the person or property <u>of another</u>." On this point, the Court adopts the

reasoning of Judge Urbanski's decision in *United States v. Plunkett*, as filtered through the

Court's own analysis set forth above. *See* No. 04-CR-70083, 2024 WL 4173806, at *6–7 (W.D.

Va. Sept. 12, 2024).

Plainly, a threat to use force against oneself or one's own property does not meet Section

924(c)'s force requirement. *See Torres v. Lynch*, 578 U.S. 452, 466 (2016) (noting that 18

U.S.C. § 16's identical "crime of violence" definition "would not reach arson in the many States

defining that crime to include the destruction of one's own property"). Because the reasonable

fear element covers placing the victim in fear of the death of an immediate family member,

spouse, or intimate partner, a perpetrator who fits into one of those categories could satisfy the

elements of the stalking offenses by threatening self-harm.

Examples are not hard to come by.  "For instance, a woman's estranged husband could travel in interstate commerce with the intent to harass her and, in the course of doing so, threaten to shoot himself if she refused to meet with him."  *Plunkett*, 2024 WL 4173806, at *7. "Similarly, a man's daughter could travel in interstate commerce with the intent to harass him and, in the course of doing so, threaten to take an overdose of pills if he did not agree to do something that she demanded of him."  *Id.  Plunkett* did not involve a "death results" element, but for the same reasons explained earlier, a death of the stalking victim resulting from a threat of self-harm by the perpetrator would suffice.  For example, a stalking victim may attempt to wrestle a gun from the suicidal spouse in the first *Plunkett* hypothetical, only for the gun to accidentally discharge and kill the victim.

The Government's primary argument against this interpretation is that it would be absurd or run counter to Congress' intent in drafting the statute.  Neither of these analytical frames are relevant to the Court's analysis under the categorical approach, but even if they were the Court cannot agree with the Government's arguments.  First, the Government argues that threats of self-harm should not qualify because harming yourself, whether by suicide or by deciding to end lifesaving medical treatment, is not itself criminal, and allowing self-harm to qualify would risk criminalizing innocent conduct.  *See* Opp. at 86–87.  For the reasons noted above, this is not persuasive.  Earlier elements of the crime, such as travel with intent to kill, injure, harass, or intimidate, suffice to separate wrongful from innocent conduct.  Second, the Government argues that including the perpetrator in the definition of immediate family member would mean that other statutes, like 18 U.S.C. § 115, that criminalize "threats to assault, kidnap, or murder a member of the immediate family of a United States official," would not be crimes of violence either.  *See id.* at 87–88.  But most of these statutes contain language that solves this problem; for

example, you cannot assault, kidnap, or murder yourself. And to the extent they don't, the Court

takes no position on what a thorough analysis of those statutes would reveal about whether under

Supreme Court precedent they do not qualify as crimes of violence. Third, the Government

suggests that reading the statute to allow the victim's fear of injury to the perpetrator to qualify

would pervert the statute's animating purpose of protecting stalking victims from perpetrators.

*See id.* at 84–85. But the reality is that family violence and intimate partner violence are

complicated. Victims often remain in relationships with perpetrators, and love and affection on

the part of the victim can persist towards an abuser even where the victim chooses to end the

relationship. If anything, including threats of perpetrator self-harm is more consistent with the

broadest protection for victims.

## CONCLUSION

For the forgoing reasons, the Defendant's motion to dismiss Counts Three and Four of

the Indictment is GRANTED.


Dated: January 30, 2026
          New York, New York


                                        SO ORDERED.


                                        _____
                                        MARGARET M. GARNETT
                                        United States District Judge